FILED
CLERK, U.S. DISTRICT COURT

DEC 2 7 2010

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

1

2

3

4

5

6

7

8  **UNITED STATES DISTRICT COURT**

9  **CENTRAL DISTRICT OF CALIFORNIA**

10

11  JOSE ANTONIO FRANCO-GONZALES, )   Case No. CV 10-02211 DMG (DTB)
    ET AL.,                       )
12                 Petitioner,    )   **UNDER SEAL**
                                  )
13            v.                  )
                                  )   **AMENDED ORDER RE PLAINTIFFS'**
14  ERIC H. HOLDER, JR. ATTORNEY  )   **MOTION FOR A  PRELIMINARY**
15  GENERAL, ET AL.,              )   **INJUNCTION**
               Respondents.       )
16                                )

17

18

1

2

3

4

5

6

7

8 **UNITED STATES DISTRICT COURT**

9 **CENTRAL DISTRICT OF CALIFORNIA**

10

11 JOSE ANTONIO FRANCO-GONZALES, )   Case No. CV 10-02211 DMG (DTB)
   ET AL.,                       )

12                Petitioner,     )   **UNDER SEAL**

13          v.                    )

14                                )   **AMENDED** ORDER RE PLAINTIFFS'
   ERIC H. HOLDER, JR. ATTORNEY  )   **MOTION FOR A  PRELIMINARY**

15 GENERAL, ET AL.,               )   **INJUNCTION**

16                Respondents.    )
   _____    )

17

18

19        This matter is before the Court on the Motion for a Preliminary Injunction filed by

20 Plaintiffs Aleksandr Petrovich Khukhryanskiy and Ever Francisco Martinez-Rivas

21 ("Plaintiffs").  The Court conducted a hearing on December 8, 2010 (the "December 8

22 Hearing").  Having duly considered the parties' respective positions, as presented in their

23 briefs and at oral argument, the Court now renders is decision.  For the reasons set forth

24 below, Plaintiffs' Motion is GRANTED in part.

25 //

26 //

27 //

28 //

# I.

## PROCEDURAL BACKGROUND

On March 26, 2010, Petitioner Jose Antonio Franco-Gonzales ("Franco") filed a Petition for Writ of *Habeas Corpus* (the "Petition") in this Court alleging various violations of the Immigration and Nationality Act ("INA"), the Due Process Clause of the 5th Amendment to the U.S. Constitution, and Section 504 of the Rehabilitation Act. On March 31, 2010, Respondents released Franco from custody on his own recognizance, under conditions of supervision pursuant to section 236 of the INA, 8 U.S.C. § 1226.

On August 2, 2010, Franco attempted to file a first amended class action complaint (the "Amended Complaint"), which sought to add new plaintiffs and new causes of action and sought certification on behalf of a class of plaintiffs whose situations are similar to Franco's former situation, *i.e.,* mentally disabled immigrant detainees who are held in custody without counsel. (Am. Compl. ¶¶ 39-82, 96-137.) On August 6, 2010, the Honorable David T. Bristow, United States Magistrate Judge, rejected the Amended Complaint as untimely under Fed. R. Civ. P. 15(a). On August 23, 2010, Franco filed an *Ex Parte* Application to file the Amended Complaint, which Magistrate Judge Bristow denied on September 3, 2010.

On September 14, 2010, Franco filed a Motion for Review of Magistrate Judge's Decision Denying *Ex Parte* Application to Amend Complaint. On October 18, 2010, this Court granted Franco's Motion and provided Franco 15 days to file an amended complaint. [Doc. # 54.]

On November 2, 2010, Franco filed a First Amended Class Action Complaint ("First Amended Complaint"), which added Khukhryanskiy and Martinez as well as three other named plaintiffs. [Doc. # 64.] The First Amended Complaint alleges the following causes of action: (1) right to a competency evaluation under the INA; (2) right to a competency evaluation under the Due Process Clause; (3) right to appointed counsel under the INA; (4) right to appointed counsel under Section 504 of the Rehabilitation Act; (5) right to appointed counsel under the Due Process Clause; (6) right to release

under the INA; (7) right to release under the Due Process Clause; (8) right to a detention hearing under the INA; (9) right to a detention hearing under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 ("Section 504"); (10) right to a detention hearing under the Due Process Clause; and (11) violation of the Administrative Procedures Act.[1]

On November 15, 2010, Plaintiffs filed (1) a TRO Application [Doc. # 57], (2) a Motion for a Preliminary Injunction [Doc. # 57], and (3) an Expedited Discovery Application [Doc. # 60]. On November 16, 2010, Defendants filed an Opposition to the TRO Application, and on November 17, 2010, Plaintiffs filed a Reply. Defendants filed their Opposition to the Expedited Discovery Application on November 19, 2010, and on November 22, 2010, Plaintiffs filed a Reply. On November 24, 2010, the Court issued an order (the "TRO") granting Plaintiffs' TRO Application and denying Plaintiffs' Expedited Discovery Application. [Doc. # 78.] The Court also set a hearing on the Preliminary Injunction Motion for December 8, 2010.

On December 1, 2010, Defendants filed an Opposition to Plaintiffs' Preliminary Injunction Motion. On December 6, 2010, Plaintiffs filed a Reply. On December 15, 2010, each of the parties filed supplemental briefs on issues identified at the December 8 Hearing, and on December 17, 2010, the parties filed their respective supplemental responses. On December 20, 21, and 22, 2010, the parties submitted additional unsolicited filings, including Defendants' "Notice of Clarification," a "Response to Defendants' Notice of Clarification," and Defendants' Status Reports regarding their efforts to secure *pro bono* counsel for Plaintiffs.

//
//
//
//

---

[1] Plaintiff Martinez does not allege the first two causes of action. Franco does not allege the First through Fifth causes of action; only Franco alleges the Sixth and Seventh causes of action.

## II.

## FACTUAL BACKGROUND

**A.   ALEKSANDR KHUKHRYANSKIY**

Plaintiff Khukhryanskiy is a 45-year-old native and citizen of Ukraine who was admitted to the United States as a refugee on January 9, 1998. (Pls.' Req. for Judicial Notice ("RJN"), Ex. 58.) According to Defendants, Khukhryanskiy failed to adjust his status to that of a legal permanent resident, a step that he was required to take as early as January 9, 1999, pursuant to 8 U.S.C. § 1159(a)(1)(C).[2] (Defs.' Opp'n at 6.)

On April 15, 2010, Khukhryanskiy was taken into custody by Department of Homeland Security ("DHS"). He was referred to Immigration and Customs Enforcement ("ICE") from the United States Citizenship and Immigration Services ("USCIS") after submitting his application for refugee adjustment of status pursuant to 8 U.S.C. § 1159. (Pls.' RJN, Ex. 58.) DHS initiated removal proceedings against him, charging him as deportable for having been convicted of an aggravated felony on the basis of his 2005 conviction for attempted assault and robbery. (Pls.' RJN, Ex. 64.) He is currently detained at the Northwest Detention Center in Tacoma, Washington.

**1.   Khukhryanskiy's Psychiatric Evaluation**

Khukhryanskiy has been diagnosed with paranoid schizophrenia and psychosis (not otherwise specified), post-traumatic stress disorder, and major depression. (Decl. of Ahilan T. Arulanantham ("Arulanantham Decl. ¶¶ 5-6, Exs. 60-61.) He has been receiving mental health treatment after being involuntarily placed at Adventist Mental Health Services in 2004 through a mental health commitment hearing. (Arulanantham Decl. ¶ 7, Ex. 62.)

---

[2] Section 1159 provides that "Any alien who has been admitted to the United States under section 1157 of this title . . . who has not acquired permanent resident status, shall, at the end of such year period, return or be returned to the custody of the Department of Homeland Security for inspection and examination for admission to the United States as an immigrant in accordance with the provisions of sections 1225, 1229a, and 1231 of this title." 8 U.S.C. § 1159(a)(1)(C) (emphasis added).

1   DHS's Form I-213, "Record of Deportable/Inadmissible Alien," for
2   Khukhryanskiy states:

3   Subject has been diagnosed by [Snake River Correctional
4   Institute] medical as a Paranoid Schizophrenic and is taking
5   involuntary Haldol Decanoate (150 mg IM q 3 weeks)
6   injections as well as Cogentin (2mg bid prn) twice daily
7   otherwise the subject has no visible defects or injuries.

8   (Defs.' RJN, Ex. 58 at 4.)

9   Khukhryanskiy's medical records indicate that on August 20, 2010,
10   Khukhryanskiy went to the clinic and stated:

11   The voices are really bothering me.  I can not be here anymore.
12   Let them deport me.  I have court on the 30th, I will sign any
13   thing they ask me to sign.  Just get me out of here.  I am not
14   sleeping.  I need something to help me sleep.

15   (Decl. of Ahilan Arulanantham in Supp. of Pls.' Reply ("Arulanantham Reply Decl.") ¶
16   8, Ex. 87, at 84.)  Then, on August 21, 2010, Khukhryanskiy was brought to medical staff
17   because he was deemed to be a danger to himself.  (*Id.* at 82.)  One entry for August 21,
18   2010 states:

19   Patient with paranoid schizophrenia brought down to medical
20   for danger to self.  He is banging his head extremely hard to the
21   point that he will injure himself and was yelling.  He was
22   brought into clinic in a state of streaming [sic] and struggling
23   with the officers . . . He is delusional and hallucinating and in a
24   psychotic episode with aggitation/acting out [sic].

25   (*Id.*)  Another entry on August 21, 2010 indicates that Khukhryanskiy placed a cord
26   around his neck:

27

28

1           Suicide Watch Started p/ detainees in POD reported
2           Khuklhyanskiy [sic] was hitting his head against the wall and
3           had placed a 'cord' around his neck . . .
4           S: 'I can't take this place anymore, I can't control the voices in
5           my head. I need to be released. I am going mad here!!!'
6           When asked if he would hurt/kill self he said, 'No,' but when
7           RN asked detainee why he had wrapped a cord around his neck
8           he said it was because he was going mad. Detainee would not
9           elaborate on voices, but instead just kept saying, 'I must get
10          out.'

11 (*Id.* at 83.)

12     On September 20 and September 24, 2010, Kimberly Barrett, a professor at the

13 University of Washington's Department of Psychology with 20 years of experience

14 conducting competency and mental health evaluations in criminal and immigration

15 proceedings, met with Khukhryanskiy. Declaration of Riddhi Mukhopadhyay

16 ("Mukhopadhyay Decl.") ¶¶ 10-11.) In a report dated October 3, 2010, which is entitled,

17 "Psychological Evaluation: Aleksandra [sic] Mestrovic Khukhryanskiy," Dr. Barrett

18 states that Khukhryanskiy's mental illness is "chronic and very severe." (Mukhopadhyay

19 Decl. ¶¶ 10-11, Ex.). Dr. Barrett states:

20           Mr. Khukhryanskiy suffers from a very active and pronounced
21           psychotic disorder, schizophrenia of the paranoid type. . . . He
22           has frequent auditory hallucinations that occur every day, most
23           of the day. . . . His psychosis interferes with a great deal of his
24           cognitive functioning including thinking, judgment,
25           concentration, interpretation of verbal input, and inability to
26           express himself a great deal of the time. . . . <u>This client is not</u>
27           <u>competent to represent himself, nor is he competent to stand</u>
28           <u>trial with an attorney.</u>"

1  (Mukhopadhyay Decl. ¶¶ 10-11, Ex. at 2-3; emphasis in original.)

