1  AHILAN T. ARULANANTHAM (State Bar No. 237841)
   aarulanantham@aclu-sc.org
2  ACLU FOUNDATION OF SOUTHERN CALIFORNIA
   1313 West 8th Street
3  Los Angeles, California 90017
   Telephone: (213) 977-5211
4  Facsimile: (213) 417-2211

5  *Attorneys for Plaintiffs-Petitioners*
   [Additional Counsel for Plaintiffs
6  Listed on Following Pages]

7

8

9            **UNITED STATES DISTRICT COURT**

10          **CENTRAL DISTRICT OF CALIFORNIA**

11

12  JOSE ANTONIO FRANCO-          )   Case No. CV 10-2211 DMG (DTB)
    GONZALEZ, EVER FRANCISCO      )
13  MARTINEZ-RIVAS, ALEKSANDR     )   **THIRD AMENDED CLASS-**
    PETROVICH KHUKHRYANSKIY,      )   **ACTION COMPLAINT FOR**
14  MAKSIM ZHALEZNY, JOSE         )   **DECLARATORY AND**
    CHAVEZ, YONAS                 )   **INJUNCTIVE RELIEF AND**
15  WOLDEMARIAM, JOSE ANTONIO     )   **PETITION FOR WRIT OF**
    MORENO-VASQUEZ, and JUAN      )   **HABEAS CORPUS**
16  CARLOS SEPULVEDA-PEREZ on     )
    behalf of themselves and all others )   Judge:   Honorable Dolly M. Gee
17  similarly situated,           )
                                  )
18        *Plaintiffs-Petitioners,*   )
                                  )
19              v.                )
                                  )
20  ERIC H. HOLDER, JR., Attorney )
    General, THOMAS G. SNOW, Acting )
21  Director of the Executive Office of )
    Immigration Review, JANET     )
22  NAPOLITANO, Secretary of      )
    Homeland Security, JOHN MORTON, )
23  Assistant Secretary of U.S.   )
    Immigration and Customs       )
24  Enforcement, and TIMOTHY S.   )
    ROBBINS, Field Office Director for )
25  the Los Angeles District of U.S. )
    Immigration and Customs       )
26  Enforcement,                  )
                                  )
27        *Defendants-Respondents.*   )
                                  )
28

1  MICHAEL H. STEINBERG (State Bar No. 134179)
   steinbergm@sullcrom.com
2  SULLIVAN & CROMWELL LLP
   1888 Century Park East, Suite 2100
3  Los Angeles, California  90067-1725
   Telephone: (310) 712-6600
4  Facsimile: (310) 712-8800

5  JUDY LONDON (State Bar No. 149431)
   jlondon@publiccounsel.org
6  TALIA INLENDER (State Bar No. 253796)
   tinlender@publiccounsel.org
7  PUBLIC COUNSEL
   610 South Ardmore Avenue
8  Los Angeles, California 90005
   Telephone: (213) 385 2977
9  Facsimile: (213) 385-9089

10  JUDY RABINOVITZ (State Bar No. JR-1214)
    JRabinovitz@aclu.org
11  ACLU IMMIGRANTS' RIGHTS PROJECT
    125 Broad Street, 18th Floor
12  New York, New York 10004-2400
    Telephone: (212) 549-2618
13  Facsimile: (212) 549-2654

14  DAVID BLAIR-LOY (State Bar No. 229235)
    dblairloy@aclusandiego.org
15  SEAN RIORDAN (State Bar No. 255752)
    sriordan@aclusandiego.org
16  ACLU OF SAN DIEGO & IMPERIAL COUNTIES
    P.O. Box 87131
17  San Diego, California 92138
    Telephone: (619) 232-2121
18  Facsimile: (619) 232-0036

19  JAMES PREIS (State Bar No. 82690)
    jpreis@mhas-la.org
20  MENTAL HEALTH ADVOCACY SERVICES
    3255 Wilshire Boulevard, Suite 902
21  Los Angeles, California 90010
    Telephone: (213) 389-2077
22  Facsimile: (213) 389-2595

23  MATT ADAMS (State Bar No. 28287)
    matt@nwirp.org
24  RIDDHI MUKHOPADHYAY
    riddhi@nwirp.org
25  NORTHWEST IMMIGRANT RIGHTS PROJECT
    615 2nd Avenue, Suite 400
26  Seattle, Washington 98104-2244
    Telephone: (206) 957-8611
27  Facsimile: (206) 587-4025

28

1 | VICTORIA A. LOPEZ (IL State Bar No. 6275388)
(*pro hac vice* application forthcoming)
2 | vlopez@acluaz.org
ACLU FOUNDATION OF ARIZONA
3 | 3707 N. 7th Street, Suite 235
Phoenix, Arizona 85014
4 | Telephone: (602) 650-1854
Facsimile: (602) 650-1376

5

*Attorneys for Plaintiffs-Petitioners*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# PRELIMINARY STATEMENT

1.    "No trial can be fair that leaves the defense to a man who is insane, unaided by counsel, and who by reason of his mental conditions stands helpless and alone before the court." *Massey v. Moore*, 348 U.S. 105, 108 (1954).  The unanimous Supreme Court's observation more than five decades ago in *Massey* is as irrefutable now as it was then, yet trials that are supposed to be fair continue in the immigration courts of this Nation with no protection at all for those whose mental conditions render them "helpless and alone before the court."

2.    Plaintiffs are indigent individuals, detained by the United States, who suffer from mental disabilities that may render them incompetent to defend themselves, but who are nevertheless forced to do so in immigration court. Rarely are these individuals able to obtain counsel to assist them, undoubtedly as a function of the challenges arising from their mental disabilities, the poverty that accompanies those with serious mental disorders and defects, and the detention that hinders their access to those who might help.  Without counsel to guide them, these detained individuals are often simply left to create their own "defense" in detention centers, awaiting the point in time (if such a day ever comes) when their mental facilities will be sufficiently clear to allow them to represent themselves and navigate through the complex and highly-technical field of immigration law.  For others whose fog of mental disabilities never lifts, they are simply pushed through the immigration process, without any comprehension of the proceedings, and ultimately deported, irrespective of whether they had a legal right to remain in the United States or to obtain release from custody during the pendency of the often-prolonged proceedings

3.    Congress has specified that these individuals are entitled to a hearing to determine whether there is a basis for the deportation, has mandated that this hearing be fundamentally fair, and has specifically directed the Attorney General to promulgate safeguards for detainees who are not competent.  Nonetheless, the

1   Government has created no system to identify individuals who are not competent
2   to represent themselves due to their mental illness, promulgated no meaningful
3   safeguards to ensure that hearings for mentally incompetent prisoners are, in fact,
4   fair, and provided no safeguards that afford these individuals any ability to
5   challenge their prolonged detention.

6   4.      Even the extremely limited "safeguards" that currently exist are rarely, if
7   ever, invoked:  the Government has established *no* procedures for defining
8   competence; *no* procedures for identifying whether a person is "incompetent" in
9   the first instance, such as by noting when an individual's past evidences
10   significant "red flags" as to their competency; *no* procedures for evaluating the
11   mental health of individuals in immigration proceedings, even if an Immigration
12   Judge suspects that an individual may not be competent; *no* system for appointing
13   counsel for those incompetent to represent themselves; and *no* rules for
14   determining how people subject to prolonged detention as a result of their mental
15   disabilities can be considered for release from incarceration pending resolution of
16   their immigration cases.  In the case of Plaintiff-Petitioner Jose Antonio Franco-
17   Gonzalez ("Mr. Franco"), after he was identified as incompetent in 2005, he was
18   forgotten in a detention facility for more than four and a half years, and not
19   released until this lawsuit was first filed.  Mr. Franco's story is, unfortunately, not
20   unique.

21   5.      Without any meaningful procedures to protect those with serious mental
22   disabilities, the resulting system is paradigmatically arbitrary.  In many cases, the
23   Government forces detainees to represent themselves in removal hearings –
24   proceedings to determine whether they will be permanently banished from the
25   United States – even though the detainees lack the mental capacity to understand
26   the nature of the proceedings against them.  In other cases, Immigration Judges
27   continue or close cases, leaving people with mental disabilities subject to
28   indefinite incarceration while their cases, like their mental health, remain in a

1    perpetual limbo. Even in those rare cases where an Immigration Judge orders a
2    mental health evaluation and the Government actually conducts it, the evaluators
3    have no standards or procedures to use in their assessments, which only adds to
4    the arbitrary and capricious nature of the current regime.

5    6.      Plaintiffs pursue this action because the Due Process Clause of the United
6    States Constitution, the immigration laws, and the Rehabilitation Act require a
7    better system — one that ensures the fair treatment of people with mental
8    disabilities facing immigration proceedings while in Government custody.

9                         **JURISDICTION AND VENUE**

10   7.      Plaintiffs challenge the Government's failure to create procedures for
11   dealing with people with mental disabilities in immigration proceedings
12   (including detention, removal, and any appellate proceedings), on constitutional
13   and federal statutory grounds, and pursue this lawsuit to obtain procedures to
14   avoid the harm that has befallen these Plaintiffs.

15   8.      Congress has provided this Court with subject matter jurisdiction over this
16   case pursuant to the general federal question statute. 28 U.S.C. § 1331. This
17   Court also has jurisdiction under 28 U.S.C. § 2241 (habeas corpus) to consider
18   the claims of Plaintiff-Petitioners whose immigration cases are supervised within
19   this judicial district, and residual jurisdiction over all claims under 28 U.S.C. §
20   1651 (All Writs Act).[1]

21   9.      Personal jurisdiction exists over the Defendants in this case, owing to,
22   among other things, the federal and nationwide nature of Defendants' conduct.

23   10.     Venue is proper in the Central District of California under 28 U.S.C.
24   § 1391(e)(2) because a significant number of the events relevant to this action,
25   particularly with respect to the initial Plaintiff-Petitioner in this action, Mr.

26

27   _____
     [1]     The Suspension Clause, Due Process Clause, and Article III also require that
28   some forum remain available for Plaintiff-Petitioners' claims.

3

1  Franco, including the majority of his prolonged detention and removal

2  proceedings, took place in this District, and because numerous witnesses reside in

3  this District.  Venue is also proper pursuant to 28 U.S.C. § 2241(d) because

4  certain relevant legal custodians reside in this District.

5  **PARTIES**

6  *Plaintiffs-Petitioners*

7  11.    Plaintiff-Petitioner Jose Antonio Franco-Gonzalez ("Mr. Franco") is a

8  native and citizen of Mexico who has been diagnosed with moderate mental

9  retardation and is not competent to represent himself in his immigration

10  proceedings.  For nearly five years, the Department of Homeland Security

11  ("DHS") incarcerated Mr. Franco while his case sat in limbo after an Immigration

12  Judge administratively closed it on account of the fact that he was unrepresented

13  and mentally incompetent.  Mr. Franco was released from DHS detention three

14  business days after filing the original complaint in this case.  The Government

15  retains discretion to detain him at any time.  Although he was unrepresented for

16  many years, counsel undersigned in this action from Public Counsel now

17  represent him in his removal proceedings.

18  12.    Plaintiff Ever Francisco Martinez-Rivas ("Mr. Martinez") is a native and

19  citizen of El Salvador and a Lawful Permanent Resident of the United States.

20  Mr. Martinez has been diagnosed with schizophrenia (with symptoms including

21  hallucinations, disorganized speech and behavior, and flat or inappropriate

22  affect), and is not competent to represent himself in his immigration proceedings.

23  Although Mr. Martinez's mental illness is documented in DHS's records, DHS

24  did not request, and the Immigration Judge did not order, an evaluation of Mr.

25  Martinez's competency in the approximately ten months that the case was before

26  the immigration court.  Rather, in response to filings in this lawsuit, DHS

27  provided the Immigration Judge with a copy of a psychiatric evaluation,

28  conducted at the request of undersigned counsel, which concluded that Mr.

4

1   Martinez is not competent to represent himself in immigration proceedings.  On

2   September 16, 2010, the Immigration Judge terminated Mr. Martinez's removal

3   case and certified her decision to the Board of Immigration Appeals ("BIA").

4   His appeal brief to the BIA was originally due on December 8, 2010, but this

5   Court required the Government to locate representation for him at the Board in its

6   preliminary injunction order.  Mr. Martinez's BIA brief was due on May 6, 2011,

7   and the Government secured counsel on appeal for Mr. Martinez in compliance

8   with the preliminary injunction.  Mr. Martinez's case remains pending before the

9   BIA.

10   13.   Plaintiff Aleksandr Petrovich Khukhryanskiy ("Mr. Khukhryanskiy") is a

11   refugee from the Ukraine.  Mr. Khukhryanskiy has been diagnosed with paranoid

12   schizophrenia and psychosis (not otherwise specified), along with major

13   depression.  Mr. Khukhryanskiy is not competent to represent himself in

14   immigration proceedings.  Nonetheless, he was forced to proceed unrepresented

15   before the Immigration Judge.  Neither DHS counsel nor the Immigration Judge

16   ordered an evaluation to determine if Mr. Khukhryanskiy is competent to

17   represent himself in immigration proceedings, despite repeated references to his

18   mental health issues in the record.  Apparently acknowledging that Mr.

