AHILAN T. ARULANANTHAM (State Bar No. 237841)
aarulanantham@aclu-sc.org
MARISOL ORIHUELA (State Bar No. 261375)
morihuela@aclu-sc.org
ACLU FOUNDATION OF SOUTHERN CALIFORNIA
1313 West 8th Street
Los Angeles, California 90017
Telephone: (213) 977-5211
Facsimile: (213) 417-2211

MICHAEL H. STEINBERG (State Bar No. 134179)
steinbergm@sullcrom.com
SULLIVAN & CROMWELL LLP
1888 Century Park East, Suite 2100
Los Angeles, California  90067-1725
Telephone: (310) 712-6600
Facsimile: (310) 712-8800

*Attorneys for Plaintiffs-Petitioners*
(Additional Counsel for Plaintiffs
 on Following Page)

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSE ANTONIO FRANCO-GONZALEZ, et al.,<br><br>*Plaintiffs-Petitioners,*<br><br>v.<br><br>ERIC H. HOLDER, Jr., Attorney General, et al.,<br><br>*Defendants-Respondents.* | Case No. 10-CV-02211 DMG (DTBx)<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Honorable Dolly M. Gee<br><br>Hearing Date:  August 9, 2012<br><br>Hearing Time:  2:00 p.m. |

JUDY LONDON (State Bar No. 149431)
jlondon@publiccounsel.org
TALIA INLENDER (State Bar No. 253796)
tinlender@publiccounsel.org
PUBLIC COUNSEL
610 South Ardmore Avenue
Los Angeles, California 90005
Telephone: (213) 385 2977
Facsimile: (213) 385-9089

JUDY RABINOVITZ (State Bar No. JR-1214)
JRabinovitz@aclu.org
ACLU IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, New York 10004-2400
Telephone: (212) 549-2618
Facsimile: (212) 549-2654

DAVID LOY (State Bar No. 229235)
dblairloy@aclusandiego.org
SEAN RIORDAN (State Bar No. 255752)
sriordan@aclusandiego.org
ACLU OF SAN DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, California 92138
Telephone: (619) 232-2121
Facsimile: (619) 232-0036

JAMES PREIS (State Bar No. 82690)
jpreis@mhas-la.org
MENTAL HEALTH ADVOCACY SERVICES
3255 Wilshire Boulevard, Suite 902
Los Angeles, California 90010
Telephone: (213) 389-2077
Facsimile: (213) 389-2595

MATT ADAMS (State Bar No. 28287)
matt@nwirp.org
RIDDHI MUKHOPADHYAY
riddhi@nwirp.org
NORTHWEST IMMIGRANT RIGHTS PROJECT
615 2nd Avenue, Suite 400
Seattle, Washington 98104-2244
Telephone: (206) 957-8611
Facsimile: (206) 587-4025

JAMES LYALL (State Bar No. 330045)
jlyall@acluaz.org
ACLU FOUNDATION OF ARIZONA
3707 N. 7th Street, Suite 235
Phoenix, Arizona 85014
Telephone: (602) 773-6001
Facsimile: (602) 650-1376

*Attorneys for Plaintiffs-Petitioners*

1

**TABLE OF CONTENTS**

2

INTRODUCTION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

3

UNCONTROVERTED  FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

4

5

ARGUMENT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

6   I.     THE REHABILITATION ACT REQUIRES LEGAL
           REPRESENTATION AS A REASONABLE ACCOMMODATION
7          FOR INDIVIDUALS WHO ARE NOT COMPETENT TO
           REPRESENT THEMSELVES BY VIRTUE OF THEIR MENTAL
8          DISABILITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

9          A.    Plaintiffs Have Established a Prima Facie Case Under
                 the Rehabilitation Act  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

10

11         B.    Defendants are Required to Provide Legal Representation
                 as a Reasonable Accomodation  . . . . . . . . . . . . . . . . . . . . . . . . 11

12         C.    *Matter of M-A-M-* Does Not Provide Safeguards that
                 Constitute Reasonable Accomodations  . . . . . . . . . . . . . . . . . . 14

13

14  II.    THE IMMIGRATION AND NATIONALITY ACT AND THE DUE
           PROCESS CLAUSE REQUIRE THE APPOINTMENT OF COUNSEL
           FOR UNREPRESENTED NON-CITIZENS WHOSE SERIOUS
15         MENTAL DISABILITIES RENDER THEM INCOMPETENT TO
           REPRESENT THEMSELVES  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

16

17         A.    The Fair Hearing Requirement Requires Legal Representation  . . . . 16

18               1.    All Non-Citizens, Including Those with Serious Mental
                       Disabilities, Have a Right to a Fair Hearing . . . . . . . . . . . . . 16

19               2.    Non-Citizens Whose Serious Mental Disabilities
                       Render Them Incompetent to Represent Themselves
20                     Cannot Receive a Fair Hearing Without Counsel . . . . . . . . . 16

21         B.    Even were Appointed Counsel Not Required to Ensure a
                 Fair Hearing, the Important Interests at Stake Would Entitle
22               Plaintiffs to Appointed Counsel . . . . . . . . . . . . . . . . . . . . . . . . 19

23               1.    Plaintiffs' Private Interest is Clearly Substantial . . . . . . . . . . 21

24               2.    The Risk of Error from Failure to Appoint Counsel is
                       Significant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

25

26               3.    The Government's Interest in Barring Appointment of
                       Counsel is Not Significant . . . . . . . . . . . . . . . . . . . . . . . . . 28

27

28

i

III.   THE IMMIGRATION STATUTES, DUE PROCESS CLAUSE, AND  REHABILITATION ACT ALL REQUIRE THE PROVISION OF RIGOROUS BOND HEARINGS FOR THOSE CLASS MEMBERS WHO HAVE BEEN DETAINED FOR MORE THAN SIX MONTHS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

1

# TABLE OF AUTHORITIES

2

3 **CASES**

4

5 *Aguilera-Enriquez v. INS,*
    516 F.2d 565 (6th Cir. 1975)...........................................................................28

6

7 *Alexander v. Choate,*
    469 U.S. 287 (1985)......................................................................................12

8 *American Council of the Blind v. Paulson,*
9     525 F.3d 1256 (D.C. Cir. 2008) ........................................... 11, 13, 14

10 *Bridges v. Wixon,*
    326 U.S. 135 (1945)......................................................................................21

11

12 *Casas-Castrillon v. Department of Homeland Security,*
    535 F.3d 942 (9th Cir. 2008).................................................................23, 30

13

14 *Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986)........................................................................................8

15

16 *Centeno-Ortiz v. Culley,*
    2012 WL 170123 (S.D. Cal. 2012)..................................................................30

17 *Cinapian v. Holder,*
18     567 F.3d 1067 (9th Cir. 2009)......................................................................16

19 *Cooper v. Oklahoma,*
    517 U.S. 348 (1996)......................................................................................18

20

21 *Correctional S'vces Corp. v. Malesko,*
    534 U.S. 61 (2001)........................................................................................32

22

23 *Diouf v. Napolitano,*
    634 F.3d 1081 (9th Cir. 2011).......................................................................30

24

25 *Escobar-Grijalva* v. *INS,*
    206 F.3d 1331 (9th Cir. 2000)..................................................................24, 27

26

27 *Galvez –Letona v. Kirkpatrick,*
    54 F.Supp.2d 1218 (D. Utah 1999) ...............................................................10

28

*Garcia-Jaramillo v. I.N.S.*,
    604 F.2d 1236 (9th Cir. 1979)................................................................16

*Gideon v. Wainright*,
    372 U.S. (1963) ......................................................................................17

*Giebeler v. M & B Associates*,
    343 F.3d 1143 (9th Cir. 2003)..............................................................11

*Heryford v. Parker*,
    396 F.2d 393 (10th Cir. 1968)..............................................................23

*In re Gault*,
    387 U.S. 1 (1967)...................................................................................20

*Indiana v. Edwards*,
    554 U.S. 164 (2008)..............................................................................18

*Lassiter v. Dep't Soc. Serv.*,
    452 U.S. 18 (1981) .......................................................... 20, 21, 28, 29

*Lin v. Ashcroft*,
    377 F.3d 1014 (9th Cir. 2004)..............................................................27

*Lovell v. Chandler,*
    303 F.3d 1039 (9th Cir. 2002)...........................................................9, 11

*Massey v. Moore*,
    348 U.S. 105 (1954)....................................................................17, 18, 27

*Mathews v. Eldridge*,
    424 U.S. 319 (1976)..................................................................20, 21, 23

*Matter of Exilus*,
    18 I. & N. Dec. 276 (BIA 1982)............................................................16

*Matter of M-A-M-*,
    25 I & N Dec. 474 (BIA 2011)......................................................*passim*

*Nadarajah v. Gonzales*
    443 F.3d 1069 (9th Cir. 2006)..............................................................30

*Ng Fung Ho v. White*,
    259 U.S. 276 (1922)..............................................................................21

iv

*Padilla v. Kentucky*,
   130 S. Ct. 1473 (2010).................................................................22, 24

*Palmer v. Ashe*,
   342 U.S. 134 (1951).................................................................17

*Perez-Lastor v. INS*,
   208 F.3d 773 (9th Cir. 2000).....................................................18

