1    AHILAN T. ARULANANTHAM (State Bar No. 237841)
     aarulanantham@aclu-sc.org
2    MARISOL ORIHUELA (State Bar No. 261375)
     morihuela@aclu-sc.org
3    ACLU FOUNDATION OF SOUTHERN CALIFORNIA
     1313 West 8th Street
4    Los Angeles, California 90017
     Telephone: (213) 977-5211
5    Facsimile: (213) 417-2211

6    MICHAEL H. STEINBERG (State Bar No. 134179)
     steinbergm@sullcrom.com
7    SULLIVAN & CROMWELL LLP
     1888 Century Park East, Suite 2100
8    Los Angeles, California  90067-1725
     Telephone: (310) 712-6600
9    Facsimile: (310) 712-8800


10   *Attorneys for Plaintiffs-Petitioners*
     (Additional Counsel for Plaintiffs
11    on Following Page)

12

13                **UNITED STATES DISTRICT COURT**

14               **CENTRAL DISTRICT OF CALIFORNIA**

15

16   JOSE ANTONIO FRANCO-            )    Case No. 10-CV-02211 DMG (DTBx)
     GONZALEZ, et al.,               )
17                                   )    **SUPPLEMENTAL DECLARATION**
          *Plaintiffs-Petitioners,*  )    **OF MARISOL ORIHUELA,**
18                                   )    **OF AUGUST 24, 2012**
                   v.                )
19                                   )    **EXHIBITS**
     ERIC H. HOLDER, Jr., Attorney   )
20   General, et al.,                )    Hearing Date:  September 7, 2012
                                     )
21        *Defendants-Respondents.*  )    Hearing Time:  11:00 a.m.
                                     )
22   _____ )    Honorable Dolly M. Gee

23

24

25

26

27

28

JUDY LONDON (State Bar No. 149431)
jlondon@publiccounsel.org
TALIA INLENDER (State Bar No. 253796)
tinlender@publiccounsel.org
PUBLIC COUNSEL
610 South Ardmore Avenue
Los Angeles, California 90005
Telephone: (213) 385 2977
Facsimile: (213) 385-9089

JUDY RABINOVITZ (State Bar No. JR-1214)
JRabinovitz@aclu.org
ACLU IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, New York 10004-2400
Telephone: (212) 549-2618
Facsimile: (212) 549-2654

DAVID LOY (State Bar No. 229235)
dblairloy@aclusandiego.org
SEAN RIORDAN (State Bar No. 255752)
sriordan@aclusandiego.org
ACLU OF SAN DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, California 92138
Telephone: (619) 232-2121
Facsimile: (619) 232-0036

JAMES PREIS (State Bar No. 82690)
jpreis@mhas-la.org
MENTAL HEALTH ADVOCACY SERVICES
3255 Wilshire Boulevard, Suite 902
Los Angeles, California 90010
Telephone: (213) 389-2077
Facsimile: (213) 389-2595

MATT ADAMS (State Bar No. 28287)
matt@nwirp.org
RIDDHI MUKHOPADHYAY
riddhi@nwirp.org
NORTHWEST IMMIGRANT RIGHTS PROJECT
615 2nd Avenue, Suite 400
Seattle, Washington 98104-2244
Telephone: (206) 957-8611
Facsimile: (206) 587-4025

JAMES LYALL (State Bar No. 330045)
jlyall@acluaz.org
ACLU FOUNDATION OF ARIZONA
3707 N. 7th Street, Suite 235
Phoenix, Arizona 85014
Telephone: (602) 773-6001
Facsimile: (602) 650-1376

*Attorneys for Plaintiffs-Petitioners*

## SUPPLEMENTAL DECLARATION OF MARISOL ORIHUELA, OF AUGUST 24, 2012

I, Marisol Orihuela, declare as follows:

1.      I am a member of the State Bar of California and a staff attorney at the ACLU of Southern California in Los Angeles, California.  I am co-counsel for Plaintiffs in this litigation.  I submit this declaration in support of Plaintiffs' Motion for Partial Summary Judgment.  I have personal knowledge of the facts set forth in this declaration and, if called as a witness, could and would competently testify to such facts under oath.

**Correspondence Regarding Subclass One members**

2.      On July 18, 2012, after Plaintiffs filed their Motion for Partial Summary Judgment, Plaintiffs' counsel sent another letter to the Government regarding the provision of legal representation and bond hearings for the individuals the Government identified as Subclass One members.  A copy of the July 18 letter is filed concurrently, under seal, as Exhibit 305.

3.      In the July 18, 2012 letter, as they had done in previous correspondence,[1] Plaintiffs asked Defendants to "refrain from pursuing removal proceedings against [Subclass One members] while [they] remain[] unrepresented" and to "provide" those who had been detained for over six months "a bond hearing at which [they are] represented and in accordance with the Court's preliminary injunction orders."

---

[1] On May 8, 2012, Plaintiffs asked Defendants that they "refrain from pursuing removal proceedings against  [Subclass One members] unless Defendants first provide the Subclass One members legal representation in the form of a pro bono or paid qualified representative".  *See* Ex. 269 at 1.  On June 6, 2012, Plaintiffs, asked Defendants to "state whether Defendants intend to obtain legal representation for identified Subclass One members or schedule bond hearings (with representation) for those detained over 180 days."  *See* Ex. 272.

1    4.    The July 18, 2012 letter asked for a response by no later than July 27,

2    2012, and specifically asked for a sooner response for one Subclass One member

3    who had a hearing scheduled for July 19, 2012.

4    5.    Plaintiffs did not receive a response by July 27, 2012 as to any of the

5    individuals mentioned in the July 18, 2012 letter.

6    6.    On August 7, 2012, I wrote Defendants' counsel Mr. Victor Lawrence

7    an email inquiring as to the letter.  On August 8, 2012, Mr. Lawrence sent me an

8    email indicating that the letter has been "misplaced" and that he suspected he

9    would be able to respond on August 9, 2012.  A copy of the email correspondence

10   is filed concurrently, under seal, as Exhibit 306.

11   7.    Since that time, Plaintiffs have not received any response to the July

12   18, 2012 letter requesting legal representation for Subclass One members and bond

13   hearings for those Subclass One members who have been detained for longer than

14   six months, whether by letter or email.

15   **Defendants' Representations Regarding Custody Hearings**

16   8.    Mr. Samuel Go, in his declaration in support of Defendants'

17   opposition to Plaintiffs' Motion for Summary Judgment, attests that Mr. Maximino

18   Gutierrez Solano received a bond hearing in October 2011.  Plaintiffs first inquired

19   as to Mr. Gutierrez Solano's length of detention, and whether Defendants intended

20   to provide him a bond hearing, on May 8, 2012.  *See* Ex. 269.  On May 16, 2012,

21   Defendants' counsel indicated that Mr. Gutierrez Solano had been detained for

22   longer than six months but that he had been provided a bond hearing in October

23   2011.  *See* Ex. 271.  On June 6, 2012, Plaintiffs asked Defendants *specifically*

24   whether Mr. Gutierrez Solano had received a bond hearing in accordance with this

25   Court's preliminary injunction orders.  Ex.272.   On June 13, 2012, Defendants'

26   counsel confirmed that Mr. Gutierrez Solano's bond hearing was not in accordance

27   with the preliminary injunction orders, by confirming that he was not represented

28   at the bond hearing. Ex. 273.  Defendants' counsel was also silent as to whether

the bond hearing otherwise complied with the Court's prior orders by placing the burden of proof on the government to justify any further detention, and by requiring the standard of proof to be by clear and convincing evidence. *Id.* On July 18, 2012, Plaintiffs renewed their request that Mr. Gutierrrez Solano receive a bond hearing in accordance with this Court's prior orders. Ex. 305. As mentioned above, Defendants have ignored that correspondence, and Mr. Go's declaration does not state Defendants' intention to provide Mr. Gutierrez Solano a bond hearing at which he is represented and where the Government bears the burden of justifying any further detention by clear and convincing evidence. Based on the Parties' correspondence, it appears that Mr. Gutierrez Solano has been detained for over ten months, and (at least for the past two months) has been detained without having any hearing scheduled.

9.       Mr. Go also attests in his declaration that Mr. Nicolas Guerrero Ramirez is scheduled for a bond hearing on September 11, 2012, but does not attest whether Mr. Guerrero Ramirez will be represented at this bond hearing.

**Defendants' Representations Regarding Self-Representation**

10.       I have reviewed the Parties' correspondence regarding Subclass One members, *see* Exs. 269-273, 305-306. None of Defendants' correspondence state that they will guarantee legal representation to all Subclass One members, or that they will refrain from pursuing removal proceedings while the Subclass One members remain unrepresented.

11.       I have also reviewed the evidence submitted by Defendants in opposition to Plaintiffs' Motion for Partial Summary Judgment. Nowhere in Defendants' evidence is there confirmation that Defendants will guarantee legal representation to all Subclass One members, or that they will refrain from pursuing removal proceedings while the Subclass One members remain unrepresented.

12.       Of the four individuals the Government concedes remain detained, unrepresented, and in removal proceedings, *see* Go Declaration at ¶ 26, I am aware

3

1   that Mr. Zotov, Mr. Guerrero-Ramirez, and Mr. Gutierrez-Solano have been

2   detained for longer than six months.

3       13.   Based on class counsel's interactions with Mr. Zotov, I have reason to

4   believe that Mr. Zotov has been detained for over one year and two months.  *See*

5   Ex. 256 (Declaration of Sean Riordan) at ¶ 4 (noting that Mr. Zotov was detained

6   in June 2011).

7       14.   Based on the Parties' correspondence, indicating that Mr. Gutierrez-

8   Solano was in ICE custody as of October 2011, I have reason to believe that Mr.

9   Guteierrez-Solano has been detained for at least ten months.

10      15.   Based on the Parties' correspondence, indicating that as of May 16,

11   2012, Mr. Guerrero-Ramirez had been detained for over six months, I have reason

12   to believe that Mr. Guerrero-Ramirez has been detained for over ninth months.

13      16.   As indicated in my prior Declaration of July 9, 2012, I personally

14   observed Mr. Merlon Chinchilla, a former Subclass One member, proceed *pro se*

15   during removal proceedings.

16      17.   Based on conversations I have had with summer students who have

17   observed the removal proceedings of other Subclass One members and other

18   Plaintiffs' counsel, I am aware that other Subclass One members have been forced

19   to proceed *pro se* during removal proceedings.  Their declarations are filed

20   concurrently as Exhibits 312-314.

21      18.   In the removal proceeding of one Subclass One member, Mr. Luis

22   Gonzalez, the Immigration Judge, at the request of the DHS trial attorney, made a

23   finding of removability against Mr. Gonzalez, even though he was not competent

24   to represent himself and was proceeding *pro se*.  Ex. 314.

25      19.   In the removal proceedings of another Subclass One member, Mr.

26   Weldyes, the DHS trial attorney was permitted to question Mr. Weldyes despite

27   the fact that he lacked representation and was not competent to proceed *pro se*.  Ex.

28   312 at ¶¶ 4-5.  According to the student personally observing the removal

proceedings, the Immigration Judge noted in that case that DHS kept asking for continuances without explaining how Mr. Weldyes's rights were being protected. *Id.* at ¶ 7.

