JOYCE R. BRANDA
Acting Assistant Attorney General
WILLIAM C. PEACHEY
Director, Office of Immigration Litigation
District Court Section
JEFFREY S. ROBINS
Assistant Director, Office of Immigration Litigation
District Court Section
U.S. Department of Justice
450 5th Street, N.W., Rm. 6102
Washington, D.C. 20530
Telephone: (202) 616-1246
Facsimile: (202) 305-7000
Jeffrey.Robins@usdoj.gov

Attorneys for Defendants-Respondents

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSE ANTONIO FRANCO-GONZALEZ, *et al.*, <br><br> *Plaintiffs - Petitioners*, <br><br> v. <br><br> ERIC H. HOLDER, JR., Attorney General, *et al.*, <br><br> *Defendants - Respondents,* <br> _____ | Case No. 10-CV-02211 DMG (DTBx) <br><br> **SEPARATE STATEMENT IN RESPONSE TO THE COURT'S DRAFT MONITORING ORDER**[1] <br><br> Honorable Dolly M. Gee |

---

[1] Today, at 7:43 p.m. EST, Plaintiffs advised Defendants, for the first time, that they would be filing their portion of the parties' joint statement separately. Shortly thereafter, Plaintiffs confirmed that the parties had reached agreement on joint revisions to certain provisions of the Court's Draft Order. Plaintiffs will undoubtedly seek in their separate statement to characterize Defendants as uncooperative. To the contrary, over the course of the past week, Defendants have repeatedly articulated their positions to Plaintiffs both orally and in writing, including during a meet-and-confer, in an earlier draft of Defendants' statement (including redline text of the Draft Order reflecting the revisions Defendants seek) and, earlier today, in their final portion of a joint statement. Defendants have received no details from Plaintiffs regarding their position except for general statements that they intended to defend the order. Nevertheless, Plaintiffs refused to incorporate Defendants' final statement into a joint statement – necessitating this separate filing. To the extent that Plaintiff's separate filing contains any mischaracterizations, in addition to positions, issues, and/or argument that Plaintiffs have not identified to Defendants in the past week, Defendants reserve the right to seek leave to file a supplemental statement.

**I.     Defendants' Introductory Statement:**

Defendants present the following final comments and requests for clarifications of the Court's Draft Order Appointing Monitor ("Draft Order"). In light of the scope, time, and expense contemplated by the Draft Order's terms, a close review of each of the myriad provisions is not only warranted, but is vital. Despite the Special Master's role in prior negotiations on this issue, which resulted in Defendants' progressive attempts to reach a reasonable compromise, the Court's most recent discussions and Draft Order were issued without the benefit of a Report and Recommendation from the Special Master (as has been the Court's practice since the Special Master's appointment). As a result, Defendants have not been afforded an opportunity to address each provision of the Draft Order, or an opportunity to demonstrate how the numerous provisions may interrelate to pose significant obstacles and unforeseen burdens. Because numerous provisions have not been specifically addressed by the Court, there is meaningful benefit to the Court in fully addressing Defendants' serious concerns prior to the Monitor's appointment to avoid the necessity of a potential appeal or future requests to modify the Draft Order. Defendants respectfully request the opportunity to be heard regarding their comments and requests for clarifications set forth herein.[2]

While the Court has stated "more information is better"[3] to monitor compliance with the Court's Implementation Documents, such a mandate is only productive to a point. Additionally, the information provided must nevertheless remain relevant to the Monitor's responsibilities, which "shall be limited to monitoring compliance with the Implementation Documents." Draft Order at 2. Defendants' serious concerns that irrelevant, unnecessary, and cumulative

---

[2] Defendants also note for clarity that at the time of this separate filing, Plaintiff have not indicated their position on Defendants' suggestion that the parties' request to meet in-person with the Monitor soon after her formal appointment.

[3] *See* Transcript of Jan. 9, 2015 Status Conf. ("Trans.") at 36.