2      **2.**    <u>**Immigration Court Proceedings**</u>

3      At a hearing on May 25, 2010, Khukhryanskiy stated to the Immigration Judge:

4          I have to say that I have to be back - - to go urgently to the

5          hospital. I have some problems with my head.

6  (Pl.'s RJN, Ex. 88.) In response, the Immigration Judge stated:

7          All right, sir. There is a public health clinic here at the facility

8          and you can see them on a daily basis, sir. Let the officer know

9          you need to go to the clinic for any reason.

10  (*Id.*)

11      On August 25, 2010, the Immigration Judge held a master calendar hearing (the

12  "August 25 Hearing"). At that hearing, Khukhryanskiy stated, "I just want to leave this

13  country." (Pls.' RJN, Ex. 66 at 8-9.) Defendants also highlight the following exchange:

14          <u>Judge to Respondent</u>: . . . Sir, are you afraid to return to

15          the Ukraine?

16          <u>Respondent to Judge</u>: No.

17          <u>Judge to Respondent</u>: Would you like to choose the

18          Ukraine as the country of deportation?

19          <u>Respondent to Judge</u>: Yes, I want to be deported to the

20          Ukraine.

21          <u>Judge to Respondent</u>: Okay. All right, then I will enter

22          an Order of Removal. You do not wish to apply for any relief

23          from removal? You just want to go home?

24          <u>Respondent to Judge</u>: Yes.

25  (Pls.' RJN, Ex. 66, at 13.) On that basis, the Immigration Judge ordered Khukhryanskiy

26  removed from the United States to Ukraine. (Pls.' RJN, Ex. 65.) The Order of the

27  Immigration Judge indicates that Khukhryanskiy waived his right to appeal, even though

28  no such waiver is explicit in the record. (*Id.*)

1   During that same August 25 Hearing, Khukhryanskiy stated that he did not

2 understand the proceedings:

3      <u>Judge to Respondent</u>:  Okay.  But before I do that, sir,

4      we've got to go through some other things first.  Do you

5      understand what's happening today?

6      <u>Respondent to Judge</u>:  Yes.  But I don't understand

7      anything now.

8 (Pls.' RJN, Ex. 66, at 10.)  Plaintiffs contend that Robert Mason, a DHS officer, attended

9 the August 25 Hearing to assist the Immigration Judge by answering questions regarding

10 Mr. Khukhryanskiy.  According to Defendants, however, Mr. Mason was not present to

11 serve as Mr. Khukhryanskiy's representative.

12   Khukhryanskiy's appeal is pending at the Board of Immigration Appeals ("BIA"),

13 which issued a briefing schedule requiring Khukhryanskiy to file his appeal brief by

14 November 12, 2010.  (Pls.' RJN, Ex. 67.)  Through the Legal Orientation Program

15 ("LOP") provided by the Executive Office for Immigration Review ("EOIR"),

16 Khukhryanskiy received assistance filing a Briefing Extension Request, which extended

17 the briefing schedule to approximately December 3, 2010. (Pls.' RJN, Ex. 68)  But for

18 the issuance of the TRO, Khukhryanskiy's brief would have been due on or about

19 December 3, 2010.

20 **B.**  **EVER FRANCISCO MARTINEZ-RIVAS**

21   Plaintiff Martinez is a 31-year-old native and citizen of El Salvador who has been a

22 Lawful Permanent Resident since 2006.  (Declaration of Maria Elena Felipe ("Felipe

23 Decl.") ¶¶ 2-3.)  On May 30, 2008, Martinez was convicted in the Riverside Superior

24 Court for a violent crime against his stepfather. (Felipe Decl. ¶ 6; Defs.' RJN, Exs. 1-2.)

25 At that time, Martinez was initially deemed incompetent to stand trial for the offense, but

26 was eventually restored to competency and pled guilty. (Arulanantham Decl. ¶ 9, Ex. 71

27 at 6.)  ICE served Martinez with a Notice to Appear ("NTA") dated October 20, 2009,

28 which placed Martinez in removal proceedings. (Pls.' RJN, Ex. 72; Defs.' RJN, Ex. 4.)

1  Martinez is currently detained at the Otay Mesa Detention Facility in San Diego,
2  California. (Pls.' RJN, Ex. 75.)

3       **1.    Martinez's Psychiatric Evaluation**

4       Martinez suffers from schizophrenia and has been repeatedly hospitalized over a
5  number of years due to this disability. (Arulanantham Decl. ¶ 8, Ex. 70.) DHS's Form I-
6  213, "Record of Deportable/Inadmissible Alien," for Martinez states that he "is
7  schizophrenic and currently is taking medication for said medical condition." (Pls.' RJN,
8  Ex. 72 at 2.)

9       On August 2, 2010, Robert Burchuk, M.D., a member of the Expert Panel of the
10  Los Angeles Superior Court, examined Martinez. (Declaration of Robert Burchuk, ¶¶ 3-
11  4.)  Following his examination, Dr. Burchuk diagnosed Martinez with "Schizophrenia,
12  Undifferentiated Type, Continuous with Prominent Negative Symptoms," and described
13  Martinez's symptoms as "[a]ffective flattening—the absence of facial expression,
14  alogia—the inability to speak more than a few words at a time, and avolition—the
15  inability to initiate and persist in goal-directed activity." (Burchuk Decl. ¶¶ 6-7.)
16  According to Dr. Burchuk, Martinez:

17            [c]annot understand, formulate, and verbally express ideas in a
18            way that most other people can.  His schizophrenia also causes
19            him to suffer from auditory hallucinations and a paucity of
20            spontaneous thoughts, and renders him unable to process and
21            synthesize information . . . As a result of his illness, Mr.
22            Martinez is only marginally competent to proceed in the
23            deportation hearing with the assistance of an attorney.  He is
24            clearly not competent to represent himself.  His illness
25            precludes a capacity to conceptualize ideas and verbally
26            advocate a defense in his removal proceedings.

27  (*Id.*) (emphasis added.)
28  //

-9-

## 2.   **Immigration Court Proceedings**

During the pendency of his removal proceedings, Martinez attended several master calendar hearings before the San Diego Immigration Court. (Felipe Decl. ¶ 9, Pls.' RJN, Ex. 75.)  At a hearing on June 4, 2010, Martinez's mother, Ms. Maria Elena Felipe, addressed the court to point out that she had served as her son's conservator for several years.  (Felipe Decl. ¶ 9; Pls.' RJN, Ex. 75 at 3.)  At each of the hearings, the Immigration Judge apprised Martinez of his right to obtain counsel and recommended he seek attorneys from the LOP. (Pls.' RJN, Ex. 75 at 2.) Martinez remained unrepresented during the entirety of his Immigration Court proceedings. (*Id.*)

On April 2, 2010, the Immigration Judge took Martinez's pleas to the NTA and provided Martinez with a copy of Form I-589 for Martinez to pursue relief under the Convention Against Torture.  (*Id.* at 2.)    Martinez filed the application with the Immigration Court on May 25, 2010. (*Id.*) The immigration court set the merits hearing on September 16, 2010 (the "September 16 Hearing"). (*Id.* at 3.)

On August 31, 2010, Defendants submitted Dr. Burchuk's evaluation to the Immigration Court.  (Pls.' RJN, Exs. 74-75.)  In a memorandum to the Immigration Judge, DHS stated "in the event that Martinez is determined by the Court to be mentally incompetent, this Court has the authority to appoint a custodian, such as Maria Elena Felipe (Martinez's mother and former conservator) to speak on his behalf." (Pls.' RJN, Ex. 74.) Martinez's mother was not in attendance at the September 16 Hearing.

At the September 16 Hearing, the Immigration Judge found that Martinez was not mentally competent to proceed *pro se* in the removal proceedings.  The judge further stated that:

> Due to the unstable and fluctuating competence of the Respondent, and at the request of the government to ensure that all of the Respondent's rights and privileges be protected, since the Court cannot be certain that the Respondent was mentally competent when:   (1) he was served the NTA; (2) when

1            pleadings were taken; (3) when exhibits were admitted; (4) and

2            when the Respondent filed his relief application, the Court, out

3            of an abundance of caution and to ensure that all of the

4            Respondent's rights and privileges are protected, will set aside

5            all prior actions taken in this case. Additionally, the court will

6            find that the NTA was not properly served, since it was served

7            on a mentally incompetent *pro se* individual, and it was not

8            properly served on an individual who was authorized to accept

9            such service on behalf fo [sic] the Respondent . . . Simply put,

10           the Respondent is unrepresented and is mentally incompetent.

11           The Court finds that the Respondent is unable to effectively

12           participate in a coherent manner, to comprehend the nature and

13           consequences of the proceedings, to communicate with the

14           Court in any meaningful dialog, to assert or waive any rights,

15           and to seek various forms of relief.

16 (Pls.' RJN, Ex. 75 at 8-9.)

17     The Immigration Judge terminated the proceedings and certified her decision for

18 appellate review. (*Id.* at 9-10.) Martinez's case is currently pending before the BIA and,

19 but for the issuance of the TRO, his brief would have been due on December 8, 2010.

20 (Declaration of Talia Inlender [Doc. # 69-1] ¶ 3.)

21                                 **III.**

22                    **LEGAL STANDARDS**

23     Federal Rule of Civil Procedure 65 governs the issuance of preliminary

24 injunctions. The purpose of such injunctive relief is to preserve the rights and relative

25 positions of the parties, *i.e.*, the *status quo*, until a final judgment issues. *See U.S. Philips*

26 *Corp. v. KBC Bank N.V.*, 590 F.3d 1091, 1094 (9th Cir. 2010) (citing *Univ. of Tex. v.*

27 *Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981)). An injunction is

28 an exercise of a court's equitable authority, which should not be invoked as a matter of

1   course, and "only after taking into account all of the circumstances that bear on the need
2   for prospective relief." *Salazar v. Buono*, __ U.S. __, 130 S.Ct. 1803, 1816, 176 L.Ed.2d
3   634 (2010).