19   Khukhryanskiy is not competent to represent himself, Defendants assigned Mr.

20   Khukhryanskiy a "custodian" for his removal hearing, presumably to satisfy their

21   obligations under 8 C.F.R. § 1240.4.  Remarkably, the "custodian" assigned was

22   Mr. Khukhryanskiy's deportation officer, Officer Robert Mason.  Officer Mason

23   offered no defense for Mr. Khukhryanskiy, and failed to speak on Mr.

24   Khukhyranskiy's behalf at the immigration court hearing, even when Mr.

25   Khukhyranskiy was ordered deported.  When Mr. Khukhryanskiy was ordered

26   removed on August 25, 2010, he stated at the hearing that he did not understand

27   the proceedings.  In ordering his removal, the Immigration Judge relied on Mr.

28   Khukhryanskiy's prior admission of removability, despite the fact that 8 C.F.R.

1    1240.10(c) expressly prohibits any reliance on the admission of an unrepresented

2    incompetent respondent. After this Court entered its motion granting preliminary

3    injunctive relief, Defendants successfully procured counsel to represent Mr.

4    Khukhryanskiy on his appeal of the removal order to the Board of Immigration

5    Appeals ("BIA"). The BIA then vacated the removal order and remanded his

6    case to the Immigration Judge for further proceedings. While Mr.

7    Khukhryanskiy was forced to appear at the first remanded hearing without

8    representation before the Immigration Judge, Defendants subsequently complied

9    with this Court's preliminary injunctive order by ensuring that he was represented

10   for further proceedings. Similarly, pursuant to this Court's order, Defendants

11   obtained legal counsel to represent him at a custody hearing. However, because

12   the Immigration Judge set a $30,000 bond, which Mr. Khukhryanskiy is unable

13   to pay, he remains in detention.

14   14.    Plaintiff Maksim Piotrovich Zhalezny ("Mr. Zhalezny") is a 20-year-old

15   native and citizen of Belarus and a Lawful Permanent Resident of the United

16   States. Mr. Zhalezny suffers from schizophrenia experienced as delusions,

17   hallucinations, and negativism, and is not competent to represent himself in his

18   removal proceedings. Although an Immigration Judge recognized Mr.

19   Zhalezny's mental disability, attempted to secure legal assistance for Mr.

20   Zhalezny through the UC Davis Immigration Law Clinic, recommended to Mr.

21   Zhalezny's father that he arrange for a psychiatric evaluation of Mr. Zhalezny on

22   his own accord, and later found Mr. Zhalezny to be mentally incompetent to

23   represent himself, Mr. Zhalezny remains unrepresented in his immigration

24   proceedings. While Mr. Zhalezny's father initially agreed to act as his son's

25   representative at the Immigration Judge's request, he subsequently withdrew his

26   consent because he does not speak English and does not feel qualified to serve as

27   his son's legal representative. After Plaintiffs filed a preliminary injunction

28   motion on Mr. Zhalezny's behalf, the Government unilaterally continued his

6

hearing by nearly three months, to May 2, 2011. On June 30, 2011, pursuant to the Court's preliminary injunction order in his case, Mr. Zhalezny was afforded a bond hearing at which he was represented by a pro bono attorney from the UC Davis law clinic. The Immigration Judge ordered him released subject to certain conditions, and Mr. Zhalezny has now been released from detention. However, he remains unrepresented with respect to the merits of his removal case. Absent a ruling from this Court or action by the Government to locate a pro bono attorney for him, he will be obligated to argue for asylum, present witnesses, and submit documentation supporting his case on his own, despite the fact that Mr. Zhalezny does not understand the nature of the proceedings to which he is being subjected.

15.    Plaintiff-Petitioner Jose Chavez ("Mr. Chavez") is a native and citizen of El Salvador. He has a long history of mental illness, and has been diagnosed with schizoaffective disorder and chronic paranoid schizophrenia with psychotic symptoms. Mr. Chavez's immigration case has been ongoing sporadically since June 23, 2006, and is currently administratively closed, pending an unscheduled asylum hearing. Mr. Chavez is unrepresented, but is not competent to represent himself at that hearing or any other proceedings in his case.

16.    Plaintiff Yonas Woldemariam ("Mr. Woldemariam") is a 48-year-old Lawful Permanent Resident who was born in Ethiopia but is ethnically Eritrean. He has been diagnosed with bipolar disorder with psychotic features. Mr. Woldemariam was unrepresented at the time the First Amended Complaint was filed in this case, but has since secured counsel through his family's assistance. He remained detained for over six months without being afforded a bond hearing, notwithstanding the delays in his case that occurred in part because of his mental disability. In March of 2011, Mr. Woldemariam was transferred to Sacramento County Jail because he refused to take a type of anti-psychotic medication that makes the voices in his head worse and irritates his prostate, making it extremely

1　difficult for him to urinate.  At the Sacramento County Jail, Mr. Woldemariam

2　was subject to lockdown for 23 hours a day, which exacerbates the voices in his

3　head that tell him that he is worthless, no good, and that he is going to die if he is

4　forced to return to Ethiopia or Eritrea.　This Court ordered Respondents to afford

5　him a bond hearing pursuant to its order granting Plaintiffs' Motion for

6　Preliminary Injunction on his behalf.  Pursuant to that order, Mr. Woldemariam

7　finally received a bond hearing before an Immigration Judge on October 4, 2011.

8　The Judge ordered him released on $1,500 and subject to certain conditions, and

9　Mr. Woldemariam is now out on bond and living with his family.  His removal

10　case remains pending.

11　17.　Plaintiff Jose Antonio Moreno Vasquez ("Mr. Moreno") is allegedly a 55-

12　year-old native and citizen of Mexico.  He has been diagnosed with

13　schizophrenia, multiple personality disorder, and possibly bipolar disorder.

14　While in immigration detention, Mr. Moreno is believed to have received

15　Seroquel for his symptoms.  Despite the medication, he continued to experience

16　auditory, visual, and sensory hallucinations.  Mr. Moreno first appeared before

17　the Immigration Court in El Paso, where he was represented by counsel.

18　However, he requested and was granted leave to transfer venue to California so

19　that he could be closer to his family.  On January 3, 2010, Mr. Moreno's counsel

20　filed a motion for a telephonic hearing with the Immigration Judge in California,

21　noting that Mr. Moreno has a serious mental health condition, that the

22　Government has failed to prove alienage, that the attorney was no longer able to

23　represent Mr. Moreno in light of the changed venue, and that Mr. Moreno was

24　unable to secure independent counsel in Los Angeles.  On April 4, 2011, a DIHS-

25　employed forensic psychologist noted that Mr. Moreno was confused about his

26　court proceedings and stated that his psychological testing could not be

27　completed because of Mr. Moreno's active hallucinations and lack of

28　concentration.  While the forensic psychologist found Mr. Moreno competent to

1   assist counsel in preparing a defense of his case, no conclusion was drawn in

2   regard to Mr. Moreno's competency to represent himself.  On April 20, 2011, an

3   Immigration Judge granted Mr. Moreno's request for withholding of removal

4   apparently based on his mental disability.  However, the Government appealed

5   that decision.  Because Mr. Moreno would have had to defend against the

6   Government's appeal while unrepresented, Plaintiffs filed a motion for

7   preliminary injunction on his behalf.  While that motion was pending, the Board

8   of Immigration Appeals remanded Mr. Moreno's case without allowing any

9   briefing, on the ground that the record was incomplete.  On remand, Mr. Moreno

10  appeared in immigration court without representation.  On August 2, 2011, the

11  same day that an EOIR-28 was apparently entered on his behalf, the Immigration

12  Judge returned the case to the Board of Immigration Appeals.  Then, after nearly

13  18 months in detention (and shortly before the hearing on Plaintiffs' preliminary

14  injunction motion on his behalf) the Government located pro bono counsel to

15  assist Mr. Moreno at the Board of Immigration Appeals.  His appeal remains

16  pending at the Board.

17  18.     Plaintiff-Petitioner Juan Carlos Sepulveda-Perez ("Mr. Sepulveda") is a

18  native and citizen of the Dominican Republic who has been diagnosed with

19  chronic paranoid schizophrenia, schizoaffective disorder and psychotic disorder.

20  He has been in the custody of DHS since approximately May 2011 and is

21  currently held in segregated confinement in the "F-Med" psychiatric unit at the

22  San Diego Correctional Facility ("SDCF") in Otay Mesa.  He is in removal

23  proceedings and is not competent to represent himself.

24  **Defendants-Respondents**

25  19.     Defendant Eric H. Holder, Jr. is the Attorney General of the United States

26  and the head of the U.S. Department of Justice (the "DOJ").  Mr. Holder shares

27  responsibility for implementation and enforcement of the immigration laws along

28  with Defendant Janet Napolitano.  Mr. Holder is sued in his official capacity.

20.    Defendant Thomas G. Snow is the Acting Director for the Executive Office for Immigration Review ("EOIR"), which is the federal agency that runs the Immigration Courts. Mr. Snow is responsible for the supervision of the Deputy Director, the Chairman of the Board of Immigration Appeals ("BIA"), the Chief Immigration Judge, the Chief Administrative Hearing Officer, and all EOIR agency personnel in the execution of their duties. Mr. Snow is sued in his official capacity.

21.    Defendant Janet Napolitano is the Secretary of Homeland Security and the highest-ranking member of DHS, the arm of the U.S. Government responsible for enforcement of the immigration laws. Ms. Napolitano is sued in her official capacity.

22.    Defendant John Morton is the Assistant Secretary of U.S. Immigration and Customs Enforcement ("ICE"), the arm of DHS charged with detaining and removing aliens pursuant to federal immigration law. Mr. Morton is sued in his official capacity.

23.    Defendant and Respondent Timothy S. Robbins is the Field Office Director for the Los Angeles District of ICE. Mr. Robbins has authority over and legal custody of Plaintiff-Petitioner Franco and Plaintiff-Petitioner Chavez. Mr. Robbins is sued in his official capacity.

### FACTS AND PROCEDURAL HISTORY

24.    A significant number of detained individuals in immigration proceedings have serious mental disabilities, including those held in custody in California, Arizona and Washington, the three western states containing between 15 and 25 percent of the Nation's immigration detainee population on any given day. Upon information and belief, a significant number of the detainees with serious mental disabilities, including those held in custody in California, Arizona and Washington, are not competent to represent themselves in their immigration proceedings. Upon information and belief, a large number of those people,

1   including those in California, Arizona and Washington, also suffer long delays in

2   their removal cases due to their mental disabilities, as a result of which they

3   languish in detention for well over six months, and often for years, without a

4   hearing where the Government bears the burden of proof to show that their

5   detention remains justified.

6   25.    Neither the DOJ nor DHS has any procedure to identify exactly how many

7   individuals in removal proceedings have a mental disability that renders them

8   incompetent to represent themselves.  Nevertheless, recent data gathered by the

9   Department of Immigration Health Services ("DIHS") indicates that, in 2008,

10  two to five percent of *all* immigration detainees—or between 7,571 and 18,929

11  detainees—had a "serious mental illness."[2]

12  26.    Given the potentially high costs of legal representation and the special

13  difficulty finding attorneys for detained individuals, most persons in immigration

14  proceedings have no legal representation.  Government data for fiscal year 2009

15  shows that 61 percent of respondents in immigration proceedings did not have a

16  lawyer.  *See* EOIR Statistical Year Book FY2009, at G1.  For detained

17  respondents (like Plaintiffs here), the percentage is even higher.[3]

---

[2]    *Selected responses from ICE to questions posed by The Washington Post regarding the provision of mental health care to immigration detainees*, May 2008, http://media.washingtonpost.com/wp-srv/nation/specials/immigration/documents/day3_ice_mentalhealth.gif (accessed May 11, 2010); *see also* Dr. Dora Schriro, Dep't of Homeland Security, Immigration Detention Overview and Recommendations 2 (2009), http://www.ice.gov/doclib/091005_ice_detention_report-final.pdf (accessed July 30, 2010) (stating that 378,582 persons were detained by ICE in FY 2008).