*Range Road Music, Inc. v. East Coast Foods, Inc.*,
   668 F.3d 1148 (9th Cir. 2012)....................................................7

*Rodde v. Bonta*,
   357 F.3d 988 (9th Cir. 2004).....................................................14

*Rohan v. Woodford*,
   334 F.3d 803 (9th Cir. 2003).....................................................18

*Singh v. Holder*,
   638 F.3d 1196 (9th Cir. 2011)....................................................31

*Tejeda-Mata v. INS*,
   626 F.2d 721 (9th Cir. 1980).....................................................18

*Tennessee v. Lane*,
   541 U.S. 509 (2004).................................................................16

*Turner v. Rogers*,
   131 S. Ct. 2507 (2011)........................................................*passim*

*United States v. Arrieta*,
   224 F.3d 1076 (9th Cir. 2000)....................................................15

*United States v. Campos-Asencio*,
   822 F.2d 506 (5th Cir. 1987).....................................................28

*United States v. Pallares-Galan*,
   359 F.3d 1088 (9th Cir. 2004)....................................................15

*Vitek v. Jones*,
   445 U.S. 480 (1980).................................................................19

*Wade v. Mayo*,
   334 U.S. 672 (1948).................................................................17

*White v. Lee*,
     227 F.3d 1214 (9th Cir. 2000) .................................................................... 4

*Yamataya v. Fisher*,
     189 U.S. 86 (1903) ................................................................................... 16


**STATUTES**

8 U.S.C. 1225(b) ........................................................................................... 30

8 U.S.C. 1226(a) ........................................................................................... 30

8 U.S.C. 1226(c) ........................................................................................... 30

8 U.S.C. 1229a(b)(4)(B) (2010) ................................................................... 16

8 U.S.C. 1231(a)(6) ...................................................................................... 30


**REGULATIONS**

6 C.F.R. 15.30 ............................................................................................ 8, 9

6 C.F.R. 15.30(a) (2008) ........................................................................... 9, 10

6 C.F.R. 15.50 .............................................................................................. 12

8 C.F.R. 1240.4 .............................................................................................. 6

28 C.F.R. 39.101-39.103 ............................................................................... 10

28 C.F.R. 39.103 ............................................................................................. 9

28 C.F.R. 39.130 ..................................................................................... 8, 9, 10

28 C.F.R. 39.150 ........................................................................................... 12

Fed. R. Civ. P. 56(a) ....................................................................................... 8

Fed. R. Civ. P. 56(c) ....................................................................................... 7

Immigration and Nationality Act .................................................................. 15

Section 504 of the Rehabilitation Act of 1973 ....................................... *passim*

1

## OTHER AUTHORITIES

2

U.S. Citizenship and Immigration Services, Citizenship Through
Naturalization, Exceptions and Accommodations,
http://www.uscis.gov/portal/site/uscis ............................................................10

TASK FORCE ON THE RIGHTS AND EMPOWERMENT OF AMERICANS WITH
DISABILITIES, FROM ADA TO EMPOWERMENT (1990) ........................................12

BIA Practice Manual Section 2.3 ............................................................12

IJ Benchbook, Steps to Guide Proceedings,
http://www.justice.gov/eoir/vll/benchbook/tools /MHI/index.html .................13

PAN-AM. HEALTH ORG., HUMAN RIGHTS & HEALTH: PERS. WITH
MENTAL DISABILITIES (2008),
http://www.paho.org/english/DD/PUB/10069_Mental.pdf. .............................22

HUMAN RIGHTS WATCH AND THE AMERICAN CIVIL LIBERTIES UNION,
DEPORTATION BY DEFAULT: MENTAL DISABILITY, UNFAIR HEARINGS, AND
INDEFINITE DETENTION IN THE US IMMIGRATION JUSTICE SYS.(2010) ...............26

TEXAS APPLESEED, JUSTICE FOR IMMIGRATION'S HIDDEN POPULATIONS ...............26

NINA SIULC ET AL.,VERA INSTITUTE FOR JUSTICE, IMPROVING EFFICIENCY
AND PROMOTING JUSTICE IN THE IMMIGRATION SYSTEM (2008),
http://www.vera.org/download?file=1780/LOP%2BEvaluation_May2008
_final.pdf ............................................................................................29

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# INTRODUCTION

Despite this Court's clear rulings in three separate preliminary injunction orders (from which Defendants never appealed), Defendants still refuse to adopt any binding legal rules requiring either legal representation for individuals who are not competent to represent themselves due to a serious mental disability (Subclass One members), or bond hearings for those whose cases are delayed due to their mental disabilities and remain detained for more than six months (Subclass Two members). To prevent further unlawful detention and deportation in derogation of the legal rules set forth in this Court's prior orders, Plaintiffs now move for partial summary judgment on behalf of Named Plaintiffs Martinez, Khukhryanhskiy, Chavez, and Zhalezny, and therefore seek relief for Subclass One members on Counts 3-5 (right to appointed counsel). Plaintiffs also move for partial summary judgment on behalf of Named Plaintiffs Martinez, Khukhryanskiy, Zhalezny, and Sepulveda, and therefore seek relief on behalf of all Subclass Two members on Counts 8-10 (right to detention hearing).[1]

# UNCONTROVERTED FACTS

In this Motion, there are but three important facts.  ***Fact No. 1:***  the

---

[1]      Although Plaintiffs are not moving for summary judgment on the competency evaluation claims at this time, they do *not* believe that the competency determination system that Defendants now employ satisfies either statutory or constitutional requirements.  To the contrary, Defendants failed to provide timely evaluations to any of the Named Representatives.  SUF # 4, # 10, # 15.  Even worse, after this Class was certified, Defendants appear to have abandoned competency evaluations altogether (perhaps to avoid identifying more Subclass One members).  Plaintiffs continue to dispute both that *Matter of M-A-M-* adequately addresses the definition of *pro se* competency and that it provides accurate procedures to determine who is incompetent to proceed *pro se*.  Because those issues may benefit from further development through the discovery process, Plaintiffs do not seek resolution of them at this time.

Government detains and places into removal proceedings individuals who are not competent to represent themselves by reason of a serious mental disorder or defect, as they did with Subclass One Representatives Martinez, Khukhryanskiy, Zhalezny, and Chavez. *Fact No. 2:* the Government imposes on itself no legal obligation to provide representation for such individuals in their immigration proceedings. *Fact No. 3:* the Government detains Subclass Two members, such as Representatives Martinez, Khukhryanskiy, Zhalezny, and Sepulveda, for more than six months without providing bond hearings where it must show by clear and convincing evidence that any further detention is justified (a "*Casas*" hearing).

No genuine dispute can exist as to any of these three basic facts:

*Fact No. 1:* There can be no serious dispute that Defendants detain for removal proceedings individuals who are not competent to represent themselves. Were more detail needed, this Court has already described the facts surrounding the Subclass One Representatives' cases and deemed them "typical" for purposes of class certification. Therefore, Plaintiffs incorporate the factual descriptions concerning those Plaintiffs — Martinez, Khukhryanskiy, Zhalezny and Chavez — as set forth in the Court's prior preliminary injunction orders, Dkt. 107; 215 and the Court's order granting class certification. Dkt. 348. *See generally* Statement of Uncontroverted Facts (hereinafter, "SUF") (filed concurrently with this Motion).[2]

As discussed at length in the Court's prior orders, these Subclass One Representatives, like members of the subclass they represent, suffer from serious mental disorders or defects that render them incompetent to represent

---

[2]    For ease of reference, Plaintiffs have re-attached to this Motion any exhibit referenced herein, even if that exhibit was previously submitted. Plaintiffs, however, have preserved the original exhibit numbering to ensure that Plaintiffs' exhibits in the case remain continuously numbered.

themselves in removal proceedings.  In Mr. Khukhryanskiy's case, Dr. Barrett, a clinical professor of psychology with twenty years of experience, determined that Mr. Khukhryanskiy (i) was unable to represent himself because, due to his mental disability, he (ii) did not understand the proceedings against him, (iii) did not understand the role of the judge or the court process, (iv) was neither rational nor logical, and (v) did not have an understanding of his own history or the facts of his case.  *See* SUF #5.  In Mr. Martinez's case, Dr. Robert Burchuk, M.D., a member of the Expert Panel of the Los Angeles Superior Court, concluded that "[h]e is clearly not competent to represent himself."  As Dr. Burchuk explained, Mr. Martinez's mental disability precludes him from participating in and rationally understanding the proceedings against him in order to represent himself.  SUF #11.  With respect to Mr. Zhalezny, Dr. Jessica Ferranti, M.D., an Assistant Clinical Professor of Psychiatry at U.C. Davis, concluded that Mr. Zhalezny was "unable to understand the nature of the immigration proceedings or the charges against him, and he was unable to represent himself in his immigration hearings."   SUF #16; *see also* Dkt. 215 at 3 (describing Plaintiff Zhalezny's lack of contact with reality, including due to his belief that the lights in the jail are killing him).  Finally, Mr. Chavez has spent a significant portion of the past 10 years in mental hospitals, and was found incompetent to stand trial in a criminal proceeding in 2004.  SUF #22.  Dr. David C. Stone, M.D., concluded that Mr. Chavez's chronic paranoid schizophrenia, which caused him to suffer from auditory hallucinations, persecutory delusions, and suicidal ideations, renders him incompetent to represent himself in immigration proceedings.  SUF #23.  Even today, Mr. Chavez remains in a secure *mental* hospital, but DHS has reserved the right to re-initiate removal proceedings against him at any time.  SUF #24.