20.     In the removal proceedings of another Subclass One member, Mr. Zhang, a student personally observed the Immigration Judge request a competency evaluation from DHS, and when DHS failed to provide one, decide that he could not proceed with removal proceedings without an evaluation. *See* Ex. 313 at ¶¶ 3, 7-9.

**Newly-Identified Subclass One Members**

21.     Since Plaintiffs filed their Motion for Partial Summary Judgment, Defendants have identified 5 individuals as Subclass One members, for a total of 26 Subclass One members identified since March 29, 2012.

22.     Out of the total of 26 Subclass One members identified since March 29, 2012 (when Defendants agreed to start identifying Subclass One members), only 21 are addressed by Defendants in their Opposition to Plaintiffs Partial Summary Judgment motion, although 24 had been identified prior to the time Defendants filed their Opposition.  Defendants have not indicated any intention to provide the 5 Subclass One members identified since June 29, 2012, or any future Subclass One members, with representation either at their removal proceedings or at bond hearings for those individuals subject to detention for longer than six months.

**Exhibits in Support of this Motion**

23.     A true and correct copy of the Budget for the Executive Office of Immigration Review for the Fiscal Year 2013, found at http://www.justice.gov/jmd/2013summary/index.html, is attached hereto as Exhibit 308.

24.     A true and correct copy of the Overview Budget for the Department of Justice for the Fiscal Year 2013, found at

1   http://www.justice.gov/jmd/2013summary/index.html, is attached hereto as Exhibit

2   309.

3        25.    A true and correct copy of a letter dated August 10, 2010 which bears

4   the signature of David A. Martin on Department of Homeland Security letterhead

5   is attached hereto as Exhibit 310.

6        26.    A true and correct copy of a document produced by Defendants in

7   discovery that appears to be an email dated August 25, 2010 is attached hereto as

8   Exhibit 311.

9        27.    A true and correct copy of the Declaration of Elizabeth Kelley dated

10  July 26, 2012 is attached hereto as Exhibit 312.

11       28.    A true and correct copy of the Declaration of Yanira Lemus dated

12  August 10, 2012 is attached hereto as Exhibit 313.

13       29.    A true and correct copy of the Declaration of Julia Hunter dated

14  August 24, 2012 is attached hereto as Exhibit 314.

15       30.    A true and correct copy of Exhibit 158, the Declaration of Sean

16  Kennedy, Federal Public Defender, previously submitted to the Court, is re-

17  attached to this declaration for the Court's convenience.

18       I declare under penalty of perjury under the laws of the United States of

19  America that the foregoing is true and correct. Executed on August 24, 2012  in

20  Los Angeles, California.

21

22

23                              Marisol Orihuela

24

25

26

27

28

6

# Exhibit 308



# Administrative Review and Appeals
# Executive Office for Immigration Review (EOIR)

| FY 2013 Budget Request At A Glance | |
| --- | --- |
| FY 2012 Enacted: | $302.3 million (1,582 positions; 506 attorneys) |
| Current Services Adjustments: | +$7.0 million |
| Program Changes: | +$1.4 million |
| FY 2013 Budget Request: | $310.6 million (1,582 positions; 506 attorneys) |
| Change From FY 2012 Enacted: | +$8.4 million (+2.8%) |

**Mission:**

The mission of EOIR is to adjudicate immigration cases in a careful and timely manner, including cases involving detained aliens, criminal aliens, and aliens seeking asylum as a form of relief from removal, while ensuring the standards of due process and fair treatment for all. The Board of Immigration Appeals' mission is to provide timely guidance and interpretation of immigration law.

**Organization:**

EOIR was created on January 9, 1983, through an internal Department of Justice (DOJ) reorganization that combined the Board of Immigration Appeals (BIA or Board) with the Immigration Judge function. Besides establishing EOIR as a separate agency within DOJ, this reorganization made the Immigration Courts independent of the agency charged with enforcement of federal immigration laws. The Office of the Chief Administrative Hearing Officer was added in 1987. EOIR is headed by a Director, appointed by the Attorney General, who oversees 58 Immigration Courts nationwide, as well as BIA and the headquarters organization located in Falls Church, VA.

**Resources:**

The FY 2013 budget request for EOIR totals $310.6 million, which is a 2.8% increase over the FY 2012 Enacted. The FY 2012 Enacted and FY 2013 Request include an annual $4 million transfer from the DHS Immigration Fee Account to EOIR. The FY 2013 Request for DHS/ICE includes language that states ICE can transfer up to $5 million to EOIR "to increase the efficiency of the immigration court process."

**Personnel:**

The EOIR's direct authorized positions for FY 2013 total 1,582 positions and is the same as FY 2012 Enacted. EOIR's FY 2012 enacted appropriation made permanent 24 positions that were originally funded in the FY 2010 Southwest Border Supplemental.

**Funding (FY 2010 - 2013)**



| | 2010 | 2011 | 2012 | 2013 |
| --- | --- | --- | --- | --- |
| Appropriation | $298 | $297 | $302 | $311 |

**Personnel (FY 2010 - 2013)**



| | 2010 | 2011 | 2012 | 2013 |
| --- | --- | --- | --- | --- |
| Authorized Positions | 1,558 | 1,558 | 1,582 | 1,582 |
| Attorneys | [500] | [500] | [506] | [506] |

**FY 2013 Strategy:**

EOIR represents the Department's front-line presence with respect to the application of immigration law. Cases are received on-site, across the Nation, directly from Department of Homeland Security (DHS) enforcement personnel. As such, the coordination of resource allocation between DOJ/EOIR and DHS is critical.

EOIR strategies to respond to this issue are two-fold. First, on a continuing basis, EOIR's Office of the Chief Immigration Judge monitors caseload volume, trends, and geographic concentration and adjusts resource allocations accordingly (modifying local dockets, adjusting detail assignments, and permanently reassigning judge and staff positions from lower to higher volume courts). This also includes the expansion of the use of video teleconferencing to hear cases from remote locations. This strategy involves close national and local coordination with DHS immigration enforcement personnel.

EOIR's second strategy also involves coordinating initiatives and program increases with DHS. Within DHS, Immigration and Customs Enforcement and Customs and Border Protection bring together the majority of immigration enforcement programs that generate immigration caseload.

EOIR has to plan and coordinate with DHS as enforcement programs increase. EOIR's immigration court cases continue to grow with DHS' heightened enforcement efforts. In FY 2009, EOIR received approximately 393,000 matters, a record volume which was replicated in FY 2010. Case receipts continue to rise and topped over 430,000 at the end of FY 2011. As a consequence, case backlogs have continued to increase, i. e., from 190,000 matters pending at the start of 2009 to over 295,000 matters pending by the start of FY 2012. Additionally, BIA receives over 30,000 appeals per year, which is an extremely large volume for an appellate body.

The current and planned expansion of DHS enforcement efforts will likely continue to increase immigration court case receipts well into the future. Most notably, EOIR is working closely with DHS as it expands the Secure Communities initiative, a program that has a direct impact on EOIR court operations. As a result, the FY 2013 request includes an increase of $2 million for EOIR's Legal Orientation Program (LOP), which educates detained aliens on EOIR immigration proceedings, allowing them to make more informed decisions earlier in the adjudication process, thereby increasing efficiencies for both EOIR courts and DHS detention programs. This $2 million program increase along with the remaining $11 million in current services adjustments, is crucial in order to allow EOIR to keep pace with its increasing workload and the continued enforcement efforts of DHS.

**FY 2013 Program Changes:**

**Legal Orientation Program:** $2.0 million and 0 positions
To expand the successful Legal Orientation Program to improve efficiencies in immigration court proceedings for detained aliens by increasing their awareness of their rights and the overall process. Evaluation reports have shown that LOP participants complete their immigration court cases in detention on an average of 13 days faster than detainees who do not participate in an LOP. The $2 million requested program increase will respond to elevated demand at existing sites and allow LOP to expand to at least 6 additional sites. The FY 2013 current services for this initiative are $6 million.

**Program Offset - IT Savings:** -$545,000 and 0 positions
This offset represents savings that will be generated through greater inter-component collaboration in IT contracting. Funds will be redirected to support the Department's Cyber-security and IT transformation efforts as well as other high priority requests.

**Executive Office for Immigration Review**
(Dollars in Thousands)

| | Executive Office for Immigration Review | | |
| --- | --- | --- | --- |
| | Pos | FTE | Amount |
| 2011 Enacted | 1,558 | 1,596 | 297,359 |
| 2012 Enacted | 1,582 | 1,620 | 302,275 |
| 2013 Request | 1,582 | 1,620 | 310,643 |
| Change 2013 from 2012 Enacted | 0 | 0 | 8,368 |
| | | | |
| Technical Adjustments | | | |
|    Technical Adjustment | 0 | 0 | -4,000 |
| Subtotal Technical Adjustments | 0 | 0 | -4,000 |
| Total Technical Adjustments | 0 | 0 | -4,000 |
| Adjustments to Base | | | |
| Increases: | | | |
|    ATB Transfers | 0 | 0 | 4,424 |
|    Pay & Benefits | 0 | 0 | 2,481 |
|    Domestic Rent & Facilities | 0 | 0 | 4,045 |
| Subtotal Increases: | 0 | 0 | 10,950 |
| Decreases: | 0 | 0 | 0 |
| Total Adjustments to Base | 0 | 0 | 10,950 |
| Total Adjustments to Base and Technical Adjustments | 0 | 0 | 6,950 |
| | | | |
| 2013 Current Services | 1,582 | 1,620 | 309,225 |
| Program Changes | | | |
| Increases: | | | |
|    Legal Orientation Program | 0 | 0 | 1,963 |
| Subtotal, Program Increase | 0 | 0 | 1,963 |
| Decreases: | | | |
|    Program Offset - IT Savings | 0 | 0 | -545 |
| Subtotal, Program Decrease | 0 | 0 | -545 |
| Total Program Changes | 0 | 0 | 1,418 |
| 2013 Request | 1,582 | 1,620 | 310,643 |
| Change 2013 from 2012 Enacted | 0 | 0 | 8,368 |

**Executive Office for Immigration Review**
(Dollars in Thousands)

| Comparison by activity and program | 2012 Enacted | | | 2013 Current Services | | |
|---|---|---|---|---|---|---|
| | Perm Pos. | FTE | Amount | Perm Pos. | FTE | Amount |
| Executive Office for Immigration Review | 1,582 | 1,620 | 302,275 | 1,582 | 1,620 | 309,225 |
| Total | 1,582 | 1,620 | 302,275 | 1,582 | 1,620 | 309,225 |
| Reimbursable FTE | 0 | 0 | 0 | 0 | 0 | 0 |
| Grand Total | 1,582 | 1,620 | 302,275 | 1,582 | 1,620 | 309,225 |

| Comparison by activity and program | 2013 Total Program Changes | | | 2013 Request | | |
|---|---|---|---|---|---|---|
| | Perm Pos. | FTE | Amount | Perm Pos. | FTE | Amount |
| Executive Office for Immigration Review | 0 | 0 | 1,418 | 1,582 | 1,620 | 310,643 |
| Total | 0 | 0 | 1,418 | 1,582 | 1,620 | 310,643 |
| Reimbursable FTE | 0 | 0 | 0 | 0 | 0 | 0 |
| Grand Total | 0 | 0 | 1,418 | 1,582 | 1,620 | 310,643 |

**Mason, Robert M**

| | |
|---|---|
| **From:** | ▮▮ |
| **Sent:** | Wednesday, August 25, 2010 1:56 PM |
| **To:** | ▮▮ |
| **Cc:** | Mason, Robert M |
| **Subject:** | FW: A71 317 008 |

**Importance:** High

DO Mason is on his way.