1

information and documents will substantially impede their implementation of the Court's injunction and implementation plan are particularly important where they have not consented to this Draft Order[4] and where the Draft Order's terms will consume the same limited government resources and personnel necessary to ensure execution of the Implementation Documents. Relatedly, inundating the Monitor with voluminous data and documentation may similarly impede the Monitor's ability to meaningfully ensure substantial compliance with the Court's orders. As drafted, rather than serving its professed purpose— verifying that Defendants are acting reasonably to afford Class Members the relief awarded by the Court—the Draft Order will impose burdens and requirements expanding well beyond the scope of the Implementation Documents.

Defendants' proposed revisions to the Draft Order, *see* Exhibit 1, seek to adequately balance the intent of monitoring, as expressed by the Court, with the shared interest in efficiently implementing the Court's underlying orders by: (1) clarifying the Draft Order so that the parties and the Monitor understand what is necessary for compliance; (2) eliminating those provisions that are unrelated to Defendants' compliance with the Implementation Documents; and (3) clarifying or modifying those provisions that would result in such operational burden to Defendants as to undermine their ability to comply with the Implementation Documents.

---

[4] Defendants' lack of consent mandates that the Court's appointment of a monitor be limited to judicial duties. *See, e.g., Cobell v. Norton*, 334 F.3d 1128, 1142 (D.C. Cir. 2003). Notwithstanding the authority that Courts have exercised to appoint monitors or special masters for the purposes of implementing a judgment, Courts should take clear steps to insure that such court-appointed authorities are not an "advocate" for the plaintiffs or a "roving federal district court." *Id*. at 1143 (citations omitted).

## II. Defendants' Commentary Concerning Main Class Member Statistics (Sec. B.1.e), File Sampling Protocol (Sec. B.2), Requests for Other Documents (Sec. B.1.b)[5]

As detailed below, Defendants highlight two primary obstacles, and seek clarifications, related to the provision of Main Class Member Statistics, File Samples, and Other Documents.

First, the Draft Order requires the production of statistics and documents for a minimum fifty percent of all Main Class Members for each reporting cycle. However, contrary to the Court's stated intent, the Order does not provide the Monitor with the express discretion to require less. Trans. at 14 ("I will definitely give the monitor discretion to scale that [fifty percent] back if she feels that that's not necessary as time goes on . . ."). Obligating Defendants to provide statistics and documentation for "no fewer than 50% of all Main Class Members" for each reporting cycle, without providing the Monitor with the discretion to reduce that number, unnecessarily limits the Monitor's ability to determine whether certain statistics or documentation, or the volume of those statistics or documentation, are "necessary or duplicative of other information." Trans. at 36.

Defendants respectfully request that the Court confirm the Monitor's express discretion to depart from that initial number through the course of her monitoring term. Similarly, with regard to the File Sampling Protocol, Defendants respectfully request that the Monitor retain the discretion to place a limit on the number of sample files from which Defendants are obligated to provide specified documentation.[6] Each reporting cycle may impose additional and unforeseen burdens on Defendants with the passage of time. *See generally,* Fed. R. Civ. P. 26(b)(2)(C)(iii) ("the court must limit the frequency or extent of discovery … if …

---

[5] Defendants request that the Court clarify that, similar to the requirement that the Monitor consider the burden her requests for non-privileged information or documents under Section B.1.b may impose on Defendants, such burden, if undue, may serve as a basis for Defendants to object to the Monitor's requests.

[6] Whereas the Court and the Special Master have previously addressed the appropriate percentage of Main Class Members for whom Defendants should initially provide statistics, they have not addressed the appropriate percentage of files that should be provided under a Sampling Protocol.