4       A plaintiff seeking injunctive relief must show that (1) it is likely to succeed on the
5   merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3)
6   the balance of equities tips in its favor; and (4) that an injunction is in the public interest.
7   *Toyo Tire Holdings Of Ams. Inc. v. Cont'l Tire N. Am., Inc.*, 609 F.3d 975, 982 (9th Cir.
8   2010) (citing *Winter v. Natural Res. Def. Council, Inc.*, __ U.S. __, 129 S.Ct. 365, 374,
9   172 L.Ed.2d 249 (2008)).   An injunction may be appropriate when a plaintiff raises
10  "serious questions going to the merits" and demonstrates that "the balance of hardships
11  tips sharply in the plaintiff's favor." *Alliance for Wild Rockies v. Cottrell*, __ F.3d __,
12  2010 WL 2926463, at *7 (9th Cir. July 28, 2010) (quoting *The Lands Council v. McNair*,
13  537 F.3d 981, 987 (9th Cir. 2008)).

14      Unlike a preliminary injunction, a mandatory injunction "goes well beyond simply
15  maintaining the status quo [p]endente lite [and] is particularly disfavored." *Marlyn*
16  *Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009)
17  (internal quotations omitted).   Mandatory injunctions should be denied unless the facts
18  and law clearly favor the moving party. *Transwestern Pipeline Co. v. 17.19 Acres of*
19  *Property Located in Maricopa County*, 550 F.3d 770, 776 (9th Cir. 2008) (citing *Stanley*
20  *v. University of Southern California*, 13 F.3d 1313, 1320 (9th Cir. 1994)).   The Court,
21  however, is empowered to grant mandatory injunctions, especially when prohibitory
22  orders may be ineffective or inadequate. *Katie A., ex rel. Ludin v. Los Angeles County*,
23  481 F.3d 1150, 1156-57 (9th Cir. 2007).

24  **IV.**
25  **DISCUSSION**
26  **A.**    **THE COURT HAS JURISDICTION TO REVIEW PLAINTIFFS' CLAIMS**
27      Defendants argue that the Preliminary Injunction Motion should be denied
28  because:   (1) judicial review of legal questions arising from Plaintiffs' removal

proceedings are barred by 8 U.S.C. §§ 1252(a)(5), (b)(9); (2) Plaintiffs failed to exhaust their administrative remedies; and (3) the Court lacks jurisdiction under 8 U.S.C. 1252(g) because the Preliminary Injunction Motion arises from the BIA's decision or action to adjudicate Plaintiffs' cases.   Defendants concede that their "jurisdictional argument specifically pertains to [Plaintiffs'] appointment of counsel claim [and that Plaintiffs'] challenges to detention are still permitted under the Real ID Act because they are deemed independent of the removal proceedings themselves."  (Defs.' Opp'n to Pl.'s App. for Expedited Discovery at 3 n.1.)

    1.    **Sections 1252(a)(5) and (b)(9) Do Not Strip This Court of Jurisdiction In This Case**

Defendants contend that Plaintiffs' claims are barred by the REAL ID Act because Plaintiffs seek judicial review of legal and factual questions "arising from" Plaintiffs' removal proceedings.  Plaintiffs respond that neither Section 1252(a)(5) nor Section 1252(b)(9) bar review of their claims because they do not challenge final orders of removal.[3]

_____

[3] Section 1252(a)(5) provides:

> Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, a petition for review filed with an appropriate court of appeals in accordance with this section shall be the sole and exclusive means for judicial review of an order of removal entered or issued under any provision of this chapter, except as provided in subsection (e) of this section. For purposes of this chapter, in every provision that limits or eliminates judicial review or jurisdiction to review, the terms "judicial review" and "jurisdiction to review" include habeas corpus review pursuant to section 2241 of Title 28, or any other habeas corpus provision, sections 1361 and 1651 of such title, and review pursuant to any other provision of law (statutory or nonstatutory).

8 U.S.C. § 1252(a)(5) (emphasis added).

Section 1252(b)(9) provides:

> Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a

-13-

1   As a general matter, the REAL ID Act of 2005 eliminated district court *habeas corpus*
2   jurisdiction over orders of removal and vested jurisdiction exclusively in the courts of
3   appeals. *Morales-Izquierdo v. Dept. of Homeland Security,* 600 F.3d at 1080, 1083. The
4   Ninth Circuit has determined that "[b]y virtue of their explicit language, both §§
5   1252(a)(5) and 1252(b)(9) apply only to those claims seeking judicial review of <u>orders of</u>
6   <u>removal</u>." *Singh,* 499 F.3d at 978 (emphasis added); *see also Nadarajah v. Gonzales,*
7   443 F.3d 1069, 1075 (9th Cir. 2006) (the REAL ID Act's jurisdiction stripping does not
8   apply to *habeas* petitions that do not involve final orders of removal).

9        Under the REAL ID Act, an "order of removal" means:

10        the order of the special inquiry officer, or other such
11        administrative officer to whom the Attorney General has
12        delegated the responsibility for determining whether an alien is
13        deportable, concluding that the alien is deportable or ordering
14        deportation.

15   8 U.S.C. § 1101(a)(47)(A); *see also Morales-Izquierdo,* 600 F.3d at 1082.

16        An order of removal becomes <u>final</u> upon the earlier of:

17        (i) a determination by the Board of Immigration Appeals
18        affirming such order; or
19        (ii) the expiration of the period in which the alien is permitted
20        to seek review of such order by the Board of Immigration
21        Appeals.

22   8 U.S.C. § 1101(a)(47)(B); *see also Singh,* 499 F.3d at 979.

---

<u>final order under this section</u>. Except as otherwise provided in this section, no court shall have jurisdiction, by habeas corpus under section 2241 of Title 28 or any other habeas corpus provision, by section 1361 or 1651 of such title, or by any other provision of law (statutory or nonstatutory), to review such an order or such questions of law or fact.

8 U.S.C. § 1252(b)(9) (emphasis added).

-14-

1    In *Singh*, the Ninth Circuit distinguished between challenges to removal orders and
2   "challenges that arise independently." 499 F.3d at 978. Although the petitioner's
3   ineffective assistance of counsel claim arose *after* the issuance of the final removal, the
4   court emphasized that permitting Singh's petition would "lead to nothing more than a
5   'day in court' for Singh." *Id.* at 979. The *Singh* court recognized that while Singh's
6   ultimate goal may have been to overturn the final removal order, success on his *habeas*
7   petition itself would not produce that result. Rather, Singh's petition was "consistent
8   with Congressional intent underlying the REAL ID Act" and neither Sections 1252(a)(5)
9   nor (b)(9) stripped the court of jurisdiction. *Id.* at 973.

10   In their Opposition, Defendants highlight the fact that Singh's claim arose *after* the
11   issuance of the final order of removal. *Singh*, 499 F.3d at 979. The Court is not
12   persuaded by Defendants' attempt to distinguish *Singh*. In fact, the timing of Singh's
13   claim was not critical to the Ninth Circuit's analysis. *See, e.g., Kharana v. Chertoff*, 2007
14   WL 4259323, at *3 (N.D. Cal. 2007) (*Singh* court did not limit its holding to situations
15   where the ineffective assistance claim arose *after* the issuance of the removal order).
16   Instead, emphasizing the difference between the immediate goal of his *habeas* petition
17   and his "ultimate goal," the Ninth Circuit concluded that Singh's claim was a "challenge
18   that [arose] independently." Likewise, in the instant matter, if Plaintiffs prevail on the
19   merits of this case, they would be entitled only to relief that would help to ensure their
20   meaningful participation in removal and/or custody proceedings.

21   At this time, neither Plaintiff has received a final removal order. Their BIA
22   appeals are currently pending. While Plaintiffs' ultimate goal undoubtedly pertains to the
23   removal orders themselves, their petition for relief before this Court is indistinguishable
24   from that in *Singh*. As Plaintiffs explain in their Reply:

25       If [Plaintiffs] cannot litigate their appointment of counsel claim
26       prior to the BIA briefing deadlines, they could be deported
27       imminently—if the BIA dismisses their cases because they
28       have failed to file a brief—and in any event will never be able

-15-

1    to present their claim, because they are not competent to brief it

2    *pro se*.  In contrast, if the relief sought is granted, then once this

3    Court has resolved their claim for right to appointed counsel,

4    the BIA can continue to assess their cases (hopefully with the

5    assistance of counsel).  Plaintiffs will still have one and only

6    one opportunity to seek judicial review of their removal orders,

7    as Congress intended.

8    (Pl.'s Reply at 6.)

9    Defendants also rely on *Aguilar v. U.S. Immigr. and Customs Enf. Div. of Dep't of*

10   *Homeland Sec.*, 510 F.3d 1 (1st Cir. 2007), in support of their contention that this Court

11   is devoid of jurisdiction.  The petitioners in *Aguilar*, who had been detained *en mass* in a

12   raid along with more than 300 individuals, filed a *habeas* petition and a complaint

13   alleging a violation of constitutional and statutory rights, including the right to counsel.

14   No formal removal proceedings had been initiated as of the time of their petition.  Noting

15   the "frequency with which right-to-counsel claims arise in removal proceedings" and

16   finding no evidence that the petitioners would be irreparably harmed if they were

17   required to administratively exhaust their claims, the court held that Section 1252(b)(9)

18   stripped the court of jurisdiction to consider the petitioners' right-to-counsel claims.  *Id.*

19   at 13.

20   This Court is neither bound by the First Circuit's decision nor persuaded that it is

21   applicable in this case.  Here, as discussed *supra*, the weight of the evidence presented

22   demonstrates that Plaintiffs are mentally incompetent.  Plaintiffs' unique circumstances

23   withstand characterization as the same type of right-to-counsel claims that the First

24   Circuit found are "frequently" raised in removal proceedings.  Because Plaintiffs are

25   mentally incompetent, they are likely to be irreparably harmed if they are unable to

26   meaningfully participate in their respective immigration proceedings.  The Court finds

27   that Plaintiffs' claims represent the other category of cases recognized by the *Aguilar*

28   court, *i.e.,* those in which "adequate relief" is unavailable through the administrative

-16-

1  process because irreparable injury would result from requiring administrative exhaustion.

2  *Id.* at 12. As the *Aguilar* court noted, "courts have demonstrated a particular hostility" to

3  requiring administrative exhaustion in such circumstances.

4        Finding no basis to construe Plaintiffs' claims as a challenge to a final order of

5  removal as defined in 8 U.S.C. § 1101(a)(47)(B), the Court concludes that 8 U.S.C. §§

6  1252(a)(5) and (b)(9) do not strip the Court of jurisdiction in this case.