[3]    *See, e.g.*, Vera Institute for Justice, Improving Efficiency and Promoting Justice in the Immigration System: Lessons from the Legal Orientation Program 1 (2008) (finding that 84 percent of immigration detainees in 2006-2007 did not have a lawyer); Texas Appleseed, Justice for Immigration's Hidden Population: Protecting the Rights of Persons with Mental Disabilities in the Immigration Court and Detention System 13 (2010) (finding that 97 percent of immigration detainees in Texas were unrepresented in 2009).

27.     Without counsel to assist them, many individuals with serious mental disabilities languish in detention for years, are precluded from obtaining fair hearings, and are erroneously deported.  These tragic facts have been documented by several different organizations.[4]

28.     The immigration detention system's treatment of people with mental disabilities stands in stark contrast to federal legislative policy in this area.  For over 20 years, Congress has recognized and condemned the many ways in which legal systems exclude individuals with disabilities from accessing their services.[5]

29.      Because no meaningful procedures are in place to deal with the unique problems faced by people with mental disabilities in immigration proceedings (or

---

[4]      *See generally* Human Rights Watch and the American Civil Liberties Union, Deportation by Default: Mental Disability, Unfair Hearings, and Indefinite Detention in the US Immigration Justice System (2010) (hereafter "HRW Report"); Texas Appleseed, Justice for Immigration's Hidden Population: Protecting the Rights of Persons with Mental Disabilities in the Immigration Court and Detention System (2010); *see also* Editorial, *Detention and the Disabled*, N.Y. Times, July 31, 2010, at A18, *available at* http://www.nytimes.com/2010/07/31/opinion/31sat3.html?_r=3&ref=global; Nina Bernstein, *Disabled Immigration Detainees Face Deportation*, N.Y. Times, March 30, 2010, at A18, *available at* http://www.nytimes.com/2010/03/30/us/30immig.html?_r=1&ref=texas; Renee C. Lee, *Mentally ill detainees' care criticized*, Houston Chronicle, March 30, 2010, *available at* http://www.chron.com/disp/story.mpl/metropolitan/6936070.html; Julian Aguilar, *The Dumping Point: Mental Health Patients Suffer in Detention*, Texas Tribune, March 30, 2010, *available at* http://www.texastribune.org/immigration-in-texas/immigration/mental-health-patients-suffer-in-detention/; Nina Bernstein, *Mentally Ill and in Immigration Limbo*, N.Y. Times, May 4, 2009, at A17, *available at* http://www.nytimes.com/2009/05/04/nyregion/04immigrant.html; Nina Bernstein, *Immigrant Finds Path Out of Maze of Detention*, N.Y. Times, Sept. 11, 2009, at A20, *available at* http://www.nytimes.com/2009/09/11/nyregion/11mental.html.

[5]      *See, e.g., Oversight Hearing on H.R. 4498 before the House Subcommittee on Select Education of the Committee on Education and Labor*, 100th Cong., 2d Sess., 40-41, 48 (1988) (including testimony from individuals with disabilities who described their inability to access courtrooms and court services); Task Force on the Rights and Empowerment of Americans with Disabilities, *From ADA to Empowerment* (1990) (documenting examples of people with developmental disabilities being denied an opportunity to testify in court cases involving abuse, individuals with physical disabilities being unable to access courtrooms, people with hearing impairments being denied interpretive services, and people with visual and hearing impairments being excluded from jury service).

1   even to identify them), and in particular because no counsel is appointed for

2   them, people with serious mental disabilities are left unable to present evidence

3   or arguments in support of their claims to remain in the United States. *See* HRW

4   Report at 4-6, 51-56.

5   30.     Likewise, without any clear policies or procedures within DHS

6   concerning when to release detainees with mental disabilities, such individuals

7   are more likely than others to languish in detention unnecessarily for months or

8   even years.  In some cases where an Immigration Judge recognizes (almost by

9   chance) that a respondent with a mental disability needs assistance, the typical

10  course of action is to delay the proceedings, thereby subjecting the detainee to

11  prolonged incarceration precisely because he or she suffers from a mental

12  disability. *See* HRW Report at 47-49, 72-74 (noting that Immigration Judges are

13  not authorized to release detainees, many of whom are deemed subject to

14  mandatory detention, notwithstanding their serious mental disabilities and the

15  prolonged length of their detention).

16  31.     The Government's inability to implement even the most basic procedural

17  protections for detained individuals with mental disabilities in immigration

18  proceedings has had drastic human consequences on the named Plaintiffs, as their

19  individual cases make clear:

20  ***Jose Antonio Franco-Gonzalez***

21  32.     Mr. Franco is a 31-year-old native and citizen of Mexico.  He is the son of

22  Maria and Francisco Franco, both Lawful Permanent Residents of the United

23  States. Mr. Franco is one of twelve siblings, eleven of whom live in the United

24  States. Mr. Franco and all of his siblings who reside in the United States have, or

25  are in the process of obtaining, legal status.  Mr. Franco's three eldest brothers

26  are United States citizens.  Two of his sisters are Lawful Permanent Residents.

27  Mr. Franco and five of his siblings have approved family petitions that will

28  ultimately permit them to adjust to Lawful Permanent Resident status.

13

33.     Mr. Franco has been diagnosed with moderate mental retardation, a condition generally characterized by an IQ level of between 35 and 55. *See Diagnostic and Statistical Manual of Mental Disorders,* 4th Edition (DSM-IV). He did not learn to speak at all until he was six or seven years old. He does not know his own birthday or age. He has trouble recognizing numbers and counting. He cannot tell time. Mr. Franco functions at the cognitive level of a child, by some measures a two-year-old.

34.     In April 2005, the Government transferred Mr. Franco from criminal to immigration custody after he pled guilty to a charge of assault with a deadly weapon (non-firearm). The Government then commenced removal proceedings against Mr. Franco. During these proceedings, Mr. Franco was unrepresented by counsel.

35.     On May 23, 2005, pursuant to an Immigration Judge's request, a psychiatrist evaluated Mr. Franco. The psychiatrist determined that Mr. Franco "had no clue as to what type of court [the Immigration Judge] presided over, what the possible outcomes might be, or how to defend himself at trial. Diagnostically, he has a Severe Cognitive Disturbance, probably life-long, secondary to development disability. In view of this, it is impossible for him to stand trial." On June 6, 2005, an Immigration Judge ordered the administrative closure of Mr. Franco's removal proceedings, citing his incompetence.

36.     Mr. Franco, however, was not released from immigration custody. Despite the fact that there were no open removal proceedings against him, Mr. Franco remained incarcerated for approximately four and a half years. During that entire period, Mr. Franco never had a hearing to determine whether his lengthy detention was justified or at all appropriate.

37.     Finally, on December 29, 2009, the Government moved to re-calendar Mr. Franco's removal proceedings. In its motion, the Government provided no

14

1　explanation whatsoever for its extraordinarily lengthy delay in addressing Mr.

2　Franco's removal proceedings.

3　38.　While Mr. Franco is currently represented in his removal proceedings by

4　undersigned counsel from Public Counsel, Mr. Franco was not represented for the

5　first four and a half years of his immigration case.

6　39.　On March 26, 2010, Mr. Franco filed the original action in this case. *See*

7　Original Complaint, CV 10-02211 DMG (DTB).　On March 31, 2010, three

8　business days later, DHS released Mr. Franco subject to a number of conditions.

9　Should Mr. Franco violate any of these provisions, or should he lose on the

10　merits of his removal case, he will again be subject to detention.

11　40.　Mr. Franco's case is currently pending before the Los Angeles

12　Immigration Court.

13　***Ever Francisco Martinez-Rivas***

14　41.　Mr. Martinez is a 32-year-old Lawful Permanent Resident of the United

15　States.　Originally from El Salvador, three generations of Mr. Martinez's family

16　now lawfully reside in the United States.　Mr. Martinez's grandmother, Ana

17　Martinez, became a Lawful Permanent Resident of the United States almost ten

18　years ago; his mother, Maria Elena Felipe ("Ms. Felipe"), became a Lawful

19　Permanent Resident four years ago; Mr. Martinez himself has been a Lawful

20　Permanent Resident since July 24, 2006.

21　42.　Mr. Martinez has been diagnosed with schizophrenia, with symptoms

22　including hallucinations, disorganized speech and behavior, and flat or

23　inappropriate affect.　Mr. Martinez's illness prevents him from conceptualizing

24　ideas or verbally articulating them in a way that would allow him to defend

25　himself in immigration proceedings.　Accordingly, he is not competent to

26　represent himself.

27　43.　Mr. Martinez has a lengthy history of mental illness.　At the age of 21, Mr.

28　Martinez was admitted to the psychiatric ward at Cedars Sinai Medical Center

1   after he arrived at the emergency room in a "catatonic state" and was determined

2   by a physician to be "a gravely disabled person." For the next six years, Mr.

3   Martinez remained at various mental health facilities because he was unable to

4   care for himself and lacked the capacity to "knowingly and intelligently" accept

5   or refuse treatment. During this period, he was hospitalized multiple times.

6   44.    At the end of March 2007, for the first time in over six years, Mr. Martinez

7   returned home to live with his mother, Maria Elena Felipe ("Ms. Felipe"). By

8   that time, Ms. Felipe was living with her new husband, Vicente Felipe Charco.

9   The transition proved to be difficult for Mr. Martinez. In June 2007, Mr.

10  Martinez was arrested after an altercation between the two men. Ms. Felipe

11  explains that Mr. Felipe later took responsibility for initiating the fight while he

12  was drunk. This was Mr. Martinez's first and only violent crime.

13  45.    Initially, the court adjudicating Mr. Martinez's criminal case determined

14  that he was incompetent to stand trial for the offense. After several months of

15  treatment, Mr. Martinez was deemed to have been restored to competence and

16  pled guilty to a felony charge of using force to inflict serious bodily injury.

17  While serving his sentence, Mr. Martinez was placed in the mental health

18  program at California's Solano State Prison.

19  46.    Mr. Martinez was transferred from criminal to immigration custody in

20  approximately November 2009, and is housed at the SDCF in Otay Mesa,

21  California. At the time of his transfer, Mr. Martinez's mental illness was

22  documented in his immigration file. His Form I-213 (Record of

23  Deportable/Inadmissible Alien) states that Mr. Martinez "is schizophrenic and

24  currently is taking medication for said medical condition." Nevertheless, Mr.

25  Martinez appeared alone before the Immigration Court multiple times. His

26  mother, who attended some of these hearings, has explained that Mr. Martinez

27  does not seem to understand the questions he is asked in court and that it takes

28  him a very long time to answer when the judge speaks to him. Although he

16

1  requested continuances in order to try to obtain counsel, Mr. Martinez is indigent

2  and was unable to secure *pro bono* representation.

3  47.    Despite his documented disability and a prior finding of incompetence in

4  criminal court, the Immigration Court did not order (and DHS did not seek) an

5  evaluation of Mr. Martinez's competence. Nor did the court appoint counsel to

6  assist him. Rather, until the filing of this lawsuit, the Immigration Judge insisted

7  that Mr. Martinez move forward with the case on his own.

8  48.    On August 16, 2010, Mr. Martinez filed a preliminary injunction in this

9  Court seeking appointment of counsel in his immigration proceedings.[6] In

10  response, DHS notified the Immigration Judge that Mr. Martinez was a

11  prospective plaintiff in this lawsuit and provided the Immigration Judge with a

12  copy of a psychiatric evaluation, conducted at the request of undersigned counsel,

13  concluding that Mr. Martinez "is clearly not competent to represent himself. His

14  illness precludes a capacity to conceptualize ideas and verbally advocate a

15  defense in his removal proceedings." On September 16, 2010, the Immigration

16  Judge issued a written order terminating Mr. Martinez's removal proceedings

17  because of his inability to represent himself. The Immigration Judge then

18  certified her decision for appellate review; as a result, Mr. Martinez's removal

19  case is currently pending before the BIA.

20  49.    In light of concerns about Mr. Martinez's prolonged detention and inability

21  to represent himself on appeal before the BIA, counsel in this lawsuit filed a

22  preliminary injunction and temporary restraining order on November 15, 2011,

23  seeking appointment of counsel and a custody hearing for Mr. Martinez. On

24  December 27, 2010, this Court granted the preliminary injunction in part, finding

25  that the Government must provide Mr. Martinez with a custody hearing and a

26  

27  [6] On August 19, 2010, this Court denied without prejudice Mr. Martinez's motion for a preliminary injunction as premature because he had not yet been added as a

28  plaintiff to the present action.

17

1   "qualified representative" to represent Mr. Martinez in the entirety of his

2   immigration proceedings.  Pursuant to this Court's order, the Government located

3   counsel for both Mr. Martinez's bond hearing and his appeal to the BIA.