Further disclosures provided by the Government since this Court

1    granted class certification demonstrate that the Government continues to

2    detain Subclass One members for removal proceedings.  Since March 23,

3    2012, when the parties agreed to modify this Court's order requiring notice,

4    *see* Dkt. 360, Defendants have produced eight sets of information to

5    Plaintiffs that specifically identified individuals determined to be Subclass

6    One members under the Government's current competency determination

7    system.  SUF #1.  In those eight lists, Defendants have identified 21

8    individuals as Subclass One members.  SUF #28.  That identification has

9    included Subclass One members whose cases are pending before an

10   Immigration Judge, SUF #29, as well as at least one Subclass One member

11   whose case is pending before the BIA, SUF #30.  Incredibly, in November

12   2011, one Subclass One member was found incompetent to proceed *pro se*

13   by the Immigration Judge, ordered deported, and thereafter forced to file an

14   appeal on his own.  SUF #31, 39.[3]

15        **Fact No. 2**:  The Government recognizes no legally binding rule

16   requiring that Subclass One members receive legal representation.[4]  This fact

17   is amply confirmed in the discovery produced by Defendants concerning

18   their rules and policies with respect to class members, which it has been

19   legally obligated to update for months.  No document provided by the

20   Government describes any policy, let alone a legally binding one, to provide

21   legal representation to those who are not competent to represent themselves.

22   In fact, the Government has conceded that it has no such policy.  SUF #2.

23   _____

24   [3]      Mr. Zotov's case sadly highlights — yet again — the importance of legal representation, as Mr. Zotov's written notice of appeal presents no recognizable legal argument in his defense.  SUF #37.

25   [4]      While the Government still refuses to provide the required assistance, Plaintiffs need establish only that the government recognized no such legal

26   rule at the time of the filing of the complaint.  *See White v. Lee*, 227 F.3d 1214, 1243 (9th Cir. 2000) ("Standing is examined at the commencement of

27   litigation.") (quotation marks and citation omitted).

28

1    Even absent the Government's binding concession, the Named
2    Representatives' histories underscore how the systematic absence of any
3    policy palpably violates the statutory and constitutional rights of Subclass
4    One members.  Despite overwhelming evidence that the Named
5    Representatives were not competent to represent themselves, each of them
6    would have been forced to proceed *pro se* in their removal proceedings
7    absent the relief this Court granted.[5]  Incredibly, at the time of this Court's
8    orders, Mr. Martinez and Mr. Khukhryanskiy were each obligated to defend
9    themselves on appeal before the Board, while Mr. Zhalezny was forced to do
10   so before the immigration court.  SUF #7, # 12, # 17.

11       Again, the Government's post-certification disclosures confirm that
12   the Government systematically fails to provide legal representation to
13   Subclass One members.  Since the Court issued its preliminary injunction
14   orders, the Government has refused to provide Subclass One members with
15   the basic protections that Plaintiffs seek (and that this Court granted to
16   Plaintiffs Martinez, Khukhryanskiy and Zhalezny in the preliminary
17   injunction orders).  Whatever changes the Government has made since
18   Plaintiffs filed this lawsuit, those changes have failed to bring the
19   Government into compliance with applicable statutory and constitutional
20   requirements.  Of the 21 individuals identified by Defendants as Subclass
21   One members since March 29, 2012, Defendants have confirmed having
22   arranged legal representation for only *one* person.  SUF #32.  Plaintiffs have
23   dutifully written to Defendants seeking to protect the Subclass One members

24

25       [5]    The only exception is Mr. Chavez, whose case had been
     administratively closed at the time this Court certified the class.  However,
26   he had previously been scheduled to appear pro se (despite being
     hospitalized), and DHS retains the right to re-initiate removal proceedings
27   against him at any time.  SUF #24.

28

1    Defendants have identified since March 29, 2012, but Defendants have been

2    unable or unwilling to locate or provide legal representation for all

3    individuals they concede are incompetent to proceed *pro se*, and they

4    consistently refuse even to confirm in writing, let alone by adopting a

5    binding policy, that they will guarantee legal representation to all individuals

6    who are not competent to represent themselves.  SUF #34.  To this day, in

7    those instances where proceedings continue, the Government continues its

8    Kafkaesque practice of forcing such individuals to proceed *pro se* even after

9    they have been found not competent to do so.  SUF #35.

10          In other cases, Immigration Judges continue to allow, and in some

11   cases to encourage, family members who do not meet the criteria of

12   "Qualified Representatives" to "represent" individuals who likely lack the

13   capacity to represent themselves.  Declaration of Marisol Orihuela in

14   Support of Motion for Partial Summary Judgment (to be subsequently filed)

15   at ¶¶ 21-28.[6]

16          Even had the Government managed to arrange for the representation

17   of *all* individuals it had identified as Subclass One members, that would not

18   obviate the need for this Motion.  The Government has made no legally-

19   enforceable commitment to ensure such representation, and therefore

20   ─────────────────────────

21   [6]     Because Immigration Judges continue to allow, and in some cases to
     encourage, family members to act as the attorneys for people with serious

22   mental disabilities notwithstanding this Court's preliminary injunction
     orders, at least some of these individuals likely never receive a

23   determination as to whether they are competent to represent themselves,
     despite the fact that their serious mental illness may render them unable to

24   consent to "representation" by a family member.  *See* Dkt. 204 at 18-19
     (rejecting government's argument that consent is not required for family

25   member to appear on behalf of detainee under 8 C.F.R. 1240.4, and reading

26   regulations to require representation by attorneys or accredited
     representatives in such instances).

27

28

1   remains free to abandon its meagre pro bono efforts at any time, absent a

2   ruling from this Court.  However, the Government's systematic failure to

3   ensure that Subclass One members receive legal representation underscores

4   the need for a ruling at this time.[7]

5       ***Fact No. 3***:  The final undisputed fact is that the Government refuses

6   to recognize any obligation to provide "*Casas*" hearings to Subclass Two

7   members -- class members detained longer than six months.  EOIR has

8   admitted that it lacks any such policy.  SUF #3.  The Government's

9   treatment of the Named Plaintiffs as well as its subsequent behavior is

10  consistent with this admission.  *See* Dkt. 107 (ordering the Government to

11  provide Plaintiffs Martinez and Khukhryanskiy with a bond hearing within

12  30 days or release them); Dkt. 215 (same as to Mr. Zhalezny); Dkt. 285

13  (same as to Mr. Woldemariam); Dkt. 348 (noting that Mr. Sepulveda had not

14  received a bond hearing); *see also* SUF #8, # 13, # 27, # 33.  Because the

15  Government indisputably detains and seeks to remove individuals who are

16  not competent to represent themselves, recognizes no legal obligation to

17  provide legal representation for such individuals, and does not provide

18  "*Casas*" bond hearings for individuals detained for more than six months,

19  the Court need not resolve any material facts in order to grant this Motion.

## ARGUMENT

21      Summary judgment is proper where no genuine issue of material fact

22  is in dispute and the moving party is entitled to judgment as a matter of law.

23  FED. R. CIV. P. 56(c); *Range Road Music, Inc. v. East Coast Foods, Inc.*, 668

24  F.3d 1148, 1152 (9th Cir. 2012).  Rule 56 permits motions for partial

---

[7]      During the meet and confer process that preceded the filing of this Motion, the Government repeatedly emphasized that this Court's preliminary injunction orders apply only to the particular plaintiffs whose claims were litigated in those orders.  *But see* Dkt. 285 at 5 & n.3 (quoting A. Gide).

1   summary judgment such as this one.  *See* FED. R. CIV. P. 56(a) ("A party

2   may move for summary judgment, identifying each claim or defense — or

3   the part of each claim or defense — on which summary judgment is

4   sought.").  To successfully oppose summary judgment, the nonmoving party

5   must "go beyond the pleadings and, by her own affidavits, or by the

6   'depositions, answers to interrogatories, and admissions on file,' designate

7   'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp.*

8   *v. Catrett*, 477 U.S. 317, 324 (1986) (quoting FED. R. CIV. P. 56(e)).

9          No genuine issue of material fact exists with respect to the claims

10  asserted in this motion.  The Class Representatives seeking legal

11  representation via this motion are not competent to represent themselves.

12  For all other Subclass One members, the Government has already classified

13  them as not competent — *by its own admission*.  Similarly, the individuals

14  seeking a custody hearing have been subject to detention for more than six

15  months while their cases remain pending.  The only questions raised here are

16  whether Subclass One members have a right to legal representation (whether

17  paid or *pro bono*) and whether Subclass Two members are entitled to *Casas*

18  hearings.  Consistent with this Court's prior rulings, both questions should

19  be answered in the affirmative.