-----Original Message-----
From: ▮▮
Sent: Wednesday, August 25, 2010 1:48 PM
To: ▮▮
Cc: ▮▮
Subject: FW: A71 317 008
Importance: High

Is there a DO immediately available to act as a custodian for this IJ in Scala's courtroom?  Please see below.  RK

-----Original Message-----
From: ▮▮
Sent: Wednesday, August 25, 2010 1:46 PM
To: ▮▮
Subject: FW: A71 317 008
Importance: High

Ryan,

See below - can you help me get a DO in here. Sinc this guy has mental issues the judge wants a DO here to act as custodian.

Thanks,
Neil

-----Original Message-----
From: ▮▮
Sent: Wednesday, August 25, 2010 1:38 PM
To: ▮▮
Subject: FW: A71 317 008
Importance: High

▮▮

1

ICE7

# Exhibit 309

# U.S. DEPARTMENT OF JUSTICE OVERVIEW

**Organization**: Led by the Attorney General, the Department of Justice (DOJ or the Department) is comprised of 43 components that have a broad array of national security, law enforcement, and criminal justice system responsibilities. (The number of components will change in 2012 based on internal reorganizations.)  DOJ prosecutes federal law offenders and represents the U.S. Government in court; its attorneys represent the rights and interests of the American people and enforce federal criminal and civil laws, including antitrust, civil rights, environmental and tax laws; its Immigration Judges ensure speedy justice for immigrants in removal proceedings; its special agents investigate organized and violent crime, illegal drugs, gun and explosives violations; its deputy marshals protect the federal judiciary, apprehend fugitives and transport persons in federal custody; and its correctional officers confine convicted federal offenders, some of whom are illegal immigrants. DOJ also provides grants and training to state, local, and tribal law enforcement partners; and brings together national security, counterterrorism, counterintelligence, and foreign intelligence surveillance operations under a single authority.

Thomas Jefferson wrote, "The most sacred of the duties of government [is] to do equal and impartial justice to all its citizens." This sacred duty to fulfill the promise of justice for all remains the guiding ideal for the men and women of the Department in carrying out their mission:

*"To enforce the law and defend the interests of the United States according to the law; to ensure public safety against threats foreign and domestic; to provide federal leadership in preventing and controlling crime; to seek just punishment for those guilty of unlawful behavior; and to ensure fair and impartial administration of justice for all Americans."*

**Statutory Authority:**  The Judiciary Act of 1789, ch. 20, sec. 35, 1 Stat. 73, 92-93 (1789) created the Office of the Attorney General. In 1870, after the post-Civil War increase in the amount of litigation involving the United States necessitated the very expensive retention of a large number of private attorneys to handle the workload, a concerned Congress passed the Act to Establish the Department of Justice, ch. 150, 16 Stat. 162 (1870) setting it up as "an executive department of the government of the United States" with the Attorney General as its head. The Act gave DOJ control over all criminal prosecutions and civil suits in which the United States had an interest. In addition, the Act gave the Attorney General and the Department control over federal law enforcement, establishing the Attorney General as the chief law enforcement officer of the Federal Government. Finally, to assist the Attorney General, the Act created the Office of the Solicitor General.

The Act is the foundation upon which DOJ still rests. However, the structure of the Department has changed and expanded over the years, with the addition of the Deputy Attorney General and the Associate Attorney General, as well as the formation of the components. Unchanged is the steadily increasing workload of the Department. It has become the world's largest law office and the central agency for enforcement of federal laws.

**Organization Chart:**

# U.S. DEPARTMENT OF JUSTICE



Reorganizations pending in FY 2012 and other changes that will affect the DOJ organization chart include:

- **Close the National Drug Intelligence Center and merge core functions, including Document and Media Exploitation and strategic intelligence reporting, into the Drug Enforcement Administration (DEA).** This is an efficiency improvement and the merger will be completed by the end of FY 2012. DEA funding requirements to support the ongoing activities are addressed in the FY 2013 Budget. DOJ anticipates savings of $12 million in FY 2013.

- **Realign the Office of Dispute Resolution into the Office of Legal Policy.** This is an efficiency improvement. The realignment will be implemented in FY 2012. Because this is an administrative efficiency, there are no projected savings.

- **Realign the Office of Intergovernmental and Public Liaison functions into the Office of Legislative Affairs.** This is an efficiency improvement. This realignment will be implemented in FY 2012 with a savings of $495,000.

- **Merge detention functions currently performance by the Office of the Federal Detention Trustee into United States Marshals Service.** This is an efficiency improvement. Plans are underway for this merger so that full-year savings can be realized in FY 2013. DOJ anticipates savings of $5.6 million in FY 2013.

- **Change name from United States National Central Bureau to INTERPOL Washington.** This appropriation name change was adopted by reference, as requested, in the FY 2012 enacted appropriation.

The following change does not affect the DOJ organization chart, but reorganizes the Department's functions:

**Decentralize the Law Enforcement Wireless Communication (LEWC) funding.** The FY 2013 Budget realigns funding for the Radio/Interoperability program and eliminates the LEWC appropriation. Base operations and maintenance funding for legacy radio networks is transferred back to the components. The Law Enforcement Radio program lead (and associated funding) shifts from the Justice Management Division to the Federal Bureau of Investigation. To effectively implement these changes in FY 2013, the planning and transition to the new structure will begin in FY 2012.



# U.S. Department of Justice

| FY 2013 Budget Request At A Glance<br>Discretionary Budget Authority | |
|---|---|
| FY 2012 Enacted: | $27.2 billion (113,521 positions) |
| FY 2013 Budget Request: | $27.1 billion (114,347 positions) |
| Change from FY 2012 Enacted: | -0.4% (+826 positions) |

**Resources:**

The DOJ FY 2013 Budget totals $27.1 billion in discretionary budget authority, which is 0.4 percent below the FY 2012 enacted level, excluding antitrust and bankruptcy fee receipts. The FY 2013 DOJ Budget delineated by category is: law enforcement (49%); litigation (11%); prisons and detention (32%); administration/technology/other (2%); and grants (6%). In addition, DOJ is estimated to receive $4.2 billion in mandatory resources in FY 2013.

**Personnel:**

DOJ's FY 2013 request includes 114,347 authorized positions (direct only), which is an increase of 826 positions over the FY 2012 enacted level. This staffing level is comprised of: Agents (over 27,000 or 24%); Attorneys (over 12,000 or 11%); Correctional Officers (over 20,000 or 18%); Intelligence Analysts (over 4,000 or 4%); and Other (nearly 50,000 or 43%). "Other" captures administrative, clerical, analysts, information technology specialists, legal services, and security specialists. Including reimbursable staff, DOJ's total FY 2013 authorized staffing level will exceed 116,000, with over 7,000 reimbursable staff and over 1,100 staff located in foreign countries.

**Funding (FY 2010 – 2013)**



|  | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|
| Mandatory | 2,845 | 3,928 | 5,717 | 4,162 |
| Discretionary | 28,018 | 27,286 | 27,212 | 27,102 |

Note: The increase in the FY 2012 mandatory level is due to anticipated receipts and obligations in the AFF related to extraordinarily large cases currently under adjudication.

**Budget by Category**



|  | Law Enforcement | Litigation | Prisons/Detention | State & Local Assistance | Other |
|---|---|---|---|---|---|
| FY 2012 | 13,009 | 3,293 | 8,117 | 2,072 | 681 |
| FY 2013 | 12,969 | 3,360 | 8,513 | 1,675 | 585 |

Note: For FY 2013, an additional $365 million will be provided from CVF receipts for a total of $2.040 billion in State and Local Assistance funding.

## Financial Performance Snapshot FY 2011
### (in millions)

| Clean Opinion on Financial Statements | Yes | Material Weaknesses | None |
|---|---|---|---|
| Timely Financial Reporting | Yes | Net Operating Costs | $32,635 |

# FY 2013 BUDGET SUMMARY

The FY 2013 Budget request provides the necessary resources to defend national security interests, uphold the Department's traditional missions, expand federal prisons and detention capacity, and assist our state, local and tribal law enforcement partners. The Budget identifies savings and efficiencies while maintaining the President's and the Attorney General's priorities for the Department.

To this end, the FY 2013 Budget requests $27.1 billion for DOJ. Including $384.2 million in antitrust and bankruptcy fee receipts, which offset the discretionary requirement, the FY 2013 Budget totals $26.7 billion in gross discretionary budget authority for DOJ. After $8.8 billion in scorekeeping adjustments, the FY 2013 Budget totals $17.9 billion in net discretionary budget authority.

Compared to the FY 2012 enacted level, the FY 2013 Budget is essentially the same as FY 2012 in gross discretionary budget authority with an increase of 826 positions. Within the $26.7 billion request, an increase of $744.9 million maintains current services and operations. The Budget proposes a net decrease of $847.5 million in program changes and demonstrates a commitment to fiscal prudence with over $1 billion in administrative efficiencies, programmatic savings, redirections of grant program funding, and rescissions from balances. Modest program increases are requested in recognition of critical Administration priorities, including funding for financial and mortgage fraud ($55 million), traditional missions ($31.8 million), and prisons and detention ($141.2 million).

| | ($000) |
|---|---|
| **FY 2012 Enacted** | **$26,820,504** |
| Continue Existing Mission: | 744,851 |
| *Technical Adjustments* | 194,482 |
| *Base Adjustments* | 550,369 |
| **FY 2013 Current Services** | **$27,565,355** |
| FY 2013 Program Changes: | (847,509) |
| *Financial Fraud* | 55,000 |
| *Traditional Missions* | 31,820 |
| *Prisons/Detention* | 141,231 |
| *Savings and Efficiencies* | (214,639) |
| *Programmatic Savings* | (493,067) |
| *Balance Rescissions* | (367,854) |
| **FY 2013 TOTAL (Gross)** | **$26,717,846** |
| Scorekeeping Credits | (8,800,000) |
| **FY 2013 TOTAL (Net)** | **$17,917,846** |

**Funding Highlights:**

- Supports the Department's national security mission by providing for the Federal Bureau of Investigation (FBI) programs critical to mitigating and countering the threats of terrorism and fully funding the National Security Division (NSD).

- Invests more than $700 million to investigate and prosecute financial crimes, an increase of $55 million over FY 2012. The Budget provides additional FBI agents, criminal prosecutors, civil litigators, in-house investigators, and forensic accountants to improve the Department's capacity to investigate and prosecute the full spectrum of financial fraud.

- Prioritizes uniquely federal responsibilities, streamlines programs, and redirects funding to improve the capabilities of DOJ law enforcement components.

- Includes $3 million in new investments to combat transnational criminal organizations and nearly $2 billion to maintain the security of the Southwest Border.

- Maintains safe and secure capacity in federal prisons and detention facilities.

- Increases funding for the investigation and deterrence of intellectual property crime by $5 million for additional attorneys, bringing total spending to nearly $40 million annually.

- Assists state, local, and tribal criminal justice programs with $2 billion in program assistance for police hiring, general purpose criminal justice assistance, violence against women programs, and Second Chance Act grants, the same as in FY 2012.