3

the burden or expense of the proposed discovery outweighs its likely benefit"). Because the Court's Order requires Defendants to provide information related to released Main Class Members, whose proceedings are likely to remain pending for the duration of the Monitor's term, the pool of Main Class members (from which the Monitor will select a sample) will likely grow exponentially over the course of the Monitor's term. *See* Exhibit 2, Declaration of Jean King ("King Decl.") at ¶10. Not only would Defendants' burden quickly escalate,[7] but the Monitor's burdens may also unnecessarily increase absent her discretion to limit the statistical and document production to an appropriate volume that allows her to meaningfully review the information and produce a timely report to the Court. This is particularly important given that the Draft Order currently obligates Defendants to report on no fewer than forty-six (46) separate data fields for each Main Class Member. Similarly, the provision of voluminous documentation, including recordings from potentially hundreds of hearings,[8] would impinge on the Monitor's ability to meaningfully review the documentation to assess Defendants' compliance with the Implementation Documents.[9] For these reasons, Defendants

---

[7] For example, Defendant EOIR must coordinate the shipping of records in the three states subject to this Court's orders to its headquarters in Falls Church, VA, for attorney review and processing, which, in turn, may disrupt the ongoing proceedings of Class members. *See* Ex. 2, King Decl. at ¶¶ 7-9. The time and expense to produce each record is substantial, including the need for attorneys to listen to all hearing recordings before producing them to the Monitor. *See id.* at ¶¶ 3-9. Defendant ICE faces similar burdens as documents regarding Class Members' medical screening at detention facilities are not stored with Class Members' other immigration files. *See, e.g.,* DHS-ICE, 2011 Performance Based National Detention Standards at 279 (Medical Care), *available at* http://www.ice.gov/doclib/detention-standards/2011/medical_care.pdf ("Information about each detainee's health status shall be treated as confidential, and health records shall be maintained in accordance with accepted standards separately from other detainee detention files").

[8] Defendants seek clarification that such *audio* recordings may be provided to the Monitor in CD format, rather than the "searchable PDF format" otherwise required under Section B.2.

[9] This cap would not impinge on the Monitor's broad authority to request documents pursuant to Section B.1.b of the Draft Order as she deems appropriate to carry out her duties.

respectfully request that the Court clarify the Order to set a presumptive cap on a file sampling or, alternatively, provide the Monitor with the discretion to do the same.

Second, and distinct from the clarifications Defendants seek regarding document sampling, because neither the Plaintiffs nor the Court has identified the manner in which the following data fields monitor compliance with the Implementation Documents, the information should be excluded as mandatory requirements under Section B.1:[10] (1) Mental health conditions and diagnoses as referenced in any Forensic Competency Evaluations (FCEs) and the date of such FCEs (Sections B.1.e.ii.(i) and (ii))[11]; (2) Provision of "the written order and audio recording or transcript of hearing" under "Judicial Competency Inquiries" and "Competency Review" (Sections B.1.e.(v) and (vii))[12]; (3) Provision of the names of IJs under "Restoration to competency" and "Continuances or extensions" (Sections B.1.e.(ix) and (x)); (4) Position of the Qualified Representative (QR) under "Restoration to Competency" (Section B.1.e.(ix)[13]; whether released Main

---

[10] As with the presumptive cap on a file sampling, excluding these data fields would not impinge on the Monitor's broad authority to otherwise request this information pursuant to Section B.1.b of the Draft Order.

[11] Unlike the diagnostic information contained in the Mental Health Assessments referenced in Section I.A.3 of the Implementation Order, ECF No. 786 at 7-8, wherein a qualified mental health provider determines that a detainee meets the class membership criteria, diagnoses included in the FCEs have no such effect. Similarly, the dates required under the Implementation Documents relate to when an FCE is ordered and when an FCE report is filed, not when the actual evaluation occurs. In any event, this information is captured in the actual FCEs being provided to the Monitor pursuant to Section B.2. In this regard, the time required to review the FCEs, identify this information, and provide it to the Monitor would be unduly burdensome. *See, e.g.,* Fed. R. Civ. P. 26(b)(2)(C)(i).

[12] Defendants do not dispute the relevance of such documents and will provide them to the Monitor pursuant to the Sampling Protocol at Section B.2. The requirement above is duplicative and, as a practical matter, such *documentation* cannot be provided as part of the searchable electronic file.

[13] The Implementation Documents require the IJ to "invite the input" of the QR during the hearing *prior* to any finding made by the IJ. *See* ECF Dkt. # 786 at 21. Notably, the Monitor will be able to review such input as part of the audio recordings and transcripts provided under Section B.2 of the Draft Order.