7        **2.**    **Plaintiffs Are Not Required to Exhaust Administrative Remedies Before**

8               **the BIA**

9        Defendants contend that Plaintiffs should be required to proceed with their BIA

10  appeals because the BIA is already on notice in both cases that it must adjudicate the

11  issue of the procedural safeguards guaranteed to mentally ill respondents in removal

12  proceedings. Defendants fail to identify, and the Court has not found, any authority

13  mandating administrative exhaustion under these circumstances.[4] Instead, Defendants

14  contend that prudential exhaustion is "an appropriate prerequisite" for Plaintiffs' claims.[5]

15

16       [4] Defendants' reliance on *J.L. v. Social Security Administration,* 971 F.2d 260 (9th Cir. 1992),

17  *overruled in part by Lane v. Pena,* 518 U.S. 187, 116 S.Ct. 2092, 135 L.Ed.2d 486 (1996), is misplaced. In *J.L.,* the court acknowledged that the Rehabilitation Act contained no "*per se* exhaustion

18  requirement," but held that the plaintiffs should first seek relief before the Social Security Administration ("SSA") under a prudential exhaustion requirement. The court held that prudential

19  exhaustion was proper because the SSA's expertise was essential to the court's understanding of the case, the administrative scheme conformed to the Rehabilitation Act, and the plaintiffs sought the

20  adoption of new SSA application procedures. *Id.* at 271. In that case, the plaintiffs made no showing that their needs could not be satisfied through an administrative procedure and the court determined

21  exhaustion would not be futile. *Id.* Here, at the very core of Plaintiffs' claims is that without the appointment of counsel, Plaintiffs will be unable to meaningfully participate in the administrative

22  process before the BIA, and that as a result of well-established administrative policies, resort to the BIA

23  would be futile. The Court therefore finds *J.L.* distinguishable from the instant case. *Douglas v. Gonzalez,* 2006 WL 5159196 (M.D. Fla. June 12, 2006) is also inapposite. There, the petitioner

24  challenged his continued mandatory detention with simultaneous appeals to the BIA and to the district court. Noting that the petitioner's appeal to the BIA was specifically authorized by 8 C.F.R.

25  236.1(d)(3), the BIA appeal was still pending, and his appeal contained virtually the same arguments

26  made to the district court, the court determined that the petitioner should be required to first exhaust administratively before seeking relief from the court. *Id.* at * 2.

27

28       [5] Defendants cite to 28 C.F.R. § 39.170 as a basis for requiring Plaintiffs to first administratively exhaust their claims. The plain language of section 39.170, however, does not require administrative

1    Exhaustion is required where mandated by Congress, but where Congress has not

2   clearly required exhaustion, "sound judicial discretion governs." *McCarthy v. Madigan*,

3   503 U.S. 140, 144, 112 S.Ct. 1081, 117 L.Ed.2d 291 (1992).   In determining whether

4   exhaustion is required, the Supreme Court spoke of an "intensely practical" approach in

5   balancing the individual interests in prompt access to a federal judicial forum with

6   countervailing institutional interests.[6]   *Id.* ("[A]dministrative remedies need not be

7   pursued if the litigant's interests in immediate judicial review outweigh the government's

8   interests in the efficiency or administrative autonomy that the exhaustion doctrine is

9   designed to further").   The Ninth Circuit has held that there is no exhaustion requirement

10  where resort to the administrative agency would be futile, *i.e.*, in cases where the

11  agency's position "appears already set and it is very likely what the result of recourse to

12  administrative remedies would be." *El Rescate Legal Services, Inc. v. Executive Office of*

13  *Immigration Review*, 959 F.2d 742, 747 (9th Cir. 1992) (citing *Matthews v. Eldridge*, 424

14  U.S. 319, 330, 96 S.Ct. 893, 900, 47 L.Ed.2d 18 (1976) (internal quotations omitted).

15    In *El Rescate*, where the petitioners challenged the failure of the INS to require

16  translation of all removal proceedings, the Ninth Circuit determined that it would be

17  unrealistic to require the plaintiffs to exhaust their administrative remedies where the BIA

18  had already "announced and reaffirmed its policy regarding translation of immigration

19

20

21

22  exhaustion, but rather, provides that "[a]ny person who believes that he or she has been subject to discrimination prohibited by this part <u>may</u> by him or herself or by his or her authorized representative

23  file a complaint with the Official." 28 C.F.R. § 39.170 (d)(1)(i) (emphasis added).

24    [6] The Supreme Court has recognized that the interests of the individual weigh heavily against requiring administrative exhaustion in the following circumstances: (1) where requiring administrative

25  exhaustion causes undue prejudice to subsequent assertion of a court action; (2) where an administrative remedy is inadequate because of some doubt as to whether the agency was empowered to grant effective

26  relief; and (3) where the administrative body is shown to be biased or has otherwise predetermined the

27  issue. *McCarthy*, 503 U.S. at 146-148.

28

proceedings, and its understanding of the requirements of the due process clause." *El Rescate*, 959 F.2d at 747.

In this case, the Court likewise takes an "intensely practical" approach in determining whether requiring exhaustion would, in fact, be futile. Sections 2.3(a) and 5.9(h)(i) of the BIA Practice Manual indicate that the BIA neither entertains motions to hold cases in abeyance while other matters are pending nor recognizes a right to appointed counsel in removal proceedings under any circumstances.[7] Defendants argue that "Congress has decided that aliens in immigration court proceedings, whether incompetent or not, do not have a right to appointed counsel at government expense." (Defs.' Opp'n to Pl.'s App. for Expedited Discovery at 12) (citing 8 U.S.C. § 1362, 8 U.S.C. § 1229a(b)(4)(A)).[8]   The Court can discern no administrative mechanism that would even entertain Plaintiffs' claims for assistance of counsel.

---

[7] Section 2.3(a) provides:

> (a) *Right to Counsel.* — An alien in immigration proceedings may be represented by an attorney of his or her own choosing, at no cost to the government.   Unlike criminal proceedings, the government is *not* obligated to provide legal counsel.  The Immigration Courts provide lists of attorneys who may represent aliens for little or no cost, and many of these attorneys handle cases on appeal as well.  Bar associations and nonprofit agencies can also refer aliens to practicing attorneys.

(BIA Practice Manual, Section 2.3(a).)

Section 5.9(h)(i) provides:

> (i) *Motion to hold in abeyance.* — The Board does not normally entertain motions to hold cases in abeyance while other matters are pending (e.g., waiting for a visa petition to become current, waiting for a criminal conviction to be overturned).

(BIA Practice Manual, Section 5.9(h)(i).)

[8] Section 1362 provides:

> In any removal proceedings before an immigration judge and in any appeal proceedings before the Attorney General from any such removal proceedings, the person concerned shall have the privilege of being represented (at no expense to the Government)   by such counsel, authorized to practice in such proceedings, as he shall choose.

-19-

In response, Defendants argue that a variety of accommodations are possible at the administrative level short of appointment of counsel, including the appointment of guardians *ad litem*, termination of Plaintiffs' immigration proceedings, and administrative closure of Plaintiffs' immigration proceedings. Defendants further argue that Plaintiffs can move the BIA to hold their proceedings in abeyance while they pursue their administrative claims under the Rehabilitation Act.

Defendants' arguments ring hollow given the procedural background of this case and Defendants' constantly evolving positions. Plaintiffs find themselves in a unique posture following a Kafkaesque journey to this Court's door. Prior to the commencement of this action, Khukhryanskiy had been in mandatory detention without a hearing for over seven months. Despite existing evidence of his mental incompetence, the Immigration Court proceeded with a removal hearing wherein Khukhryanskiy appeared *pro se*. It is unclear whether anyone brought Khukhryanskiy's mental condition to the Immigration Judge's attention or whether anyone involved in the process considered the implications of Khukhryanskiy's condition. A removal order ultimately issued against Khukhryanskiy and he was deemed by the Immigration Judge to have waived his right to appeal, notwithstanding that no such waiver appears in the record.

Juxtaposed against Khukhryanskiy's experience is that of Martinez, who had been in mandatory detention without a hearing for more than one year. Appearing *pro se* at his removal proceeding, Martinez was deemed mentally incompetent by the Immigration Judge. To her credit, the Immigration Judge terminated the removal proceedings after recognizing that she could not go forward with the proceeding given Martinez's mental

---

8 U.S.C. § 1362 (emphasis added).

Section 1229a(b)(4)(A) provides:

> (A) the alien shall have the privilege of being represented, <u>at no expense to the Government</u>, by counsel of the alien's choosing who is authorized to practice in such proceedings. . . .

8 U.S.C. § 1229a(b)(4)(A) (emphasis added).

1  condition.  Martinez is expected, however, to represent himself on the appeal to the BIA

2  as to the propriety of the Immigration Judge's decision.

3       Aside from the voices inside their heads, both Plaintiffs are for all intents and

4  purposes voiceless.    Defendants, in essence, urge this Court to allow mentally

5  incompetent aliens to proceed *pro se* to see if they can present a thoughtful and coherent

6  analysis of, and recommendations of possible remedies for, the lack of procedural

7  safeguards facing unrepresented mentally incompetent aliens.[9]  (Defs.' Opp'n at 15-18.)

8  The Court cannot find that requiring Plaintiffs to exhaust—whether in administrative

9  proceedings prior to reaching the BIA, or before the BIA itself—would be fruitful in any

10  respect in light of the severe mental illnesses from which Plaintiffs suffer.

11       Accordingly, the Court finds that, as in *El Rescate,* it would be futile to require

12  Plaintiffs to exhaust their administrative remedies.

13      **3.**　　**Section 1252(g) Does Not Strip This Court of Jurisdiction**

14       Defendants next argue that 8 U.S.C. § 1252(g) strips this Court of jurisdiction.

15  Plaintiffs respond that Section 1252(g) does not bar this action because Plaintiffs merely

16  seek to continue their cases for a matter of several weeks until such time as they have

17  secured qualified representation.

18       Section 1252(g) states as follows:

19            Except as provided in this section and notwithstanding any

20            other provision of law (statutory or nonstatutory), including

21            section 2241 of Title 28, or any other habeas corpus provision,

22            and sections 1361 and 1651 of such title, no court shall have

23            jurisdiction to hear any cause or claim by or on behalf of any

24

25

---

26     [9] As of the date of today's Order, Defendants have shifted positions once again and have informed the Court that they have successfully located *pro bono* counsel for both Plaintiffs.

27  (Defendants' Status Report, filed December 22, 2010.)  Apparently, Defendants are of the view that this renders Plaintiffs' issues in the Preliminary Injunction Motion moot or, at least, no longer exigent.  As

28  will be discussed further below, the Court disagrees.

1           alien arising from the decision or action by the Attorney

2           General to commence proceedings, adjudicate cases, or execute

3           removal orders against any alien under this chapter.

4  8 U.S.C. § 1252(g) (emphasis added).