4   50.     But for the preliminary injunction, Mr. Martinez would remain

5   unrepresented on appeal.  With legal representation, counsel will now be able to

6   assist Mr. Martinez in demonstrating why the Immigration Judge properly

7   terminated proceedings against him.  Similarly, with legal assistance, Mr.

8   Martinez was able to demonstrate that his ongoing detention is not justified.  On

9   January 26, 2011, an IJ ordered that Mr. Martinez be released on $1,500.00 bond

10  as soon as he secures placement in a mental health facility.  On April 14, 2011—

11  approximately 17 months after first entering detention—Mr. Martinez was

12  released and transferred to a mental health hospital close to his mother.  His case

13  remains pending before the BIA.

14  ***Aleksandr Petrovich Khukhryanskiy***

15  51.     Mr. Khukhryanskiy is a 45-year-old refugee, originally from Ukraine.  Mr.

16  Khukhryanskiy was admitted to the United States as a refugee on January 9,

17  1998.  He has a 22-year-old son and a 21-year-old son who are both in the

18  process of obtaining Lawful Permanent Resident status.

19  52.     Mr. Khukhryanskiy has a history of psychiatric hospitalization and requires

20  ongoing treatment for his mental health.  He has been diagnosed with paranoid

21  schizophrenia and psychosis (not otherwise specified), along with major

22  depression.  For the past several years, Mr. Khukhryanskiy has been receiving

23  mental health treatment after being involuntarily placed at Adventist Mental

24  Health Services in 2004 through a mental health commitment hearing.  He suffers

25  from frequent auditory hallucinations that plague him daily and interfere with his

26  cognitive functioning.

27  53.     Mr. Khukhryanskiy has several convictions for driving violations, a 2001

28  conviction for menacing, and a 2005 conviction for attempted assault and

18

1    robbery.  Mr. Khukhryanskiy's convictions appear to arise from his paranoid

2    belief that others are intentionally trying to harm him and his lack of stable

3    mental health treatment.  In unfamiliar surroundings and without language

4    interpretation, Mr. Khukhryanskiy appears irritable and combative, but with

5    proper treatment his mental health care providers have noted that his affect

6    brightens and that he exhibits no dangerous or threatening behavior.

7    54.     On April 15, 2010, Mr. Khukhryanskiy was taken into DHS custody and

8    detained at the Northwest Detention Center in Tacoma, Washington.  DHS

9    initiated removal proceedings against him, charging him as deportable for having

10   been convicted of an aggravated felony based on his 2005 conviction.

11   55.     DHS has acknowledged Mr. Khukhryanskiy's mental health issues in the

12   charging documents issued against him.  His Form I-213 states that he has been

13   diagnosed by Snake River Correctional Institution ("SCRI") as a paranoid

14   schizophrenic and notes that he has been subjected to involuntary haldol

15   decanoate injections, as well as cogentin twice daily.  Nonetheless, the

16   Immigration Judge did not order (and DHS counsel did not request) an evaluation

17   to determine if Mr. Khukhryanskiy is competent to represent himself in

18   immigration proceedings.

19   56.     On August 25, 2010, appearing *pro se*, Mr. Khukhryanskiy was ordered

20   deported by the Immigration Judge.  The master calendar hearing, originally

21   scheduled for August 30, 2010, was advanced five days without notice to Mr.

22   Khukhryanskiy.  These "master calendar hearings" are for limited procedural

23   matters only – *i.e.*, "pleadings, scheduling, and other similar matters."  *See*

24   Immigration Court Practice Manual § 4.15(a).  At this hearing, however, the

25   Immigration Judge decided to resolve the merits of Mr. Khukhryanskiy's case.

26   57.     At the August 25 hearing, a DHS enforcement and removal officer named

27   Robert Mason — a Government official who makes arrangements for the

28

19

1  deportation of detained individuals — appeared as a "custodian" and

2  representative for Mr. Khukhryanskiy.

3  58.    During the hearing, Mr. Khukhryanskiy stated that he did not understand

4  what was happening during the proceedings—nevertheless, neither the

5  Immigration Judge ordered, nor did his "custodian" request, a competency

6  evaluation at that time.  At no time in the hearing did the Immigration Judge

7  explain that Mr. Khukhyranskiy was eligible to renew his application for

8  adjustment of status for lawful permanent residence, an application that had

9  previously been filed with USCIS.  Nor did the Immigration Judge explain that

10  he may be eligible to apply for asylum, withholding of removal, or relief under

11  the Convention Against Torture.  Upon ordering Mr. Khukhryanskiy deported,

12  the Immigration Judge did not ask Mr. Khukhryanskiy whether he would like to

13  reserve appeal.  Instead she marked down that he had waived his right to appeal.

14  59.    Through the Legal Orientation Program provided by EOIR, Mr.

15  Khukhranskiy received assistance filing a *pro se* appeal to the BIA.  At the same

16  time, upon learning of Mr. Khukhryanskiy's removal order, undersigned counsel

17  from the Northwest Immigrant Rights Project ("NWIRP") submitted a request to

18  participate as amicus to the BIA.

19  60.    Mr. Khukhryanskiy's brief to the BIA was originally due on November 12,

20  2010.  However, after this Court required the Government to ensure that he be

21  afforded counsel, those proceedings were suspended.  Once the Government

22  arranged counsel for Mr. Khukhryanskiy, his appeal resumed.

23  61.    On April 27, 2011, the BIA issued an order vacating the removal order

24  previously entered by the Immigration Judge and remanding the proceedings in

25  order to provide Mr. Khukhryanskiy an opportunity to apply for the relief for

26  which he qualifies.  His case remains pending before the Immigration Judge.

27  62.    Also pursuant to this Court's order, the Government provided a custody

28  hearing, but at the hearing ICE advised the IJ that they were opposed to any

1  release, even to a treatment program, but rather believed that Mr. Khukhryanskiy

2  should be subject to mandatory detention.  Consequently, the IJ set a bond of

3  $30,000, which the indigent Mr. Khukhryanskiy has been unable to post.  As

4  such, he remains subject to detention.

5  63.    But for filing a preliminary injunction and temporary restraining order with

6  this Court on Mr. Khukhryanskiy's behalf, a final order of removal would have

7  been entered against Mr. Khukhryanskiy, as he would have  been unrepresented

8  throughout the removal proceedings.

9  ***Maksim Piotrovich Zhalezny***

10  64.    Mr. Zhalezny is a 20-year-old native and citizen of Belarus.  Mr. Zhalezny

11  won the diversity visa lottery program as a derivative of his parent's application,

12  and arrived in the United States with his family as a Lawful Permanent Resident

13  on January 30, 2007.  His mother, Svetlana Zhaleznya, father, Piotr Zhalezny,

14  and brother, Vladislav Zhalezny, are all Lawful Permanent Residents as well.

15  65.    Mr. Zhalezny appears to have undifferentiated schizophrenia.  He

16  experiences delusions, hallucinations, and negativism.  He is disheveled, with

17  poor grooming and hygiene, and believes that his body is absorbing a light that is

18  killing him.

19  66.    Mr. Zhalezny's mental health problems began to manifest soon after he

20  came to the United States.  He could not speak English and had to drop out of

21  school soon after beginning.  During this time, Mr. Zhalezny started to exhibit

22  bizarre behaviors, such as talking to himself, screaming at night, and drinking

23  water out of a 5-gallon container even though his parents repeatedly gave him a

24  cup.  Mr. Zhalezny would also dress up ten to fifteen times a day, go outside the

25  apartment, smoke a cigarette, and then return and get undressed.  At times, he

26  would spend entire days in bed.  On other occasions, he would not return home

27  during an entire night and later arrive beaten up.

28

67.     From May of 2008 through February of 2010, Mr. Zhalezny was arrested on several occasions for attempting to steal small items from stores such as Rite-Aid, Wal-Mart, and Target.  He was convicted of misdemeanor theft three times, as well as petty theft with priors, misdemeanor assault, second-degree commercial burglary, and disturbing the peace.

68.     Mr. Zhalezny came to the attention of ICE in February of 2010 while being held at the Sacramento County Jail.  At the time, he was booked for petty theft and public drunkenness, though turned over to ICE without prosecution for those charges.  He was instead sentenced to 60 days in custody, apparently for violating probation arising from his August 3, 2009 conviction for petty theft with priors.

69.     Mr. Zhalezny has been in ICE detention at the Sacramento County Jail since approximately April 14, 2010.  The Government charges that Mr. Zhalezny is removable because he has committed two crimes involving moral turpitude.

70.     Since entering ICE custody, Mr. Zhalezny has appeared before an Immigration Judge on several occasions.  Throughout these proceedings, Mr. Zhalezny has exhibited bizarre and inconsistent behavior, including demanding that the lights be turned off in the courtroom because they were "hurting him."  This behavior led the Immigration Judge to inquire about Mr. Zhalezny's ability to understand the proceedings, and then to reach out to the UC Davis Immigration Law Clinic to see if they would be able to provide legal representation for Mr. Zhalezny.  Unfortunately, due to their full caseload, the Clinic was unable to provide such representation.

71.     Mr. Zhalezny's status as an unrepresented detainee with a mental disability caused significant confusion for the Immigration Judge and the DHS attorney.  At one hearing in July of 2010, DHS counsel noted that she did not know what, if any, DHS procedures there were for dealing with issues of mental competency.

1   At another hearing, the Immigration Judge expressed frustration when Mr.

2   Zhalezny's answers to questions did not make sense.

3   72.   On or about September 24, 2010, DHS sent a letter to Mr. Zhalezny's

4   father informing him that the Sacramento County Jail does not conduct

5   competency evaluations and suggesting that the family conduct its own

6   psychiatric evaluation.  While Mr. Zhalezny's father attempted to arrange for a

7   psychiatric evaluation by Blue Cross/ Blue Shield, the Sacramento County Jail

8   refused to allow Mr. Zhalezny to be released from detention for the evaluation.

9   73.   At a master calendar hearing in October of 2010, the IJ found that Mr.

10  Zhalezny was not competent to represent himself due to his mental disability.

11  The IJ then ordered Mr. Zhalezny's father, Piotr, to serve as Maksim's

12  representative, even though he does not speak English and does not believe he is

13  equipped to serve as Mr. Zhalezny's legal representative.

14  74.   Due to concerns about Mr. Zhalezny's mental competency and an inability

15  to know what had transpired in court previously, on November 1, 2010,

16  undersigned counsel from the ACLU of Southern California submitted a friend of

17  the court letter seeking to alert the Immigration Judge to concerns about Mr.

18  Zhalezny's competency to represent himself in removal proceedings.  After

19  taking note of the letter, the Immigration Judge stated that he was required by law

20  to proceed and set the next merits hearing for February 17, 2011.

21  75.   On January 14, 2011, Mr. Zhalezny filed a preliminary injunction with this

22  Court, seeking appointment of counsel and a custody hearing.  The Government

23  then unilaterally continued Mr. Zhalezny's individual hearing after the motion for

24  preliminary injunction was filed on his behalf.

25  76.   On May 4, 2011, the Court granted Mr. Zhalezny's motion for a

26  preliminary injunction, in part.  Pursuant to this Court's order, Mr. Zhalezny

27  received a bond hearing on June 30, 2011, at which he was represented by a pro

28  bono attorney from the UC Davis law clinic.  Through this attorney's assistance,

1   the Immigration Judge agreed to grant a $5,000 bond to Mr. Zhalezny subject to

2   certain conditions.  Mr. Zhalezny has since been released from detention.

3   77.    Mr. Zhalezny remains unrepresented, however, in his removal

4   proceedings.   Unless the Government locates pro bono counsel for him, Mr.

5   Zhalezny will be expected to argue for asylum, present witnesses, and submit

6   documentation supporting his case, despite the fact that he remains unrepresented

7   by counsel in his removal proceedings and does not understand the nature of his

8   case.

9   *Jose Chavez*

10   78.    Mr. Chavez is a 49 year-old native and citizen of El Salvador who came to

11   the United States in 1988 after fleeing the Salvadoran civil war.  The Government

12   has stipulated in a prior case that Mr. Chavez is eligible to apply for asylum and

13   relief under the Nicaraguan Adjustment and Central American Relief Act

14   ("NACARA").

15   79.    Mr. Chavez has been diagnosed with schizoaffective disorder—including a

16   combination of auditory hallucinations, persecutory delusions, suicidal ideations,

17   and depression—as well as chronic paranoid schizophrenia.  He has spent much

18   of the past ten years in and out of psychiatric hospitals.

19   80.    Mr. Chavez was found incompetent to stand trial in a criminal case in

20   August 2001.  At that time, he had two misdemeanor convictions for battery and

21   assault with a deadly instrument (not a firearm).  During his 2001 case, in which

22   Mr. Chavez was charged with unlawfully starting a fire that caused an inhabited

23   structure to burn, the court found him incompetent.  Because he was not

24   competent, Mr. Chavez was placed in treatment for his mental disability for the

25   next three years.  He then pleaded *nolo contendere*.