20

21  **I.    THE REHABILITATION ACT REQUIRES LEGAL
        REPRESENTATION AS A REASONABLE
22      ACCOMMODATION FOR INDIVIDUALS WHO ARE NOT
        COMPETENT TO REPRESENT THEMSELVES BY VIRTUE
23      OF THEIR MENTAL DISABILITIES.**

24      **A.    Plaintiffs Have Established a Prima Facie Case Under the
               Rehabilitation Act.**

25      The Government's failure to provide legal representation for Subclass

26  One members violates Section 504 of the Rehabilitation Act of 1973, 29

27  U.S.C. 794 ("Section 504") and its implementing regulations.  Specifically,

28  Defendants have violated Section 504, 28 C.F.R. 39.130, and 6 C.F.R. 15.30

by subjecting Plaintiffs to immigration proceedings without making reasonable accommodations for their disabilities.

Section 504 bars the federal government, including both the Department of Justice ("DOJ") and the Department of Homeland Security ("DHS"), from discriminating against any individual on the basis of a disability.  "No qualified individual with a disability in the United States, shall, by reason of his or her disability, be excluded from the participation in, be denied benefits of, or otherwise be subjected to discrimination under any program or activity conducted by the Department."  6 C.F.R. 15.30(a) (2008); 28 C.F.R. 39.130 (2003) (same).

To state a *prima facie* case under Section 504, Plaintiffs must demonstrate that: (1) they are qualified individuals with a disability, as defined under the Americans with Disabilities Act ("ADA"), (2) they are otherwise qualified for the benefit or services sought; (3) that they were denied the benefit or services solely by reason of their handicap; and (4) the program providing the benefit or services receives federal financial assistance.  *Lovell v. Chandler,* 303 F.3d 1039, 1052 (9th Cir. 2002).

Plaintiffs have stated a *prima facie* case, as this Court's prior orders confirm.  Dkt. 107; 215.  The Named Representatives, together with all Subclass One members (by definition), have a serious mental disorder or defect that renders them incompetent to represent themselves.  All such individuals have already been determined to need "safeguards" because they cannot represent themselves in removal proceedings.  *See Matter of M-A-M-,* 25 I & N Dec. 474 (BIA 2011).  Because their mental impairments significantly limit their ability to participate in major life activities, they are individuals with disabilities.  *See* 28 C.F.R. 39.103; 6 C.F.R. 15.30.

Plaintiffs also satisfy the second requirement for a *prima facie* case because they seek "benefit[s] or services" available to them in removal

1    proceedings, including the right to present evidence, to cross-examine

2    witnesses, and to make legal arguments to defend themselves against the

3    charges advanced by the Government's attorneys in their removal

4    proceedings, and because they are excluded from participation in the

5    program that would otherwise permit them to exercise those rights. *See* 6

6    C.F.R. 15.30(a) (2008); 28 C.F.R. 39.130 (2003).  Although the Government

7    initially argued otherwise (Dkt. 83 at 25-26), there can be no serious legal

8    dispute that the provision of these rights constitute a "benefit or service"

9    which Plaintiffs are "otherwise qualified" to access.  The regulations

10   implementing the Rehabilitation Act take an extremely expansive view of

11   what constitutes a "benefit or service," *see, e.g.*, 28 C.F.R. 39.101-39.103

12   (Section 504 "applies to *all* programs or activities conducted" by the DOJ)

13   (emphasis added), and another division of DHS has already interpreted those

14   regulations to require accommodations for people seeking naturalization.[8]

15   *See also Galvez-Letona v. Kirkpatrick*, 54 F.Supp.2d 1218, 1224-25 (D.

16   Utah 1999) (holding that INS violated the Rehabilitation Act when it denied

17   naturalization to an individual who, due to Downs Syndrome, could not take

18   oath of citizenship).  The Supreme Court has already interpreted the ADA to

19   apply to claims involving access to the courts, as this Court has recognized.

20   *See generally* Dkt. 57 at 30-31 (citing *Tennessee v. Lane*, 541 U.S. 509, 526-

21   27, 533-34 (2004) (noting that "[i]n the deliberations that led up to the

22   enactment of the ADA . . . Congress learned that many individuals, in many

---

[8] *See* U.S. Citizenship and Immigration Services, Citizenship Through Naturalization, Exceptions and Accommodations, http://www.uscis .gov/portal/site/uscis (follow "Citizenship Through Naturalization" hyperlink; then follow "Exceptions and Accommodations" hyperlink) ("Under Section 504 of the Rehabilitation Act of 1973, we provide accommodations or modifications for applicants with physical or mental impairments that make it difficult for them to complete the naturalization process.").

States across the country, were being excluded from courthouses and court proceedings by reason of their disabilities" and holding that the Americans with Disabilities Act ("ADA"), "applie[s] to cases implicating the fundamental right of access to the courts")).[9]

Plaintiffs also satisfy the third requirement for a *prima facie* case under Section 504, because they are denied access to these rights solely because of their disability. Defendants have never disputed this, and it is hard to imagine how they could. Plaintiffs cannot exercise the basic rights guaranteed them by the immigration laws solely because their mental disabilities preclude them from doing so. *Cf. Lovell v. Chandler*, 303 F.3d 1039, 1053 (9th Cir. 2002) (holding that exclusion from state health insurance program was due to plaintiffs' disabilities); *Giebeler v. M & B Associates*, 343 F.3d 1143 (9th Cir. 2003) (concluding that plaintiffs' disability entirely limited his ability to work and therefore was the cause of his income ineligibility for housing); *American Council of the Blind v. Paulson*, 525 F.3d 1256, 1267 (D.C. Cir. 2008) (noting, as both parties conceded, that plaintiffs who were visually impaired were excluded from determining the denominations of paper currency due to their disability).[10]

### B. Defendants are Required to Provide Legal Representation as a Reasonable Accomodation.

Once Plaintiffs have established a *prima facie* case, Defendants are obligated to provide them with a reasonable accommodation. *Alexander v.*

---

[9] *See also* TASK FORCE ON THE RIGHTS AND EMPOWERMENT OF AMERICANS WITH DISABILITIES, FROM ADA TO EMPOWERMENT (1990) (documenting examples of, *inter alia*, people with developmental disabilities being denied an opportunity to testify in court cases involving abuse and people with hearing impairments being denied interpretive services).

[10] Plaintiffs satisfy the final element of the *prima facie* case because immigration proceedings are run by the federal government.

11

1   *Choate*, 469 U.S. 287, 301 (1985) (holding that a "reasonable

2   accommodation" is one that gives the plaintiff "meaningful access" to the

3   program or services sought).  Here, the provision of legal representation

4   constitutes the only reasonable accommodation available.  Without legal

5   representation, the Named Representatives (as well as other Subclass One

6   members) are denied meaningful access to the immigration procedures

7   guaranteed them, precisely because Plaintiffs cannot effectively exercise

8   their right to present evidence, to examine the government's evidence, to

9   argue that they are entitled to relief from removal, or to any of the other

10  procedural rights that other detainees enjoy due to their mental disabilities.[11]

11          DOJ and DHS regulations recognize that Defendants "may comply

12  with the requirements of … [Section 504] through such means as  . . .

13  assignment of aides to beneficiaries."  28 C.F.R. 39.150 (DOJ); 6 C.F.R.

14  15.50 (DHS).  In this case, the appointment of counsel — a *legal* aide to the

15  beneficiary — would ensure that the procedural rights guaranteed to them

16  are, in fact, "accessible and usable" to individuals who are not mentally

17  competent to exercise those rights on their own.

18          While Defendants would be under no obligation to provide an

19  accommodation that fundamentally altered the existing immigration system,

20  the Government cannot seriously contend that the provision of legal

21  representation to Subclass One members would work such a "fundamental

22  alteration."  A fundamental alteration is likely sought where a plaintiff

23  

24  [11]     This Court has already rejected Defendants' argument that Plaintiffs
    may not assert their Rehabilitation Act claim without first exhausting it
25  before the BIA.  Dkt. 107 at 17-21.  As noted by the Court, there is no
    authority mandating exhaustion under these circumstances, and prudential
26  exhaustion is not appropriate as exhaustion before the BIA would be futile.
    *Id.  See also* BIA Practice Manual Section 2.3(a) (noting that the BIA does
27  not recognize the right to appointed counsel in immigration proceedings).
28

1    "seek[s] to expand the substantive scope of a program or benefit." *American*

2    *Council of the Blind v. Paulson*, 525 F.3d at 1267.  In contrast, where

3    plaintiffs "identify an obstacle that impedes their access to a government

4    program or benefit, they likely have established that they lack meaningful

5    access to the program or benefit." *Id.*

6         Here, the provision of legal representation can hardly be said to alter

7    the conduct of removal proceedings in any way.  Attorneys already practice

8    in immigration court.  A minority of detained immigrants hire private legal

9    counsel, and of course the government pays for attorneys to represent ICE in

10   all detention, removal, and appellate proceedings.  Indeed, *M-A-M-*

11   *recommends* that IJ's help individuals with mental disabilities secure

12   counsel.  25 I&N Dec. at 483; *see also* IJ Benchbook, Steps to Guide

13   Proceedings, http://www.justice.gov/eoir/vll/benchbook/tools

14   /MHI/index.html.  As such, the Government cannot argue that the provision

15   of legal representation would fundamentally alter immigration proceedings.