The Budget prioritizes key areas of federal law enforcement including financial and mortgage fraud, prison capacity, and prosecution. In order to eliminate redundancies and target resources, the Budget streamlines a number of law enforcement programs. Sentencing reforms have been proposed to help stabilize the growth

of the prison population and address associated long-term costs. The Budget maintains grant programs at the FY 2012 enacted level. In addition, the Budget includes $278.8 million in management savings and efficiencies throughout the Department, such as streamlining processes and reducing spending on technology projects. Further, a net decrease of $428.9 million for the redirection of funding between grant programs is captured in the savings and efficiencies total. Finally, the Budget offers one-time rescissions of balances totaling $367.9 million.

### DISCRETIONARY BUDGET AUTHORITY (BA)

The table below compares the Department's FY 2011 and FY 2012 enacted levels with the FY 2013 President's Budget and shows the change and the percent change between the FY 2012 enacted level and FY 2013 Request.

| | Dollars in Millions | | | | |
|---|---|---|---|---|---|
| | FY 2011 Enacted | FY 2012 Enacted | FY 2013 President's Budget | Change FY 2013 over FY 2012 | % Change FY 2013 over FY 2012 |
| **Federal Programs** | | | | | |
| Law Enforcement Components | $12,722 | $13,009 | $12,969 | ($40) | -0.3% |
| Litigating Components | 2,871 | 2,901 | 2,976 | 75 | 2.6% |
| Admin/Technology/Other | 720 | 661 | 585 | (76) | -11.5% |
| *Subtotal, DOJ Operations* | *16,313* | *16,571* | *16,530* | *(41)* | *0.2%* |
| Prisons and Detention | 7,897 | 8,177 | 8,513 | 336 | 4.1% |
| ***Subtotal, Federal Programs (BA)*** | ***24,210*** | ***24,749*** | ***25,043*** | ***294*** | ***1.2%*** |
| | | | | | |
| **Discretionary Grants** | | | | | |
| **Subtotal, Discretionary Grants (BA)** | 2,684 | 2,072 | 1,675 | (397) | -19.2% |
| Increased CVF Spending (Non Add) | 0 | 0 | [$365] | [$365] | NA |
| ***State and Local Grants, Total*** | ***2,684*** | ***2,072*** | ***2,040*** | ***(32)*** | ***-1.5%*** |
| | | | | | |
| **Subtotal, Gross Discretionary (BA)**[1] | **26,894** | **26,821** | **26,718** | **(103)** | **-0.4%** |
| Scorekeeping Credits[2] | (7,718) | (8,493) | (8,800) | (307) | 4.8% |
| **Total, Net Discretionary (BA)** | **$19,176** | **$18,327** | **$17,918** | **($409)** | **-2.2%** |

[1] Gross Discretionary (BA) includes antitrust and bankruptcy fee receipts, which offset the discretionary requirement. It also includes one-time balance rescissions.
[2] Scorekeeping Credits reflect credits applied to DOJ's discretionary budget authority from the Crime Victims Fund (CVF) and the Assets Forfeiture Fund (AFF).

## MAINTAIN CURRENT SERVICES

The FY 2013 Budget includes $744.9 million in adjustments to base to "keep the lights on" and pay the staff.

### People +$232.3 million

- $186.1 million for annualization and salary and benefits adjustments for approximately 114,000 authorized positions.
- $46.2 million for the 0.5 percent government-wide civilian pay raise proposed for 2013.

### Rent and Moves +$102.8 million

- $112.1 million for domestic rent and security increases.
- -$9.3 million for non-recurring lease expirations and moves.

### Other Adjustments +$207.8 million

- -$3.0 million in decreased costs for over 1,100 DOJ employees stationed overseas.
- $9.0 million for operation and maintenance of legacy law enforcement radio systems.
- $190.8 million for restoration of one-time balance rescissions enacted in FY 2012.
- $3.3 million base adjustments for the Antitrust Division (ATR) and the Foreign Claims Settlement Commission.
- $7.7 million for fee adjustments (ATR and U.S. Trustees Program).

### Prisons and Detention +$223.9 million

- $44 million to fully activate two prisons that received partial funding in FY 2012, which will increase federal prison capacity by about 3,100 beds and alleviate overcrowding and related security issues.
- $13 million to expand the Residential Drug Abuse Treatment Program (RDAP) by 1,500 federal offenders, in support of Second Chance Act objectives.
- $22 million to backfill 210 correctional worker positions at existing institutions to improve prison safety.
- $91.5 million for general prison-related cost adjustments (utilities, food, medical, etc.).
- $53.4 million for increased costs associated with the current number of detainees and increased prisoner transportation costs.

### Non-Recurring Decreases -$21.9 million

- -$10 million for one-time construction costs enacted in FY 2012. (Drug Enforcement Administration (DEA))

- -$11.9 million for one-time, non-personnel costs of FY 2012 enhancements. (FBI)

\* \* \*

The key program funding requested in the Department's FY 2013 Budget is as follows:

## NATIONAL SECURITY

Defending national security from both internal and external threats remains the Department's highest priority. The FY 2013 Budget request provides a total of $4 billion to maintain critical counterterrorism and counterintelligence programs and sustain recent increases related to intelligence gathering and surveillance capabilities, such as the Comprehensive National Cybersecurity Initiative (CNCI), the High–Value Detainee Interrogation Group, the Joint Terrorism Task Forces, and the Weapons of Mass Destruction/Render Safe Program.

The FBI uses intelligence and investigations to deter, detect, and disrupt national security threats and protect and defend the United States against terrorism and foreign intelligence threats. In FY 2011, the FBI dedicated approximately 4,200 agents to investigate more than 33,000 national security cases. Since FY 2001, the FBI has expanded the Legal Attaché Program by over 40 percent to support the FBI's core investigation priorities through liaison and operational interaction with foreign law enforcement counterparts and the overseas intelligence community.

NSD is responsible for overseeing terrorism investigations and prosecutions; handling counterespionage cases and matters; and assisting the Attorney General and other senior Department and Executive Branch officials in ensuring that the national security-related investigations and activities of the United States are consistent with the nation's laws, rules, and regulations, including privacy interests and civil liberties. In coordination with the FBI, the Intelligence Community, and the U.S. Attorneys' Offices, the NSD's primary operational functions are to prevent acts of terrorism and espionage from being perpetrated in the United States by foreign powers and to facilitate the collection of information regarding the activities of foreign agents and powers.

Investigating cyber crime and protecting our nation's critical network infrastructure is a top priority of the Department. A successful cyber attack can have devastating effects on our national security, infrastructure, and economy. The Department has strengthened its cyber

security capabilities by increasing resources for the CNCI and increasing participation in the National Cyber Investigative Joint Task Force (NCIJTF), which identifies, mitigates, and neutralizes cyber threats by coordinating and integrating counterintelligence, counterterrorism, intelligence, and law enforcement activities of member organizations. Since FY 2008, the FBI has received enhancements of 667 positions and $172.0 million for computer intrusions and cyber investigations. The FY 2013 President's Budget request maintains recent increases for FBI's cyber programs, including enhancements to FBI's cyber terrorism investigations, the NCIJTF, and the forensic examination of digital evidence.

Other DOJ components have also made critical investments to protect U.S. citizens and secure our homeland. These investments have included: improving intelligence coordination, expanding information sharing efforts, hardening cyber infrastructure, strengthening investigations of drug-trafficking organizations with ties to terrorist groups, establishing Rule of Law programs in Iraq and Afghanistan, and expanding anti-terrorism training to state and local law enforcement agencies. In FY 2013, other DOJ components will invest $863 million to continue these critical efforts to protect the United States from national security threats.

### FINANCIAL AND MORTGAGE FRAUD

The Administration and the Department remain committed to investigating and prosecuting financial and mortgage fraud that harm the American people and the financial markets. In order to strengthen our efforts at combating this fraud, we propose a new financial and mortgage fraud enforcement initiative, which is intended to complement ongoing efforts to root out various forms of fraud, including health care fraud, that are supported by existing direct resources and reimbursable funding.

DOJ plays a crucial role in the federal financial recovery effort through criminal and civil litigation. The Department requests program increases totaling $55 million for a variety of economic fraud enforcement efforts, including work being done by DOJ members of the President's Financial Fraud Enforcement Task Force. This increase will support additional FBI agents, criminal prosecutors, civil litigators, in-house investigators, forensic accountants, paralegals, and other support positions to ultimately improve the Department's capacity to investigate and prosecute allegations of financial and mortgage fraud. This national initiative will

pool state and federal resources to leverage impact.

To that end, the FY 2013 Budget requests a total program increase of $55 million (including $9.8 million for technology tools and automated litigation support) for this priority initiative. The request seeks 328 additional positions, including 40 FBI agents, 184 attorneys, 49 in-house investigators, 31 forensic accountants, 16 paralegals, and 8 support staff. Of the total $55 million program increase, $37.4 million is to increase criminal enforcement efforts and $17.6 million is to increase civil enforcement efforts.

The additional resources will support the Department's investigation and prosecution of the broad range of crimes that fall under the definition of financial fraud, including securities and commodities fraud, investment scams, and mortgage foreclosure schemes. The additional resources will build upon the successes of, the Financial Fraud Enforcement Task Force that, since its inception in FY 2010, has facilitated increased investigations and prosecutions of financial fraud relating to the financial crisis and economic recovery efforts.

As a prelude to implementing this initiative in FY 2013, the Attorney General has announced the formation of the Residential Mortgage-Backed Securities Working Group, supported by existing FY 2012 resources, which will leverage state and federal resources to strengthen current and future efforts to investigate and prosecute instances of wrongdoing in the residential mortgage-backed securities market. The working group, working under the authorities of the Financial Fraud Enforcement Task Force, will be co-chaired by senior DOJ and Securities and Exchange Commission officials, along with the New York Attorney General. It will be staffed by at least 55 DOJ attorneys, analysts, agents, and investigators from around the country.

### TRADITIONAL MISSIONS

It is the mission of DOJ to enforce the law and ensure the fair and impartial administration of justice for all Americans. Accomplishing this requires necessary resources both to investigate and to litigate. As such, the DOJ FY 2013 Budget requests $31.8 million for program increases to expand DOJ's enforcement and litigation capacity and ability to protect vulnerable populations.

For the Criminal Division, $5 million and 14 positions are requested in program increases for transnational enforcement of intellectual property law. For Justice Information Sharing

Technology, an increase of $15.2 million is requested to address new emerging cyber security threats, including insider threats; provide advanced intrusion detection and response capabilities; and implement cost efficient, scalable enterprise architecture. For Interagency Crime and Drug Enforcement, $3 million and 1 position are requested to support operational and administrative expenses in pursuit of the Department's International Organized Crime activities, including the operations of the International Organized Crime and Intelligence Operations Center. For components that focus on specialized areas, the Department requests an increase of $1.2 million, which includes $707,000 for the Office of Tribal Justice (OTJ), $468,000 for the Office of the Inspector General, and $45,000 for the Office of the Pardon Attorney.

The Department also maintains substantial responsibilities with respect to immigration, including, but not limited to, enforcement, detention, judicial functions, administrative hearings, and litigation. The FY 2013 Budget requests $2 million for the Executive Office for Immigration Review (EOIR) to expand the Legal Orientation Program, which educates detained aliens on EOIR immigration proceedings. This allows detained aliens to make more informed decisions early in the adjudication process, reducing overall processing costs for both EOIR courts and Department of Homeland Security (DHS) detention programs. This $2 million program increase, along with requested base adjustments, is crucial in order to allow EOIR to keep pace with its increasing workload and the continued enforcement efforts of DHS.