5

Class Members filed motions to reopen or were ordered removed (Sections B.1.f.ii.(iv) and (v))[14]; and (5) Standard contracts with individuals performing FCEs and QR Organizations and/or attorneys (Sections B.1.h & i).[15]

Third, the Court appears to have inadvertently incorporated language from Plaintiffs' proposal that directs Defendants to create a "database" and to meet and confer with Plaintiffs regarding the composition of the database. Defendants seek to clarify that the contemplated "database" should simply be a mechanism to maintain a list of Class members. Defendants are prepared to comply with the Draft Order's requirement to provide the Monitor the requisite data in "the form of a searchable electronic file (such as an Excel or pdf file)." Draft Order at 6. But it is solely for Defendants to determine how best to procure and provide the information required for that electronic file.[16] Any requirement to the contrary

---

[14] Despite Plaintiffs' withdrawal of their request to have the "reopening settlement" subject to the monitoring order, *see* Trans. at 17, the Court has retained provisions related to motions to reopen. Draft Order at 10, subsection f.ii.(iv). This provision, as well as the provision related to whether a released Main Class Member was ordered removed (other than through an *in absentia* order), *id.* at subsection f.ii.(v), do not assess compliance with any terms within the Implementation Documents. To the extent the Plaintiffs suggest this information is related to assessing Defendants' compliance with their obligations to released class members, the Draft Order already captures the relevant data —i.e., whether the Released Main Class Member failed to appear for an FCE (Section B.1.f.ii.(i)), was ordered removed *in absentia* (Section B.1.f.ii.(i)), and retained their Qualified Representative (Sections B.1.e.iv.(ii) and (iii)). *Compare* Implementation Order, ECF No. at 22-23 (setting forth procedures applicable to Released Main Class Members).

[15] Defendants' compliance with respect to the service providers who conduct FCEs and the provision of QRs can be assessed pursuant to the actual FCEs being provided pursuant to Section B.2. and the statistical information provided regarding QRs pursuant to Section B.1.e.iv. Any other contractual terms are irrelevant to an assessment of compliance.

[16] The creation of a government "database," including a requirement for input from Plaintiffs related thereto, contemplates an untold number of obstacles and legal implications related to privacy rights and confidentiality rules surrounding government records and authorized access to such records, which may require Defendants to pursue further review should the Court direct the creation of any shared "database." Directing the manner in which multiple federal agencies "track" cases and collect data for purposes of complying with a monitoring order is wholly inappropriate and contrary to case law. Plaintiffs' attempt to direct the Defendant agencies' internal affairs and future business practices in this manner is well outside of the scope of monitoring. *See* Trans. at 14-15.

6

would unquestionably and improperly intrude on Defendants' internal affairs. *See Cobell,* 334 F.3d at 1143.

### III. Defendants' Commentary Concerning the Monitor's Appointment (Sec. A.1), Authority (Sec. A.2), Terms and Extensions (Sec. A.3), Support and Compensation (Sec. C)

Defendants raised specific concerns and objections at the January 9, 2015 status conference regarding the actual or apparent conflicts of interest created by the appointment of Ms. Mahoney as Monitor.[17] While such conflicts may be addressed if Ms. Mahoney effectively "walls herself off" from legal work that is the subject matter of this litigation or her monitoring duties, Defendants respectfully request that the Court approve a proposed plan from Ms. Mahoney and Fellom & Solorio to limit any potential conflicts of interest.[18]

Defendants additionally seek clarification that the parties will be provided an opportunity to respond to the Monitor's request to "undertake necessary measures not specifically referred to [in the Draft Order]," Draft Order at 2, particularly to the extent this language provides for modification of the final Monitoring Order.

Defendants also seek two points of clarification surrounding the potential terms and extensions contemplated in the Draft Order: (1) the presumptive end of the term; and (2) the scope of any extension. Consistent with the Court's stated

---

[17] Defendants' proposed Monitor, retired District Judge Irma Gonzalez, for whom Plaintiffs have not objected, does not appear to present the same potential conflicts.