5      The Supreme Court has emphasized Section 1252(g)'s narrow reach. *See Reno v.*

6  *American-Arab Anti-Discrimination Committee*, 525 U.S. 471, 119 S.Ct. 936, 142

7  L.Ed.2d 940 (1999). The provision applies only to the following "three discrete actions

8  that the Attorney General may take: her decision or action to *commence* proceedings,

9  *adjudicate* cases, or *execute* removal orders." *Id.* at 482 (emphasis in original; internal

10  quotations omitted). The Supreme Court has also recognized that there are decisions or

11  actions "collateral" to those discrete actions, stating:

12           There are of course may other decisions or actions that may be

13           part of the deportation process—such as the decisions to open

14           an investigation, to surveil the suspected violator, to reschedule

15           the deportation hearing, to include various provisions in the

16           final order that is the product of the adjudication, and to refuse

17           reconsideration of that order. [¶] "It is implausible that the

18           mention of three discrete events along the road to deportation

19           was a short-hand way of referring to all claims arising from

20           deportation proceedings. Not because Congress is too unpoetic

21           to use synecdoche, but because that literary device is

22           incompatible with the need for precision in legislative drafting.

23  *American-Arab*, 525 U.S. at 482 (emphasis added).

24      Like other Circuit courts, the Ninth Circuit has recognized that Section 1252(g)'s

25  jurisdiction-stripping over decisions or actions to "adjudicate" cases does not remove

26  federal jurisdiction to grant injunctive relief to classes of aliens challenging deportation

27  procedures. *See, e.g., Barahona-Gomez v. Reno*, 236 F.3d 1115, 1121 (9th Cir. 2001)

28  (noting Fourth and Seventh Circuits have held that decisions or actions that occur during

the formal adjudicatory process are not rendered unreviewable because of Section 1252(g)). Instead, the Ninth Circuit has distinguished between actions to obtain judicial review of the merits of INS proceedings and actions to enforce constitutional rights to due process in the context of those proceedings. *See Walters v. Reno,* 145 F.3d 1032, 1052 (9th Cir. 1998).

In *Ortiz v. Meissner,* 179 F.3d 718 (9th Cir. 1999), the Ninth Circuit determined that it had jurisdiction to review administrative denials of the plaintiffs' applications for interim work authorization. In so doing, the court was particularly concerned that without district court jurisdiction, there would be no meaningful opportunity for the plaintiffs to obtain a resolution of their claim. The court stated:

> Plaintiffs, according to the government, must wait until they have been ordered deported to seek interim work authorization in a court of appeals review of the deportation proceeding. Yet by that time, the period in which plaintiffs claim they are entitled to work authorization would already have passed. The legal issue would be moot. District court jurisdiction is therefore available because limiting judicial review of the INS's construction of the statute here would be 'the practical equivalent of a total denial of judicial review' of this claim.

*Ortiz,* 179 F.3d at 722 (citing *McNary v. Haitian Refugee Center, Inc.,* 498 U.S. 479, 497 111 S.Ct. 888, 112 L.Ed.2d 1005 (1991)).

Similarly, the *Walters* court determined that it had jurisdiction to review the plaintiffs' due process claims that document fraud forms failed to provide plaintiffs with adequate notice:

> They have not raised a constitutional challenge to any of the substantive factors used by the government in determining whether to charge someone with document fraud, nor have they made any allegations as to the merits of the decision to execute

-23-

1             removal orders against them, except the extent necessary to

2             substantiate their due process claims.  Although constitutional

3             violations ultimately may have led to the plaintiffs' erroneous

4             deportation, the resulting removal orders were simply a

5             consequence of the violations, not the basis of the claims.

6             Moreover, if the plaintiffs prevail on their claims, they will not

7             be entitled to any substantive benefits; rather, they will only be

8             entitled to reopen their proceedings.

9  *Walters*, 145 F.3d at 1052.

10      In this case, Defendants contend that Plaintiffs' action is one challenging the

11  Attorney General's action to "adjudicate" Plaintiffs' cases because "their request is to

12  enjoin the adjudication of Plaintiffs' immigration cases entirely by requesting that this

13  Court prohibit any and all actions in their removal proceedings from being taken – a

14  request that is plainly barred by 8 U.S.C. § 1252(g)."  (Def.'s Opp'n at 7-8.)

15      The Court is not persuaded by Defendants' attempt to reframe Plaintiffs' petition.

16  Plaintiffs ask the Court to enjoin removal proceedings until Plaintiffs are afforded

17  adequate legal representation and to enjoin Plaintiffs' detention unless Plaintiffs are

18  provided a bond hearing before an Immigration Judge. As in *Walters,* Plaintiffs have not

19  raised a constitutional challenge to Defendants' decision to adjudicate cases against them

20  or the merits of that adjudication.   While the alleged constitutional violations that

21  Plaintiffs allege may have led to the decisions currently on appeal before the BIA, if

22  Plaintiffs prevail on their claims, they will only be entitled to legal representation to assist

23  in their removal proceedings.  Defendants disregard this pivotal distinction.

24      The Court also finds the cases cited by Defendants are inapposite. As Defendants

25  recognize in their Opposition, *Ali v. Mukasey*, 524 F.3d 145 (2d Cir. 2008), held that

26  Section 1252(g) applied to a claim that the DHS improperly exercised its discretion in

27  bringing removal proceedings against various aliens.  As discussed *supra,* the instant

28  action does not involve a challenge to the Attorney General's exercise of his discretion to

1  adjudicate Plaintiffs' cases. *Tobar-Barrera v. Napolitano*, 2010 WL 972557 (D.Md.
2  2010), simply follows the holding in *American-Arab* that Section 1252(g) deprives courts
3  of jurisdiction over challenges to government actions "to commence proceedings,
4  adjudicate cases, or execute removal orders." *Id.* at * 2. In *Tobar-Barrera*, the petitioner
5  sought to enjoin proceedings pending before the Immigration Court, challenging the
6  Government's discretion to re-commence removal proceedings against him after had
7  awaited an asylum ruling for almost 16 years.

8       Finally, *Moore v. Mukasey*, 2008 WL 4560619 (S.D. Tex. 2008), held that to the
9  extent petitioner sought to enjoin the commencement of removal proceedings, the court
10 lacked subject matter jurisdiction. Presumably, even Plaintiffs would agree that if they
11 were mounting a challenge to the Attorney General's discretion to commence
12 proceedings, adjudicate cases, or execute removal orders, such claims would be barred by
13 Section 1252(g).

14      Finding no authority to the contrary, the Court concludes that Section 1252(g) does
15 not preclude this Court from exercising jurisdiction in this case.

16 **B.  PLAINTIFFS DEMONSTRATE LIKELIHOOD OF SUCCESS ON THE**
17 **MERITS**

18      Plaintiffs maintain that they are likely to succeed on the merits of their claims
19 because:  (1) the Due Process Clause requires (a) the appointment of counsel for
20 unrepresented non-citizens whose serious mental disabilities render them incompetent to
21 represent themselves and (b) the provision of a custody hearing in light of Plaintiffs'
22 prolonged detention; (2) Plaintiffs' liberty interests at stake entitle them to appointed
23 counsel; and (3) Section 504 of the Rehabilitation Act requires (a) the appointment of
24 counsel as an accommodation for non-citizens who are not competent to represent
25 themselves and (b) a custody hearing in light of Plaintiffs' prolonged detention.

26      The Court discusses Plaintiffs' claims for appointment of counsel and for a custody
27 hearing in turn. As explained below, the Court finds that Plaintiffs have demonstrated
28 that they are likely to succeed on the merits of their claims.

1.   **Plaintiffs' Claims for Appointment of Counsel**

The Court must avoid reaching constitutional questions in advance of the necessity of deciding them. *Rosenberg v. Fleuti*, 374 U.S. 449, 451, 83 S.Ct. 1804, 10 L.Ed.2d 1000 (1963); *see also In re Joye*, 578 F.3d 1070, 1074 (9th Cir. 2009). Accordingly, the Court first addresses Plaintiffs' claims for appointment of counsel under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

a.   **Plaintiffs State a *Prima Facie* Case for Violation of the Rehabilitation Act**

Section 504 provides that no "qualified individual with a disability" be "excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency." 29 U.S.C. § 794(a); *see also* 6 C.F.R. § 15.30 (prohibiting discrimination by DHS); 28 C.F.R. § 39.130 (prohibiting discrimination by the Department of Justice). An organization that receives federal funds violates Section 504 if it denies a qualified individual with a disability a reasonable accommodation that the individual needs in order to enjoy meaningful access to the benefits of public services.[10] 28 C.F.R. § 35.130(b)(7); *Alexander v. Choate*, 469 U.S. 287, 300-01 n.21, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985); *Mark H. v. Hamamoto*, 620 F.3d 1090, 1098 (9th Cir. 2010).

To state a *prima facie* case under Section 504, Plaintiffs must demonstrate that: (1) they are qualified individuals with a disability, as defined under the Americans with

---

[10] Section 35.130(b)(7) provides:

> A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.

28 C.F.R. § 35.130(b)(7).

Disabilities Act ("ADA"), (2) they are otherwise qualified for the benefit or services sought; (3) that they were denied the benefit or services solely by reason of their handicap; and (4) the program providing the benefit or services receives federal financial assistance. *Lovell v. Chandler,* 303 F.3d 1039, 1052 (9th Cir. 2002). A "disability" is defined as:

> (A)   a physical or mental impairment that substantially limits one or more of the major life activities of such individual,
>
> (B)   a record of such an impairment, or
>
> (C)   being regarded as having such an impairment.

42 U.S.C. § 12102(1).

Defendants do not appear to challenge the fact that Plaintiffs have established a *prima facie* case under Section 504. The Court therefore assumes, for purposes of this Motion, that a *prima facie* case exists.

### b. Existing Safeguards Are Inadequate And Do Not Satisfy The Requirements Of The Rehabilitation Act

Although the INA provides aliens with the "privilege" of representation, such representation is not provided at the Government's expense. *See* 8 U.S.C. § 1229a(b)(4)(B), 8 U.S.C. § 1362.[11] Nevertheless, 8 U.S.C. § 1229a(b)(3) requires the

---

[11] Section 1229a(b)(4)(B) provides:

> (4) Alien's rights in proceeding
> In proceedings under this section, under regulations of the Attorney General—
> (A) the alien shall have the privilege of being represented, at no expense to the Government, by counsel of the alien's choosing who is authorized to practice in such proceedings,
> (B) the alien shall have a reasonable opportunity to examine the evidence against the alien, to present evidence on the alien's own behalf, and to cross-examine witnesses presented by the Government but these rights shall not entitle the alien to examine such national security information as the Government may proffer in opposition to the alien's admission to the United States or to an application by the alien for discretionary relief under this chapter, and

Attorney General to provide certain "safeguards" to protect the rights of mentally incompetent aliens:

> If it is impracticable by reason of an alien's mental incompetency for the alien to be present at the proceeding, the Attorney General shall prescribe <u>safeguards</u> to protect the rights and privileges of the alien.

8 U.S.C. § 1229a(b)(3) (emphasis added). Among such existing "safeguards" are that (1) Immigration Judges are prohibited from accepting admissions of removability from unassisted mentally ill aliens, *see* 8 C.F.R. § 1240.10(c),[12] and (2) the Government is required to serve the NTA on a mentally incompetent alien's representative, *see* 8 C.F.R.