26   81.    Mr. Chavez was taken into DHS custody on June 23, 2006 and charged

27   with being removable.  He was held in custody at the San Pedro Service

28   Processing Center in San Pedro, California and the SDCF in Otay Mesa,

1  California.  During this detention, Mr. Chavez's mental health suffered so

2  significantly that he required emergency medical assistance on at least three

3  occasions and long-term hospitalization on at least two other occasions.

4  82.    During Mr. Chavez's initial removal proceedings, he was not represented

5  by counsel.  Throughout those hearings, Mr. Chavez experienced auditory

6  hallucinations and delusions.  Nonetheless, an Immigration Judge found him

7  removable and denied his asylum claim, apparently because of the discrepancies

8  between his written and oral statements about his fear of persecution.

9  83.    With the assistance of other detainees, Mr. Chavez attempted to reverse

10  this decision through various avenues.  He first sought to appeal the decision to

11  the BIA on the ground that he was mentally incompetent, filing both a direct

12  appeal and a motion to reopen, apparently with the help of an inmate.  The BIA

13  denied both his appeal and his motion to reopen.  That decision was appealed to

14  the Ninth Circuit.

15  84.    In March of 2008, through the assistance of a *pro bono* attorney working

16  under the supervision of undersigned counsel Mental Health Advocacy Services,

17  Mr. Chavez filed a second motion to reopen arguing that he had been mentally

18  incompetent at the time of his previous removal proceedings and that his

19  statutory and constitutional rights to due process had been violated.  This time,

20  the BIA reached the opposite conclusion and granted Mr. Chavez's motion to

21  reopen because he may not have been mentally competent to waive his right to

22  counsel and proceed *pro se*.

23  85.    On September 18, 2008, an Immigration Judge ordered Mr. Chavez's case

24  to be administratively closed so that he could apply for asylum and other benefits

25  under the agreement set forth in *American Baptist Church* v. *Thornburgh*, 760 F.

26  Supp. 796 (N.D. Cal. 1991) ("ABC").  Because counsel had shown that Mr.

27  Chavez was a member of the *ABC* class, the judge ordered U.S. Citizenship and

28  Immigration Services to adjudicate his applications for relief.  The judge's order

1  stated that the Government could initiate further action against Mr. Chavez by

2  filing a written motion to re-calendar his case.

3  86.    Prior to his relief interview, Mr. Chavez was arrested and charged with

4  arson.  Subsequent to his arrest, Mr. Chavez was committed for mental health

5  treatment at Patton State Hospital, apparently based on a finding that he was not

6  competent to stand trial.  His criminal charges remain pending, as there has yet to

7  be a finding that he is competent.

8  87.    While he remained committed at Patton State Hospital, DHS officials

9  issued a new NTA on June 21, 2010 with a hearing scheduled for July 26, 2010.

10 Mr. Chavez could not attend the hearing, as he remained at Patton State Hospital.

11 Because he is no longer represented, no attorney appeared on his behalf.

12 88.    At the hearing on July 26, 2010, the Government filed a Motion to

13 Terminate the proceedings under the new charging document, claiming that it

14 was "improvidently issued" because "respondent was previously placed in

15 removal proceedings with another NTA issued back on June 17, 2006."

16 Consequently, the Immigration Judge granted the Government's Motion to

17 Terminate, but explicitly did so without prejudice to any proceedings arising

18 from the NTA issued in 2006.

19 89.    On August 12, 2010, DHS Counsel contacted undersigned counsel from

20 the ACLU of Southern California and noted that Mr. Chavez has a right to a

21 review of the denial of his NACARA application before an Immigration Judge

22 and should file a motion to re-calendar when he is released from criminal

23 custody.  However, the ACLU of Southern California does not represent Mr.

24 Chavez in his removal proceedings.

25 90.    Mr. Chavez remains both unable to hire an immigration attorney and

26 unable to obtain *pro bono* representation.  He also remains incompetent to stand

27 criminal trial and also incompetent to represent himself in his immigration case

28

*Yonas Woldemariam*

91.     Mr. Woldemariam is a 48 year-old Lawful Permanent Resident who has been living in the United States for over 32 years. Mr. Woldemariam is ethnically Eritrean, though he was born in Ethiopia at a time when Eritrea was still part of Ethiopia. He arrived in the United States on a non-immigrant visa when he was approximately 16 years old.   Shortly thereafter, Mr. Woldemariam's parents applied for political asylum, which he was granted as a derivative of their application. Mr. Woldemariam subsequently adjusted his status to become a Lawful Permanent Resident in 1983. The rest of his family members—his two parents and five siblings—are now United States citizens.

92.     Mr. Woldemariam has been diagnosed with schizoaffective order, bipolar type. He hears voices that command him to do things. These voices do not go away with medication. While Mr. Woldemariam's mental health problems began in the early 1990s, his symptoms became more severe after his brother was murdered in 1993. After this time, Mr. Woldemariam became very depressed and unable to work. His condition grew even worse when he was the victim of a hit-and-run accident a few years later. Following this accident, Mr. Woldemariam was put on disability and, approximately five years ago, spent a year at the Olive Vista Center, a healthcare center for people with chronic mental illnesses.

93.     During periods of intense depression, anxiety, and psychosis, Mr. Woldemariam would try to avoid his family and ended up living on the streets or being brought to mental institutions. Sometimes he would get arrested for minor crimes, such as shoplifting. For instance, in 2008, when Mr. Woldemariam was not taking his medication, he reported hearing voices telling him to steal clothes from a store. Mr. Woldemariam was then convicted of second-degree robbery. When a store clerk tried to stop him, Mr. Woldemariam attempted to run away, but was overpowered. Mr. Woldemariam was then convicted of second-degree

27

1   robbery and sentenced to two years in prison, in part due to violating probation

2   on a prior petty theft.

3   94.    Mr. Woldemariam was transferred from criminal to immigration custody

4   on or around September 2, 2010 to Yuba County Jail in Yuba County, California.

5   DHS initiated removal proceedings against him, charging him as deportable for

6   having been convicted of an aggravated felony.

7   95.    Mr. Woldemariam appeared *pro se* before an Immigration Judge on two

8   occasions but secured representation before his hearing on November 8, 2010

9   through the assistance of his family.  During his immigration proceedings, Mr.

10  Woldemariam sometimes understands what is happening and sometimes does

11  not.  Recently, the voices in Mr. Woldemariam's head have been telling him that

12  he is worthless, no good, and that he is going to be tortured and die if he is forced

13  to return to Ethiopia or Eritrea.

14  96.    In March 2011, DHS transferred Mr. Woldemariam to the Sacramento

15  County Jail after he refused to take a particular anti-psychotic medication that

16  enhances the voices Mr. Woldemariam hears and irritates his prostate, making it

17  extremely difficult for him to urinate.  Mr. Woldemariam suffered even more

18  significant harm from detention in the Sacramento County Jail, because that

19  facility keeps at least some of its inmates on lockdown for 23 hours of the day

20  and limits detainees' ability to make phone calls.  This kind of physical

21  restriction was extremely detrimental to Mr. Woldemariam, as he needs to be

22  able to move around in order to keep the voices in his head at bay, and his

23  condition only becomes worse when he is under stress and unable to

24  communicate with his family.

25  97.    Mr. Woldemariam's immigration attorney sought a bond hearing on June

26  7, 2011 on the grounds that his detention had become prolonged, but that request

27  was denied on June 20, 2011.

28

98.     Plaintiffs filed a motion for preliminary injunction on Mr. Woldemariam's
behalf on June 13, 2011.  The motion sought a bond hearing for Mr.
Woldemariam at which the Government must bear the burden of demonstrating
that his prolonged detention was justified.

99.     On August 23, 2011 the Court granted the motion for preliminary
injunction and ordered the Government to provide Mr. Woldemariam with a bond
hearing.  On October 4, 2011, pursuant to that order, an Immigration Judge held a
hearing and ordered Mr. Woldemariam released on bond and conditions requiring
that he submit a mental treatment plan.  He was released shortly thereafter, and is
currently living with his family in Southern California.

*Jose Antonio Moreno Vasquez*

100.     Mr. Moreno is allegedly a 55 year-old native and citizen of Mexico with
mental disabilities.  Mr. Moreno's father was a United States citizen by birth, and
he has two brothers who naturalized to become United States citizens.  Upon
information and belief, in 1981 Mr. Moreno married Susanna Johnson, also a
United States citizen, and had six children with her, all of whom are also United
States citizens.  In or around 1985, Mr. Moreno's wife filed an I-130 petition on
Mr. Moreno's behalf.  He has been living in the United States for over 33 years
and knows no one in Mexico.

101.     Mr. Moreno has been diagnosed with schizophrenia, multiple personality
disorder, and possibly bipolar disorder, and was receiving Seroquel for his
symptoms while detained.  Despite the medication, he experiences auditory,
visual, and sensory hallucinations.  He also experiences persecutory and
grandiose delusions, such as believing that he has a divine connection to God,
that he is being persecuted for his desire to bring peace to the land, and that he
will some day be a leader of great nations and rule from the White House.  He
frequently launches into speeches exclaiming, "Justice will prevail!" and "the
Captain must be free!"   Mr. Moreno also states that sometimes he does things

29

1  that he cannot control, such as exposing himself in public or speaking through the

2  voice of a young girl.

3  102.   Mr. Moreno reports that he began to develop mental health problems after

4  Child Protective Services removed his children from his care.  For the next 16

5  years, he was homeless.  He was admitted to psychiatric hospitals involuntarily

6  pursuant to California Welfare and Institutions Code 5150 on at least four

7  occasions, and spent time at mental health facilities in San Bernardino,

8  Victorville, Arrowhead, and Colton.

9  103.   In 2002, Mr. Moreno was convicted of second-degree burglary and petty

10  theft with a prior after stealing a pair of scissors from a Rite Aid, which he

11  immediately returned.  He was sentenced to 207 days in jail.  In 2009, Mr.

12  Moreno was arrested by DHS following a raid on a factory in which he was

13  working.  He was first detained at the Otero Detention Center in New Mexico and

14  represented by an attorney at the Diocesan Migrant and Refugee Services, Inc.

15  104.   On February 25, 2010, DHS served Mr. Moreno with a Notice to Appear,

16  alleging that he is deportable because he entered the United States without

17  inspection and was not thereafter admitted or paroled.  On September 3, 2010, the

18  Immigration Court in El Paso, Texas granted his attorney's Motion to Change

19  Venue to Los Angeles, based apparently on the attorney's desire to bring him

20  closer to his family and thereby permit greater investigation of his possible U.S.

21  citizenship.  Mr. Moreno was then transferred to the Mira Loma Detention

22  Facility in Lancaster, California, and then to the Santa Ana City Jail.  On January

23  3, 2010, Mr. Moreno's counsel filed a motion for a telephonic hearing with the

24  Immigration Judge, noting that Mr. Moreno has a serious mental health

25  condition, that the Government has failed to prove alienage, that the attorney was

26  no longer able to represent Mr. Moreno in light of the changed venue, and that

27  Mr. Moreno was unable to secure independent counsel on account of his mental

28  disability.  Despite raising issues of mental competency to the Court, the IJ does

30

1    not seem to have scheduled a competency evaluation to assess Mr. Moreno's

2    ability to represent himself.

3    105.   Mr. Moreno was scheduled for an individual hearing on March 7, 2011, at

4    which he was to present his claims for relief despite his inability to understand

5    the nature of the immigration proceedings.  Prior to the hearing, counsel in this

6    lawsuit learned of Mr. Moreno's condition and submitted a Friend of the Court

7    letter alerting the IJ to the fact that Mr. Moreno is unrepresented and has a serious

8    mental health condition that may render him unable to represent himself.

9    106.   Subsequently, the IJ re-calendared Mr. Moreno's case for a new master

10   calendar hearing, which was set for March 30, 2011.  At the hearing on March

11   30, the IJ asked DHS whether they had conducted a competency evaluation of

12   Mr. Moreno.  DHS stated that they would have a completed evaluation by April

13   2, 2011.  At that point, Mr. Moreno started to yell, claiming that the government

14   would fall, that his family had been adopted without his consent, that the

15   government was after his assets, and that he would one day be king.  The IJ then

16   set another hearing for April 7, 2011.