16        Nor could the Government seriously contend that the expense of

17   providing legal representation is an undue burden that renders it an

18   unreasonable accommodation.  The Government already pays for Legal

19   Orientation Program providers to give legal information to detainees, SUF

20   #40, and the appointment of attorneys may actually save the government

21   money if, as is likely, they serve to expedite proceedings and minimize the

22   cost of detaining Subclass One members.  Further still, the Government has

23   successfully obtained pro bono assistance on at least some occasions and is

24   free to do so going forward.  Such assistance imposes no cost.  In any event,

25   even were the costs of appointing legal representation significant, the Ninth

26   Circuit has held that, when analyzing a reasonable accommodation under the

27   ADA, "[f]aced with[ ] a conflict between financial concerns and preventable

28   human suffering, we have little difficulty concluding that the balance of

1    hardships tips decidedly in plaintiffs' favor." *Rodde v. Bonta*, 357 F.3d 988

2    (9th Cir. 2004). *See also American Council of the Blind*, 525 F.3d at 1272

3    (holding that federal agency failed to show an undue burden despite

4    accomodation requiring "substantial investment of labor, time, and money"

5    in part because the accommodation would constitute a "small fraction of [the

6    agency's] annual expenditures").

7
8          C.    *Matter of M-A-M-* **Does Not Provide Safeguards that Constitute Reasonable Accomodations.**

9          Defendants may argue that the safeguards made available under *M-A-*

10   *M-* constitute reasonable accommodations, but such a claim would be

11   meritless.  As a threshold matter, *M-A-M-* prescribes no particular

12   safeguards, but instead establishes that "Immigration Judges have discretion

13   to determine which safeguards are appropriate." 25 I&N Dec. at 480-81.

14   Nothing in the decision even remotely suggests any authority to *appoint*

15   *counsel* for individuals not competent to represent themselves.

16         Second, *M-A-M-* encourages "safeguards" that this Court has already

17   found inadequate.  *M-A-M-* encourages judges to allow a "near relative, or

18   friend" to "appear on the respondent's behalf," and when such individuals

19   are not available, for "the respondent's 'custodian' . . . to appear on behalf of

20   the respondent." *Id.*  As discussed in Plaintiffs' first Motion for Preliminary

21   Injunction, it was precisely this "safeguard" that led to a deportation officer

22   purporting to "assist" Mr. Khukhryanskiy at his removal hearing.  SUF #6.

23         *M-A-M-* encourages a host of other "safeguards" that on their face

24   seem likely to undermine the rights of Subclass One members.  These

25   include "closing the hearing to the public," "waiving the respondent's

26   appearance," continuing the case – thus lengthening detention – and,

27   remarkably, "administrative closure," which is precisely the procedure that

28   led to Mr. Franco's nearly five-year detention. *Id.* at 483.  Even those

14

1    safeguards that do not obviously undermine the rights of class members,

2    such as admonishing Immigration Judges to "actively aid[] in the

3    development of the record" and "inform[ing] the alien of his or her apparent

4    eligibility to apply for [relief]," *id.* at 482, are plainly inadequate, as those

5    obligations exist in all cases.  *See United States v. Arrieta*, 224 F.3d 1076,

6    1079 (9th Cir. 2000) ("[W]here the record contains an inference that the

7    petitioner is eligible for relief from deportation, the IJ must advise the alien

8    of this possibility and give him the opportunity to develop the issue.");

9    *United States v. Pallares-Galan*, 359 F.3d 1088 (9th Cir.  2004) (holding

10   that waiver of appeal from deportation order was invalid because the IJ

11   failed to advise the individual of the possibility of relief and allow him to

12   develop the issue).  Yet, Subclass One Representatives Khukhryanskiy,

13   Martinez, Zhalezny, and Chavez were all denied meaningful access to

14   immigration proceedings (including the ability to apply for relief for which

15   they were eligible) as a result of their disability, despite their Immigration

16   Judges' existing obligation to aid them in developing the record.  These

17   "safeguards" do not suffice to provide what federal law demands.

18   **II.    THE IMMIGRATION AND NATIONALITY ACT AND THE**
19   **DUE PROCESS CLAUSE REQUIRE THE APPOINTMENT OF**
     **COUNSEL FOR UNREPRESENTED NON-CITIZENS WHOSE**
     **SERIOUS MENTAL DISABILITIES RENDER THEM**
20   **INCOMPETENT TO REPRESENT THEMSELVES.**

21        The Government's systemic failure to provide legal representation to

22   individuals who are not competent to represent themselves due to a serious

23   mental disability also violates the Immigration and Nationality Act (INA)

24   and the Fifth Amendment.  Both the INA and the Due Process Clause

25   require legal representation for those not competent to represent themselves,

26   for two reasons:  *First*, the fair hearing requirement necessitates legal

27   representation for such individuals.  *Second*, the Due Process rule requiring

28   appointed counsel in certain civil cases — where important interests are at

stake — mandates legal representation in this context.

### A. The Fair Hearing Requirement Requires Legal Representation.

#### 1. All Non-Citizens, Including Those with Serious Mental Disabilities, Have a Right to a Fair Hearing.

All non-citizens have both a statutory and constitutional right to a full and fair hearing.  Congress has promoted this concept by establishing certain procedural safeguards in immigration proceedings, including the rights to examine witnesses, present evidence, and cross-examine the Government's witnesses.  8 U.S.C. 1229a(b)(4)(B) (2010).  The agency has long read these provisions to create a general requirement that removal hearings be fundamentally fair.  *Matter of Exilus*, 18 I. & N. Dec. 276, 278 (BIA 1982).  Apart from this statutory requirement, for more than a century the Supreme Court has recognized that the Due Process Clause also requires non-citizens present in the United States to receive "all opportunity to be heard upon the questions involving [their] right to be and remain in the United States." *Yamataya v. Fisher*, 189 U.S. 86, 101 (1903); *see also Cinapian v. Holder*, 567 F.3d 1067, 1073 (9th Cir. 2009) (finding that Due Process entitles people in immigration proceedings to "a full and fair hearing of [their] claims and a reasonable opportunity to present evidence on [their] behalf."); *Garcia-Jaramillo v. I.N.S.*, 604 F.2d 1236 (9th Cir. 1979) ("In a deportation hearing, an alien is entitled to the guaranty of due process which is satisfied only by a full and fair hearing.").

#### 2. Non-Citizens Whose Serious Mental Disabilities Render Them Incompetent to Represent Themselves Cannot Receive a Fair Hearing Without Counsel.

For immigration proceedings to be "full and fair," people who suffer from serious mental disabilities that render them incompetent to represent themselves must be represented by attorneys.  The Supreme Court recognized this essential Due Process requirement over fifty years ago, even

1    *before* it recognized the Sixth Amendment right to appointed counsel in

2    criminal cases.  In a trio of cases decided prior to *Gideon v. Wainwright*, the

3    Supreme Court recognized that the Due Process Clause required states to

4    appoint counsel for indigent criminal defendants who were not competent to

5    represent themselves.  372 U.S. 335 (1963).

6            The clearest enunciation of this basic Due Process principle — that

7    people incompetent to represent themselves must be represented by counsel

8    — comes from the unanimous decision in *Massey v. Moore*,  348 U.S. 105,

9    108 (1954).  *Massey* held that Due Process requires appointed counsel in

10   criminal cases for people suffering from serious mental disabilities.  The

11   Court did not consider this a close question: "if he were then insane as

12   claimed, he was effectively foreclosed from defending himself. . . . his need

13   of a lawyer to tender the defense is too plain for argument."  348 U.S. at

14   108.  The Court was unequivocal: "[n]o trial can be fair that leaves the

15   defense to a man who is insane, unaided by counsel, and who by reason of

16   his mental conditions stands helpless and alone before the court."  *Id.*

17           In two cases prior to *Massey*, the Supreme Court recognized that

18   someone could lack the mental capacity to *represent oneself* at trial even

19   while having the mental capacity to stand trial *with the assistance of counsel*.

20   In *Wade v. Mayo*, the Supreme Court reversed the conviction of an eighteen

21   year old who, proceeding *pro se*, had failed to strike any jurors or offer any

22   closing at his trial because "[t]here are some individuals who, by reason of

23   age, ignorance or mental capacity are incapable of representing themselves

24   adequately in a prosecution of a relatively simple nature."  334 U.S. 672,

25   684 (1948).  And in *Palmer v. Ashe*, the Supreme Court remanded for an

26   evidentiary hearing on allegations that defendant's mental illness rendered

27   him incapable of "protect[ing] himself in the give-and-take of a courtroom

28   trial," in violation of Due Process.  342 U.S. 134, 137 (1951); *see also*

17

1   *Massey*, 348 U.S. at 108 ("One might not be insane in the sense of being

2   incapable of standing trial and yet lack the capacity to stand trial without

3   benefit of counsel.").  The Supreme Court reaffirmed this rule in recent

4   times, holding that a defendant may have "sufficient mental competence to

5   stand trial" yet "lack[] the mental capacity to conduct his trial defense unless

6   represented."  *Indiana v. Edwards*, 554 U.S. 164, 174 (2008).

7         While Plaintiffs recognize that the Supreme Court's holdings in these

8   cases concerned *criminal* proceedings, their essential reasoning – that other

9   procedural protections are meaningless if the defendant is not competent to

10  represent himself – applies with full force to immigration proceedings.  *Cf.*

11  *Cooper v. Oklahoma*, 517 U.S. 348, 355 (1996) (holding that the state must

12  bear the burden to prove competency because "[c]ompetence to stand trial is

13  rudimentary, for upon it depends the main part of those rights deemed

14  essential to a fair trial, including the right to effective assistance of counsel,

15  the rights to summon, to confront, and to cross-examine witnesses, and the

16  right to testify on one's own behalf.") (citing *Drope v. Missouri*, 420 U.S.