Finally, the Department requests additional resources to provide for the continued vigorous enforcement of the nation's civil rights laws. The FY 2013 Budget requests an additional $5.1 million for the Civil Rights Division for programs that require further investment and to support areas the Attorney General has determined warrant specific attention including human trafficking, hate crimes, voting rights enforcement, and the Civil Rights for Institutionalized Persons Act. In addition to these requested resources for the Civil Rights Division, $391,000 and 5 positions are requested for the Community Relations Service to support an increase in workload and responsibilities related to the Matthew Shepard and James Byrd, Jr. Hate Crimes Prevention Act.

## PRISONS AND DETENTION

The Department has made strategic investments in law enforcement initiatives that have improved the nation's security and made communities safer. The result of these important enforcement efforts has been an expansion in the need for prison and detention capacity. The Department continues to prioritize the maintenance of secure, controlled detention and prison facilities, as well as investment in programs that can reduce recidivism. The FY 2013 Budget request maintains this commitment, providing $223.9 million in prison and detention adjustments to maintain current services and $141.2 million for program increases to ensure prisoners are confined in secure facilities and to improve prisoner reentry.

The FY 2013 Budget requests a total of $8.6 billion for federal prisons and detention, a 4.5 percent increase over the FY 2012 appropriated level. Of this amount, $6.8 billion is requested for the Bureau of Prisons (BOP), including a 4.1 percent increase ($268.9 million) for the Salaries and Expenses (S&E) account and a total of $99.2 million for the Buildings and Facilities (B&F) account, which is the current services level in FY 2013. Also, $1.7 billion is requested for the Federal Prisoner Detention (FPD) appropriation (formerly, the Office of the Federal Detention Trustee (OFDT)), which is a 5.5 percent increase ($87.6 million) over the FY 2012 enacted detention funding level.

For BOP, the current services level requests resources to fully activate two prisons: Federal Corrections Institution (FCI) Aliceville, AL, and FCI Berlin, NH. These prisons received partial activation funding in FY 2012, which will increase federal prison capacity and alleviate overcrowding and related security issues. A $13 million base adjustment is requested to expand the RDAP, in support of Second Chance Act objectives. The requested funding will help BOP reach the goal of providing 12-month sentence credits to all eligible inmates, resulting in fewer taxpayer resources directed at housing inmates. A $22 million adjustment is requested to hire 210 vacant correctional worker positions at existing institutions to improve prison safety. In addition, a $53.4 million adjustment is requested for increased costs associated with the projected detention population and increased prisoner transportation costs.

Program increases totaling $141.2 million are essential for ensuring the secure detention of a growing inmate population. Increases for BOP include $55.5 million to begin activation of two prisons, U.S. Penitentiary Yazoo City, MS (1,216 beds), and FCI Hazelton, WV (1,280 beds). Construction of these facilities will be completed in the fall of 2012. The request also includes

$25.8 million to procure 1,000 new contract beds. The new contract beds and the activations of newly constructed prisons will allow BOP to keep pace with the increased number of inmates. Further, $59.9 million in program increases is requested for federal detention to pay for increases in the average daily detainee population and inflationary increases for detention related costs.

Finally, detention resources will be transferred from OFDT to the FPD appropriation under the U. S. Marshals Service (USMS). This merger will allow for efficiencies in human and physical capital, while maintaining the functions and expertise that have been developed over the past decade. The merger is projected to save the detention account $5.6 million in FY 2013.

## STATE, LOCAL, AND TRIBAL LAW ENFORCEMENT

In total, the FY 2013 Budget requests $2 billion for state, local, and tribal law enforcement assistance programs. These funds will allow the Department to continue to support our state, local, and tribal partners who fight violent crime, combat violence against women, and support victim programs.

The Department continues to maintain key partnerships with state, local, and tribal officials and community members. These relationships maximize the federal government's ability to fight crime and promote justice throughout the United States. One such partnership is the Community Oriented Policing Service's (COPS) grant program. These grants enable state and local police agencies to increase the number of officers available for targeted patrol and other proven strategies designed to prevent and reduce crime. The Budget requests an additional $91 million for the COPS Hiring Program in FY 2013, for a total of $257.1 million for this program to fund officers. As part of this request, $15 million will be for community policing development initiatives and $15 million will be directed specifically to tribes.

The FY 2013 Budget requests a total of $412.5 million (equal to FY 2012) for the Office on Violence Against Women (OVW), of which $268 million is directly funded, with the balance funded through receipts from the Crime Victims Fund (CVF). This funding will provide communities with the opportunity to combat sexual assault and violence against women. The request includes a $3.5 million increase to the Rural Domestic Violence and Child Abuse Enforcement Assistance Program. This will improve the safety of children, youth, and adults

who are victims of domestic violence, dating violence, sexual assault, and stalking by supporting projects uniquely designed to address and prevent these crimes in rural jurisdictions. The request also includes $23 million for the Sexual Assault Services Program and $41 million for the Legal Assistance for Victims Program.

The Department is requesting a total of $1.4 billion for the Office of Justice Programs' (OJP) grant programs, including $1.18 billion in direct funding, with the balance funded through receipts from the CVF. Within this funding, $20 million is requested for the Byrne Criminal Justice Innovation Program, $21 million for Residential Substance Abuse Treatment, $80 million for Second Chance, $70 million for Part B Juvenile Justice Formula Grants, and $20 million for a new evidence-based juvenile justice competitive demonstration grant program.

In addition, the FY 2013 Budget proposes $250 million in mandatory funds for states to reform their laws on medical malpractice. The Budget proposes to preserve OVW and OJP grant programs that assist vulnerable populations by funding them through CVF receipts, which continue to surpass historical levels, rather than with discretionary budget authority, which has been declining.

## SAVINGS AND EFFICIENCIES

As we move forward with the tough choices necessary to rein in our deficit and put the country on a sustainable fiscal path, we must balance those efforts with the investments and actions required to maintain law enforcement and to protect the nation. This Budget streamlines programs and redirects funding to improve the capabilities of the Department. As such, the Budget proposes over $1 billion in efficiencies, offsets, redirections of grant program funding and rescissions.

Excluding the redirection of grant program funding, which is identified in Section II, the Budget includes -$646.6 million in savings, program and management offsets, and one-time rescissions of prior year balances to support our highest priority missions.

The Department is cutting -$196.7 million across the agency by identifying savings such as information technology (IT) savings, physical footprint reductions, administrative efficiencies, overhead reductions, and operational efficiencies. The IT offset (-$21.8 million) represents savings that will be generated through greater inter-component collaboration in

IT contracting. Funds will be redirected to support the Department's cyber security and IT transformation efforts as well as other high priority requests. Savings also include reducing the Department's space requirements (-$33.6 million); decreasing USMS construction account (-$5 million); administrative efficiencies for USMS and FBI (-$18.2 million); administrative efficiencies for U.S. Attorneys (-$17.5 million); and other operational efficiencies (-$77.2 million). DOJ was able to reduce costs in other programs, such as FBI's Critical Incident Response Group (-$3.4 million), the National Gang Intelligence Center (-$7.8 million), contractors (-$7.1 million), and the Relocation Program (-$5 million).

DOJ also identified savings by proposing to consolidate and realign components to increase efficiencies (-$18 million). These savings include refocusing and realigning the National Drug Intelligence Center (-$12 million); consolidating administrative functions of the Office of Legal Counsel and the Office of the Solicitor General into a single executive office (-$463,000); and merging detention functions currently performed by OFDT into USMS to better align detention resources with operations, simplify the financial process supporting detention housing, and reduce administrative costs (-$5.6 million).

In addition to DOJ-wide initiatives, component-unique program savings have been identified, totaling -$64.2 million. These include expanding BOP's compassionate release to inmates with medical conditions that have served at least 67 percent of their sentence [for non-violent offenses and no sex offenses] (-$3.2 million); implementing proposed legislation to make changes in the federal inmate good conduct time credit incentives (-$41 million); and evaluating the FPD intergovernmental agreements (IGAs), which set daily rates per detainee, known as "jail day rates," starting in FY 2012 through FY 2013 to achieve savings (-$20 million).

An additional -$367.9 million in one-time rescissions of prior year balances is proposed, including the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) S&E (-$12.4 million), ATF Violent Crime Reduction Programs (-$1 million), BOP B&F (-$75 million), COPS (-$12.2 million), DEA S&E (-$15.6 million), FBI S&E (-$162.3 million), OJP-wide (-$43 million), OVW (-$6 million), USMS S&E (-$14.4 million), and the Working Capital Fund (-$26 million).

\* \* \*

Other savings initiatives include:

## PRESIDENT'S CAMPAIGN TO CUT WASTE

The Department has actively pursued savings and efficiencies in other areas consistent with the President's Campaign to Cut Waste, and will continue to do so in FY 2013. We have made significant efforts to limit and reduce spending in the areas of publication, travel, supplies, fleet, advisory contracts, promotional items, and IT devices. The Department plans to decrease spending in these areas by the end of FY 2013 from FY 2010 levels to meet our reduction target of -$146 million.

## THE ATTORNEY GENERAL'S SAVE COUNCIL

The Attorney General created the Advisory Council for Savings and Efficiencies (the SAVE Council) in July 2010, institutionalizing the Department's pilot savings efforts, begun in June 2009, which resulted in over $59.7 million in savings/cost avoidance from June 2009 through September 2011. The SAVE Council is responsible for developing and reviewing Department-wide savings and efficiency initiatives, as well as monitoring component progress to ensure positive results for cost savings, cost avoidance, and efficiencies. The Council provides a framework to identify and implement best practices for saving taxpayer money, realizing efficiencies, and monitoring our savings progress. Representatives from selected components were appointed by the Attorney General to serve as members of the Council, and they have the lead responsibility to develop and report on the savings and efficiency initiatives.

\* \* \*

Other highlights of the Department's Budget request for FY 2013 include:

## HEALTH CARE FRAUD

The Department's efforts to combat health care fraud are funded almost exclusively through reimbursements from the Health Care Fraud and Abuse Control (HCFAC) account and the Health Insurance Portability and Accountability Act (HIPAA), both of which are administered by the Department of Health and Human Services (HHS).

For FY 2013, DOJ is requesting $294.5 million to support its health care fraud enforcement efforts. This includes $159.2 million in reimbursable discretionary and mandatory HCFAC funding to support the Department's

Health Care Fraud Prevention and Enforcement Action Team (HEAT) efforts to combat both civil and criminal health care fraud, an increase of $68.3 million over the FY 2012 enacted level. Also, DOJ is requesting $135.3 million in mandatory HIPAA funding to support the efforts of the FBI's investigations into health care fraud, an increase of $3.4 million over the FY 2012 enacted level.

This level of funding will permit DOJ to expand Medicare Fraud Strike Force operations to additional locations, in order to target agents and attorneys in the criminal hubs where health care fraud activities occur. In addition to expansion of the Strike Forces, additional funding will be provided to bolster civil enforcement efforts, including False Claims Act matters and others alleging fraudulent or false claims submitted to the government by health care providers or those caused by pharmaceutical manufacturers.

The President's Budget proposes to increase the FY 2012 base discretionary HCFAC funding for DOJ and HHS to $311 million (which is fully offset) and to provide the additional $270 million in discretionary HCFAC funding allowed by the cap adjustment, consistent with section 251(b)(2)(C) of the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.