[18] Notwithstanding a Court-approved plan regarding the Monitor's conflicts, some IJs have expressed concerns with the potential for conflict and, on a case-by-case basis, may deem their recusal warranted from proceedings wherein Ms. Mahoney and/or her firm appear. *See* Dep't. of Justice, Exec. Offc. for Immigr. Review, Offc. of the Chief Immigr. Judge, Operating Policies and Procedures Memorandum 05-02: *Procedures for Issuing Recusal Orders In Immigration Proceedings* (Mar. 21, 2005), *available at* http://www.justice.gov/eoir/efoia/ocij/oppm05/05-02.pdf. Executive Branch employees, such as IJs, are required to endeavor to avoid any actions creating the *appearance* that they are violating any of the ethics regulations (*i.e.*, participating in matters where circumstances would cause a reasonable person with knowledge of the relevant facts to question the employee's impartiality). *See* 5 C.F.R. 2635.502(a), (2)(2) and 2635.101(b)(14). Because Ms. Mahoney's role as Monitor will require her to evaluate the actions of the IJs before whom she may appear, questions as to an IJ's impartiality in cases represented by Ms. Mahoney may be raised and could result in an IJ determining that recusal is appropriate.

7

views, the presumptive end of the Monitoring Term should be 24 months, absent a requisite showing. Contrary to this view, however, the Draft Order presumes a one-year extension without the requisite proof. *Compare* Draft Order at 2 ("The Initial Term [of 24 months] may be extended . . . if . . . Plaintiffs file with the Court a Notice . . . based on serious, specific, ongoing concerns") *with* Draft Order at 3 ("Absent a showing of good cause by Plaintiffs, the presumptive end of the Term shall be no later than 36 months after the Effective Date."). While the Draft Order appropriately requires an extension beyond the initial term be based on the "serious, specific, ongoing concerns," the Order thereafter applies an apparently lower, and undoubtedly vaguer, standard of "good cause" to justify an extension beyond 36 months. More importantly, Defendants request that the Court clarify that any extended term must be specifically targeted at monitoring compliance with only the matters posing "serious, specific, and ongoing concerns" to the Monitor.[19]

Lastly, Defendants respectfully request that the parties be given an opportunity to comment on any request from the Monitor should she seek compensation or expenses in excess of what the Draft Order permits.[20]

---

[19] To the extent the Draft Order does not contemplate such a limitation, it would unjustifiably require Defendants to continue to provide information and documentation related to provisions of the Monitoring Order to which they had substantially complied.

[20] While Defendants do not lodge any specific objections to the compensation scheme contemplated in the Draft Order, Defendants continue to have concerns that the scheme may not adequately ensure that the Monitor's compensation is commensurate with the limited scope of her duties, *i.e.,* to monitor Defendants' compliance with the Implementation Documents.

8

### IV. Defendants' Commentary Concerning *Ex Parte* Communications (Sec. A.6), Interviews (Sec. B.1.a), Training by Defendants (Sec. B.1.d)[21]

Although the Monitor in this matter is not wholly conceived of as a judicial officer, to the extent the Monitor has the authority to recommend merits-based orders (*i.e.*, sanctions), and can otherwise bind the parties, the Monitor serves in a quasi-judicial role.[22] Accordingly, the conditions regarding non-substantive *ex parte* communications initiated by judicial officers should be instructive to the actions of the Monitor here.[23] For this reason, Defendants respectfully request that the Court clarify the Monitor's *ex parte* authority and append language to Section A.6.d consistent with the rule above.[24] Because *ex parte* interviews of Defendants' represented personnel could pose ethical concerns, *see*, *e.g.*, Rule 2-100 of the Cal. R. Pro. Conduct (prohibiting attorneys, such as the Monitor, from

---

[21] Because the names of government personnel who attend training has no demonstrative effect on the Monitor's assessment of Defendants' compliance with the terms of the Implementation Documents, and because there is similarly no compelling need for ICE to disclose the identities of law enforcement personnel, Defendants respectfully request that the Court permit Defendants to respond to Section B.1.d of the Draft Order by providing the categories (*e.g.*, titles) of individuals who receive training. *See, e.g., Lahr v. National Transp. Safety Bd.*, 569 F.3d 964, 978 (9th Cir. 2009) (recognizing federal law enforcement officers' cognizable privacy interest in withholding their names).