---

> (C) a complete record shall be kept of all testimony and evidence produced at the proceeding.

8 U.S.C. § 1229a(b)(4)(B) (emphasis added).

Section 1362 states:

> In any removal proceedings before an immigration judge and in any appeal proceedings before the Attorney General from any such removal proceedings, <u>the person concerned shall have the privilege of being represented (at no expense to the Government) by such counsel,</u> authorized to practice in such proceedings, as he shall choose.

8 U.S.C. § 1362 (emphasis added).

[12] Section 1240.10(c) provides:

> The immigration judge <u>shall not accept an admission of removability from an unrepresented respondent who is incompetent</u> or under the age of 18 and <u>is not accompanied by an attorney or legal representative, a near relative, legal guardian, or friend</u>; nor from an officer of an institution in which a respondent is an inmate or patient. When, pursuant to this paragraph, the immigration judge does not accept an admission of removability, he or she shall direct a hearing on the issues.

8 C.F.R. § 1240.10(c) (emphasis added).

§ 103.5a(c)(2)(ii).[13]   In addition, pursuant to 8 C.F.R. § 1240.4, a <u>representative</u> or <u>guardian</u> is permitted to appear on behalf of the alien in removal proceedings:

> When it is impracticable for the respondent to be present at the hearing because of mental incompetency, the attorney, legal representative, legal guardian, near relative, or friend who was served with a copy of the notice to appear <u>shall be permitted to appear</u> on behalf of the respondent. <u>If such a person cannot reasonably be found or fails or refuses to appear, the custodian of the respondent shall be requested to appear on behalf of the respondent</u>.

8 C.F.R. § 1240.4 (emphasis added).[14]

The parties appear to agree that neither Plaintiff received the appropriate existing "safeguards," as required by 8 U.S.C. § 1229a(b)(3). In both cases, service of the NTA was defective because it was not served on either Plaintiff's representative and, as a result, neither Plaintiff was accompanied by a representative, as contemplated by 8 C.F.R. § 1240.4.[15]   Thus, Plaintiffs were not provided with even the most minimal of

---

[13] Section 103.5a(c)(2)(ii) provides:

> In case of mental incompetency, whether or not confined in an institution, and in the case of a minor under 14 years of age, service shall be made upon the person with whom the incompetent or the minor resides; whenever possible, service shall also be made on the near relative, guardian, committee, or friend.

8 C.F.R. § 103.5a(c)(2)(ii).

[14] In Martinez's case, DHS took the position that "in the event that Martinez is determined by the [Immigration Court] to be mentally incompetent, [the Immigration Court had] the authority to appoint a custodian, such as Maria Elena Felipe (Martinez's mother and former conservator) to speak on his behalf." (Pls.' RJN, Ex. 74.)   The Immigration Judge, however, noted in her ruling that she was "unaware of any jurisdiction [the court had] to 'appoint' Ms. Felipe as the Respondent's custodian for these removal proceedings" and that even if Ms. Felipe had been served with a copy of the NTA, "the Court [could not] compel her to appear on behalf of the Respondent." (Pls.' RJN, Ex. 75.)

[15] The parties appear to dispute whether Robert Mason, a DHS officer, attended Khukryanskiy's hearing for the purposes of assisting Khukhryanskiy. According to Plaintiffs, Mason was present for the

-29-

existing safeguards under section 1240.4, let alone more robust accommodations required under the Rehabilitation Act.

Where the parties diverge is on what must be done at this juncture. According to Plaintiffs, none of the regulatory "safeguards," discussed *supra* and cited to by Defendants, even if properly implemented, would assist Plaintiffs in their appeals before the BIA absent the appointment of counsel. Defendants contend that the BIA should first be allowed to determine what procedural rights are necessary for mentally incompetent aliens.

### c. Plaintiffs' Individual Circumstances Warrant A Reasonable Accommodation

The unique circumstances of Plaintiffs' case present a matter of first impression to the Court. The Court must take into account Plaintiffs' individual characteristics and the procedural posture of their cases pending before the BIA in order to assess the reasonableness of the accommodation requested. *See Mark H.*, 620 F.3d at 1098 (a determination of what is "reasonable" depends on an individualized inquiry and requires a "fact-specific, individualized analysis of the disabled individual's circumstances and the accommodations that might allow meaningful access to the program).

### i. Plaintiff Martinez

Martinez prevailed in his underlying Immigration Court removal proceedings. After being presented with Dr. Burchuk's finding of Martinez's mental incompetency, the Immigration Judge determined Martinez was not competent to proceed *pro se* and *sua sponte* terminated the proceedings and set aside all prior actions taken in the case. She then certified her decision for review by the BIA.

---

purposes of assisting Khukhryanskiy, but was an inadequate safeguard to protect Khukhryanskiy's rights. Defendants clarified at the December 8 Hearing that Mason was not present to represent Khukhryanskiy, but instead, was present to ensure Khukhryanskiy appeared at the hearing and to prevent an *in absentia* order from being filed against Khukhryanskiy.

On the facts presented, it is difficult to conceive of any paradigm in which Martinez could proceed *pro se*. Dr. Burchuk found that Martinez's mental illness "causes him to suffer from auditory hallucinations and a paucity of spontaneous thoughts, and renders him unable to process and synthesize information," the result of which is that he is unable to "understand, formulate, and verbally express ideas in a way that most other people can." (Burchuk Decl. ¶¶ 6-7.) What Martinez now faces is the daunting task of drafting and filing a brief that sets forth the factual and legal basis upon which the BIA should uphold the termination of his removal proceedings.[16] Indeed, if, as the regulations recognize, an Immigration Judge cannot accept an admission of removability from an unrepresented mentally incompetent alien, it is hard to imagine how Martinez could now be deemed competent to represent himself in presenting arguments in support of his position on any appellate review.

Federal regulations permit a mentally incompetent alien to be accompanied by an "attorney, legal representative, legal guardian, near relative, or friend who was served with a copy of the notice to appear," or if such person cannot be found, a "custodian." 8 C.F.R. § 1240.4. As the Immigration Judge noted in her decision, however, "[t]he regulations at 8 C.F.R. § 1204.4 [sic] are only a single paragraph long, and fail to define key terms, such as 'custodian.'" (Pls.' RJN, Ex. 75 at 7.)

Notwithstanding that Martinez's mother had been appointed as his conservator at certain times in the past, she was not so appointed at the time of the September 16 Hearing and was not served with the NTA on Martinez's behalf. In any case, the Immigration Judge found that the Immigration Court could not "compel her to appear" on Martinez's behalf. Plaintiffs also present Ms. Felipe's testimony that she "could not and cannot serve" as Martinez's legal representative, stating:

---

[16] Defendants conceded at the December 8 Hearing, the BIA proceedings are "almost always" paper proceedings, *i.e.*, there is no hearing, but a brief needs to be filed.

> I want what is best for my son.  I cannot do as good a job as an attorney because I have no experience or education in the law. I do not understand many of the legal terms that I have heard used by the judge at court.  I also do not have access to all of the information that real attorneys need to make legal arguments.  For instance, I do not have or know how to use a computer, and I do not have books about the law.

(Decl. of Maria Elena Felipe, dated December 2, 2010, ¶ 8) [Doc. # 85-1].

Even if the Court could compel Ms. Felipe to serve as Martinez's "representative," the Court is not convinced that doing so would be a "reasonable accommodation" for Martinez at this juncture.  Martinez finds himself at this critical crossroad due to Defendants' failure to provide adequate safeguards at the inception of his detention and removal proceedings.  What Martinez's case presents is an opportunity for the BIA to finally provide, at best, systemic guidelines for unrepresented mentally incompetent aliens who require reasonable accommodations in removal proceedings, and, at least, clearer guidance to the Immigration Court, Defendants, and Martinez in this uncharted area of the law.  As the Immigration Judge plaintively pointed out in her decision, there is a marked lack of precedent and guidance available to immigration judges in proceedings pertaining to unrepresented mentally incompetent aliens:

> The current law and regulations offer little guidance, as to how the Court should proceed with a *pro se* Respondent who has been deemed mentally incompetent to proceed with removal proceedings. . . . [T]he Attorney General has provided little guidance regarding steps to take to protect the rights and privileges of the alien.  Immigration case law has also failed to adequately address what such steps are to be taken for an incompetent, *pro se*, alien in removal proceedings . . . Currently there are no cases discussing the procedural safeguards for an

1    *unrepresented* mentally incompetent alien; on the contrary, the
2    cases discuss matters where the aliens *were represented* by
3    counsel or an accredited representative or where the
4    Respondent was deemed to be *competent.*
5    (Pls.' RJN, Ex. 75 at 6) (emphasis in original).

6    Given Plaintiff Martinez's mental condition and the importance of the issues at
7    stake in the pending BIA appeal, the Court is compelled to conclude that he is entitled
8    under the Rehabilitation Act to a reasonable accommodation that would provide him with
9    adequate representation.

10                       **ii.    Plaintiff Khukhryanskiy**

11   Unlike Martinez, Khukhryanskiy was ordered removed at his removal proceeding.
12   The Immigration Judge in Khukhryanskiy's case did not address whether Khukhryanskiy
13   was mentally competent to proceed *pro se*, despite the plethora of evidence in
14   Khukhryanskiy's medical records indicating that he suffers from severe mental illness.

15   Not only did the Form I-213 in Khukhryanskiy's file reveal that he was diagnosed
16   as a paranoid schizophrenic, his medical records indicate that on August 20, 2010, just
17   five days before the August 25 Hearing in which he admitted to his removability,
18   Khukhryanskiy complained of hearing voices in his head, stating he "[would] sign
19   anything they ask [him] to sign." (Arulanantham Reply Decl. ¶ 8, Ex. 87, at 84.)  The
20   next day, on August 21, 2010, Khukhryanskiy was taken to medical staff because he was
21   "banging his head extremely hard to the point that he will injure himself and he was
22   yelling" and wrapped a cord around his neck.  (*Id.* at 82.)  According to the medical
23   records, Khukhryanskiy stated, "I can't take this place anymore, I can't control the voices
24   in my head.  I need to be released.  I am going mad here!!!" (*Id.* at 83.)

25   As in Martinez's case, the NTA was not served on a "near relative, guardian,
26   committee, or friend," as required by 8 C.F.R. § 103.5a(c)(2)(ii).   Khukhryanskiy
27   appeared *pro se* at his August 25 Hearing.  The Immigration Judge ordered him removed
28   and Khukhryanskiy filed an appeal before the BIA.  Plaintiffs ask the Court to enjoin the

1  BIA appellate proceedings pending appointment of counsel at Government expense to
2  assist Khukhryanskiy in prosecuting his appeal.