17   107.   On April 7, 2011, DHS submitted a competency evaluation to the IJ which

18   noted that Mr. Moreno has a mental illness and that certain psychological tests

19   could not be completed because of Mr. Moreno's active hallucinations and lack

20   of concentration.  The evaluation also indicated that Mr. Moreno was confused

21   about the nature of his immigration proceedings and did not feel as though he

22   could represent himself in court.  Nevertheless, the psychologist concluded that

23   Mr. Moreno would be competent to assist counsel in preparing his case.

24   However, the evaluation provides no assessment, or even discussion, of Mr.

25   Moreno's competence to represent himself in his removal proceedings.

26   108.   On April 20, 2011, Mr. Moreno appeared unrepresented before the

27   immigration court at his removal hearing.  The Immigration Judge granted

28   withholding of removal apparently based on the likelihood that Mr. Moreno

1  would suffer persecution on account of his mental disability.  The Government

2  timely appealed that decision. Mr. Moreno had no counsel on appeal to the Board

3  of Immigration Appeals.

4  109.  On June 13, 2011, Plaintiffs filed a motion for preliminary injunction on

5  Mr. Moreno's behalf.  The motion sought appointed representation for Mr.

6  Moreno at his immigration proceedings - both with respect to his merits hearings

7  and bond proceedings.

8  110.  On June 30, 2011, the Board of Immigration Appeals remanded Mr.

9  Moreno's removal case back to the Immigration Judge on the ground that the

10  record was incomplete due to some missing transcription.  On July 20, 2011, Mr.

11  Moreno again appeared without counsel before the immigration court.  However,

12  the Immigration Judge apparently found the missing audio, and on August 2,

13  2011 reinstated her prior decision granting withholding of removal.  The case was

14  then returned to the BIA, apparently pursuant to the Government's prior appeal.

15  111.  In September 2011, after Mr. Moreno had been detained for nearly 18

16  months and after argument on the motion for preliminary injunction filed on his

17  behalf, the Government located pro bono counsel to assist him in his appeal.  The

18  Court then dismissed the motion for preliminary injunction without prejudice.

19  Mr. Moreno's brief is now due to the Board of Immigration Appeals on

20  November 15, 2011.

21  112.  Mr. Moreno's bond proceedings have been equally complex.  On or around

22  June 15 or 16, 2011, the Government secured pro bono counsel Antonio Bugge

23  for Mr. Moreno's bond proceedings.  Mr. Bugge, who was located in Florida and,

24  upon information and belief, did not meet or speak with Mr. Moreno, then

25  requested a bond hearing on his behalf.  Counsel did not argue that the

26  Government should bear the burden of proof at that hearing, or that it should

27  otherwise comply with the requirements for prolonged detention hearings in the

28  Ninth Circuit.

32

113.   The Government arranged for Mr. Bugge to appear telephonically at the bond hearing.  On July 7, 2011, Mr. Bugge purported to represent Mr. Moreno at a bond hearing, although Mr. Moreno referred to Mr. Bugge as a "friend of the Court" at that hearing.  The Immigration Judge set a $5,000 bond - an amount that Mr. Moreno's family struggled to pay.  In August 2011, Mr. Moreno's family secured the required funds and, after nearly 18 months of detention, Mr. Moreno was released on bond.

114.   But for the filing of a preliminary injunction on his behalf, Mr. Moreno would not have been afforded a bond hearing and would remain unrepresented on appeal.  With legal representation, Mr. Moreno was able to secure a bond and release from nearly 18 months of detention.  Similarly, Mr. Moreno will now have an attorney to assist him before the Board of Immigration Appeals.  That attorney can investigate the facts of Mr. Moreno's case to determine whether he is a United States citizen by virtue of his father, whether he has an approved I-130 application through his marriage to a United States citizen, and defend the Immigration Judge's grant of withholding of removal.

### *Juan Carlos Sepulveda-Perez*

115.   Mr. Sepulveda is a 53-year-old Lawful Permanent Resident of the United States.  Originally from the Dominican Republic, Mr. Sepulveda entered the United States on an immigrant visa in 1974.  All of his living siblings are either Lawful Permanent Residents or U.S. Citizens.  He also has two U.S. Citizen daughters.  Except for a brief trip abroad for about one month in 1985, he has not left the United States in the nearly forty years since his arrival.  He has no remaining connection to his country of birth and there is nobody there to care for him.  He is terrified of being deported there.

116.   Mr. Sepulveda used to work, but has been unable to do so since his mental illness worsened in recent years.  Since 2006, Mr. Sepulveda has been hospitalized for psychiatric treatment on several occasions.  For example, during

33

1   his first hospitalization, he was admitted for acute inpatient treatment on the

2   finding that he was a "danger to self" and was "gravely disabled." Among Mr.

3   Sepulveda's recurrent symptoms are what a psychiatrist called "persecutory

4   command auditory hallucinations" – voices telling him to harm himself.

5   117.  In 2008, DHS detained Mr. Sepulveda and initiated removal proceedings

6   based on criminal convictions that he incurred during a period when he was

7   frequently homeless and sometimes used illicit drugs to try to control the voices

8   in his head.  DHS health care staff at the detention center diagnosed Mr.

9   Sepulveda as suffering from "schizophrenic disorders" and prescribed several

10  anti-psychotic drugs for him to take.

11  118.  Mr. Sepulveda was represented by counsel in those proceedings.  His

12  counsel obtained an independent psychiatric evaluation of Mr. Sepulveda, which

13  diagnosed Mr. Sepulveda with schizoaffective disorder.  The evaluation

14  concluded that he was able to "rationally consult with and aid his counsel," but

15  that without treatment, he would likely become severely delusional, be unable to

16  communicate clearly or make rational decisions rationally, and would hurt

17  himself by acting on his command auditory hallucinations.

18  119.  That evaluation also determined that Mr. Sepulveda would not be able to

19  represent himself *pro se*, noting that Mr. Sepulveda did not understand why he

20  had to go to immigration court, why he was in immigration detention, what a

21  prosecutor was, or that there was a lawyer representing the Government.  It also

22  noted that his "concrete and simple thinking" made it unlikely that he could

23  "organize a defense on his behalf."

24  120.  In May 2009, an IJ granted Mr. Sepulveda's application for cancellation of

25  removal.  After Mr. Sepulveda's release from DHS custody, he obtained a

26  placement in a Board and Care facility for individuals in need of intensive mental

27  health services.

28

34

121. On March 29, 2011, Mr. Sepulveda pled no contest to possession of methamphetamine and drug paraphernalia. He served a brief jail sentence and was transferred once again to DHS custody.

122. DHS initiated the current proceedings against Mr. Sepulveda in approximately May 2011. On May 16, 2011 an ICE detention officer appeared at Mr. Sepulveda's master calendar hearing and told the IJ that he was a schizophrenic and was "a little off." Mr. Sepulveda then repeatedly told the IJ that he was being held in a cell where he was hearing lots of voices telling him to kill himself, was left without clothes, and was cold. The IJ asked Mr. Sepulveda whether he had been able to contact any family members to assist him. Mr. Sepulveda explained that he was not allowed to make any calls from his cell and that he did not have any money to make phone calls. At the end of the hearing, the IJ asked the DHS prosecutor to try to contact Mr. Sepulveda's public defenders and prior immigration attorney and ask them how to get in touch with Mr. Sepulveda's relatives. The IJ said he wanted to find Mr. Sepulveda's daughters and expressed concern at what would happen if they weren't willing to help.

123. Mr. Sepulveda's subsequent hearings were similarly marked by confusion. He was never able to secure a lawyer or to contact his family. At one point, Mr. Sepulveda explained to the IJ that he believed his former lawyer still represented him. At another, he asked the IJ who in the room was "against him." When the IJ asked him if he understood why ICE was trying to deport him, he responded, "I don't understand anything. I already complied with ICE's sentence." On the day of his final hearing, Mr. Sepulveda told the judge: "I feel dizzy," "my mind hurts," and "I feel crazy. They took me to a mental hospital. I see things swirling around me."

124. At a June 23 hearing, despite Mr. Sepulveda's mental infirmity and fear of return to the Dominican Republic, the IJ ordered him removed without providing

35

1   him an opportunity to apply for asylum, withholding of removal, or relief under

2   the Convention Against Torture. The IJ reserved appeal on Mr. Sepulveda's

3   behalf. At the close of the hearing, Mr. Sepulveda turned to the interpreter and

4   said, "I didn't understand anything." Mr. Sepulveda later confirmed that he did

5   not understand how to appeal his case, despite his fear of return to the Dominican

6   Republic and his desire to remain in the United States.

7   125.   In order to prevent Mr. Sepulveda's imminent removal, Plaintiffs' counsel

8   assisted him in preparing a *pro se* notice of appeal to the Board of Immigration

9   Appeals. In a notice dated September 9, 2011, the BIA remanded Mr.

10  Sepulveda's case to the IJ because "indiscernible notations" rendered the IJ's oral

11  decision "incomplete." The BIA instructed the IJ to "ensure preparation of a

12  complete transcript of the proceedings, including a new hearing if necessary."

13  126.   Mr. Sepulveda has remained detained, severely mentally impaired, and

14  without legal representation for nearly six months, during which time his mental

15  health has deteriorated. He is currently being held in an isolation cell and reports

16  that although the amount of psychiatric medication he is taking has increased, he

17  continues to hear voices that tell him to kill himself. If he had an attorney, Mr.

18  Sepulveda could pursue an application for asylum, withholding of removal, and

19  relief under the Convention Against Torture based on his fear of return to the

20  Dominican Republic. He also could likely pursue some form of humanitarian

21  relief before DHS given his long-time legal residence in this country and his

22  serious mental illness. Mr. Sepulveda's next master calendar hearing is set for

23  October 20, 2011.

24                        **LEGAL BACKGROUND & CLAIMS**

25                        ***The Current Regulatory Framework***

26  127.   The Immigration and Nationality Act ("INA") and corresponding

27  regulations require that all persons in Immigration Court have a "reasonable

28  opportunity" to present, examine and object to evidence. 8 U.S.C.

1   § 1229a(b)(4)(B); 8 C.F.R. § 1240.10(a)(4). In addition, all persons in removal

2   proceedings have the right to be advised of the charges against them, 8 U.S.C.

3   § 1229(a); 8 C.F.R. § 239.1, and the "privilege of being represented, at no

4   expense to the Government, by counsel of the alien's choosing." 8 U.S.C.

5   § 1229a(b)(4)(A); 8 C.F.R. § 1240.10 (a)(1); 8 C.F.R. § 238.1(b)(2).

6   128. The INA also requires the Attorney General to provide procedural

7   "safeguards" for people in removal proceedings who are incompetent due to

8   serious mental disability and who are not "present" at their proceedings. *See* 8

9   U.S.C. § 1229a(b)(3). But the Attorney General's minimal regulations dealing

10   with persons who have mental disabilities do nothing to provide these

11   "safeguards." The only such regulations are:

12   8 C.F.R. § 1240.10(c), which prohibits Immigration Judges from accepting

13   admissions by unrepresented, incompetent persons, but allows admissions by

14   friends or relatives of the person and allows DHS to prove removability without

15   involvement of the incompetent person;

16   8 C.F.R. § 103.5a(c)(2), which requires DHS to serve charging documents upon a

17   known mentally incompetent person by service upon the custodian of the facility

18   where the person is housed and, if possible, "the near relative, guardian,

19   committee, or friend;" and

20   8 C.F.R. § 1240.4, which allows a mentally incompetent person to be represented

21   by a guardian, near relative, friend, or the custodian of the facility where the

22   person is housed.

23   Far from providing "safeguards" to protect the rights of incompetent persons,

24   these regulations merely make it easier to facilitate their removal.

25   129. Most shockingly, none of these regulations—nor any other rules,

26   regulations, policies or procedures adopted by the Attorney General, DHS, ICE

27   or EOIR—defines mental incompetence, requires a review of readily available

28   information to determine if the detainee has a serious mental disability, sets forth

37

1  procedures for determining whether any given person lacks competence to

2  represent himself or herself, or states what, if any, additional safeguards should

3  be provided to a non-citizen found to be incompetent. The regulations also make

4  no provision for appointment of counsel in cases where individuals are not

5  competent to represent themselves, and make no provision for altering the

6  custody status of individuals whose cases have been delayed or stopped

7  indefinitely due to their mental disability.

8  ***The Government's Refusal to Systemically Address this Critical Problem***

9  130.   While the Attorney General's delegate, EOIR, has acknowledged the

10  absence of needed procedures concerning treatment of people with mental

11  disabilities in the detention and removal system, the Attorney General, Secretary

12  of Homeland Security and corresponding agencies have failed to take measures to

13  ensure fair procedures for this vulnerable population.