17  162, 171-72 (1975)); *Rohan v. Woodford*, 334 F.3d 803, 809 (9th Cir. 2003)

18  (holding, in the context of post-conviction habeas proceedings, that because

19  the "capacity to communicate remains a cornerstone of due process," post-

20  conviction detainees have a "right to competency").

21        That the Due Process Clause requires an appointed attorney for

22  mentally incompetent detainees follows as well from the well-accepted

23  constitutional requirement that the Government provide translation services

24  for detainees in removal proceedings.  *See, e.g.*, *Perez-Lastor v. INS*, 208

25  F.3d 773, 778 (9th Cir. 2000) ("If an alien does not speak English,

26  deportation proceedings must be translated into a language the alien

27  understands."); *Tejeda-Mata v. INS*, 626 F.2d 721, 726 (9th Cir. 1980) ("this

28  court and others have repeatedly recognized the importance of an interpreter

1    to the fundamental fairness of such a [deportation] hearing if the alien

2    cannot speak English fluently").

3          While there are no doubt differences between an attorney's

4    "translation" for a detainee with a serious mental disability and an

5    interpreter's translation, none of them suffices to explain why only the latter

6    is required for a "full and fair" hearing.  Both impose a cost on the

7    Government, yet both are necessary to ensure that detainees have a

8    meaningful opportunity to contest the charges and obtain available relief.

9    *See Vitek v. Jones*, 445 U.S. 480, 497 (1980) (White, J., for plurality) ("[W]e

10   have recognized that prisoners who are illiterate and uneducated have a

11   great[] need for assistance in exercising their rights[;] A prisoner thought to

12   be suffering from a mental disease or defect requiring involuntary treatment

13   probably has an even greater need for legal assistance, for such a prisoner is

14   more likely to be unable to understand or exercise his rights.").

15         Here, Plaintiffs seek relief for individuals who have been determined

16   incompetent to represent themselves under the Government's existing

17   system.  In each of their cases, Plaintiffs have shown, DHS has conceded, or

18   an Immigration Judge has concluded that the "respondent lacks sufficient

19   competency to proceed with the hearing," and therefore that the individual in

20   question is entitled to additional "safeguards to protect the rights and

21   privileges of the alien," including most obviously the right to a fair hearing.

22   *M-A-M-*, 25 I&N Dec. at 481.  Because these individuals cannot represent

23   themselves, the basic statutory requirement that they be afforded full and fair

24   immigration proceedings requires that they have appointed counsel.

25         **B.    Even were Appointed Counsel Not Required to Ensure a**
           **Fair Hearing, the Important Interests at Stake Would**
26         **Entitle Plaintiffs to Appointed Counsel.**

27         Even if the right to a fair hearing, by itself, is not sufficient to require

28   the appointment of counsel, the Court must ensure legal representation for

1    Subclass One members under the Supreme Court's right-to-counsel

2    jurisprudence in civil cases because of the important interests at stake.

3          The Due Process Clause unquestionably requires the appointment of

4    counsel in some civil cases.  *In re Gault*, 387 U.S. 1, 41 (1967) (requiring

5    appointed counsel in juvenile delinquency proceedings); *Lassiter v. Dep't*

6    *Soc. Serv.*, 452 U.S. 18 (1981)  (requiring appointed counsel on a case-by-

7    case basis for some parental termination proceedings).  Under these cases,

8    the Court determines whether Due Process requires appointed counsel by

9    applying the balancing analysis set forth in *Mathews v. Eldridge*, 424 U.S.

10   319, 335 (1976) (requiring balancing of (i) the private interest involved, (ii)

11   the government's interest, and (iii) the additional risk of error created by the

12   absence of the procedure sought).

13         The Court recently considered a claim for appointed counsel in civil

14   contempt proceedings in *Turner v. Rogers*, 131 S. Ct. 2507 (2011), and

15   while it rejected the claim, its analysis strongly suggests that the Due

16   Process Clause requires appointed counsel for Subclass One members.  In

17   *Turner*, a family court judge ordered up to one year's imprisonment for a

18   South Carolina man for so long as he continued to refuse to pay child

19   support.  *Id*. at 2513.  Turner had appeared *pro se* (as had the mother of his

20   child, Ms. Rogers, who was present as the opposing party, *id*. at 2513), and

21   for that reason challenged the constitutionality of his civil contempt

22   sentence.  The Court agreed that Turner's incarceration violated Due

23   Process, but also held that people imprisoned as a result of civil contempt

24   proceedings pursuant to South Carolina's procedures do not *necessarily* have

25   a right to appointed counsel in their contempt proceedings.  However,

26   *Turner*'s analysis of the *Mathews* test, along with pre-existing law

27   concerning due process protections in the immigration context, clearly

28   demonstrates Plaintiffs' entitlement to appointed counsel under the Due

1   Process Clause.  *See* Dkt. 57 at 23 (arguing for appointed counsel under

2   *Mathews* prior to *Turner*).[12]

### 1.  Plaintiffs' Private Interest is Clearly Substantial.

4       The first factor that the Court must consider in the Due Process

5   analysis concerns the nature of Plaintiffs' interest in the right they seek to

6   vindicate.  Plaintiffs have an overwhelming private interest in securing

7   counsel for their immigration hearings.  That interest arises from both the

8   threat of deportation and the detention incident to the removal process.

9       The Supreme Court has long recognized that deportation can result in

10  massive hardship.  *See, e.g.*, *Bridges v. Wixon*, 326 U.S. 135, 164 (1945)

11  ("The impact of deportation upon the life of an alien is often as great if not

12  greater than the imposition of a criminal sentence. . . . Return to his native

13  land may result in poverty, persecution, even death.").  As Justice Brandeis

14  stated ninety years ago, deportation "may result also in loss of both property

15  and life; or of all that makes life worth living." *Ng Fung Ho v. White*, 259

16  U.S. 276, 282, 284 (1922).

17      The Supreme Court has not retreated from its long-standing

18  recognition of the profound deprivation of liberty at stake in immigration

19  proceedings in recent times.  Just two years ago the Court again underscored

20  the serious deprivation at issue when it held that the quasi-criminal nature of

21  deportation as a sanction, and its close connection to criminal proceedings,

22  required criminal counsel to provide accurate advice to non-citizen

23

24  [12]     *Turner* rejected the claim that any hearing that could result in the
    denial of physical liberty *necessarily* requires the appointment of counsel.

25  *See Turner*, 131 S.Ct. at 2516-17 (reading statements in *Lassiter* as dicta).
    This portion of *Turner* forecloses one of Plaintiffs' prior arguments for the

26  appointment of counsel.  *See* Dkt. 57 at 23 (arguing that physical liberty
    interests for Subclass One members were alone sufficient to establish

27  constitutional right to appointed counsel).

28

defendants concerning the immigration consequences of potential convictions.  *Padilla v. Kentucky*, 130 S. Ct. 1473, 1486 (2010) (holding that the Sixth Amendment requires competent advice as to immigration consequences in part because of "the severity of deportation – the equivalent of banishment or exile").

While all individuals risk harm from wrongful deportation, Subclass One members are more likely to suffer extremely serious consequences should the immigration courts wrongly order them removed.  The Named Representatives' cases amply illustrate this point – Khukhryanskiy, Martinez, Zhalezny, and Chavez all risk brutal treatment if deported.  *See* Ex. 63 at 2, 4-6; Ex. 69  ¶ 10; Ex. 106 at ¶¶ 3, 14, 16; Ex. 124A at 4-5.[13]

Apart from the threat of removal, those who are not competent to represent themselves have a further interest in obtaining counsel in their removal proceedings because they face detention while their removal proceedings remain pending.  Courts have long recognized the interest in

---

[13]     In addition, many of the Subclass One members are from countries in Latin America that have adopted harsh policies towards people with mental disabilities.  The Pan-American Health Organization has decried the treatment of persons with mental disabilities in Latin America:

> Throughout the Americas, persons with mental disabilities . . . are often confined against their will and without due process, and may be left to languish for years, at times for their entire lives, in deplorable conditions. Some are forcibly institutionalized for years on end, with little hope of having their case reviewed. Some are held in isolation in remote mental health hospitals, far removed from any government scrutiny or regulation enforcement. Some lie in their own waste, are shackled to their beds, waste away in caged beds, or are tied outdoors with no protection from the elements. Some are deprived of food, medication, or clothing. Some are beaten. Some are raped.

PAN-AM. HEALTH ORG., HUMAN RIGHTS & HEALTH: PERS. WITH MENTAL DISABILITIES (2008);  *See* http://www.paho.org/english/DD/PUB/10069_Mental.pdf.

1    freedom from imprisonment – whether civil or criminal – as an interest of

2    the highest order in the civil counsel context.  *See, e.g.*, *Heryford v. Parker*,

3    396 F.2d 393, 396 (10th Cir. 1968) (holding that Due Process requires

4    appointed counsel for civil commitment proceedings).