## PUBLIC SAFETY IN INDIAN COUNTRY

There are over 56 million acres of Indian Country and 565 federally recognized American Indian tribes. The Major Crimes Act provides federal criminal jurisdiction over certain specified major crimes if the offender is Indian, while tribal courts retain jurisdiction for conduct that might constitute a lesser offense. Thus, federal investigation and prosecution of felonies in Indian Country cannot be deferred to a local jurisdiction and therefore federal law enforcement is both the first and only avenue of protection for the victims of these crimes.

Many tribal law enforcement agencies face unique obstacles that often challenge their ability to promote and sustain community policing effectively. Unlike municipal police agencies, many tribes still lack basic technology to modernize their departments, such as laptops installed in police vehicles. The officer-to-population ratio still remains lower on Indian reservations than in other jurisdictions across the country. Finally, tribal law enforcement has a unique challenge of patrolling large areas of sparsely populated land.

The FY 2013 President's Budget requests $345 million in total resources for public safety initiatives in Indian Country. Investments include significant grant resources for addressing a broad range of criminal justice issues and additional resources for OTJ. OTJ is the primary point of contact in the Department for federally recognized Native American tribes, and advises the Department on legal and policy matters pertaining to Native Americans.

* * *

This section outlines the Department's FY 2013 Performance Plan and discusses other recent initiatives to improve agency performance and increase accountability to stakeholders.

### FY 2013 PERFORMANCE PLAN

The Department recognizes that performance information is vital to making resource allocation decisions and should be an integral part of the Budget. This year, the Department produced a new Strategic Plan for Fiscal Years 2012-2016. It contains 3 high-level strategic goals and 12 long-term outcome goals. The long-term outcome goals will be tracked and reported in the FY 2012 Performance and Accountability Report.

Under the Government Performance and Results Act of 1993 (GPRA) and the GPRA Modernization Act of 2010 (GPRAMA), government agencies are required to develop long-term Strategic Plans defining general goals and objectives for their programs, and to develop Annual Performance Plans specifying measurable performance goals for all of the program activities in their Budgets. DOJ provides detailed component-specific Annual Performance Plans within individual Budget submissions, which also serve as the Department's Annual Performance Plan.

The Department's FY 2007-2012 Strategic Plan contains three goals. Additionally, it includes 20 long-term outcome goals that address its highest priorities toward achieving these long-term outcome goals.

Based on available data, the Department achieved 80 percent of its long-term outcome goals in FY 2011, which is higher than last year's overall success of 77 percent. A more detailed discussion about performance is in Section III.

DOJ will continue to examine its overall performance management system and implement improvements where necessary. In

particular, the Department will seek to improve the quality and utility of performance information and develop the capacity to use performance information through the use of technology and reliable data systems.

## PERFORMANCE AND ACCOUNTABILITY

The GPRAMA, signed into law on January 4, 2011, amended the GPRA. GPRAMA creates a more defined performance framework by establishing a governance structure and by better connecting strategic plans, programs, and performance information. This law also requires more frequent reporting and reviews (on a quarterly basis) that are intended to increase the use of performance information in programmatic decision-making.

The legislation incorporates key elements of the Office of Management and Budget's performance management approach, such as agency leaders setting priorities and using ambitious targets to communicate such priorities. The law also creates new responsibilities, including cross-agency federal priority goals. In addition, the bill improves federal performance management by establishing a Chief Operating Officer within each agency tasked with improving the performance of his or her agency. It also codifies and strengthens the existing resources for performance management, including the Performance Improvement Officers within the federal agencies and the interagency Performance Improvement Council.

## PRIORITY GOALS
## AND PERFORMANCE INFORMATION

A "Priority Goal" is a measurable commitment to a specific result that the federal government will deliver for the American people. These goals represent high priorities for both the Administration and the agency and have high relevance to the public or reflect the achievement of key agency missions. The Priority Goals do not fully reflect the agency's strategic goals nor do they cover the entire agency mission; rather, they are a subset of the measures used to regularly monitor and report performance. To view the full set of DOJ performance information, please visit: http://www.justice.gov/02organizations/bpp.htm.

The Department's FY 2012-2013 Priority Goals represent the Attorney General's priorities and support the Administration's priorities. These priority goals support our role as the American people's law enforcer, litigator, and as partner with state, local, and tribal governments. The

Department's priority goals focus our actions in four key areas: national security, violent crime, financial and health care fraud, and vulnerable people, all to fulfill one core mission – that of protecting the American people.

The Department's FY 2010-2011 Priority Goals, and the Priority Goals for FY 2012-2013, follow:

### FY 2010-2011 Priority Goals:

**National Security** - Increase the percentage of total counterterrorism investigations targeting Top Priority threats by 5 percent by the end of FY 2011.

The Department achieved 62.7 percent of its FY 2011 goal of targeting 65.1 percent of all counterterrorism investigations toward Top Priority threats.

Counterterrorism threats, which comprise the FBI's "top priority," have evolved since this measure was adopted at the end of FY 2009. New threats have emerged, requiring the diversion of resources away from the threats originally defined to be within the scope of this measure. Because of these emerging threats, the FBI's performance on this measure does not reflect the FBI's reallocation of its investigative resources against the most significant counterterrorism threats.

Additionally, data collection for this Priority Goal has led to improved accounting for investigative resources within the FBI's Counterterrorism Division (CTD). The CTD now follows various strategies to better track its investigations against priority threats, including guidance it provides to FBI Field Offices on how to appropriately classify investigations, and a stronger internal review process which can identify new threats and aid FBI Field Offices in their response.

The FBI anticipates that these actions will improve its response capability for terrorist threats facing the United States.

**White Collar Crime** - Increase white collar caseload by 5 percent concerning mortgage fraud, health care fraud, and official corruption by FY 2012, with 90 percent of cases favorably resolved.

The Department surpassed its FY 2011 caseload target and favorably resolved 92.6 percent of its white collar crime cases through the fourth quarter, surpassing its annual target.

**Violent Crime** - Increase agents and prosecutors by 3 percent, in order to reduce

incidents of violent crime in high crime areas by FY 2012.

The Department surpassed its FY 2011 annual target of increasing the number of agents and prosecutors assigned to violent crime by 276. This increased the number of agents and prosecutors to 2,584.

**Immigration -** Increase Immigration Judges by 19 percent so that, as DHS criminal alien enforcement activity increases, not less than 85 percent of immigration court detained cases are completed within 60 days.

The Department was unable to meet its targeted increase of Immigration Judges due to the FY 2011 enacted funding level, which was $19 million less than the FY 2011 President's Budget request. $11 million of that reduction would have funded 21 additional Immigration Judges. The Department did, however, complete 88 percent of detained immigration court cases within 60 days, surpassing its target.

**Public Safety -** Support 7,200 additional police officers by FY 2012 via COPS Hiring Programs to promote community policing strategies that are evidence-based.

The Department supported 7,115 officers via COPS Office Hiring Programs through the fourth quarter of FY 2012, narrowly missing its target of 7,200 by one percent. The target of 7,200 was based in part on estimated cost of living adjustments (COLAs). The COLA costs in FY 2010 and FY 2011 were greater than anticipated, reducing available resources to support additional officers. The FY 2011 enacted funding level was less than anticipated. While significant progress toward this Priority Goal was made, the goal was not achieved by the end of FY 2011. The COPS Office anticipates achievement of this goal during FY 2012.

**Civil Rights -** Increase the number of persons favorably impacted by resolution of civil rights enforcement cases and matters. By the end of FY 2011:

- Increase the criminal civil rights caseload by 18 percent, with 80 percent of cases favorably resolved.
- Increase the non-criminal civil rights caseload by 28 percent, with 80 percent of cases favorably resolved.
- Increase the number of complaints finalized by mediation by 10 percent, with 75 percent of mediation complaints successfully resolved.

The Department met or surpassed all of its targets for this Priority Goal, with one exception – the FY 2011 goal to increase the criminal civil rights caseload by 18 percent.

**FY 2012-2013 Priority Goals:**

**National Security –** Protect Americans from terrorism and other threats to national security – both at home and abroad: By September 30, 2013, the FBI will increase by 6% the number of counterterrorism intelligence products shared with the U.S. Intelligence Community, state and local Law Enforcement Community partners, and foreign government agencies.

**Violent Crime –** Reduce Gang Violence: by September 30, 2013, in conjunction with state and local law enforcement agencies, reduce the number of violent crimes attributed to gangs to achieve 5% increases on 3 key indicators:

- Youths who exhibited a change in targeted behaviors as a result of participation in DOJ gang prevention program;
- Coordination on gang investigations among federal, state, and local law enforcement resulting in gang arrests; and
- Intelligence products produced in support of federal, state, and local investigations that are focused on gangs posing a significant threat to communities.

**Financial Fraud –** Protect the American people from financial and health care fraud: In order to efficiently and effectively address financial fraud and health care fraud, by the end of FY 2013, increase by 5 percent over FY 2011 levels, the number of investigations completed per DOJ attorney working on financial fraud and health care fraud cases; additionally, institute a system for tracking compliance by corporate defendants with the terms of judgments, consent decrees, settlements, deferred prosecution agreements, and nonprosecution agreements.

**Vulnerable People –** Protect those most in need of help - with special emphasis on child exploitation and civil rights: by September 30, 2013, working with state and local law enforcement agencies, protect potential victims from abuse and exploitation by achieving a 5% increase for 3 sets of key indicators:

- Open investigations concerning non-compliant sex offenders, sexual exploitation of children, and human trafficking;
- Matters/investigations resolved concerning sexual exploitation of children and human trafficking; and

- Number of children depicted in child pornography that are identified by the FBI.

Per the GPRAMA, 31 U.S.C. 1115(b)(10), requirement to address federal goals in the agency Strategic Plan and Annual Performance Plan, please refer to www.Performance.gov for information on Federal Priority Goals and the agency's contributions to those goals, where applicable.

# Exhibit 310

*Office of the General Counsel*
**U.S. Department of Homeland Security**
Washington, DC 20528



December 10, 2010

The Honorable Thomas J. Perrelli
Associate Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

      Re:    Views Concerning Whether It Is Legally Permissible to Use Discretionary
                Federal Funding for Representation of Aliens in Immigration Proceedings

Dear Associate Attorney General Perrelli:

I write in response to the request we have received from the Department of Justice for the views of
the Department of Homeland Security (DHS) concerning whether it is legally permissible to use
discretionary federal funding for representation of aliens in immigration proceedings. DHS
concludes that there is no general statutory prohibition on such use of discretionary funding.
Ultimately, however, whether any particular expenditure is permissible depends upon a fiscal law
analysis of the specific proposed funding source.[1]

In applying the "necessary expense" test for determining the permissibility of an expenditure under
the Purpose Statute, 31 U.S.C. § 1301(a), the central issue is whether the expenditure is prohibited
by law. *See* Customs and Border Protection – Relocation Expenses, Comp. Gen. B-306748 (July 6,
2006). In conducting this analysis, we focus on 5 U.S.C. § 3106 and Immigration and Nationality
Act (INA) § 292, 8 U.S.C. § 1362, the two legal provisions that were addressed in a 1995 legal
opinion by the Immigration and Naturalization Service on this subject,[2] as well as a provision
enacted in 1996 that is essentially the same as § 292, INA § 240(b)(4)(A), 8 U.S.C. § 1229a(b)(4).