[22] While Fed. R. Civ. P. 53(c)(2) authorizes Courts to empower Masters and Monitors with the authority to recommend contempt sanctions, the Monitor's authority should be specifically limited to alleged contempt by either party in carrying out the Order Appointing Monitor, not the Court's Implementation Documents, consistent with Draft Order's directive that the "Monitor shall have no authority to intervene in or direct Defendants' activities." Draft Order at 3.

[23] *See, e.g.,* Cal. Code Jud. Ethics, canon 3(B)(7)(d) ("A judge may initiate ex parte communications, where circumstances require, for scheduling administrative purposes, or emergencies that do no deal with substance matters provided: (i) the judge reasonably believes that no party will gain a procedural or tactical advantage as a result of the ex parte communication and (ii) the judge makes provision promptly to notify all other parties of the substance of the ex parte communication and allows an opportunity to respond."); *Howe v. City of Akron*, 17 F. Supp. 3d 690 (N.D. Ohio 2014) ("[t]he Monitor shall not communicate to the Court any substantive matter the Monitor learned about during an ex party communication between the Monitor and any party").

[24] This would include communications that may occur prior to filing an interim report pursuant to Section D.1.c.

9

contacting represented parties without first contacting such parties' counsel),[25] Defendants also request clarification that the Monitor will, at a minimum, coordinate interviews through designated agency points of contact and, in general, will allow the presence of such contacts during any coordinated interviews.[26] Defendants have no desire to chill the Monitor's efforts to find facts relevant to Defendants' compliance with the Implementation Documents, and coordination with the specified agency points of contact are likely to foster more thorough discussion with the employees selected for interview, and may help to identify additional information that may be responsive to the Monitor's inquiry.[27]

## V. Defendants' Statement re: Joint Request for Modifications:

Defendants respectfully inform the Court that the parties have jointly agreed to request the modifications set forth in redline text at Exhibit 3.

---

[25] Defendants' employees, including "managing agents" such as ICE's supervisory officers and EOIR's Assistant Chief Immigration Judge (ACIJs), would fall within the scope of section (B)(1). Because their acts or omissions "may be binding upon or imputed to the organization for purposes of civil or criminal liability." *Id.*

[26] While the Draft Order generally limits the ability of the Monitor to initiate contact with IJs, it does not preclude the reverse. In the Special Master's commentary to the parties on October 6, 2014, he explicitly stated that any contact between the IJs and the Monitor was inappropriate. His view reflects the fact that contact between a Monitor and independent adjudicators creates substantial concerns – including the Monitor's ethical obligation not to have contact with represented parties or their employees, even if they reach out to the Monitor – and, therefore, the language allowing for IJs to initiate contact with the Monitor should be stricken. Any such communications, if permitted by the Court, must at minimum be limited to the IJ's role regarding procedural aspects of the Implementation Documents and not the substance any of the IJ's underlying decisions. Defendants note that ACIJs who preside over Class Members' individual cases also have responsibility for training other IJs. Thus, any interviews of ACIJs must be similarly limited.

[27] To the extent Plaintiffs are concerned about the role Defendants' agency point of contact would play in such interviews, Defendants' proposed revisions to Section A.6, *supra*, would require the Monitor to report on any discussions regarding issues of substance. Moreover, Defendants are open to a provision that would allow the Monitor to: seek the consent of Defendants' agency points of contact to conduct an interview outside their presence, and in extreme circumstances, to seek authorization from the Court or Special Master to conduct an interview without the presence of the designated agency counsel points of contact.

Dated: February 13, 2015  Respectfully submitted,

/s/ Jeffrey S. Robins
JEFFREY S. ROBINS
*Attorney for Defendants-Respondents*