3      On the evidence presented, the Court finds that Khukhryanskiy was not mentally
4  competent when he was served with the NTA and when his pleadings were taken. Thus,
5  Khukhryanskiy, like Martinez, did not meaningfully participate in his removal
6  proceedings as a result of his mental illness. As with Martinez, the Court finds that
7  Khukhryanskiy is likely to prevail on his claim that Defendants violated the
8  Rehabilitation Act when they failed to provide him with adequate safeguards at the
9  inception of his detention and during removal proceedings and that he is entitled to
10 adequate representation under that Act.

11          **d. A "Qualified Representative" Is A Reasonable Accommodation For**
12          **These Plaintiffs**

13     Given the Court's finding that Plaintiffs are entitled to adequate representation
14 under the Rehabilitation Act, the Court must next examine what constitutes "adequate
15 representation" and determine whether paid appointed counsel would be a reasonable
16 accommodation for Plaintiffs in this case.

17     While a reasonable accommodation does not require an organization to make a
18 "fundamental" or "substantial" alteration to its programs, reasonable adjustments may be
19 required at times to assure "meaningful access." *Alexander*, 469 U.S. at 300-01.

20     Defendants attack the reasonableness of Plaintiffs' proposed accommodation—
21 paid appointed counsel—and argue that Section 504 is only intended to level the playing
22 field and not to provide advantages to the disabled.[17]  Defendants fail, however, to

23
24

25     [17] Defendants initially took the position that Section 504 does not apply at all to removal
26 proceedings because it could not override the specific provisions of the INA. In their reply to Plaintiffs'
   supplemental brief on administrative exhaustion, Defendants concede that the Rehabilitation Act does
27 apply to immigration removal proceedings. (Defs.' Reply to Pls.' Supp. Brief [Doc. # 97] at 1.) *See* 6
   C.F.R. § 15.30 (prohibiting discrimination by DHS); 28 C.F.R. § 39.130 (prohibiting discrimination by
28 the Department of Justice).

1  address well-established authority holding that an accommodation that provides a

2  preference is not, in and of itself, unreasonable. In *Barnett,* the U.S. Supreme Court held:

3  　　　　While linguistically logical, this argument fails to recognize

4  　　　　what the Act specifies, namely, that preferences will sometimes

5  　　　　prove necessary to achieve the Act's basic equal opportunity

6  　　　　goal. The Act requires preferences in the form of "reasonable

7  　　　　accommodations" that are needed for those with disabilities to

8  　　　　obtain the *same* workplace opportunities that those without

9  　　　　disabilities automatically enjoy. By definition any special

10  　　　　"accommodation" requires the employer to treat an employee

11  　　　　with a disability differently, *i.e.,* preferentially. And the fact that

12  　　　　the difference in treatment violates an employer's disability-

13  　　　　neutral rule cannot by itself place the accommodation beyond

14  　　　　the Act's potential reach.

15  *Barnett,* 535 U.S. at 397 (emphasis added); *see also Giebeler v. M&B Associates,* 343

16  F.3d 1143, 1150 (9th Cir. 2003) (applying *Barnett* to hold that an accommodation may

17  result in a preference for disabled individuals over otherwise similarly situated

18  nondisabled individuals).[18]

19  　　　Defendants initially urged the Court, at this critical phase of the BIA proceedings,

20  to allow important issues to be presented to the BIA and addressed by an unrepresented

21  mentally incompetent alien. Defendants contended that the fact that the BIA is on notice

22  of Plaintiffs' mental incompetence is a sufficient safeguard of Plaintiffs' rights.[19] (Defs.'

---

24  [18] The Ninth Circuit has recognized that "[t]here is no significant difference in analysis of the

25  rights and obligations created by the [ADA] and the Rehabilitation Act." *Pierce v. County of Orange,*
526 F.3d 1190, 1216 n.27 (9th Cir. 2008) (citing *Zukle v. Regents of Univ. of California,* 155 F.3d 1041,

26  1045 n.11 (9th Cir. 1999)) (internal quotations omitted).

27  [19] Defendants also made much of the fact that the Northwest Immigrant Rights Project

28  ("NWIRP"), an LOP associated with the EOIR requested leave with the BIA to file an *amicus* brief in
support of Khukhryanskiy's appeal. (Defs.' Opp'n at 16.) Defendants' efforts to secure *pro bono*

1    Opp'n at 15-18.)   Perhaps recognizing that such a position is untenable, Defendants
2    alternatively requested that the Court permit them time to find *pro bono* counsel to
3    represent Martinez or to hold the immigration proceedings in abeyance while Plaintiffs
4    exhaust their administrative remedies under the Rehabilitation Act.   As discussed *supra*,
5    in light of the Court's finding that requiring Plaintiffs to administratively exhaust would
6    be futile, the Court does not find merit in Defendants' request to hold the immigration
7    proceedings in abeyance pending exhaustion of administrative remedies.
8         On December 21, 2010, Defendants filed a status report [Doc. # 103] informing the
9    Court that on December 20, 2010, the Capital Area Immigrants' Rights ("CAIR")
10   Coalition, a *pro bono* legal organization, agreed to represent Martinez in his case before
11   the BIA, which Defendants argue extinguishes the exigency of Martinez's claim.
12   Defendants filed another status report  on December 22, 2010 to report that they had
13   located *pro bono* counsel for Khukhryanskiy and requested the Court delay its ruling on
14   Plaintiff's Motion until December 27, 2010 to see if the *pro bono* representation would
15   "come[] to fruition." (Defendants' Status Report, filed December 22, 2010.)
16        The Court is not authorized to extend the TRO beyond the date of this Order
17   without the parties' consent.   Rule 65(b)(2) of the Federal Rules of Civil Procedure
18   states:

19              The order expires at the time after entry—not to exceed 14
20              days—that the court sets, unless before that time the court, for
21              good cause, <u>extends it for a like period</u> or <u>the adverse party</u>
22              <u>consents to a longer extension</u>. The reasons for an extension
23              must be entered in the record.

24   Fed. R. Civ. P. 65(b)(2) (emphasis added).   The Court issued the TRO on November 24,
25   2010 and it cannot be extended more than 28 days without the parties' consent.   At the
26
27   counsel for Plaintiffs appear to be a concession that an *amicus* brief from the NWIRP would not be a
28   reasonable accommodation for Khukhryanskiy.

1  telephonic status conference held on December 21, 2010, the parties declined to consent
2  to any further extension of the TRO.

3      As of the date of this Order, Defendants have filed a "status report." There is no
4  sworn declaration confirming that Defendants have secured counsel for both Martinez
5  and Khukhryanskiy relating to their immigration proceedings, presenting evidence that a
6  retainer agreement has been signed by Plaintiffs and *pro bono* counsel, or providing the
7  Court with information demonstrating that the scope of the proposed representation
8  encompasses the full extent of the legal proceedings contemplated by Plaintiffs'
9  Preliminary Injunction Motion.   Rather, Defendants have notified the Court that
10  Defendants have engaged in the process of securing counsel for Plaintiffs and that certain
11  counsel have responded favorably to Defendants' efforts.  Such information, in and of
12  itself, is insufficient to either extinguish the urgency of, or to moot, Plaintiffs' claims.
13  *See Rosemere Neighborhood Ass'n v. U.S. EPA*, 581 F.3d 1169, 1173 (9th Cir. 2009)
14  ("the mere [voluntary] cessation of illegal activity in response to pending litigation does
15  not moot a case").  Defendants' offer of counsel speaks volumes, however, regarding the
16  reasonableness of the proposed accommodation and the absence of undue burden in
17  providing the accommodation.

18      In response to Defendants' offer of *pro bono* counsel, Plaintiffs argue that "to
19  allow the Expedited Relief Plaintiffs to be accelerated in their consideration for pro bono
20  work would lessen the ability of others in the proposed class to be considered, and would
21  thus impact the fiduciary duties that Plaintiffs' counsel has for class members." (Parties'
22  Joint Report [Doc. # 99] at 3.)  While Plaintiffs dismiss Defendants' offer of *pro bono*
23  counsel as a calculated effort to moot Plaintiffs' claims with piecemeal remedies,
24  Plaintiffs, too, have piecemealed their claims by bringing their Motion as to just two of
25  their named Plaintiffs. What Plaintiffs seem to forget is that before the Court at this time
26  is a fact-specific, individualized analysis of the accommodations that may allow Plaintiffs
27  Martinez and Khukhryanskiy to meaningfully participate in their removal proceedings
28

1  and proposed custody hearing.  The merits of the putative class members' claims are not
2  before the Court on Plaintiffs' Preliminary Injunction Motion.

3        The Court finds it significant that Plaintiffs themselves define what they consider
4  to be adequate representation.   Plaintiffs ask that the representative (a "Qualified
5  Representative") meet five criteria, including that he or she: "(1) be obligated to provide
6  zealous representation; (2) be subject to sanction by the EOIR for ineffective assistance;
7  (3) be free of any conflicts of interest; (4) have adequate knowledge and information to
8  provide representation at least as competent as that provided by a detainee with ample
9  time, motivation, and access to legal materials; and (5) maintain confidentiality of
10 information."   (*Id.*)   The Court finds that a Qualified Representative would be a
11 reasonable accommodation for Plaintiffs whether he or she is performing the services
12 *pro bono* or at Defendants' expense.

13       In view of the circumstances presented by Plaintiffs' cases, Plaintiffs' definition of
14 a Qualified Representative, and Defendants' apparent offer of counsel that meet such
15 criteria, the Court finds that it is a reasonable accommodation for Defendants to provide a
16 Qualified Representative(s) to represent Plaintiffs in the entirety of their immigration
17 proceedings, whether such Qualified Representative is performing the services *pro bono*
18 or at Defendants' expense.[20]

19 _____

20    [20] Plaintiffs urge the Court to appoint an attorney pursuant to 18 U.S.C. §§ 3006A(a)(1)(D), (I) of
   the Criminal Justice Act ("CJA").  Plaintiffs cite authority for their position that the CJA has been
21 applied in civil proceedings and that courts recognize that deportation involves the "loss of liberty."
   Defendants, on the other hand, point to section 210.20.50(d) of the "Guidelines for Administering the
22 CJA and Related Statutes," volume 7, Part A of the Administrative Office of the United States Courts'
   Guide to Judiciary Policy ("Guide to Judiciary Policy"), which provides:
23

24       Cases or proceedings which are not covered by or compensable under the
         CJA include the following. . . .  Administrative proceedings before the
25       U.S. Citizenship and Immigration Services (USCIS), removal or
         deportation proceedings before the Immigration Court, review of the
26       Immigration Court's decision by the Board of Immigration Appeals, and
         judicial review by the federal courts of appeals of petitions for review
27       from these administrative decisions. **But see:** § 210.20.30 (ancillary
         matters) and § 210.20.20(a)(2) (habeas corpus cases).
28

1        **e. Plaintiffs' Due Process Claims**

2        Plaintiffs also contend that they are likely to prevail in their quest for appointed

3   counsel based upon the Due Process Clause.  They analogize their need for appointed

4   counsel to the recognized right to translation services in removal proceedings.  They

5   point out that the Due Process Clause applies to deportation hearings and that deportation

6   proceedings violate due process if the alien does not receive a "full and fair" hearing and

7   suffers prejudice as a result.  *Cruz Rendon v. Holder*, 603 F.3d 1104, 1109 (9th Cir.