14  131.   In February of 2009, Congress explicitly directed EOIR to "develop[ ]

15  standards and materials for immigration judges to use in conducting competency

16  evaluations of persons appearing before the courts." 155 Cong. Rec. H1762

17  (Feb. 23, 2009) (citing a now binding explanatory statement in Comm. on

18  Appropriations, 111th Cong., Omnibus Appropriations Act 2009, Legislative

19  Text and Explanatory Statement, H.R. 1105, P.L. 111-8, at 175 (Comm. Print

20  2009). To this day, no such materials seemingly exist.[7]

21

22  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
[7] In 2010, Congress renewed this commitment to ensuring competency procedures
in immigration court, stating "EOIR is directed to report to the House and Senate
Committees on Appropriations within 30 days of the enactment of this Act on the
status of its efforts to develop this competency bench book. The report should also
address the steps DOJ has taken to provide safeguards for the rights of aliens
judged to be mentally incompetent, as required by 8 U.S.C. 1229a(b)(3)." H.R.
111-149. The report EOIR submitted in May 2010 confirmed that no definition of
competency or procedure for obtaining an evaluation has yet been enacted:
"Immigration law has never defined competency or established a legal framework
for making competency determinations. The safeguards in the regulations presume
that a finding of incompetency has already been made. Yet, no authority provides
when or how an immigration judge should make a competency finding."
Executive Office of Immigration Review, *Competency Standards Report* (2010) at
2.

132.   In April of 2009, the EOIR published an article by Immigration Judge Mimi E. Tsankov, in the Government's *Immigration Law Advisor*, highlighting the lack of guidance for Immigration Judges faced with respondents who are not competent to represent themselves.   Mimi E. Tsankov, *Incompetent Respondents in Removal Proceedings*, 3 Immigration Law Advisor 1, 17 (2009) (noting the "limited regulatory framework").   Earlier this year, the EOIR added a chapter to the *Immigration Judge Benchbook* acknowledging the current lack of procedures for identifying and evaluating mental health claims, and the lack of guidelines for providing appropriate safeguards, including the appointment of counsel.   EOIR, *Immigration Judge Benchbook*, http://www.justice.gov/eoir/vll/benchbook/tools/MHI/index.html.

133.   In July of 2009, a group of 60 advocacy organizations and 11 individuals sent a detailed letter to the Attorney General setting forth the problems facing persons with mental disabilities in immigration proceedings and requesting that the Attorney General utilize his statutory authority to "prescribe safeguards to protect the rights and privileges" of persons whose incompetency prevents them from being present at their hearings, in particular by providing for a right to appointed counsel.   *See* Letter to the Honorable Eric H. Holder, Jr., Attorney General of the United States, U.S. Department of Justice regarding non-citizens with mental disabilities, July 24, 2009, *available at* http://www.caircoalition.org/wp-content/uploads//2009/09/July-24-Holder-Letter-final-sent-to-AG-7-24-09.pdf.   Nonetheless, the Attorney General has failed to provide any further safeguards.

### Legal Background and Claims

134.   Plaintiffs and the proposed class raise both statutory and constitutional challenges to the Government's failure to adopt procedures to deal with the needs of people with mental disabilities in immigration proceedings.   Specifically, they contend that federal statutory law as well as the Constitution require the

1    Government to (1) conduct adequate competency evaluations for all those whom

2    the Government knows or should know may be incompetent to represent

3    themselves, (2) appoint counsel for those found in need of counsel as a result of

4    the evaluations, and (3) conduct custody hearings for those who face prolonged

5    detention as a result of the delays caused by their mental disability.

6    135.   Both the statute mandating that the Attorney General provide individuals

7    with "safeguards to protect [their] rights and privileges" and the Constitution

8    require—as a first step—that people with a serious mental disorder or defect

9    receive an adequate competency evaluation. For an evaluation to be "adequate,"

10   it must at a minimum have procedures which screen all individuals with a serious

11   mental disorder or defect and ultimately provide independent assessments to

12   those individuals, identified by the screen or otherwise, as likely to be

13   incompetent. The assessment must be conducted by an independent clinician

14   with a license or certification in psychiatry or psychology. The assessment must

15   ultimately be considered by the Immigration Judge at the time of the detainee's

16   immigration proceedings.

17   136.   The Supreme Court held more than a century ago that non-citizens present

18   in the United States could not be removed without a hearing. *See Yamataya v.*

19   *Fisher (The Japanese Immigration Case)*, 189 U.S. 86, 100-101 (1903). Subject

20   to certain limitations not relevant to this lawsuit, the Due Process Clause

21   continues to require "a full and fair hearing of [their] claims and a reasonable

22   opportunity to present evidence on [their] behalf." *Cinapian v. Holder,* 567 F.3d

23   1067, 1073 (9th Cir. 2009). Without an initial competency evaluation, the

24   promise of a "full and fair" hearing for people with serious mental disabilities is

25   an empty one.

26   137.   For those detained individuals who are in fact not mentally competent to

27   represent themselves in immigration proceedings, federal statutes and the

28

40

1  Constitution also require the appointment of counsel if no counsel is otherwise
2  available to represent them.

3  138.  Section 504 of the Rehabilitation Act and its implementing regulations
4  require the appointment of counsel as a reasonable accommodation for
5  individuals with mental disabilities who are discriminated against in their access
6  to immigration court services.  EOIR's failure to create procedural protections for
7  unrepresented, mentally incompetent detainees in immigration proceedings
8  precludes those with mental disabilities from receiving fair hearings in a number
9  of ways.  Absent counsel, such detainees are unable to understand and participate
10  meaningfully in the adversarial process.  They are far less likely to contest the
11  charges of removability, and where found removable, less likely to demonstrate
12  eligibility for applications for relief.  In addition, the Attorney General's
13  regulations allow a system to exist with lower standards for the representation of
14  an incompetent individual, allowing untrained representatives with potential and
15  unexamined conflicts of interest to waive non-citizens' fundamental rights
16  without their consent or even comprehension.  Where such representatives are
17  unavailable, the current system permits Immigration Judges to delay or close
18  cases for an indefinite time, thereby resulting in indefinite detention.  Given the
19  many ways individuals with mental disabilities are excluded from accessing
20  justice within the Immigration Courts, EOIR has a duty to accommodate the
21  special needs of people with mental disabilities, just as it does individuals with
22  physical disabilities.

23  139.  The Due Process Clause also requires the appointment of counsel for
24  people not competent to represent themselves in immigration proceedings.
25  Without the assistance of legal counsel, individuals who are both unrepresented
26  and not mentally competent cannot understand the proceedings against them and
27  obtain a full and fair hearing.  The Supreme Court repeatedly recognized this
28  aspect of Due Process in criminal cases before it recognized the Sixth

1    Amendment right to appointed counsel in the criminal justice system. *Massey v.*
2    *Moore*, 348 U.S. 105, 108 (1954) ("No trial can be fair that leaves the defense to
3    a man who is insane, unaided by counsel, and who by reason of his mental
4    conditions stands helpless and alone before the court."); *Wade v. Mayo*, 334 U.S.
5    672, 684 (1948) (noting that mental incapacity may render individuals incapable
6    of representing themselves, and that in such circumstances "the refusal to appoint
7    counsel is a denial of due process of law under the Fourteenth Amendment.").
8    More recently, several circuit courts have held that the Due Process Clause may
9    in some circumstances require that non-citizens in removal proceedings be
10   afforded appointed counsel.[8]

11   140.   Plaintiffs subject to prolonged detention on account of their disabilities are
12   also entitled to release hearings under Section 504 of the Rehabilitation Act.
13   DHS's application of the existing detention statutes to detainees with serious
14   mental disabilities, coupled with the absence of any meaningful EOIR procedures
15   for dealing with "mental competency," leads to disability discrimination because
16   detainees whose cases have been continued or administratively closed on account
17   of their mental disability are at increased risk of languishing in detention without
18   any opportunity to contest their incarceration.  For these individuals, a reasonable
19   accommodation would be for DHS to allow them to have a hearing concerning
20
21

22   [8]     *See Lin v. Ashcroft*, 377 F.3d 1014, 1033 (9th Cir. 2004) (holding in the
23   context of unaccompanied minors placed in removal proceedings that "[a]bsent a
     minor's knowing, intelligent, and voluntary waiver of the right to counsel, the IJ
     may have to take an affirmative role in securing representation by competent
24   counsel."); *United States v. Torres-Sanchez*, 68 F.3d 227, 230-31 (8th Cir. 1995)
     ("…in some instances, depriving an alien of the right to counsel may rise to [a]
25   due process violation."); *United States v. Campos-Asencio*, 822 F.2d 506, 509 (5th
     Cir. 1987) ("…an alien has a right to counsel if the absence of counsel would
26   violate due process under the fifth amendment."); *Aguiler-Enriquez v. INS*, 516
     F.2d 565, 568 n.3 (6th Cir. 1975) ("…where an unrepresented indigent alien
27   would require counsel to present his position adequately to an immigration judge,
     he must be provided with a lawyer at the Government's expense. Otherwise
28   'fundamental fairness' would be violated.").

1   the appropriateness of their continued detention in light of their mental

2   disabilities.[9]

3   141.   Finally, both relevant statutes and the U.S. Constitution prohibit DHS from

4   subjecting mentally incompetent individuals to prolonged detention without

5   providing a custody hearing to determine if their detention is justified.  Because

6   their mental disabilities and the Government's failure to create a system for

7   dealing with those disabilities result in prolonged detention for many of these

8   individuals, the immigration statutes and the Due Process Clause require that they

9   be provided individualized bond hearings to determine whether or not their

10   ongoing detention is justified.

11                                **CLASS ACTION ALLEGATIONS**

12   142.   Pursuant to Fed. R. Civ. P. 23, Plaintiffs bring this action on behalf of

13   themselves and all other similarly-situated individuals.  Plaintiffs do not seek

14   claims for compensatory relief.  Instead, Plaintiffs seek injunctive relief broadly

15   applicable to members of the Plaintiff Class, Subclass-1 and Subclass-2 as

16   defined below.  The requirements of Rule 23, and in particular Rule 23(b)(2), are

17   met with respect to the classes defined below.

18   143.   The plaintiff-class ("Plaintiff Class") consists of:

19   *All individuals who are or will be in DHS custody for removal proceedings in*

20   *California, Arizona, and Washington who have been identified by or to medical*

21   *personnel, DHS, or an Immigration Judge, as having a serious mental disorder*

22   *or defect that may render them incompetent to represent themselves in detention*

23

24

---

25   [9]   *See, generally, Alexander v. Choate,* 469 U.S. 287, 302 n.21 (1985) (stating
26   that "[t]he regulations implementing Section 504 are consistent with the view that reasonable adjustments in the nature of the benefit must be made to assure
27   meaningful access."); *School Board of Nassau County, Fla. v. Arline,* 480 U.S. 273 (1987) (underscoring the importance of individualized hearings under Section
28   504 of the Rehab Act to determine whether an individual has a qualifying disability and, if so, whether  reasonable accommodations can be made).

1 | *or removal proceedings, and who presently lack counsel in their detention or*

2 | *removal proceedings.*

3 | 144.   In addition, a first sub-class of individuals ("Sub-Class 1") is defined as:

4 | *Individuals in the above-named Plaintiff Class who have a serious mental*

5 | *disorder or defect that renders them incompetent to represent themselves in*

6 | *detention or removal proceedings.*

7 | 145.   Further, a second sub-class of individuals ("Sub-Class 2") is defined as:

8 | *Individuals in the above-named Plaintiff Class who have been detained for more*

9 | *than six months.*

10 | 146.   Each of the Plaintiff Class, Sub-Class 1 and Sub-Class 2 (collectively, the

11 | "Classes") is so numerous that joinder of all members is impracticable.  The

12 | number of individuals in DHS custody who are incompetent to represent

13 | themselves in removal proceedings due to a serious mental disorder or defect is

14 | not known with precision.  It fluctuates continually as DHS takes immigrants into

15 | its custody for removal proceedings.  The size of each of the Classes also varies

16 | as Immigration Courts rule in favor or against removal from the United States.

17 | The number of members of the Classes is believed to be in the hundreds, based

18 | on internal DHS estimates that two to five percent of immigrants in custody have

19 | a serious mental illness.[10]

20 | 147.   Moreover, members of the Classes reside in various DHS detention

21 | facilities across the western United States.  Joinder of the members of the Classes

22 |

23 |

_____

24 | [10] *See Selected responses from ICE to questions posed by The Washington Post regarding the provision of mental health care to immigration detainees*, May

25 | 2008, http://media.washingtonpost.com/wp-srv/nation/specials/immigration/documents/day3_ice_mentalhealth.gif (accessed

26 | May 11, 2010); *see also* Dr. Dora Schriro, Dep't of Homeland Security, Immigration Detention Overview and Recommendations 2 (2009),

27 | http://www.ice.gov/doclib/091005_ice_detention_report-final.pdf (accessed July 30, 2010) (stating that

28 | 378,582 persons were detained by ICE in FY 2008).