5           While *Turner* holds that the deprivation of physical liberty is

6    insufficient, without more, to establish the right to appointed counsel under

7    *Mathews*, it reaffirms that the interest at stake arising from the detention is

8    weighty and properly taken into account in determining whether counsel

9    should be appointed.  The Court characterized the interest as "the freedom

10   from bodily restraint, [that] lies at the core of the liberty protected by the

11   Due Process Clause" and found that it weighed strongly in the detainee's

12   favor.  *Id.* at 2518 (internal citations omitted).  Finally, class members'

13   claims to right to counsel are further strengthened by the fact that their

14   serious mental disorders often create delays in their cases, thus prolonging

15   their detention.  *Cf. Casas-Castrillon v. Department of Homeland Security*,

16   535 F.3d 942, 950 (9th Cir. 2008) (recognizing immigration detainees'

17   "constitutionally protected interest in avoiding physical restraint").

18
19        **2.    The Risk of Error from Failure to Appoint Counsel is
                   Significant.**

20          The second factor in the Due Process analysis concerns the likely risk

21   of error created by the absence of counsel, and this factor also counsels very

22   strongly in favor of Plaintiffs' claim.  Immigration Judges simply cannot

23   provide a fair hearing, let alone make an accurate determination as to the

24   rights of any given detainee, when that individual cannot understand the

25   proceedings.  As this Court succinctly described the problem in the context

26   of one Subclass One representative, "it is difficult to conceive of any

27   paradigm in which Martinez could proceed *pro se*."  Dkt. 107 at 31.

28          The Supreme Court's recent analysis of the "risk of error" factor in

                                            23

1   *Turner v. Rogers* confirms that it cuts strongly in Plaintiffs' favor, for three

2   reasons:

3        *First*, *Turner* noted that the primary issue in a civil contempt

4   proceeding concerns whether the contemnor has the ability to pay his or her

5   child support – that is, whether he or she is indigent.  That question is

6   generally not complex, and is routinely determined without the benefit of

7   counsel even in criminal cases.  *Turner*, 131 S.Ct. at 2519.  Here, by

8   contrast, federal courts have repeatedly recognized the complexity of

9   immigration cases and the resulting potential for error even when mentally

10  competent individuals are forced to defend themselves without legal

11  representation.  *See, e.g., Padilla v. Kentucky*, 130 S.Ct. 1473, 1483 (2010)

12  ("Immigration law can be complex, and it is a legal specialty of its own.");

13  *Escobar-Grijalva* v. *INS*, 206 F.3d 1331, 1335 (9th Cir. 2000) ("Deprivation

14  of the statutory right to counsel deprives an alien asylum-seeker of the one

15  hope she has to thread a labyrinth almost as impenetrable as the Internal

16  Revenue Code.").

17       It should be obvious that the potential for error in such complex

18  proceedings is greatly magnified when they involve individuals who, by

19  definition, are not competent to proceed *pro se*.  The history of this litigation

20  is already replete with egregious error arising from removal proceedings

21  involving detainees who were not competent to represent themselves.

22       Mr. Khukhryanskiy's case amply demonstrates this point.  The IJ

23  apparently already knew that he would not understand the proceedings, as

24  she had asked a deportation officer to "assist" with his representation.  SUF

25  #6.  Nonetheless, with this "assistance" in place, the IJ moved forward and

26  ordered him removed to the Ukraine, SUF # 9, even though he clearly

27  informed the IJ that he could not understand what was happening at his

28  hearing, and even though he was eligible for relief from removal.  At the

1    time this Court granted his motion for preliminary injunction, he was *pro se*

2    before the BIA.  As this Court already concluded, Mr. Khukhryanskiy "did

3    not meaningfully participate in his removal proceedings as a result of his

4    mental illness," Dkt. 107 at 34.  After he obtained representation pursuant to

5    this Court's order, however, he won a remand for a new hearing from the

6    BIA, and then obtained the relief for which he had been eligible all along

7    before the Immigration Judge.  There can be no serious dispute that Mr.

8    Khukhryanskiy would have been wrongfully deported were it not for the

9    provision of legal representation pursuant to this Court's order.

10        Mr. Martinez's case provides further evidence that the complexity of

11   immigration cases makes the risk of error unacceptably high when Subclass

12   One members must proceed *pro se*.  Mr. Martinez spent 11 months

13   languishing before the Immigration Judge, SUF #14, and likely would have

14   been ordered removed were it not for Plaintiffs' counsel's letter to the judge,

15   and then the Court's preliminary injunction ruling, which came at a time

16   when Mr. Martinez was being forced to defend, *pro se*, against the DHS's

17   appeal of the Immigration Judge's decision terminating proceedings due to

18   his incompetence.  SUF #12.  Since obtaining representation and a bond

19   hearing pursuant to this Court's order, Mr. Martinez has been released to a

20   mental health facility, and his case has been closed until the government

21   finds him an attorney, as this Court's order requires.

22        Mr. Zhalezny's case provides still further illustration of the risk of

23   error.  He spent over a year in immigration detention before this Court

24   granted his motion for preliminary injunctive relief, SUF #19, as the Judge

25   in his case repeatedly delayed resolution while trying to find him an attorney

26   and, when that failed, by trying to enlist his father to represent him.  SUF

27   #20.  Mr. Zhalezny was scheduled to defend his asylum application with the

28   help of his father, even though his father had informed the immigration court

1    that he felt unable to provide legal assistance to his son, at the time of this

2    Court's order.  SUF #21.[14]

3         Finally, Mr. Chavez's case further supports Plaintiffs' argument that

4    the risk of error is grave.  The Immigration Judge erroneously accepted a

5    waiver of representation from Mr. Chavez even though he was not

6    competent to represent himself, and ultimately denied his application for

7    withholding or relief under the Convention Against Torture and ordered him

8    deported.  SUF #25.  It was this error that led the Board of Immigration

9    Appeals to reopen Mr. Chavez's proceedings in 2008.  SUF #26.

10        The experiences of other Subclass One members confirm that the

11   problems experienced by the Named Representatives are the result of

12   systemic failures.  Subclass One member Mr. Zotov has been detained since

13   December 2010, and was ordered removed while being unrepresented in

14   December 2011, even after the IJ concluded that he was incompetent to

15   proceed *pro se*.  SUF #38, # 39.  And other Subclass One members continue

16   to attend hearings where they appear *pro se*.  SUF #35.

17        *Second*, *Turner* placed significant weight on the fact that the party

18   seeking enforcement of a civil contempt order — often an indigent single

19   parent — is frequently unrepresented in the civil contempt proceedings.  The

20

21   [14]      Two recent studies of the issue conclude that allowing detainees with
     serious mental disabilities to proceed *pro se* creates a high risk of error in
22   removal proceedings.  *See, e.g.*, TEXAS APPLESEED, JUSTICE FOR
     IMMIGRATION'S HIDDEN POPULATIONS at 49 ("[A] mental health disorder can
23   have a particularly devastating impact on the ability of a [pro se] immigrant
     to receive a fair hearing."); HUMAN RIGHTS WATCH AND THE AMERICAN
24   CIVIL LIBERTIES UNION, DEPORTATION BY DEFAULT: MENTAL DISABILITY,
     UNFAIR HEARINGS, AND INDEFINITE DETENTION IN THE US IMMIGRATION
25   JUSTICE SYS.(2010) (hereafter "HRW Report") at 54 ("Without a lawyer,
     many individuals with mental disabilities who have viable claims will not
26   have the chance to present their cases and defend their rights in immigration
27   court—even if they have reasonable grounds for a defense.").

28

1  Court thus cautioned that the "asymmetry of representation" could "make
2  the decision *less* fair overall." *Id*. at 2519 (emphasis in original).  But here,
3  of course, the asymmetry of representation cuts strongly in Plaintiffs' favor,
4  because individuals who are not competent to represent themselves stand
5  "helpless and alone before the Court," *Massey*, 348 U.S. at 108, while the
6  Government is always represented by an attorney trained in the complexities
7  of immigration law, who is advocating their removal.  As Dr. Barrett, Dr.
8  Burchuk, Dr. Ferranti, and Dr. Stone explained with respect to Plaintiffs
9  Khukhryanskiy, Martinez, Zhalezny, and Chavez, the risk of error is
10 substantial under such conditions.  *See supra* Section III.A.1.c.

11     *Third*, *Turner* held that, given the simplicity of civil contempt
12 proceedings, the State could satisfy its Due Process obligations through the
13 use of certain safeguards – notice to the detainee of the central issue in the
14 proceeding, a form eliciting relevant information, and a requirement for
15 questioning based on that form.  *Turner*, 131 S. Ct. at 2519.  But, as noted
16 above, no comparable safeguards short of counsel are available in
17 immigration cases, given their complexity and, relatedly, the inability to
18 reduce the critical information needed to a simple form.  And even if such
19 forms could suffice for some detained immigrants, they certainly could not
20 for those who suffer from serious mental disabilities.