Several courts have considered the meaning and scope of INA § 292, which provides: "In any
removal proceedings . . . the person concerned shall have the privilege of being represented (at no
expense to the government) by such counsel . . . as he shall choose." The courts have
understandably determined that section 292 does not provide an affirmative right to appointed
counsel. None of those decisions, however, directly address whether INA § 292 *prohibits* the
provision of counsel at government expense. In our view, the plain language of section 292 does not
lend itself to such interpretation. Rather, the parenthetical language, "at no expense to the
Government," is most reasonably interpreted to limit or describe the "privilege" of representation by
counsel. If Congress had intended to limit the expenditure of appropriations, it would have done so
expressly, as it has in many other situations.

---

[1] Because no specific funding source has been proposed in the request we received, this letter does not address the
applicable fiscal law issues.
[2] Memorandum from the Immigration and Naturalization Service (INS) Office of the General Counsel to T. Alexander
Aleinikoff, Executive Associate Commissioner of Programs, INS, Funding of a Pilot Project for the Representation of
Aliens in Immigration Proceedings (Dec. 21, 1995).

This interpretation is further supported by the context of the qualifier, "at no expense to the Government," which appears in provisions bearing the heading "Right to counsel," INA § 292, and "Alien's rights in proceeding." INA § 240(b)(4). Because "the title of a statute and the heading of a section are tools available for the resolution of a doubt about the meaning of a statute," *Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998) (citations omitted), the most reasonable interpretation is that the parenthetical qualifies or limits the rights of aliens. We fully agree with the conclusion of the 1995 INS legal opinion that § 292 does not limit the discretion of the Government to fund counsel, if funding is otherwise authorized.

We also conclude that the use of federal discretionary funds to provide appointed counsel in immigration proceedings is not prohibited by 5 U.S.C. § 3106. Beginning with the predecessor statute to that provision, the Department of Justice Act of June 22, 1870, 16 Stat. 162, Congress intended to "centralize the conduct and supervision of all litigation in which the government was involved" and to "ensure the presentation of uniform positions with respect to the laws of the United States." The Attorney General's Role as Chief Litigator for the United States, 6 Op. Off. Legal Counsel 47, 49 (1982) (citing Cong. Globe, 41st Cong., 2d Sess., 3036 (1870)). In effect, with limited statutory exceptions, § 3106 merely channels all litigation on behalf of the Executive Branch through the Department of Justice, specifically by precluding Cabinet Departments from acting independently through retaining their own counsel for litigation. That provision was not intended to preclude the provision of federally funded counsel for a private party in administrative proceedings, if such funding is otherwise consistent with the particular appropriation from which the funding would be drawn.[3]

We conclude that nothing in INA § 240(b)(4), INA § 292, or 5 U.S.C. § 3106 prohibits the use of discretionary federal funding for representation of aliens in immigration proceedings. Whether any particular expenditure would be permissible, however, depends upon a fiscal law analysis of the specific proposed funding source.

Very truly yours,

David A. Martin
Principal Deputy General Counsel

cc:     Access to Justice Initiative, Department of Justice

---

[3] To the extent that the brief treatment of 5 U.S.C. § 3106 in the 1995 INS legal opinion could be read as contrary to this position, DHS, as the successor agency to legacy INS, withdraws from that portion of the 1995 opinion.

# Exhibit 311

**Mason, Robert M**

| | |
|---|---|
| From: | ████ |
| Sent: | Wednesday, August 25, 2010 1:56 PM |
| To: | ████ |
| Cc: | Mason, Robert M |
| Subject: | FW: A71 317 008 |
| | |
| Importance: | High |

DO Mason is on his way.

-----Original Message-----
From: ████
Sent: Wednesday, August 25, 2010 1:48 PM
To: ████
Cc: ████
Subject: FW: A71 317 008
Importance: High

Is there a DO immediately available to act as a custodian for this IJ in Scala's courtroom?  Please see below.  RK

-----Original Message-----
From: ████
Sent: Wednesday, August 25, 2010 1:46 PM
To: ████
Subject: FW: A71 317 008
Importance: High

Ryan,

See below - can you help me get a DO in here. Sinc this guy has mental issues the judge wants a DO here to act as custodian.

Thanks,
Neil

-----Original Message-----
From: ████
Sent: Wednesday, August 25, 2010 1:38 PM
To: ████
Subject: FW: A71 317 008
Importance: High

████

1

ICE7

Can you help with this - see below?  I didn't know if J was here.



-----Original Message-----
From: 
Sent: Wednesday, August 25, 2010 1:31 PM
To: Arroyo, Jose H
Subject: FW: A71 317 008
Importance: High

I need some help.. The judge wants a DO down here to act as custodian based on mental issues.  This guy just wants an order.  Can you come to Judge Scala's courtroom – like now??

Thanks,

-----Original Message-----
From:
Sent: Wednesday, August 25, 2010 1:25 PM
To:
Cc:
Subject: RE: A71 317 008
Importance: High



-----Original Message-----
From:
Sent: Wednesday, August 25, 2010 1:24 PM
To:
Subject: A71 317 008

Who has cases ending in 8?  I need a DO down here ASAP to act as custodian for this guy that wants to take an order.  Can you let me know who it is?

Thanks,

ICE8

# Exhibit 312

### DECLARATION OF ELIZABETH KELLEY

I, Elizabeth Kelley, declare as follows:

1.     I am a legal intern with Public Counsel Law Center in Los Angeles, California.  I am a student at Loyola Law School, Los Angeles.  I submit this declaration in support of Plaintiffs' Motion for Partial Summary Judgment.  I have personal knowledge of the facts set forth in this declaration and, if called as a witness, could and would competently testify to such facts under oath.

2.     On July 17, 2012, I attended and observed the immigration court hearing of Mr. Asefa Alemu Weldyes, a Subclass One member detained at Adelanto Detention Facility, appearing *pro se* before Immigration Judge Rose Peters.  The Department of Homeland Security ("DHS") was represented by a trial attorney.  Mr. Weldyes appeared via video.

3.     The trial attorney requested a continuance in order to obtain a medical examination of Mr. Weldyes.  Judge Peters explained that the case had already been re-set, and that at a previous hearing the government had submitted a medical examination.  The Judge noted that she had asked the government to provide additional information on Mr. Weldyes's mental competency and that the government had failed to provide this information.

4.     During the hearing, Judge Peters allowed the trial attorney to ask Mr. Weldyes questions regarding his mental competency.  The trial attorney asked Mr. Weldyes if he was currently taking medication.  Mr. Weldyes stated that he was trying to take his medication every day.  He also stated that people are in control of him and that they slam his head against the wall.  The trial attorney then asked him who slammed his head against the wall.  The Respondent described people that control his mind, that they have a concept of science, and that he knows they have the ability to control minds.

5.    After additional questions, the trial attorney renewed her request for a continuance to obtain a medical examination of Mr. Weldyes. Judge Peters denied this request. She stated that the Notice to Appear was issued three months prior, and that since that time there had been no progress on Mr. Weldyes's case. Judge Peters also stated that Mr. Weldyes was not mentally competent and that the government had failed to provide safeguards to protect his rights. The Judge explained that she would terminate Mr. Weldyes's case without prejudice until the government provides safeguards.

6.    Judge Peters then issued an oral decision. She first explained that Mr. Weldyes is a 43 year-old male, and that the Notice to Appear was dated April 23, 2012. She stated that the government alleged that Mr. Weldyes is a Legal Permanent Resident convicted of crimes for a controlled substance and an aggravated felony. She stated that Mr. Weldyes's first hearing was on May 14, 2012, which was re-scheduled for May 18, 2012 in order to provide him with a translator. Judge Peters explained that at the May 18 hearing Mr. Weldyes stated that he heard voices and that he was confused. For this reason, Judge Peters stated that the court was unable to give Mr. Weldyes his rights or take pleadings. The hearing was re-set for June 1, 2012 to give the government an opportunity to obtain a psychological evaluation of Mr. Weldyes. However, the hearing was then re-scheduled to June 14 after the government informed the court that DHS does not provide psychological evaluations. Judge Peters then stated that the medical examination indicated that Mr. Weldyes's judgment was poor. Judge Peters also noted that the words on the medical examination were handwritten and thus difficult to read.

7.    Judge Peters reiterated that the government now requests another continuance for a medical evaluation. She noted, however, that there is no indication from the government of how they plan to proceed with Mr. Weldyes's

1    case.  Judge Peters stated that the government continues to ask for continuances

2    without explaining how Mr. Weldyes's rights will be protected.  Judge Peters

3    added that the medical documents indicate that Mr. Weldyes is taking sleeping

4    pills, and that he is hearing voices.  She noted that this is consistent with the

5    manner in which Mr. Weldyes has testified.

6            8.      Judge Peters stated that the court finds that Mr. Weldyes is not

7    mentally competent.  She added that the government has provided no safeguards to

8    protect Mr. Weldyes's rights.  She explained that DHS made no efforts to contact

9    Mr. Weldyes's family nor did they provide him with legal assistance.  For these

10   reasons, Judge Peters stated that she was denying DHS's motion to continue.

11           9.      In the end, Judge Peters ordered that Mr. Weldyes's case be

12   terminated without prejudice until the government could provide him with

13   safeguards to protect his rights.  The trial attorney reserved the right to appeal.

14   After receiving a nonsensical response from Mr. Weldyes about whether he too

15   wished to reserve appeal, the Judge reserved the right to appeal on his behalf.

16

17   I declare under penalty of perjury that the foregoing is true and correct to the best

18   of my knowledge. Executed on July 26, 2012 in Los Angeles, California.

19

20

21   Elizabeth Kelley

22

23

24

25

26

27

28

# Exhibit 313

### DECLARATION OF YANIRA LEMUS

I, Yanira Lemus, declare as follows:

      1.     I am a legal intern with Public Counsel Law Center in Los Angeles, California. I am a student at Loyola Law School, Los Angeles. I submit this declaration in support of Plaintiffs' Motion for Partial Summary Judgment. I have personal knowledge of the facts set forth in this declaration and, if called as a witness, could and would competently testify to such facts under oath.

      2.     On July 17, 2012, I attended and observed the immigration court hearing of Mr. Bin Zhang, a Subclass One member detained at Theo Lacy Facility, appearing *pro se* before Immigration Judge John Walsh. The Department of Homeland Security ("DHS") was represented by a trial attorney. Mr. Zhang appeared via video.

      3.     The court requested a medical evaluation to determine whether Mr. Zhang was mentally incompetent. The court added that although the BIA had made a determination of mental incompetency, there was no evidence on file to show how the BIA made this determination. Therefore, a professional medical evaluation was necessary to prove mental incompetency. The trial attorney did not object to this request and the matter was continued for August 1, 2012.