8   2010).  The Ninth Circuit has held that "a competent translation is fundamental to a full

9   and fair hearing" and that "an incorrect or incomplete transaction is the functional

10  equivalent of no translation." *Perez-Lastor v. I.N.S.*, 208 F.3d 773, 778 (9th Cir. 2000).

11       In light of the Court's ruling under the Rehabilitation Act, however, the Court need

12  not, and does not, address the merits of Plaintiffs' Due Process claims at this time.

13       **2.   Plaintiffs' Claims for a Custody Hearing**

14       Plaintiffs also contend that they are entitled to a custody hearing at which

15  Defendants will bear the burden of showing that further detention is justified under 8

16  U.S.C. § 1226(c).   Section 1226(c) only authorizes mandatory detention where

17  immigration proceedings are "expeditious."[21]   Plaintiffs in this case have been held for

18  prolonged periods.

19

20  Guide to Judiciary Policy, § 210.20.50(d) (available at http://www.uscourts.gov/FederalCourts/
21  AppointmentOfCounsel/CJAGuidelinesForms/vol7PartA/vol7PartAChapter2.aspx#210_20)(emphasis in
    original); *cf. Chamblin v. I.N.S.*, 176 F. Supp. 2d 99 (D.N.H. 2000) (appointing counsel under the CJA to
22  represent INS detainees on *habeas* petitions under 28 U.S.C. § 2241), *Saldina v. Thornburgh*, 775 F.
23  Supp. 507 (D.Conn. 1991) (appointing counsel under the CJA for *pro se habeas* petitioners because the
    interests of justice so required).
24       The Court is not persuaded that it has authority under the CJA to appoint counsel to represent
    Plaintiffs in their administrative proceedings before the Immigration Court. As far as the Court is aware,
25  CJA Panel Attorneys, at least in the Central District of California, are screened and selected based upon
26  their qualifications to serve as criminal defense attorneys.  Appointing a criminal defense attorney to
    represent Plaintiffs in a case that revolves around reasonable accommodations for mentally incompetent
27  aliens in removal proceedings would not appear to be a reasonable use of CJA funds or an appropriate
    accommodation for Plaintiffs.
28       [21] Section 1226(c) provides:

-39-

"A statute permitting indefinite detention of an alien would raise a serious constitutional problem." *Zadvydas v. Davis,* 533 U.S. 678, 689, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001). The Supreme Court has estimated the mandatory detention period under Section 1226(c) to last "roughly a month and a half in the vast majority of cases in which it is invoked, and about five months in the minority of cases in which the alien chooses to appeal.[22] *Demore v. Kim,* 538 U.S. 510, 530, 123 S.Ct. 1708, 155 L.Ed.2d 724 (2003). After the six-month period, once an alien provides good reason to believe that there is "no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing." *Zadvydas,* 533 U.S. at 701; *see also Nadarajah v. Gonzales,* 443 F.3d 1069 (9th Cir. 2006). The six-month presumption does not require release of every alien not removed after six months. *Id.* The Ninth Circuit has held that detention beyond an expedited period ceases to be mandatory under Section 1226(c) and instead becomes discretionary under Section

---

(1) Custody
The Attorney General shall take into custody any alien who--
(A) is inadmissible by reason of having committed any offense covered in section 1182(a)(2) of this title,
(B) is deportable by reason of having committed any offense covered in section 1227(a)(2)(A)(ii), , (A)(iii), (B), (C), or (D) of this title,
(C) is deportable under section 1227(a)(2)(A)(i) of this title on the basis of an offense for which the alien has been sentenced to a term of imprisonment of at least 1 year, or
(D) is inadmissible under section 1182(a)(3)(B) of this title or deportable under section 1227(a)(4)(B) of this title,
when the alien is released, without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense.

8 U.S.C. § 1226(c).

[22] Because non-citizens detained under Section 1226(c) are not given a bond hearing before an Immigration Judge, they do not have the opportunity to show that they do not pose a danger to the community or a flight risk such that their detention is unnecessary. *Casas-Castrillon,* 535 F.3d 942, 946 (9th Cir. 2008).

1226(a).  *Rodriguez v. Hayes,* 591 F.3d 1105, 1116 (9th Cir. 2010); *see also Casas-Castrillon v. Dep't of Homeland Security,* 535 F.3d 942, 951 (9th Cir. 2008) ("Because the prolonged detention of an alien without an individualized determination of his dangerousness or flight risk would be 'constitutionally doubtful,' . . . § 1226(a) must be construed as *requiring* the Attorney General to provide the alien with such a hearing").

In this case, both Plaintiffs have been held pursuant to the mandatory detention authority under Section 1226(c) for longer than the presumptively reasonable six months. Thus, their detention has ceased to be mandatory and is now deemed discretionary under Section 1226(a).  *See Rodriguez,* 591 F.3d at 1116.  In light of the Court's ruling on Plaintiffs' Motion, the Court finds that for both Plaintiffs, there is not "significant likelihood of removal in the reasonably foreseeable future."  Plaintiffs are therefore entitled to a custody hearing under Section 1226(a) at which Defendants must demonstrate that further detention is necessary.

**C.   PLAINTIFFS DEMONSTRATE A LIKELIHOOD OF IRREPARABLE HARM AND THE BALANCE OF HARDSHIPS TIPS SHARPLY IN THEIR FAVOR**

Plaintiffs argue that unless counsel is provided, Plaintiffs could be found removable and subsequently deported without ever having an opportunity to litigate the issues that they raise in this lawsuit.  If deported, Plaintiffs claim that they could face persecution in their home countries due to their mental disabilities.  Plaintiffs further argue that without a custody hearing, Plaintiffs are likely to remain detained for a lengthy and indeterminate period pending their BIA appeals.  Plaintiffs also contend that the cost of providing an attorney to represent them is modest if such representation helps to expedite proceedings and thus minimize the cost of detaining Plaintiffs.  They point out that because Defendants regularly conduct custody hearings, holding two custody hearings for Plaintiffs is not a significant burden to Defendants.

Defendants neither contest Plaintiffs' position regarding irreparable harm nor present any evidence to the contrary.  In fact, in a Notice of Clarification filed on

December 20, 2010, Defendants clarified that, contrary to the position they took at the December 8 Hearing, the time period for completing removals is not dependent on the expiration of the 30-day period for appeals taken from the BIA to the Ninth Circuit Court of Appeals. [Doc. # 101.]  Indeed, 8 C.F.R. § 241.33 provides that "once an order of deportation becomes final, an alien shall be taken into custody and the order shall be executed," and "the order shall be executed no sooner than 72 hours after service of the decision, regardless of whether the alien is in Service custody."  Thus, Plaintiffs become deportable within 72 hours after the BIA renders its decision.

In light of these circumstances, the Court finds that the likelihood of irreparable harm and the balance of hardships tip sharply in favor of Plaintiffs.

**D.    AN INJUNCTION IS IN THE PUBLIC INTEREST**

Finally, the Rehabilitation Act embodies Congress' response to its finding that "individuals with disabilities continually encounter various forms of discrimination in such critical areas as . . . public accommodations . . . and public services" and that "the goals of the Nation properly include the goal of providing individuals with disabilities with the tools necessary to . . . make informed choices and decisions. . . ." 29 U.S.C. § 701(a)(5), (a)(6).  Defendants do not dispute that the public has a strong interest in accurate and fair determinations in removal proceedings.  By granting Plaintiffs' Motion, the Court will be furthering the public interest.

**E.    A MANDATORY INJUNCTION IS APPROPRIATE IN THIS CASE**

As discussed *supra*, while a mandatory injunction is generally disfavored, the Court is nevertheless empowered to grant a mandatory injunction when prohibitory orders are otherwise ineffective or inadequate.  *See, e.g., D.R. v. Antelope Valley Union High School District*, ___ F. Supp. 2d ___, 2010 WL 4262047 (C.D. Cal. 2010) (granting mandatory injunction to provide disabled plaintiff with elevator key as a reasonable accommodation).  For the reasons discussed *supra*, any relief short of providing a Qualified Representative for Plaintiffs in this case would be both ineffective and inadequate in providing them with meaningful access to participate in their immigration

proceedings.  As the Court finds that the law and facts clearly favor Plaintiffs and that the potential for irreparable harm cannot be remedied by a later award of damages, the Court also finds that Plaintiffs have met their burden of demonstrating the need for a mandatory injunction.

## VI.

## CONCLUSION

In light of the foregoing:

(1)    The Court GRANTS Plaintiffs' Motion for a Preliminary Injunction as follows:

(a)    Pending a trial on the merits, Defendants, and their officers, agents, servants, employees and attorneys, and all those who are in active concert or participation with them, are hereby enjoined from pursuing further immigration proceedings against Plaintiffs until such time as (i) Plaintiffs are afforded a Qualified Representative(s) who is willing and able to represent Plaintiffs during all phases of their immigration proceedings, including appeals and/or custody hearings, whether *pro bono* or at Defendants' expense, and (ii) after the implementation of a briefing schedule to be mutually agreed upon by the parties in the underlying BIA proceedings;

(b)    Pending a trial on the merits, Defendants, and their officers, agents, servants, employees and attorneys, and all those who are in active concert or participation with them, are hereby enjoined from detaining Plaintiffs Martinez and Khukhryanskiy under 8 U.S.C. § 1226(c) unless, within 30 days of this Order, they provide both Plaintiffs with a bond hearing before an Immigration Judge with the authority to order their release on conditions of supervision, unless the Government shows that Plaintiffs' ongoing detention is justified.

(2)    The Court waives the bond requirement.  *See, e.g.*, *Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999) (nominal security not an abuse of discretion where "vast majority of aliens [affected by class action] were very poor"); *Cal. ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319, 1325 (9th Cir. 1985)

-43-

("[t]he district court has discretion to dispense with the security requirement, or to request mere nominal security, where requiring security would effectively deny access to judicial review").

(3)   Due to privacy considerations, this Order shall be filed under seal.  Within 14 days from the date of this Order, the parties will meet and confer regarding which portions of the Order they propose to be redacted such that a redacted version of the Order may be filed.  The parties shall file a joint report with the Court by no later than January 7, 2011 regarding the proposed redacted version of the Order.

IT IS SO ORDERED.

DATED:      December 27, 2010

_____
DOLLY M. GEE
United States District Judge