1  in one case would create significant challenges to the efficient administration of
2  justice that make the joinder of the members of the Classes impracticable.

3  148. Further, there are questions of law and fact common to the members of the
4  Classes. Common questions of law include but are not limited to the following:

5  a.  Whether it is unlawful to conduct any immigration proceedings for any
6      member of the Plaintiff Class without first evaluating whether that
7      person is competent to represent himself or herself, when there is a
8      bona fide doubt raised regarding his or her competency;

9  b.  Whether the United States Constitution or federal statutory law requires
10     the Government to conduct adequate competency evaluations for all
11     those who may not be competent to represent themselves in
12     immigration proceedings;

13 c.  Whether the United States Constitution or federal statutory law requires
14     the Government to appoint counsel for those found incompetent to
15     represent themselves as a result of the evaluations;

16 d.  Whether the United States Constitution or federal statutory law requires
17     that the Government conduct custody hearings for those who face
18     prolonged detention as a result of the delays caused by their mental
19     disability; and

20 e.  Whether the regulations promulgated by the Attorney General are truly
21     "safeguards" and whether those suffering from a mental disability may
22     receive a fair hearing with those "safeguards."

23 149. The claims of the named Plaintiffs are typical of the claims of the Plaintiff
24 Class. Plaintiffs know of no conflict between their interests and those of the
25 Classes they seek to represent. The members of the Plaintiff Class can be readily
26 identified through notice and discovery. In defending their own rights, the
27 individual Plaintiffs will defend the rights of all proposed Plaintiff Class
28 members. Plaintiffs have retained counsel experienced in class litigation and in

45

1   immigration law to represent them and the Classes for the purpose of this
2   litigation.

3   150.   Defendants have acted, or refused to act, on grounds generally applicable
4   to each member of the Plaintiff Class, insofar as they have failed to provide
5   Plaintiffs and the members of the Classes with an adequate mental competency
6   evaluation utilizing appropriate standards to determine if they are competent to
7   represent themselves, and failed to provide Plaintiffs and members of Sub-Class
8   1 with counsel in the event that the evaluation found a person to be unable to
9   represent himself or herself in removal proceedings.  With respect to Sub-Class 2,
10   Defendants have detained members of that Sub-Class for longer than six months
11   without a custody hearing.

12   151.   A class action is superior to other methods available for the fair and
13   efficient adjudication of this controversy because joinder of all members of the
14   Classes is impracticable.  Further, members of these Classes are unrepresented in
15   these immigration proceedings and, absent the relief sought here, there would be
16   no other way for the Plaintiff Class members to individually redress the wrongs
17   suffered by them.

18                          **FIRST CAUSE OF ACTION**

19                  **Violation of Immigration and Nationality Act**

20   **(Against All Defendants by all Plaintiffs Except Franco and Woldemariam)**

21                  **(Right to an Adequate Competency Evaluation)**

22   152.   Plaintiffs reallege and incorporate by reference each and every allegation
23   contained in the preceding paragraphs as if set forth fully herein.

24   153.   The Immigration and Nationality Act requires that Plaintiffs be afforded
25   adequate evaluations to determine whether they are mentally competent to
26   represent themselves.  8 U.S.C. 1229a(b)(3).

27

28

154.   Plaintiffs and the Plaintiff Classes have suffered and will imminently suffer irreparable injury as a proximate result of this conduct, and are entitled to injunctive relief to avoid that injury.

**SECOND CAUSE OF ACTION**

**<u>Violation of Fifth Amendment Due Process Clause</u>**

**(Against All Defendants by all Plaintiffs Except Franco and Woldemariam)**

**(Right to an Adequate Competency Evaluation)**

155.   Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

156.   The Due Process Clause requires that Plaintiffs be afforded adequate evaluations to determine whether they are mentally competent to represent themselves.

157.   Plaintiffs and the Plaintiff Classes have suffered and will imminently suffer irreparable injury as a proximate cause of this failure to act, and are entitled to injunctive relief to avoid any injury.

**THIRD CAUSE OF ACTION**

**<u>Violation of Immigration and Nationality Act</u>**

**(Against all Defendants by all Plaintiffs Except Franco and Woldemariam)**

**(Right to Appointed Counsel)**

158.   Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

159.   The Immigration and Nationality Act's requirement that all people in removal proceedings be afforded a reasonable opportunity to examine and present evidence and witnesses, *see* 8 U.S.C. 1229a(b)(4)(B), requires that unrepresented individuals who are not mentally competent to represent themselves be afforded appointed counsel in their immigration detention and removal proceedings, if they are unable to secure counsel by other means.

1   160.   Plaintiffs and the Plaintiff Classes have suffered and will imminently suffer

2   irreparable injury as a proximate conduct of this failing and are entitled to

3   injunctive relief to avoid any injury.

4   ## FOURTH CAUSE OF ACTION

5   ## Violation of Section 504 of the Rehabilitation Act

6   **(Against All Defendants by All Plaintiffs Except Franco and Woldemariam)**

7   **(Right to Appointed Counsel)**

8   161.   Plaintiffs reallege and incorporate by reference each and every allegation

9   contained in the preceding paragraphs as if set forth fully herein.

10   162.   Section 504 of the Rehabilitation Act and its implementing regulations

11   require the appointment of counsel as a reasonable accommodation for

12   unrepresented individuals with mental disabilities that render them incompetent

13   to represent themselves in immigration detention and removal proceedings.

14   163.   Plaintiffs and the Plaintiff Classes have suffered and will imminently suffer

15   irreparable injury as a result of this failure to provide accommodations and are

16   entitled to injunctive relief to avoid any injury.

17   ## FIFTH CAUSE OF ACTION

18   ## Violation of Fifth Amendment Due Process

19   **(Against all Defendants by all Plaintiffs Except Franco and Woldemariam)**

20   **(Right to Appointed Counsel)**

21   164.   Plaintiffs reallege and incorporate by reference each and every allegation

22   contained in the preceding paragraphs as if set forth fully herein.

23   165.   The Due Process Clause requires that unrepresented non-citizens who are

24   not mentally competent to represent themselves in immigration detention and

25   removal proceedings be afforded appointed counsel if they are unable to obtain

26   counsel by other means.

27

28

48

166.   Plaintiffs and the Plaintiff Classes have suffered and will imminently suffer irreparable injury by this failure to act and are entitled to injunctive relief to avoid any injury.

## SIXTH CAUSE OF ACTION

### Violation of Immigration and Nationality Act (Right to Release)

### (Against all Defendants by Franco)

167.   Plaintiff-Petitioner Franco realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

168.   Plaintiff-Petitioner Franco is entitled to immediate release from detention because the Government's unreasonable delay in pursuing removal proceedings renders his detention unauthorized by the Immigration and Nationality Act.

## SEVENTH CAUSE OF ACTION

### Violation of Fifth Amendment Due Process

### (Right to Release)

### (Against All Defendants by Franco)

169.   Plaintiff-Petitioner Franco realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

170.   Defendant-Respondents' continued detention of Mr. Franco has become so prolonged that it is no longer reasonably related to its purpose of effecting removal and therefore violates the Due Process Clause of the Fifth Amendment to the U.S. Constitution.

## EIGHTH CAUSE OF ACTION

### Violation of Immigration and Nationality Act

### (Against All Defendants by all Plaintiffs)

### (Right to a Detention Hearing)

171.   Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

172.    Defendants' continued detention of Plaintiffs without a hearing violates the Immigration and Nationality Act, because no immigration detention statute authorizes their detention for a prolonged period of time, absent a hearing where the Government bears the burden to prove that their prolonged detention remains justified in light of their mental disabilities and the attendant delays in their removal proceedings.

173.    Plaintiffs and the Plaintiff Classes have suffered and will imminently suffer irreparable injury as a result of this conduct and are entitled to injunctive relief to avoid that injury.

**NINTH CAUSE OF ACTION**

**Violation of Section 504 of the Rehabilitation Act and**

**Implementing Regulations**

**(Against all Defendants by all Plaintiffs)**

**(Right to a Detention Hearing)**

174.    Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

175.    Section 504 of the Rehabilitation Act and its implementing regulations require the provision of detention hearings where the Government bears the burden to prove that prolonged detention remains justified, notwithstanding Plaintiffs' mental disabilities and attendant delays in removal proceedings, as a reasonable accommodation for detained individuals with mental disabilities who have suffered prolonged detention.

176.    Plaintiffs and the Plaintiff Classes have suffered and will imminently suffer irreparable injury as a result of this failing and are entitled to injunctive relief to avoid any injury.

## TENTH CAUSE OF ACTION

### Violation of Fifth Amendment Due Process

### (Against all Defendants by all Plaintiffs)

### (Right to a Detention Hearing)

177.   Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

178.   Defendants' continued detention of Plaintiffs without a hearing where the Government bears the burden to prove that their prolonged detention remains justified in light of their mental disability and the attendant delays in their removal proceedings violates their right to be free of prolonged non-criminal detention without adequate justification and sufficient procedural safeguards, as guaranteed by the Due Process Clause.

179.   Plaintiffs and the Plaintiff Classes have suffered and will imminently suffer irreparable injury as a right of this failing and are entitled to injunctive relief to avoid any injury.

## ELEVENTH CAUSE OF ACTION

### Violation of the Administrative Procedures Act

### (Against All Defendants by all Plaintiffs)

180.   Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

181.   8 U.S.C. § 1229a(b)(3) of the INA requires Defendants to prescribe safeguards to protect Plaintiffs' rights and privileges in immigration proceedings.

182.   Defendants' continued failure—for an unreasonable period of more than 50 years—to promulgate and implement meaningful regulations in compliance with this Congressional mandate violates the Administrative Procedure Act, 5 U.S.C. § 702, *et seq*.

183.   Plaintiffs and the Plaintiffs Classes have suffered and will imminently suffer irreparable injury as a proximate result of Defendants' failure to act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and Petitioners respectfully request that the Court grant the following relief:

a.      Certify a class pursuant to Federal Rule of Civil Procedure 23 in accordance with the allegations of this Amended Complaint and the forthcoming class certification motion;

b.      Grant preliminary injunctive relief for the named Plaintiffs in accordance with the forthcoming motions for preliminary injunction;

c.      Declare that Defendants' failure to afford Plaintiffs and other class members with adequate competency evaluations, appointed counsel, and detention hearings violates federal statutory and constitutional law;

d.      Order the Government to provide all class members with adequate competency evaluations, to provide qualifying class members with appointed counsel, and to provide qualifying class members with adequate detention hearings;

e.      Alternatively, appoint counsel to represent Plaintiffs and other class members in their immigration proceedings, which includes all proceedings before the Immigration Judge, the BIA, and any petitions for review in the Courts of Appeal, pursuant to the Criminal Justice Act;

f.      Grant such other relief as the Court deems just and equitable, including but not limited to fees under the Rehabilitation Act, Equal Access to Justice Act, and any other applicable statute or regulation.

Respectfully submitted,

ACLU OF SOUTHERN CALIFORNIA

Dated: October 25, 2011        By: _____
                               AHILAN T. ARULANANTHAM
                               Attorney for Plaintiffs-Petitioners

52

1

## PROOF OF SERVICE

2 STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

3     I am employed in the County of Los Angeles, State of California.  I am over

4 the age of 18 and not a party to the within action.  My business address is 1313

5 West Eighth Street, Los Angeles, California 90017. I am employed in the office of

6 a member of the bar of this court at whose direction the service was made.

7     On October 25, 2011, I served the following document:

8 **THIRD AMENDED CLASS-ACTION COMPLAINT FOR DECLARATORY**

9 **AND INJUNCTIVE RELIEF AND PETITION FOR WRIT OF HABEAS**

10 **CORPUS** on the parties in this action by enclosing a true and correct copy of said

11 document in a sealed envelope, addressed as follows:

12 Victor Lawrence
US DOJOffice of Immigration Litigation
13 District Court Section
450 5th Street, NW
14 Room 6052
Washington, DC 20530
15

16     I caused such envelope(s) to be placed in the United States Mail at Los

17 Angeles, California.  I am "readily familiar" with the firm's practice of collection

18 and processing correspondence for mailing.  Under that practice it would be

19 deposited with the US Postal Service on that same day with postage thereon fully

20 prepaid at Los Angeles, California in the ordinary course of business.

21     I also caused said document to be delivered by electronic mail to Mr.

22 Lawrence's email address, Victor.Lawrence@usdoj.gov.

23     I declare under penalty of perjury under the laws of the State of California

24 that the above is true and correct.

25     Executed on October 25, 2011, at Los Angeles, California.

26

27

28                                     Geneva Tien