21     In the immigration context, several circuit courts have concluded that
22 Due Process requires that at least *some* individuals receive appointed
23 counsel, depending on the circumstances of their particular cases.  While
24 these cases were decided prior to *Turner*, their reasoning supports Plaintiffs'
25 claim that the subset of immigration detainees who are not competent to
26 represent themselves due to their serious mental disorders are entitled to
27 appointed counsel.  *See Lin v. Ashcroft*, 377 F.3d 1014, 1034 (9th Cir. 2004)
28 (holding in the context of unaccompanied minors in immigration

proceedings that "[a]bsent a minor's knowing, intelligent, and voluntary waiver of the right to counsel, the IJ may have to take an affirmative role in securing representation by competent counsel."); *United States v. Campos-Asencio*, 822 F.2d 506, 509 (5th Cir. 1987) (holding that "an alien has a right to counsel if the absence of counsel would violate due process under the fifth amendment" because, in some cases, "the laws and regulations determining [an alien's] deportability [a]re too complex for a pro se alien") (citing *Partible v. INS*, 600 F.2d 1094, 1096 (5th Cir. 1979)); *Aguilera-Enriquez v. INS*, 516 F.2d 565, 568 n.3 (6th Cir. 1975) ("[W]here an unrepresented indigent alien would require counsel to present his position adequately to an immigration judge, he must be provided with a lawyer at the Government's expense. Otherwise 'fundamental fairness' would be violated.").

For all of these reasons, *Turner* and pre-existing civil counsel caselaw strongly suggest that appointed counsel is necessary to mitigate the risk of erroneous deprivations of liberty for Subclass One members facing immigration detention and removal.

### 3.   The Government's Interest in Barring Appointment of Counsel is Not Significant.

The Government's competing interest in denying counsel is insignificant.  The Government actually shares Plaintiffs' interest in accurate decisions in removal cases.  As *Lassiter* explained, "the State . . . shares the parent's interest in an accurate and just decision.  For this reason, the State may share the indigent parent's interest in the availability of appointed counsel."  *Lassiter*, 452 U.S. at 27.  While the Government no doubt has a threshold *pecuniary* interest in resisting the appointment of counsel, that interest is mitigated by two factors.  *First*, the number of cases involved is extremely small in comparison to the number of immigration cases in which the Government already provides counsel for itself, let alone the number of

criminal cases in which the Government already appoints counsel.  SUF #28. *Cf. Lassiter*, 452 U.S. at 28 ("though the State's pecuniary interest is legitimate, it is hardly significant enough to overcome private interests as important as those here, particularly in light of the concession . . . that the 'potential costs of appointed counsel in termination proceedings . . . is [sic] admittedly de minimis compared to the costs in all criminal actions.'"). *Second*, because the Government already pays for the detention of unrepresented people with mental disabilities and those cases are often greatly lengthened by the absence of counsel, the Government may save money by appointing counsel for people with serious mental disabilities.[15]

For all of these reasons, the Due Process Clause requires the provision of counsel to Subclass One members.

III.   **THE IMMIGRATION STATUTES, DUE PROCESS CLAUSE, AND REHABILITATION ACT ALL REQUIRE THE PROVISION OF RIGOROUS BOND HEARINGS FOR THOSE CLASS MEMBERS WHO HAVE BEEN DETAINED FOR MORE THAN SIX MONTHS.**

The immigration detention statutes, Due Process Clause, and the Rehabilitation Act all require that Class members detained for more than six months (Subclass Two members) be afforded a custody hearing where the Government bears the burden of proof to justify their continued detention by

---

[15]   For example, the Government has promoted its Legal Orientation Program in part because of evidence that the immigration courts are able to more quickly process the cases of those with greater understanding of the immigration system and thus able to save on detention costs.  *See* Nina Siulc et al.,Vera Institute For Justice, Improving Efficiency and Promoting Justice in the Immigration System (2008), *available at* http://www.vera.org/download?file=1780/LOP%2BEvaluation_May2008_final.pdf ("The more quickly detained cases are completed, the sooner detained persons are eligible to be released from custody or removed from the U.S. This can free available bed space at detention facilities and substantially reduce costs for the federal government.").

29

1   clear and convincing evidence, given the substantial delays they have

2   suffered (and likely will suffer) due to their mental disabilities and the

3   government's failure to adopt procedures to deal with those disabilities.

4           This Court has already ruled that governing Ninth Circuit law requires

5   bond hearings for all class members detained for longer than six months

6   while their cases are pending.  *See* Dkt. 107 at 39-41 (adopting rule with

7   respect to Mr. Martinez and Mr. Khukhryanskiy); 215 at 9-14 (reaffirming

8   rule with respect to Mr. Zhalezny); 285 at 6-8 (reaffirming rule, again, with

9   respect to Mr. Woldemariam).  The logic of those rulings plainly applies

10  here; none of the immigration statutes under which Subclass Two members

11  are detained authorizes prolonged detention without rigorous bond hearings.

12  Instead, each statute authorizes detention without such hearings only where

13  that detention is brief.  *See Casas-Castrillon*, 535 F.3d at 951 (requiring

14  bond hearings under 8 U.S.C. 1226(a) because prolonged mandatory

15  detention without an individualized determination of dangerousness or flight

16  risk under Section 1226(c) would be "constitutionally doubtful"); *Diouf v.*

17  *Napolitano*, 634 F.3d 1081, 1091 (9th Cir. 2011) (holding that non-citizen

18  facing prolonged detention under 8 U.S.C. 1231(a)(6) is entitled to bond

19  hearing before an immigration judge); *Nadarajah v. Gonzales* 443 F.3d

20  1069, 1079 (9th Cir. 2006) (holding that the period of detention allowed

21  under the general detention statutes must be "brief and reasonable," as the

22  Supreme Court has held when construing similar provisions); *Centeno-Ortiz*

23  *v. Culley*, 2012 WL 170123 (S.D. Cal. 2012) (holding that non-citizen

24  detained under 8 U.S.C. 1225(b) is entitled to a bond hearing before an

25  immigration judge where detention is prolonged).

26          This Court and the Ninth Circuit have already held that proceedings

27  are no longer "expeditious" and instead become "prolonged" at six months.

28  Dkt. 285 at 7 (citing *Diouf*, 634 F.3d at 1092).  And the Ninth Circuit has

1    held that in custody hearings for persons subject to prolonged detention, the

2    burden shifts to the government to justify detention by clear and convincing

3    evidence.  *Singh v. Holder*, 638 F.3d 1196, 1203 (9th Cir. 2011).

4             For these reasons, the Court should order the Government to afford all

5    Class members who have been detained for more than 180 days (that is, all

6    Subclass Two members) with custody hearings before an IJ with authority to

7    grant their release unless the Government proves that further detention is

8    justified by clear and convincing evidence.  *See* Dkt. 285 at 8 (citing *Singh v.*

9    *Holder*, 638 F.3d at 1203).

10            As an additional basis for this relief, Plaintiffs are entitled to partial

11   summary judgment on the claim that an individualized bond hearing is

12   required to determine whether their detention is appropriate as an

13   accommodation under Section 504 and its implementing regulations.

14   Because the Government interprets Section 1226(c)'s mandatory detention

15   requirement to contain no exception for people with mental disabilities and

16   at the same time provides no procedures for dealing expeditiously with the

17   cases of mentally disabled detainees in immigration proceedings, such

18   individuals are far more vulnerable than others to be subject to prolonged

19   detention pending their proceedings.  *See* Dkt. 215 at 13-14 (noting delays in

20   Mr. Zhalezny's case due to "the lack of systemic guidelines for

21   unrepresented mentally incompetent aliens" and because of continuances to

22   allow "[Mr. Zhalezny's family []] to fully litigate his removal"); Dkt. 285 at

23   8-9 (noting multiple continuances to allow Mr. Woldermariam to seek

24   assistance of counsel and for competency hearing).  Here, by definition,

25   even under the Government's existing system for identifying individuals

26   with serious mental disabilities, any Class member must receive an

27   additional hearing under *M-A-M-* that creates additional delay in their

28   removal hearing.  Many Class members likely encounter far greater delays

1  as well, given the inefficiencies of the Government's existing system.

2  Affording such individuals a bond hearing after six months of detention as a

3  reasonable accommodation would ameliorate the discrimination that Section

4  504 of the Rehabilitation Act was designed to curtail.[16]

5  **CONCLUSION**

6  For the foregoing reasons, Plaintiffs respectfully request that the Court

7  grant summary judgment in their favor on the claims asserted herein, that the

8  Court order the government to provide legal representation in the

9  immigration proceedings (including bond proceedings) of all Subclass One

10  members, and that the Court order the government to provide *Casas*

11  hearings to all Subclass Two members.

12  Respectfully submitted,

13  ACLU OF SOUTHERN CALIFORNIA

14  Dated:  July 9, 2012       s/ Ahilan T. Arulanantham
                               AHILAN T. ARULANANTHAM
15                             Counsel for Plaintiffs-Petitioners

16

17

18

19

20

---

21  [16] It follows from this Court's orders granting preliminary injunctive relief

22  that Plaintiffs are entitled to a permanent injunction consistent with the
    arguments set forth in this Memorandum.  For reasons this Court has

23  previously explained, the Named Plaintiffs and Subclass members who seek

24  relief by this Motion all have suffered or will suffer irreparable harm for
    which no remedy at law can compensate them, equitable relief is warranted

25  to remedy that harm, and the public would suffer no disservice by the

26  provision of such relief.  *See* Dkt. 107 at 41-43; 215 at 24-25; 285 at 11-12.
    *See also Correctional S'vces Corp. v. Malesko*, 534 U.S. 61, 74 (2001)

27  ("[I]njunctive relief has long been recognized as the proper means for

28  preventing entities from acting unconstitutionally.").