      4.     During the July 17 hearing, Judge Walsh asked Mr. Zhang basic questions, however, Mr. Zhang appeared to be distracted and provided the court with extraneous comments. For example, when Judge Walsh asked Mr. Zhang if Mandarin was his best language, Mr. Zhang responded by stating repeatedly that he had a student visa, which should last for seven years. The interpreter appeared to have difficulty understanding and keeping up with Mr. Zhang's comments because he was speaking fast and he interrupted Judge Walsh a number of times. Judge Walsh was able to get a few responses from Mr. Zhang by the end of the questioning, however, many of his responses were contrary to the

1   information on file or interjected with nonsensical comments. For example, when

2   Judge Walsh asked Mr. Zhang if he had contact information for his brother, Mr.

3   Zhang responded by shouting, "He is a steak-head! He is a steak-head! He is a

4   steak-head!" Additionally, when Judge Walsh asked Mr. Zhang if he was

5   currently taking medication, Mr. Zhang stated that he was not. Yet there was a

6   basic medical report on file indicating that Mr. Zhang was psychotic, bipolar,

7   manic, and was taking Xyprexa.

8          5.    Judge Walsh refused to rely on the BIA's determination of

9   mental incompetency and added that as far as he knew, Mr. Zhang could be

10   fabricating his mental condition or could actually have a diagnosable condition.

11   He also refused to rely on the medical report on file, which indicated that Mr.

12   Zhang was psychotic, bipolar, and manic, because there was no indication about

13   how these findings were made and because the report appeared to have been made

14   hastily.

15          6.    On August 1, 2012, I attended and observed the continued

16   immigration court hearing of Mr. Bin Zhang who again appeared *pro se* before

17   Immigration Judge John Walsh. The Department of Homeland Security ("DHS")

18   was represented by a trial attorney. Mr. Zhang appeared via video.

19          7.    Judge Walsh asked the trial attorney if DHS was able to get a

20   medical evaluation. The trial attorney responded that they had not because the

21   government does not perform this type of medical evaluation any longer. Judge

22   Walsh reiterated that it was not possible for him to make a mental incompetency

23   determination without guidance from a medical officer and proceeded to terminate

24   the case.

25          8.    Judge Walsh issued an oral decision. Judge Walsh explained

26   the government's medical evaluation was insufficient to make a mental

27   incompetency determination. Judge Walsh emphasized that he was terminating

28

1    Mr. Zhang's case primarily because the documents were illegible and he could not

2    determine how the BIA arrived at the diagnosis noted on the report.  The court

3    requested a medical evaluation from the government, four or five times, but the

4    government was unable to provide one.  Therefore, Judge Walsh stated that the

5    court could not proceed any further without a medical evaluation and the case was

6    terminated.

7            9.      In the end, Judge Walsh ordered that Mr. Zhang's case be

8    terminated without prejudice.  The trial attorney was informed that she had until

9    August 31, 2012 to appeal this decision.

10

11   I declare under penalty of perjury that the foregoing is true and correct to the best

12   of my knowledge. Executed on August 10, 2012 in Los Angeles, California.

13

14                        *Yanira M. Lemus*

15                   Yanira M. Lemus

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit 314

EXHIBIT 314

Declaration of Julia Hunter of August 24, 2012

I, Julia Hunter, declare as follows:

1.     I was a legal intern with the ACLU of San Diego and Imperial Counties in San Diego, California from May to August 2012. I am a student at the University of San Diego School of Law. I submit this declaration in support of Plaintiffs' Motion for Partial Summary Judgment. I have personal knowledge of the facts set forth in this declaration and, if called as a witness, could and would competently testify to such facts under oath.

2.     On June 19, 2012, I observed the merits hearing of Mr. Luis Gonzalez, a Subclass One member detained at the San Diego Correctional Facility, appearing *pro se* before Immigration Judge Zsa Zsa DePaolo. The Department of Homeland Security ("DHS") was represented by a trial attorney.

3.     Judge DePaolo explained to Mr. Gonzalez that during this hearing she would not be asking him any questions. She stated that based on his answers to a series of questions in a previous hearing, she did not believe he was competent to represent himself. Judge DePaolo then cited the extensive compilation of mental health records documented by the Government, including the IHSC 883 Form, as demonstrating his serious mental illness. She verbally agreed that the Government's mental health findings in the IHSC 883 Form supported the determination that Mr. Gonzalez is incompetent and unable to represent himself.

4.     At this point in the proceeding, the DHS trial attorney stated that since the last hearing all attempts at locating a custodian or family member to appear on Respondent's behalf had failed. The DHS trial attorney stated that the Government had been unable to contact any of Mr. Gonzalez's family in Texas.

5.     The DHS trial attorney submitted additional evidence to Judge DePaolo for her consideration. This evidence apparently included a copy of Mr. Gonzalez's entry visa from when he was 13 years old, recent medical reports from detention facility psychiatrists and psychologists, and additional documentation from Mr. Gonzalez's prior criminal conviction. The DHS trial attorney requested that Judge DePaolo make an independent finding of removability based on the objective evidence on the record.

6.     While Judge DePaolo reviewed the evidence, she explained to Mr. Gonzalez what she was looking at and how it affected his case. The medical records and IHSC 883 Form, she claimed, demonstrated that Mr. Gonzalez suffered from a severe mental illness and was legally incompetent. As a result, she said, she could not accept a plea of removability from him.

7.     At the DHS trial attorney's insistence, Judge DePaolo stated that she agreed with DHS that Mr. Gonzalez was subject to removal based on his prior conviction for robbery. Judge DePaolo explained to Mr. Gonzalez that although he had originally been sentenced to only 364 days in prison on a conviction for robbery, his conviction became an "aggravated felony" when he was sentenced to 51 additional days in prison for violating probation. Judge DePaolo asked Mr. Gonzalez if he remember that he was convicted of an aggravated felony. He said he did not and he began to cry. She lamented that none of the documents from the 2008 robbery conviction mention Mr. Gonzalez's mental illness or any type of competency evaluation despite his representation by a public defender.

8.     Again, the DHS trial attorney requested that Judge DePaolo make an independent finding of removability based on the objective evidence in the case  Mr. Gonzalez never addressed or responded to the DHS trial attorney. He only spoke to Judge DePaolo when questioned.

9.      Judge DePaolo attempted to explain to Mr. Gonzalez the forms of relief available to him, but she did not finish the explanation, apparently because Mr. Gonzalez was unable to maintain attention. Mr. Gonzalez never requested or indicated a preference for termination or deferral of removal.

10.      Eventually, Judge DePaolo stated that Mr. Gonzalez cannot meaningfully participate in the proceeding and that even with a lawyer Mr. Gonzalez would be unable to understand the legal consequences of choosing between his two possible forms of relief: termination or deferral of removal.

11.      The DHS trial attorney requested that Judge DePaolo choose between termination and deferral.  After deliberation, Judge DePaolo stated that she would grant Mr. Gonzalez deferral of removal.  Judge DePaolo commented that if she terminates the proceeding and the Government appeals, the Board of Immigration Appeals will remand the case.

12.      The DHS trial attorney reserved the right to appeal and requested that in her determination, Judge DePaolo make a finding based on the objective evidence as to whether Mr. Gonzalez is subject to removal.

13.      In the end, Judge DePaolo ordered that although Mr. Gonzalez was subject to removal, he was also entitled to deferral of removal because his mental illness could subject him to conditions that amount to torture if he were deported to Mexico.

14.      I declare under penalty of perjury that the foregoing is true and correct. Executed on August 24, 2012  in San Diego, California.

_____
Julia Hunter

Case 2:10-cv-02211-DMG-AGR   Document 454   Filed 08/24/12   Page 49 of 52   Page ID
#:9479
Case 2:10-cv-02211-DMG -DTB   Document 217-2   Filed 06/13/11   Page 17 of 60   Page ID
#:3875

# Exhibit 158

1   SEAN K. KENNEDY (SBN 145632)
    Federal Public Defender
2   (E-mail:  Sean_Kennedy@fd.org)
    321 East 2nd Street
3   Los Angeles, California  90012-4202
    Telephone (213) 894-2854
4   Facsimile (213) 894-0081

5

6

7                    UNITED STATES DISTRICT COURT

8                    CENTRAL DISTRICT OF CALIFORNIA

9                           WESTERN DIVISION

10
    JOSE ANTONIO FRANCO-                )   NO. CV 10-2211-DMG (DTB)
11  GONZALEZ, et al.,                   )
                                        )   **DECLARATION OF FEDERAL**
12               Petitioners,           )   **PUBLIC DEFENDER SEAN K.**
                                        )   **KENNEDY**
13          v.                          )
                                        )
14  ERIC HOLDER, ATTORNEY               )   Honorable Dolly M. Gee
    GENERAL, et al.                     )
15                                      )
                 Respondents.           )
16                                      )

17

18          At the request of Plaintiffs, Federal Public Defender Sean K. Kennedy files

19  this declaration re: appointment of counsel for detained mentally disabled persons in

20  removal proceedings.

21                                           Respectfully,

22

23  Dated: June 13, 2011

24                                           SEAN K. KENNEDY
                                             Federal Public Defender
25

26

27

28

## DECLARATION OF SEAN K. KENNEDY

I Sean K. Kennedy declare that:

1) I am the Federal Public Defender for the Central District of California.

2) The ACLU inquired whether the Federal Public Defender's Office (FPDO) would voluntarily accept appointment as counsel of record for detained mentally disabled persons in immigration proceedings. After consulting with officials from the Administrative Office of the United States Courts and independently researching the issues, the FPDO has determined that the Criminal Justice Act (CJA) would authorize their appointment in this case and is prepared to accept such an appointment to represent detained mentally disabled persons facing removal proceedings in the Central District of California.

3) The federal courts have long held that in some circumstances fundamental fairness may require the appointment of counsel in removal proceedings. In *Aguilera-Enriquez v. INS*, 516 F.2d 565 (5th Cir. 1975), the court stated that "[t]he test for whether due process requires the appointment of counsel for an indigent alien is whether, in any given case, the assistance of counsel would be necessary to provide 'fundamental fairness--the touchstone of due process.'" *Id.* at 568. *See also Escobar-Ruiz v. INS*, 787 F.2d 1294, 1297 n.3 (9th Cir. 1986) (noting that "[t]he fifth amendment guarantee of due process applies to immigration proceedings, and in specific proceedings, due process could be held to require that an indigent alien be provided with counsel despite the prohibition of section 292").

4) The Criminal Justice Act also authorizes appointment of counsel to any indigent who "faces loss of liberty in a case, and Federal law requires the appointment of counsel." *See* 18 U.S.C. § 3006A(a)(1)(F).

5) In this case, the district court has held that federal law requires that detained mentally disabled persons in removal proceedings be provided with

2

1   representation.  Such a person "faces loss of liberty" and "federal law [29 U.S.C. §

2   794, the Rehabilitation Act] requires appointment of counsel."  Consequently, the

3   FPDO will accept appointment as counsel of record under the circumstances.

4        6)    While most cases in which the FPDO is appointed by the

5   court as counsel involve federal criminal offenses, it is not uncommon for federal

6   public and community defenders throughout the United States to represent clients in

7   federal habeas proceedings, state habeas exhaustion proceedings, federal and state

8   clemency proceedings, civil commitment proceedings, indefinite immigration

9   detention matters and  grand jury witness matters.  Court-ordered representation of

10  detained mentally disabled persons in removal proceedings in order to comply with

11  federal law is analogous to these types of representation, and in our view would be a

12  reasonable and appropriate use of our resources.  Consequently, I believe the CJA

13  authorizes the appointment, and I do not believe that or any other federal statute bars

14  appointing the FPDO under these circumstances.

15        I declare under penalty of perjury that the foregoing is true and correct.

16

17  Dated: June 13, 2011

18                                              SEAN K. KENNEDY

19

20

21

22

23

24

25

26

27

28

                                    3