1   AHILAN T. ARULANANTHAM (SBN 237841)
    aarulanantham@aclusocal.org
2   CARMEN IGUINA (SBN 277369)
    ciguina@aclusocal.org
3   ACLU FOUNDATION OF SOUTHERN CALIFORNIA
    1313 West 8th Street
4   Los Angeles, California 90017
    Telephone: (213) 977-5211
5   Facsimile: (213) 417-2211

6   MICHAEL H. STEINBERG (SBN 134179)
    steinbergm@sullcrom.com
7   SULLIVAN & CROMWELL LLP
    1888 Century Park East, Suite 2100
8   Los Angeles, California 90067-1725
    Telephone: (310) 712-6600
9   Facsimile: (310) 712-8800

10  *Attorneys for Plaintiffs-Petitioners*
    (Additional Counsel for Plaintiffs on Following Page)

11

12

13                    **UNITED STATES DISTRICT COURT**

14                    **CENTRAL DISTRICT OF CALIFORNIA**

15

16   JOSE ANTONIO FRANCO-            )   Case No. 10-CV-02211 DMG (DTBx)
     GONZALEZ, et al.,               )
17                                   )   **PLAINTIFFS' MEMORANDUM OF
           *Plaintiffs & Petitioners,* )   POINTS AND AUTHORITIES IN
18                                   )   SUPPORT OF THEIR MOTION
                 v.                  )   FOR ATTORNEYS' FEES**
19                                   )
     ERIC H. HOLDER, Jr., Attorney   )   Hearing Date:  October 30, 2015
20   General, et al.,                )
                                     )   Hearing Time:  10:00 a.m.
21         *Defendants & Respondents.* )
                                     )   Honorable Dolly M. Gee
22   _____)

23

24

25

26

27

28

1  JUDY LONDON (SBN 149431)
   jlondon@publiccounsel.org
2  TALIA INLENDER (SBN 253796)
   tinlender@publiccounsel.org
3  PUBLIC COUNSEL
   610 South Ardmore Avenue
4  Los Angeles, California 90005
   Telephone: (213) 385 2977
5  Facsimile: (213) 385-9089

6  JUDY RABINOVITZ (pro hac vice)
   JRabinovitz@aclu.org
7  ACLU IMMIGRANTS' RIGHTS PROJECT
   125 Broad Street, 18th Floor
8  New York, New York 10004-2400
   Telephone: (212) 549-2618
9  Facsimile: (212) 549-2654

10 BARDIS VAKILI (State Bar No. 247783)
   bvakili@aclusandiego.org
11 DAVID LOY (SBN 229235)
   davidloy@aclusandiego.org
12 ACLU OF SAN DIEGO & IMPERIAL COUNTIES
   P.O. Box 87131
13 San Diego, California 92138
   Telephone: (619) 232-2121
14 Facsimile: (619) 232-0036

15 JAMES PREIS (SBN 82690)
   jpreis@mhas-la.org
16 MENTAL HEALTH ADVOCACY SERVICES
   3255 Wilshire Boulevard, Suite 902
17 Los Angeles, California 90010
   Telephone: (213) 389-2077
18 Facsimile: (213) 389-2595

19 MATT ADAMS (SBN 28287)
   matt@nwirp.org
20 NORTHWEST IMMIGRANT RIGHTS PROJECT
   615 2nd Avenue, Suite 400
21 Seattle, Washington 98104-2244
   Telephone: (206) 957-8611
22 Facsimile: (206) 587-4025

23 JAMES LYALL (SBN 330045)
   jlyall@acluaz.org
24 ACLU FOUNDATION OF ARIZONA
   3707 N. 7th Street, Suite 235
25 Phoenix, Arizona 85014
   Telephone: (602) 773-6001
26 Facsimile: (602) 650-1376

27 *Attorneys for Plaintiffs-Petitioners*

28

# **TABLE OF CONTENTS**

I.    INTRODUCTION ............................................................................... 1

II.   BACKGROUND AND PROCEDURAL HISTORY ..................................... 3

    A.   Plaintiffs Prevailed on All Major Issues Presented in the Case. ......... 3

    B.   Defendants Pre- and Post-Filing Litigation Conduct and Tactics Substantially Increased the Costs of Litigation. ................................ 6

        1.   The Ultimate Outcome on the Counsel and Detention Claims Was Inevitable in 2011, but Defendants' Tactics Delayed Resolution for Two Extra Years .............................. 7

        2.   Defendants' Repeated, Unsuccessful Challenges to Class Certification ................................................................. 8

        3.   Defendants' Discovery Abuses ...................................... 9

        4.   Defendants' Unjustified Opposition to Monitoring ................ 11

III.  ARGUMENT ................................................................................... 11

    A.   Plaintiffs Are Entitled to Fees Under the Rehabilitation Act. ........... 13

        1.   Plaintiffs Obtained Excellent Results ...................................... 14

        2.   The Fees Sought Are Reasonable ........................................... 16

            i.    Plaintiffs' Hours are Reasonable .................................... 17

            ii.   Plaintiffs' Rates are Reasonable .................................... 18

    B.   Plaintiffs are Entitled to Fees Under EAJA. ........................................ 19

        1.   EAJA Threshold Requirements Are Met .................................. 20

        2.   Defendants' Positions Were Not Substantially Justified ......... 20

        3.   The Fees Sought Are Reasonable ........................................... 22

     i.  The Number of Hours Claimed is Reasonable...............22

     ii.  Attorneys Preis, Steinberg, Rabinovitz, London, Adams, and Arulanantham Are Entitled to Enhanced Rates ............................................................23

  C.  Plaintiffs Are Entitled to Recover Out-of-Pocket Costs....................25

IV. CONCLUSION ..............................................................25

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Allee v. Medrano,*
    416 U.S. 802 (1974) ............................................................................. 8

*Andrew v. Bowen,*
    837 F.2d 875 (9th Cir. 1988) ............................................................. 21

*Barrios v. Cal. Interscholastic Fed'n,*
    277 F.3d 1128,1134 (9th Cir. 2002) ................................................. 20

*Bay Area Peace Navy v. United States,*
    914 F.2d 1224 (1990) ......................................................................... 20

*Bell v. Clackamas Cnty.,*
    341 F.3d 858 (9th Cir. 2003) ............................................................. 14

*Blum v. Stenson,*
    465 U.S. 886 (1984) ........................................................................... 14

*Casas-Castrillon v. DHS,*
    535 F.3d 942 (9th Cir. 2008) ............................................................. 21

*Caudle v. Bristol Optical Co., Inc.,*
    224 F.3d 1014 (9th Cir. 2000) ........................................................... 16

*City of Riverside v. Rivera,*
    477 U.S. 561 (1986) ........................................................................... 15

*Ctr. for Food Safety v. Johanns,*
    2007 WL 3072860 (D. Haw. Oct. 18, 2007) .............................. 12, 13

*Dang v. Cross,*
    422 F.3d 800 (9th Cir. 2005) ............................................................. 25

*Diouf v. Napolitano (Diouf II),*
    634 F.3d 1081 (9th Cir. 2011) ........................................................... 21

*Farrar v. Hobby,*
    506 U.S. 103 (1992) ........................................................................... 14

-iii-

*Gates v. Gomez,*
  60 F.3d 525 (9th Cir. 1995) .................................................................. 16

*Gay Officers Action League v. Puerto Rico,*
  247 F.3d 288 (1st Cir. 2001) ................................................................... 2

*Gonzales v. City of Maywood.,*
  729 F.3d 1196 (9th Cir. 2013) .............................................................. 18

*Greater Los Angeles Council on Deafness v. Cmty. Television of S. California,*
  813 F.2d 217 (9th Cir. 1987) ................................................................ 18

*Hall v. Bolger,*
  768 F.2d 1148 (9th Cir. 1985) .............................................................. 14

*Harris v. Marhoefer,*
  24 F.3d 16 (9th Cir. 1994) .................................................................... 14

*Hensley v. Eckerhart,*
  461 U.S. 424 (1983) ...................................................................*passim*

*Kerr v. Screen Extras Guild, Inc.,*
  526 F.2d 67 (9th Cir. 1975) .................................................................. 16

*Matter of M-A-M-,*
  25 I & N Dec. 474 (BIA 2011) ............................................................. 15

*Mantolete v. Bolger,*
  791 F.2d 784 (9th Cir. 1986) ................................................. 6, 13, 14

*Mazza v. American Honda Motor Co.,*
  666 F.3d 581 (9th Cir. 2012) .................................................................. 9

*Missouri v. Jenkins,*
  491 U.S. 274 (1989) ............................................................................. 19

*Moreno v. City of Sacramento,*
  534 F.3d 1106 (9th Cir. 2008) ........................................................ 2, 17

*Nadarajah v. Gonzales,*
  443 F.3d 1065 (9th Cir. 2006) .............................................................. 21

*Nadarajah v. Holder,*
  569 F.3d 906 (9th Cir. 2009) ............................................... 18, 20, 23

*Nat'l Org. for Reform of Marijuana Laws v. Mullen,*
828 F.2d 536 (9th Cir. 1987) ................................................................. 11

*Nat'l Org. for Women v. Bank of Cal., Nat'l Ass'n.,*
680 F.2d 1291 (9th Cir. 1982) ............................................................... 25

*Pa. v. Del. Valley Citizens Council for Clean Air,*
478 U.S. 546 (1986) ............................................................................... 16

*Pierce v. Cnty of Orange,*
905 F. Supp. 2d 1017 (C.D. Cal. 2012) ........................................... 12, 13

*Pierce v. Underwood,*
487 U.S. 552 (1988) ............................................................................... 24

*Pirus v. Bowen,*
869 F.2d 536 (9th Cir. 1989) ........................................................... 23, 24

*Richard S. v. Dep't of Developmental Servs. of State of Cal.,*
317 F.3d 1080 (9th Cir. 2003) ............................................................... 20

*Rodriguez v. Robbins,*
715 F.3d 1127 (9th Cir. 2013) ......................................................... 21, 23

*Sorenson v. Concannon,*
161 F. Supp. 2d 1164 (D. Or. 2001) ...................................................... 12

*Tijani v. Willis,*
430 F.3d 1241 (9th Cir. 2005) ............................................................... 21

*United States v. First Nat'l. Bank of Circle,*
732 F.2d 1444 (9th Cir. 1984) ..................................................... 1, 3, 20

*United States v. Marolf,*
277 F.3d 1156 (9th Cir. 2002) ............................................................... 22

*V. Singh v. Holder,*
638 F.3d 1196 (9th Cir. 2011) ............................................................... 21

**Statutes**

8 U.S.C. § 1225(b) .................................................................................. 21

8 U.S.C. § 1226(c) .................................................................................. 21

8 U.S.C. § 1231(a)(6) ............................................................................. 21

28 U.S.C. § 1920 .................................................................................................. 25

28 U.S.C. § 2412(a)(1) ......................................................................................... 25

28 U.S.C. § 2412(d)(1)(A) ........................................................................ 7, 13, 19

28 U.S.C. § 2412(d)(2)(A) ................................................................................... 24

28 U.S.C. § 2412(d)(2)(A)(ii) .............................................................................. 23

28 U.S.C. § 2412(d)(2)(B) ................................................................................... 20

29 U.S.C. §§ 790, et seq. ..................................................................................... 13

29 U.S.C. § 794 ...................................................................................................... 3

29 U.S.C. § 794a(b) ............................................................................................. 13

42 U.S.C. § 1988 .................................................................................................. 14

**Federal Rules**

Fed. R. Civ. Proc. Rule 26 ................................................................................... 11

Fed. R. Civ. Proc. Rule 26(a) .............................................................................. 10

Fed. R. Civ. Proc. Rule 30(b)(6) .......................................................................... 10

Fed. R. Civ. Proc. 54 ............................................................................................ 25

Fed. R. Civ. Proc. 54(d) ....................................................................................... 25

# I. INTRODUCTION

This Court's orders have secured several remarkable "firsts." The *first* preliminary injunction requiring representation for immigration detainees (Aleksandr Khukhryanskiy and Ever Martinez) who could not represent themselves due to their serious mental disorders. The *first* permanent injunction requiring that relief for an entire class, i.e., the *first* judgment recognizing a right to appointed representation for any immigrants in removal proceedings. The *first* requirement that the Government assess the mental health of every immigration detainee in the States of California, Arizona and Washington. The *first* judicial definition of *pro se* competency. And, to our knowledge, the *first* independent monitor ever ordered against the Department of Homeland Security (DHS).

Both the legal academy and popular press have lauded the landmark protections obtained here. As one professor explained: "[*Franco*] led to the first major expansion in the right to counsel in federal courts in three decades."[1] *The New York Times* described *Franco* "as the first time a court has required the government to provide legal assistance for any group of people before the nation's immigration courts." *See* Declaration of Michael Steinberg ("Steinberg Decl."), ¶ 66. The public interest legal communities have celebrated this litigation, with Plaintiffs' counsel receiving the American Immigrants Lawyers Association Jack Wasserman Memorial Award for Excellence in Litigation (2014).

The tangible results achieved are striking. The most obvious one: the appointment of counsel to more than 300 *Franco* Class members and counting, including 201 Main and Sub-Class One members identified just since the start of this year, as the Implementation Plan order went into effect. *See* Declaration of Ahilan Arulanantham ("Arulanantham Decl.") ¶ 58. One less tangible, but equally

---

[1] W. Warren H. Binford, *Giving Voice to Unaccompanied Children in Removal Proceedings*, 21 Willamette J. Int'l L. & Disp. Resol. 34, 48 (2013). *See also* Arulanantham  Decl. ¶ 64.

1   important, achievement: the Government's promise to implement *Franco*

2   *nationwide*, without anyone instituting litigation in any other forum (although it

3   was threatened), *see* Dkt. 583; Steinberg Decl. ¶ 67.

4        There has also been a wonderful *intangible* result of this lawsuit: hope. Hope

5   for Mr. Franco, who is now permitted to live with his family in the United States.

6   Hope for the 300+ Sub-Class One members, that they will not stand alone against

7   the Government as they face deportation. Hope for the mothers and fathers of

8   *Franco* Class members, who will no longer feel the overwhelming pressure of

9   being forced to "represent" them, as Piotr Zhalezny did for his son Maksim.

10       Plaintiffs obtained substantially all the relief they sought; as a result, they are

11  entitled to a reasonable "lodestar" in fees and costs. True to form, Defendants

12  oppose the motion. They will claim the fees are too high, the effort undertaken was

13  too great, there were too many briefs (and too much care placed in drafting them),

14  too much discovery, too much time evaluating responses to the Government's

15  tactics, too many lawyers working together to achieve this historic outcome. But

16  Defendants cannot second-guess Plaintiffs' litigation choices, particularly after

17  they lost virtually every substantive issue in the case. *Moreno v. City of*

18  *Sacramento*, 534 F.3d 1106, 1112 (9th Cir. 2008) ("By and large, the court should

19  defer to the winning lawyer's professional judgment as to how much time he was

20  required to spend on the case; after all, he won, and might not have, had he been

21  more of a slacker."); *Gay Officers Action League v. Puerto Rico*, 247 F.3d 288,

22  297-298 (1st Cir. 2001) ("Effective preparation and presentation of a case often

23  involve the kind of collaboration that only occurs when several attorneys are

24  working on a single issue;" after mounting "a Stalingrad defense," the government

25  cannot "castigate the plaintiffs for putting too many troops in the field.").

26       Having driven up the expenses, but failed on the merits, Defendants cannot

27  ask for absolution, praying this Court has a short memory.

28

## II.    BACKGROUND AND PROCEDURAL HISTORY

### A.    Plaintiffs Prevailed on All Major Issues Presented in the Case.

This litigation began on March 26, 2010, when Mr. Franco filed his Petition for Writ of Habeas Corpus alleging violations of the Immigration and Nationality Act ("INA"), the Due Process Clause, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794. *See* Dkt. 1. Mr. Franco had spent nearly five years of his life in detention because he had no representation and was denied a bond hearing. Five days later, Defendants released Mr. Franco from custody. Defendants then asserted "mootness," to avoid any evaluation of their conduct. Dkt. 15.

But Mr. Franco's experience was far from unique. His horrific plight was the inevitable by-product of a system with no procedures for screening detainees' mental health, sharing mental health information with Immigration Judges, evaluating competency in immigration court, appointing representation to those unable to represent themselves, or considering such detainees for release on bond.

To ensure that others would not suffer Mr. Franco's fate, Plaintiffs amended their complaint, Dkt. 64, adding new plaintiffs, new claims, and seeking to certify classes of individuals similarly situated to Mr. Franco. Plaintiffs presented four core issues; Plaintiffs obtained conclusive victories on each.

*First*, Plaintiffs argued that detained immigrants with serious mental disabilities that render them unable to represent themselves are entitled to representation in their immigration proceedings. Plaintiffs first presented this argument to the Court on November 15, 2010, through a motion for a temporary restraining order ("TRO") and preliminary injunction on behalf of Named Plaintiffs Khukhryanskiy and Martinez. *See* Dkt. 57. On December 27, 2010, the Court issued an historic order, finding Plaintiffs "likely to prevail on [their] claim…that [they are] entitled to adequate representation under the [Rehabilitation] Act." Dkt. 107 at 34. The Court then enjoined Defendants from proceeding further against Plaintiffs Khukhryanskiy and Martinez until they "are afforded a Qualified

Representative(s) who is willing and able to represent Plaintiffs during all phases of their immigration proceedings, including appeals and/or custody hearings, whether *pro bono* or at Defendants' expense." *Id.* at 43.

The Government could have elected to provide representation to other detainees unable to represent themselves, just as the Court had ordered. Defendants also could have appealed. But they did neither. A few weeks later, because Named Plaintiff Maksim Zhalezny faced virtually the same harms that Messrs. Martinez and Khukhryanskiy had faced, Plaintiffs sought a second preliminary injunction. The Court again ordered the appointment of a Qualified Representative, this time specifically at a bond hearing. *See* Dkt. 215 at 20-21.

For the next two years, through heavily contested class certification, intensive discovery, and several months of fruitless settlement negotiations, Plaintiffs' request that the Government apply the same rules from these injunctions to all other individuals determined incompetent went ignored. To protect class members during this period, Plaintiffs repeatedly sought to accelerate the pace of the litigation. Finally, on April 23, 2013, the Court entered its landmark Permanent Injunction, in which it ordered relief on a classwide basis. *See* Dkts. 592; 593. This judgment constitutes the first ever to recognize the right to legal representation for any group of immigrants in immigration proceedings.

*Second*, *Franco* presented the question whether immigration detainees with serious mental disabilities are entitled to bond hearings after six months of detention. Plaintiffs first presented this issue on behalf of Named Plaintiffs Khukhryanskiy and Martinez. *See* Dkt. 57. On December 27, 2010, the Court ruled in favor of Plaintiffs, holding that because "Plaintiffs have been held . . . for longer than the presumptively reasonable six months, . . . Plaintiffs are therefore entitled to a custody hearing under Section 1226(a) at which Defendants must demonstrate that further detention is necessary." Dkt. 107 at 41.

Again, the Government declined to apply the Court's ruling to any other individuals, forcing Plaintiffs to seek the same relief for Mr. Zhalezny. The Court reaffirmed its detention ruling on May 4, 2011. Still the Government persisted, forcing Plaintiffs to file a third preliminary injunction, on August 2, 2011, on behalf of Named Plaintiff Yonas Woldemariam. *See* Dkts. 215; 262. Plaintiffs won again, but as with the representation issue, the Government refused to apply the Court's ruling to other Class Members. Although the Court had (artfully) noted that its decision on the third preliminary injunction was already merely applying prior rulings, Dkt. 262 at 5 n.3 (quoting Andre Gide), the Government's intransigence forced Plaintiffs to file a *fourth* preliminary injunction on this issue before the Court resolved it with respect to the entire Class. *See* Dkt. 554; Dkt. 592 at 34. The Court ordered the Government to provide Sub-Class Two members "with a bond hearing before an Immigration Judge with the authority to order their release on conditions of supervision, unless the Government shows by clear and convincing evidence that the Sub-Class Two members' ongoing detention is justified." Dkt. 593 at 3. Plaintiffs thus obtained victory on the second major question.

*Third*, Plaintiffs argued that the relief they sought should be applied on a classwide basis. Plaintiffs presented this issue on February 14, 2011, through their motion for class certification. *See* Dkt. 127. The Government opposed on multiple grounds, including a vigorous attack on numerosity. The Government argued that Plaintiffs' identification of putative class members was insufficient and flawed, Dkt. 161, at 10, even though a basic review of its own files would have established numerosity. In response to the Government's assertions, the Court ordered months of discovery on that subject. Dkt. 206. Again, the Court ruled in favor of Plaintiffs. On November 21, 2011, certifying one Main Class and two Sub-Classes, holding *inter alia* that "the number of individuals falling within the definition of the proposed Class and Sub-Classes is sufficiently large to warrant class treatment,"

1   Dkt. 348 at 16, and the "common legal questions" identified by Plaintiffs "are

2   susceptible of class-wide resolution." Dkt. 348 at 20. The hundreds of Subclass

3   One members now identified show this Court was correct.

4       *Fourth*, *Franco* presented the question whether the certified class of

5   detainees with serious mental disabilities were entitled to robust screening and

6   competency determination procedures. After entry of the Permanent Injunction, the

7   Parties engaged in extensive litigation and negotiations, overseen by the Special

8   Master, culminating in another historic ruling, in which the Court ordered

9   Defendants to implement a comprehensive system for identifying Main Class and

10  Sub-Class One members. *See* Dkt. 786. That Order also articulated a

11  comprehensive and entirely unprecedented pro se competency standard. *See id.* at

12  13-15. Again, Plaintiffs obtained a complete victory.[2]

13          **B.   Defendants Pre- and Post-Filing Litigation Conduct and Tactics
14                 Substantially Increased the Costs of Litigation.**

15      Plaintiffs developed their novel legal arguments for the *Franco* Class in the

16  face of Defendants' unusual litigation tactics. As this Court remarked in one of its

17  preliminary injunction orders (*hundreds* of docket entries ago): "Certainly,

18  Defendants' voluntary compliance with the Court's prior orders would have

19  promoted judicial economy and efficiency in this case." *See* Dkt. 285 at 11. In

20  enacting the two fee-shifting statutes at issue here, Congress sought not only to

21  ensure just compensation for civil rights litigants, but also to deter the Government

22  from engaging in unlawful conduct and litigation tactics against individuals with

23  meritorious claims. *See Mantolete v. Bolger*, 791 F.2d 784, 787 (9th Cir. 1986)

24  (purpose of Rehab Act's fee shifting provision is "ensuring compliance with the

---

25  [2] Plaintiffs have secured additional benefits beyond those four major issues. For
26  instance, Plaintiffs secured a settlement agreement with Defendants that would
    create a path for Class members who were ordered removed prior to the
27  Implementation Plan Order effective date to reopen their immigration cases, *see*
    Dkt. 806, which this Court has preliminarily approved, *see* Dkt. 818. And, of
    course, Plaintiffs secured the release of Mr. Franco and a settlement that ensures
28  his freedom and safety in the United States.

Act"); 28 U.S.C. 2412(d)(1)(A) (under EAJA, prevailing party entitled to fees unless government's position was substantially justified). Therefore, an understanding of the extent to which Defendants' litigation tactics unreasonably delayed relief to class members and increased the costs of this litigation is relevant to assessing Plaintiffs' fee request.

### 1. The Ultimate Outcome on the Counsel and Detention Claims Was Inevitable in 2011, but Defendants' Tactics Delayed Resolution for Two Extra Years

After the Martinez/Khukhryanskiy preliminary injunction in December of 2010, *see* Dkt. 107, and certainly after the Zhalezny preliminary injunction in May 2011 and the class certification motion in November of 2011, *see* Dkt. 348, it was clear that the Court would order representation and bond hearing protections on a classwide basis. Yet Defendants refused to follow the Court's guidance. Defendants instead spent the next *17 months* resisting the logical result of the Court's detailed orders, repeating their *mantra* that existing safeguards satisfied their obligations under the Rehabilitation Act and eliminated the need to provide representation and bond hearings for Class and Sub-Class members. *See* Dkt. 328 at 17-20. Defendants even argued that relief for Class members was unnecessary because Plaintiffs' counsel could *personally* represent Class members in their proceedings, *see* Dkt. 554 at 17-19, a plea that came complete with attacks on Plaintiffs' counsel's ethics. *See* Arulanantham Decl. ¶ 40.

These tactics forced Plaintiffs to conduct extensive merits discovery, and ultimately to spend tremendous resources litigating a *fourth* preliminary injunction and motion for summary judgment and permanent injunctive relief, all to establish that the same rules already articulated no later than November of 2011.[3]

---

[3] Defendants' resistance rested in part on a position contrary to the Government's own stated position. The Government repeatedly argued that Sections 1229a(b)(4)(A) and 1362 of the INA *precluded* appointment of legal representation to immigrants in their proceedings, notwithstanding, as this Court recognized, that the Office of the General Counsel for the DHS had already explicitly disavowed

## 2. *Defendants' Repeated, Unsuccessful Challenges to Class Certification*

Defendants engaged in an unending effort to avoid, and then reverse, class certification, often by dubious tactics, which dramatically increased the time and effort Plaintiffs had to spend. Defendants first step in this strategy was their attempt to "pick off" Named Plaintiffs. Defendants released Mr. Franco within days of the first filing and then argued that the case was moot. Dkt. 15. Defendants similarly claimed that any Named Plaintiff who obtained preliminary relief no longer had standing to assert claims on behalf of the Class. *See* Dkt. 161 at 2-7, 20. While the Court rejected these challenges, it did so only after extensive briefing and months of wasted effort. *See* Dkts. 54; 348. So obvious was the tactic that Judge Bristow ordered, when requiring Defendants to produce information about potential class members, that "the defendants shall be affirmatively estopped from challenging the standing of any such plaintiffs in order to prevent class certification." *See* Dkt. 283 at 3.[4]

Yet more waste arose from Defendants' contesting numerosity for the Main Class and the Sub-Classes, even though information in Defendants' own files contradicted this position. Worse, they simultaneously objected to the production of documents and testimony that Plaintiffs needed to prove numerosity. *See, e.g.*, Dkts. 161 at 9-12; 328 at 4-15. After enormous effort, Plaintiffs eventually reviewed data on hundreds of files to establish numerosity. Even after receiving this evidence, Defendants continued to resist. When faced with direct proof, Defendants acknowledged that the Main Class contained at least 55 individuals on a given day, Dkt. 348 at 16, yet *still* argued that this was insufficient, contrary to controlling authority. *See* Dkt. 348 at 12, 16.

---

this position. *See Franco-Gonzalez v. Holder*, No. CV 10-02211 DMG DTBX, 2013 WL 3674492, at *6 (C.D. Cal. Apr. 23, 2013).

[4] This standing challenge was based in part on a mis-citation of *Allee v. Medrano*, 416 U.S. 802, 829 (1974). *See* Dkt. 194 at 4. *See* Arulanantham Decl. ¶ 36.

1    Nor was this the end of the matter. Despite the Court's detailed certification

2    order, Defendants moved for reconsideration shortly afterward under *Mazza v.*

3    *American Honda Motor Co.*, 666 F.3d 581 (9th Cir. 2012). *See* Dkt. 389 at 8-9. To

4    obtain a further advantage based on this meritless argument, Defendants filed an *ex*

5    *parte* application to obtain a discovery stay while they litigated the motion. *See*

6    Dkt. 420. The Court predictably rejected Defendants' motion, *see* Dkt. 455, but

7    only after unnecessary briefing and even more delay.

8    Defendants also attempted to limit this Court's rulings by repeatedly arguing

9    that class membership should be determined by immigration judges rather than

10   objective medical criteria. *See* Dkts. 328 at 11, n.4; 389 at 20; 611 at 18-21.

11   Despite the Court repeatedly rejecting this position, *see* Dkts. 348 at 25 n.14; 455,

12   Defendants instructed their agency clients – who then instructed trial attorneys and

13   immigration judges – that immigration judges were responsible for determining

14   class membership. *See* July 19, 2013 Hr'g Tr. at 52:7-53:13. Plaintiffs eventually

15   brought this practice to the Court's attention, *see id.*, after which the Court issued

16   yet another order on the issue. *See* Dkt. 626 at 2.

17   Defendants also repeatedly attempted to narrow the *Franco* classes in ways

18   that ran counter to the stated rationale underlying the Court's multiple orders.

19   These included requests to limit the class: (1) to individuals in proceedings

20   governed by Section 1229a, *see* Dkts. 328 at 11 n.4; 389 at 20; (2) to individuals

21   detained under Section 1226(c), *see* Dkt. 577 at 2-5, (3) to individuals who were

22   represented before the BIA but not in detention proceedings, *see* Dkt. 554 at 14-15;

23   and (4) to individuals not in post-removal order bond hearings. The Court rejected

24   these attempts, but only after extensive briefing on each occasion, *see* Dkt. 348;

25   Dkt. 592; Dkt. 750 at 3-4, which further delayed classwide relief.

26                    ***3.    Defendants' Discovery Abuses***

27   Defendants dramatically increased the cost of litigation through their

28   discovery conduct. From the start, Defendants failed to comply with the most

-9-

1   pedestrian requirement – Rule 26(a) initial disclosures – stating that because the

2   case raised "generally legal matters," they had not identified *any* fact witnesses

3   with discoverable information, other than the Plaintiffs and class members. *See*

4   Dkt. 133 at 1; *See* Arulanantham Decl. ¶ 39.

5         Defendants' discovery tactics concerning certification are instructive. As

6   noted above, they contested numerosity while simultaneously objecting to

7   discovery on that subject. Intensive discovery battles followed, with extensive

8   intervention by Judge Bristow and five depositions, none of which were needed

9   given information in Defendants' own files. *See, e.g.*, Dkts. 161 at 9-12; 328 at 4-

10  15. To oppose certification and related discovery, Defendants represented that they

11  did not track the number of individuals in DHS custody with serious mental health

12  conditions, *see, e.g.*, Dkt. 126-1, Ex. 131 at 2, even though they did, *see, e.g.*, Dkt.

13  611-2; and relied upon regulations to wrongfully direct a Rule 30(b)(6) witness not

14  to answer questions, contrary to Ninth Circuit authority. *See* Dkt. 228, at 9-12.

15        Defendants also engaged in document production strategies that frustrated

16  Plaintiffs' legitimate right to learn about the class. Defendants first refused to

17  produce the A-files, medical documents, and records of proceedings for virtually

18  any Class Members, requiring Plaintiffs to move to compel this fundamental

19  information about the Class. *See* Dkt. 405. Even after the Court compelled the

20  production of those documents, Defendants produced the A-files and records of

21  proceedings in a "shuffled" and incomprehensible document dump, littered with

22  stray pages from documents devoid of all context, improper redactions for non-

23  responsiveness, and unlogged privilege redactions. Defendants also withheld

24  altogether many discoverable documents, making the production enormously

25  difficult, if not impossible, to review. *See* Dkt. 604 at 3-4. After Plaintiffs won yet

26  another motion to compel, Defendants began reproducing documents that had

27  previously been wrongly redacted, but the "unredacted" replacement documents

28  had no identification number by which Plaintiffs could determine where in the

1   original production the documents were located, or to what the documents related.

2   Defendants also withheld numerous documents based upon so-called "categorical"

3   privilege logs that did not comply with the mandates of Rule 26, leading to further

4   motion practice. *See* Dkt. 587 at 14-15; Dkt. 604 at 10-14. These tactics caused

5   Plaintiffs to move to compel re-production, and later for sanctions against Defense

6   counsel Victor Lawrence on two separate occasions, because Defendants would

7   not voluntarily correct the glaring deficiencies. *See* Dkts. 587; 604.

8          Defendants also unjustifiably invoked the Privacy Act and other disclosure

9   rules, triggering extensive negotiations on the appropriate form and scope of *five*

10  separate protective orders. Defendants insisted that each protective order only

11  apply to certain designated discovery requests, requiring Plaintiffs to repeat the

12  same inefficient process numerous times. *See* Dkts. 84; 214; 294; 367; 507.

13              ***4.      Defendants' Unjustified Opposition to Monitoring***

14         Despite their intransigence throughout this case, the complexities of this

15  Court's orders, and the vulnerability of the Class, Defendants argued against *any*

16  monitoring of their compliance with this Court's orders, a "just trust us" approach

17  that ignored contrary Ninth Circuit authority. *See*, *e.g.*, *Nat'l Org. for Reform of*

18  *Marijuana Laws* v. *Mullen*, 828 F.2d 536, 539, 542-43 (9th Cir. 1987). Owing to

19  Defendants' seemingly endless opposition, Plaintiffs provided at least *five*

20  submissions to the Court and the Special Master on this subject, *see* Dkts. 723-1;

21  735; 752; 791; 803, participated in multiple negotiations about it, at least three

22  meetings with Judge Matz, at least three conferences before this Court, *see* Dkts.

23  745; 782; 798, and even more phone calls, emails, and exchanges of draft

24  proposals with Defendants. The Court ultimately ordered a comprehensive

25  monitoring proposal, but only after Plaintiffs expended significant resources.

26  **III.   ARGUMENT**

27         As the prevailing party in this landmark case, Plaintiffs are entitled to

28  attorneys' fees pursuant to two different statutes. Plaintiffs are entitled to fees

1   under the Rehabilitation Act for the relief obtained for Class and Sub-Class

2   members requiring 1) the provision of Qualified Representatives to Sub-Class One

3   members; 2) the Implementation Plan Order requiring robust screening,

4   information gathering and sharing, and competency evaluation procedures; 3) the

5   reopening of immigration cases for Class members ordered removed prior to the

6   Implementation Plan Order effective date; and 4) the monitoring associated with

7   that relief. Plaintiffs are entitled to fees under the Equal Access to Justice Act

8   ("EAJA") for the relief obtained on behalf of Mr. Franco and for Sub-Class Two

9   members requiring the provision of bond hearings after six months of detention.

10          When more than one statute provides for attorneys' fees and, as here, the

11   claims involve inextricably intertwined facts and legal theories, "counsel's time

12   will be devoted generally to the litigation as a whole, making it difficult to divide

13   the hours expended on a claim-by-claim basis." *Hensley v. Eckerhart*, 461 U.S.

14   424, 441 (1983); *see also Sorenson v. Concannon*, 161 F. Supp. 2d 1164, 1170 (D.

15   Or. 2001) (noting the "nearly impossible nature" of allocating hours between

16   § 1988 and EAJA claims, because the claims "were inextricably intertwined").

17   Given that the Court ultimately must determine "the amount of a reasonable fee,"

18   and "necessarily has discretion in making this equitable judgment," *see Hensley*,

19   461 U.S. at 433, 436-37, the Court should apportion fees between the

20   Rehabilitation Act and EAJA without "delving into the minutiae of the work done"

21   by Plaintiffs' counsel over the last five years, but rather by evaluating relevant

22   benchmarks of attorney time, including billing records, discovery, briefs, and the

23   court's own analysis of the claims. *Pierce v. Cnty of Orange*, 905 F. Supp. 2d

24   1017, 1034-35 (C.D. Cal. 2012) (holding fifty-percent allocation appropriate where

25   plaintiff presented evidence that counsel spent an approximately equal amount of

26   time on ADA claims and constitutional claims).[5]

27

28   _____

[5] *See Ctr. for Food Safety v. Johanns*, No. CIV 03-621-JMS/BMK, 2007 WL 3072860, at \*13 (D. Haw. Oct. 18, 2007) (utilizing 75/25 percent allocation among

1    Here, often using the same evidence, Plaintiffs successfully litigated two

2 different claims on behalf of immigration detainees with mental disabilities at the

3 same time. Moreover, much of the work in the case—such as the extensive time

4 spent concerning class certification, discovery, and monitoring—is literally

5 impossible to separate amongst the two claims. To assist the Court in making any

6 allocation, Plaintiffs propose a methodology (the "Allocation Methodology") based

7 on an analysis of Plaintiffs' and the Court's resources dedicated to the different

8 claims. *See, e.g.*, *Pierce*, 905 F. Supp. 2d at 1034-35. The Allocation Methodology

9 is explained in the Arulanantham Decl., Sub-Exhibit H.[6]

10    **A.    Plaintiffs Are Entitled to Fees Under the Rehabilitation Act.**

11    The Rehabilitation Act, 29 U.S.C. § 794a(b), provides: "In any action or

12 proceeding to enforce or charge a violation of a provision of [29 U.S.C. §§ 790, et

13 seq.], the court, in its discretion, may allow the prevailing party . . . a reasonable

14 attorney's fee as part of the costs." *See also Mantolete*, 791 F.2d at 786 ("The

15 Rehabilitation Act authorizes an award of attorney fees to a prevailing party other

16 than the United States in an action to enforce or charge a violation of the Act."). In

17 the instant case, Plaintiffs are entitled to fees under the Rehabilitation Act for

18 prevailing on the Fourth Cause of Action of the Third Amended Complaint. *See*

19 Dkt. 344 at 48. This victory resulted in the appointment of Qualified

20 Representatives to Sub-Class One members, a comprehensive system for screening

21 ───────────────────

22 claims where supported by billing records, briefing, oral arguments, and the court's knowledge of the case).

23 [6] As described in the Allocation Methodology, to the extent hours are spent

24 furthering issues relevant to both the Rehabilitation Act and the INA, those hours may be apportioned entirely to the Rehabilitation Act where the work would have

25 been done regardless of the EAJA claims, where any other allocation method would effectively punish Plaintiffs for bringing successful claims pursuant to

26 multiple statutes. *See generally Ctr. for Food Safety*, 2007 WL 3072860, at *13 (finding "work in the early stages of the case was equally applicable to

27 Plaintiffs' NEPA and ESA claims" but determining "that 75 percent of the billing should be attributed to the NEPA claims and 25 percent to the ESA claims"); 28

28 U.S.C. § 2412(d)(1)(A) (EAJA provides attorneys' fees "[e]xcept as otherwise specifically provided by statute").

1    and evaluating immigration detainees with serious mental disabilities, a path for

2    reopening immigration proceedings for Class members ordered removed prior to

3    the Implementation Plan Order effective date, and the monitoring order.

4          The standards governing fee awards under the Rehabilitation Act are the

5    same as those for fees awarded pursuant to 42 U.S.C. § 1988. *See Hall v. Bolger*,

6    768 F.2d 1148, 1150-51 (9th Cir. 1985); *see also Hensley*, 461 U.S. at 433 n. 7.

7    They "should be liberally construed to achieve [their] purpose of ensuring

8    compliance with the Act." *Mantolete*, 791 F.2d at 787.

9          In deciding whether to grant Plaintiffs' requested fees, this Court must

10   "consider the relationship between the extent of [the plaintiff's] success and the

11   amount of the fee award." *Hensley*, 461 U.S. at 438. Here, the historic results

12   Plaintiffs achieved amply support the requested fees, particularly given the extent

13   to which Defendants increased the cost of this litigation. *See* Section III.A.1, *infra*.

14         As to the amount, Plaintiffs are entitled to reasonable fees "both as to the

15   number of hours spent in advancing the successful claim(s) and the billing rate per

16   hour." *Harris v. Marhoefer*, 24 F.3d 16, 18 (9th Cir. 1994). To set billing rates,

17   "[a] court awarding attorney fees must look to the prevailing market rates," *Bell v.

18   Clackamas Cnty.*, 341 F.3d 858, 868 (9th Cir. 2003), which are the rates that a

19   lawyer of "reasonably comparable skill, experience and reputation" would

20   command in the relevant community, *Blum v. Stenson*, 465 U.S. 886, 895 n.11

21   (1984). Both Plaintiffs' requested number of hours and hourly rates are more than

22   reasonable in light of the history of this litigation and the considerable and unique

23   expertise of Plaintiffs' counsel. *See* Sections III.A.2, *infra*.

24         *1.     Plaintiffs Obtained Excellent Results*

25         "The most critical factor in determining a fee award's reasonableness is the

26   degree of success obtained, since a fee based on the hours expended on the

27   litigation as a whole may be excessive if a plaintiff achieves only partial or limited

28   success." *Farrar v. Hobby*, 506 U.S. 103 (1992). Moreover, "[w]here a plaintiff

1  has obtained excellent results, his attorney should recover a fully compensatory

2  fee, and the fee award should not be reduced simply because the plaintiff failed to

3  prevail on every contention raised in the lawsuit." *City of Riverside v. Rivera*, 477

4  U.S. 561, 562 (1986).

5      There can be no serious dispute that Plaintiffs have "obtained excellent

6  results" in this case, such that this "most critical factor" cuts strongly in Plaintiffs'

7  favor. As noted in Section II.A, *supra*, Plaintiffs obtained conclusive victories on

8  all of the core issues presented in this litigation, resulting in a fundamental

9  transformation in the treatment of immigration detainees with serious mental

10  disabilities.[7] In fact, *Franco* has already been widely recognized as a landmark

11  case. *See* Steinberg Decl. ¶ 66; Arulanantham Decl. ¶ 64.

12      Most important, Plaintiffs' counsel achieved remarkable success as

13  measured by the number of clients they assisted. Just in the three states in which

14  the injunction applies, over 300 individuals have already received appointed

15  Qualified Representatives. Arulanantham Decl. ¶ 58. Hundreds more received

16  other forms of assistance. *Id.* at ¶¶ 59-61. In addition, Plaintiffs' efforts resulted in

17  a settlement agreement to allow potentially hundreds more Class members who

18  were ordered removed prior to the Implementation Plan Order effective date to

19  reopen their cases and, in some cases, for the Government to pay for their return to

20  the United States. *See* Dkt. 806; Dkt. 807-1.[8]

21  _____

22  [7] This monumental change is reflected even in the forms used for entering a notice
   of appearance when practicing before the immigration courts, which now have a
23  separate box for court-appointed attorneys. Arulanantham Decl. ¶ 63.

24  [8] Plaintiffs also protected Class members' rights before the Board of Immigration
   Appeals and the Ninth Circuit. Shortly after the first preliminary injunction ruling,
25  issues regarding the rights of immigration detainees with serious mental disabilities
   began receiving more attention at the Board (and, eventually, the Ninth Circuit).
   The Board published *Matter of M-A-M-*, 25 I & N Dec. 474 (BIA 2011), its first
26  published decision addressing competency issues in any detail, just five months the
   first preliminary injunction ruling. Plaintiffs thereafter monitored cases raising
27  issues that directly affected Class members' rights and, where necessary, filed
   amicus briefs to provide information about this case. Several Class members
28  received positive outcomes as a result, and the issues here were preserved for
   conclusive resolution by this Court. Plaintiffs are entitled to compensation for their

1    The Court must also consider Defendants' promise to implement the core

2    provisions of the injunction nationwide when evaluating Plaintiffs' success, given

3    the manifest connection between this litigation and that decision.[9]

4                    **2.      *The Fees Sought Are Reasonable***

5            To calculate an award of attorneys' fees, the Court must begin with the

6    "lodestar," which is the number of hours reasonably expended multiplied by a

7    reasonable hourly rate. *See Hensley*, 461 U.S. at 433. The "resulting product is

8    *presumed* to be the reasonable fee to which counsel is entitled." *Pa. v. Del. Valley*

9    *Citizens Council for Clean Air*, 478 U.S. 546, 564 (1986) (internal quotations

10   omitted).[10] Employing the Allocation Methodology, *see supra* at 13, to calculate

11

12   ――――――――――――
     work performed in those cases. *See Gates v. Gomez*, 60 F.3d 525, 535 (9th Cir.
13   1995); Arulanantham Decl. ¶ 43.

14   [9] Although Defendants will no doubt dispute the extent of Plaintiffs' achievements, actions will speak louder than their words. After strenuously contesting this
15   litigation, and after it became clear both that this Court would rule in Plaintiffs' favor and that there would be copycat litigation in other parts of the country absent
     change (as threatened by Plaintiffs' counsel here, *see* Steinberg Decl._¶ 67),
16   Defendants issued a memorandum on April 22, 2013, announcing that they would implement the relief that this Court had already called for in its tentative order
17   granting Plaintiffs' motion for summary judgment, dated March 22, 2013. *See* Dkt. 583. Thus, Defendants ultimately determined that they would rather *voluntarily*
18   implement such relief nationwide than appeal this Court's orders or take on the inevitable "next case" brought by Plaintiffs' counsel. On December 31, 2013, the
19   Executive Office for Immigration Review (EOIR) released further guidance to the nation's immigration judges that contained elements later ordered in the
20   Implementation Plan: EOIR, *Phase I of Plan to Provide Enhanced Procedural Protections to Unrepresented Detained Respondents with Mental Disorders*, AILA
21   InfoNet, Doc. No. 13123160 (Dec. 31, 2013), *available at* http://bit.ly/1fqGusd.

22   [10] Adjustments to this presumptively reasonable amount may then be made based on the factors set forth in *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 69-70
23   (9th Cir. 1975), to the extent they are not reflected in the lodestar. *See Caudle v. Bristol Optical Co., Inc.*, 224 F.3d 1014, 1028-29 (9th Cir. 2000). The *Kerr* factors
24   also counsel in favor of awarding Plaintiffs' full lodestar: (1) the time and labor required; (2) the novelty and difficulty of the questions involved; (3) the skill
25   requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee;
26   (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9)
27   the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client,
28   and (12) awards in similar cases.

                                    -16-

1  the current lodestar, Plaintiffs seek fees under the Rehabilitation Act in the amount
2  of $10,442,674.60. Plaintiffs' lodestar calculation for the fees sought pursuant to
3  the Rehabilitation Act is summarized in the chart attached as Exhibit A to the Chia
4  Declaration.

5  ***i.        Plaintiffs' Hours are Reasonable***

6  Where, as here, Plaintiffs obtained excellent results, the "attorney should
7  recover a fully compensatory fee. Normally this will encompass all hours
8  reasonably expended on the litigation . . . ." *Hensley*, 461 U.S. at 435.

9  Given Plaintiffs' success, they should be compensated for all the hours for
10  which they seek compensation. *Franco* presented complex legal and factual
11  questions, for which the expertise of each member of Plaintiffs' litigation team was
12  necessary. Arulanantham Decl. ¶¶ 4-7. As further demonstrated by the declarations
13  of the various attorneys representing the Plaintiff Class, Plaintiffs' counsel made
14  use of their diverse set of expertise – including mental health law; immigration
15  removal procedure; complex class action, discovery, and trial work; relevant
16  jurisdictional expertise; and knowledge of the detention system – to conduct this
17  litigation far more efficiently than other attorneys would have. *See id*. at ¶ 7.

18  The Court must also assess the reasonableness of Plaintiffs' hours in light of
19  three further factors. First, Plaintiffs have already dramatically reduced the amount
20  of time for which they seek compensation not only by eliminating arguably
21  unnecessary or duplicative hours, but also by discounting, as a sign of good faith, a
22  great deal of work that is clearly compensable. *See* Steinberg Decl. ¶ 34;
23  Arulanantham Decl. ¶¶ 31-32; Rabinovitz Decl. ¶ 17; Vakili Decl. ¶¶ 15-17;
24  London Decl. ¶¶ 18-20, 24-25; Adams Decl. ¶ 13. The overall amount reduced –
25  over 14%, Chia Decl., Exhibit A - is *already* beyond that prescribed by the Ninth
26  Circuit as a permissible general "haircut" to ensure reasonableness. *Moreno*, 534
27  F.3d at 1112 ("the district court can impose a small reduction, no greater than 10
28  percent — a 'haircut' — based on its exercise of discretion and without a more

-17-

1    specific explanation."). Second, Plaintiffs have not sought enhanced rates under

2    EAJA for several attorneys who would likely be entitled to such rates. *Compare*

3    London Decl. ¶ 13 (declining to seek enhanced rates for Ms. Inlender, who has

4    eight years of experience); Vakili Decl. ¶ 11 (same for Mr. Vakili and Mr. Riordan,

5    with nine and eight years experience, respectively) *with Nadarajah*, 569 F.3d at

6    912-15 (granting enhanced rates to Mr. Arulanantham when he had seven years

7    experience at the time the case concluded). Third, the Court must account for the

8    ways in which Defendants' litigation tactics increased the amount of time that

9    Plaintiffs had to litigate this case at every level – from the need to litigate meritless

10   arguments, *see* Arulanantham Decl. ¶¶ 34, 40, 41; Steinberg Decl. ¶ 56-60; to the

11   need to conduct unnecessary legal research to identify and correct objective errors,

12   *see* Arulanantham Decl. ¶¶ 36-37; Steinberg Decl. ¶ 61; to the need to correct

13   factual misrepresentations. *See* Arulanantham Decl. ¶ 38. *See generally supra* II.B.

14                    ***ii.        Plaintiffs' Rates are Reasonable***

15           Hours are only one portion of the lodestar; the other factor is the hourly rate.

16   *See Greater Los Angeles Council on Deafness v. Cmty. Television of S. California*,

17   813 F.2d 217, 221 (9th Cir. 1987). Reasonable hourly rates are determined by the

18   prevailing market rates in the relevant community, which is generally the forum in

19   which the district court sits. *Gonzales v. City of Maywood.*, 729 F.3d 1196, 1205

20   (9th Cir. 2013) (quoting *United Steelworkers of Am. v. Phelps Dodge Corp.,* 896

21   F.2d 403, 407 (9th Cir.1990)). Within the geographic area the district court should

22   take into consideration the experience, skill, and reputation of each attorney. *Id.* at

23   1205-06. Rate determinations in other cases are satisfactory evidence of the market

24   rate. *Id.* at 1207. The reasonableness of the hourly rate is also affected by the

25   novelty and complexity of the issues, the special skill and experience of counsel,

26   the quality of representation, and the results obtained. *Id.* (citing *Cabrales v. Cnty.*

27   *of L.A.*, 864 F.2d 1454,1464 (9th Cir. 1988)). For the fee award to be reasonable

28   under the Rehabilitation Act's scheme, it must be based on current, rather than

1    historic, hourly rates for Plaintiffs' attorneys. *Missouri v. Jenkins*, 491 U.S. 274,

2    283-84 (1989).

3        For most of Plaintiffs' counsel, there are no rates set by a market, insofar as

4    they do not charge their clients. Plaintiffs' counsel therefore seek compensation at

5    the rates set forth in the Declaration of Carol Sobel ("Sobel Decl."), which explains

6    why they are reasonable as measured by the rates charged by attorneys of

7    comparable experience and skill in the Los Angeles area. Ms. Sobel's extremely

8    detailed methodology for calculating reasonable rates has been repeatedly credited

9    by federal and state courts. *See* Declaration of Carol Sobel ("Sobel Decl.") at ¶ 3.

10       For others, prevailing rates are set by the market itself. The Steinberg

11   declaration explains why the rates sought for pro bono counsel at Sullivan &

12   Cromwell LLP are far below that rate, and therefore reasonable. The rates sought

13   (on behalf of their co-counsel here, to whom they intend to donate their fees) are

14   *lower* than the rates regularly paid to Sullivan & Cromwell LLP by their clients,

15   and *lower* than those approved for Sullivan & Cromwell LLP attorneys in the few

16   instances where its fees were litigated. *See* Steinberg Decl. ¶¶ 15-22; ¶¶ 43-47.

17       **B.    Plaintiffs are Entitled to Fees Under EAJA.**

18       Under EAJA, a prevailing party, whose net worth is not more than

19   $2,000,000, is entitled to attorneys' fees in a civil action brought against the United

20   States or one of its officials unless the position of the government was

21   "substantially justified," or special circumstances make an award unjust. *See* 28

22   U.S.C. § 2412(d)(1)(A) (2015). Here, Plaintiffs are entitled to a fee award under

23   EAJA for prevailing on the Sixth, Seventh, and Eighth Causes of Action in the

24   Third Amended Complaint. *See* Dkt. 344 at 49-50. Plaintiffs' success on these

25   claims resulted in a permanent right to bond hearings at six months for all Sub-

26   Class Two members and the release of Mr. Franco from his indefinite detention.

27

28

### 1.     EAJA Threshold Requirements Are Met

Plaintiffs meet the threshold requirements for a fee award under EAJA. *First*, EAJA permits fee awards for civil actions brought against the United States by immigrants, such as Plaintiffs, challenging their detention by immigration authorities. *See Nadarajah v. Holder*, 569 F.3d 906 (9th Cir. 2009).[11]

*Second*, Plaintiffs prevailed. On their claim for bond hearings, Plaintiffs obtained Summary Judgment and a Permanent Injunction. *See* Dkt. 344 at 49-50; Dkt. 592 at 19, 26. And Mr. Franco prevailed in the Sixth and Seventh Causes of Action seeking release from indefinite detention, as the Government both released him and agreed to settle his remaining claims, which the Court approved. *See* Dkt. 344 ¶ 11; Dkt. 678-1; Dkt. 694 (citing Cal. Civ. Proc. Code § 372); Dkt. 713.[12]

### 2.     Defendants' Positions Were Not Substantially Justified

EAJA "creates a presumption of a fee award," *see United States v. First Nat'l. Bank of Circle*, 732 F.2d 1444, 1447 (9th Cir. 1984), which the Government can only overcome by showing that its position was "substantially justified." *Id.* "In making a determination of substantial justification, the court must consider the reasonableness of both the underlying government action at issue and the position asserted by the government in defending the validity of the action in court." *Bay Area Peace Navy v. United States*, 914 F.2d 1224, 1230 (1990) (internal citations omitted). In other words, the Government must prove the reasonableness of *both*

---

[11] Plaintiffs also satisfy the net worth requirement because their "net worth did not exceed $2,000,000 at the time the civil action was filed." 28 U.S.C. § 2412(d)(2)(B). This Court already recognized Plaintiffs' extremely limited resources in its prior orders; which was appropriate in light of their status as, by definition, representatives of a class of indigent detained immigrants with serious mental disorders. *See* Dkt. 107 at 43-44 (waiving bond requirement in preliminary injunction order and citing *Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999) (nominal security not an abuse of discretion where "vast majority of aliens [affected by class action] were very poor")).

[12]     Because the Court-approved settlement awarded relief to Mr. Franco, he is a prevailing party. *See Barrios v. Cal. Interscholastic Fed'n*, 277 F.3d 1128,1134 (9th Cir. 2002); *Richard S. v. Dep't of Developmental Servs. of State of Cal.*, 317 F.3d 1080, 1088 (9th Cir. 2003).

1   its pre-litigation conduct *and* its litigation position. *Andrew v. Bowen*, 837 F.2d

2   875, 880 (9th Cir. 1988). Defendants' positions here were patently unjustified.

3        Defendants' litigation position with respect to Plaintiffs' right to a bond

4   hearing under the INA was untenable at its inception. The Ninth Circuit held in

5   2005 – five years before this lawsuit was filed – that the government had to

6   provide bond hearings for individuals subject to prolonged detention at which the

7   burden of proof would fall on the government, and strongly suggested that

8   mandatory detention became unreasonable after six months the following year. *See*

9   *Tijani v. Willis*, 430 F.3d 1241 (9th Cir. 2005) (ordering bond hearing for

10   individual subject to prolonged detention where government bears burden of

11   proof); *Nadarajah v. Gonzales*, 443 F.3d 1065, 1079 (9th Cir. 2006) (finding six

12   months to be presumptively reasonable period of detention). Multiple other cases,

13   involving both individual petitioners and classes of detained immigrants, that were

14   resolved both before and shortly after the start of this litigation, confirmed the

15   Ninth Circuit's holdings.[13]

16        Relying on this well-established case law, this Court rejected Defendants'

17   litigation position, which would permit prolonged detention of Plaintiffs without a

18   bond hearing, in three separate preliminary injunction orders and its summary

19   judgment ruling. *See* Dkts. 107 at 39-41; 215 at 9-14; 285 at 9-11, 592 at 24-25. As

20   noted above, Defendants repeatedly briefed the issue despite the governing law as

21   explained in this Court's orders, until it lost on summary judgment. *See* Dkt. 441 at

---

[13] *See Casas-Castrillon v. DHS*, 535 F.3d 942, 951 (9th Cir. 2008) (concluding that "prolonged detention must be accompanied by appropriate procedural safeguards, including a hearing to establish where releasing the alien would pose a danger to the community or a flight risk"); *Diouf v. Napolitano (Diouf II)*, 634 F.3d 1081, 1091 (9th Cir. 2011) (holding non-citizen facing prolonged detention under 8 U.S.C. § 1231(a)(6) is entitled to bond hearing before an immigration judge once detention exceeds six months); *V. Singh v. Holder*, 638 F.3d 1196, 1203 (9th Cir. 2011) (holding that in custody hearings for prolonged detainees, the burden shifts to the government to justify detention by clear and convincing evidence); *Rodriguez v. Robbins*, 715 F.3d 1127, 1130-31 (9th Cir. 2013) (requiring bond hearings at six months for immigrants detained under 8 U.S.C. §§ 1226(c), 1225(b) with burden of proof on government).

23-28; Dkt. 83 at 27-35; 150 at 23-25; 232 at 8-22; Dkt. 592 at 24-25. Thus, the Government's detention litigation positions here present a paradigmatic example of a position that was not "substantially justified."

Defendants' pre-litigation conduct, particularly with respect to Mr. Franco, also fails to meet the substantial justification standard. *See United States v. Marolf*, 277 F.3d 1156, 1163-64 (9th Cir. 2002) ("A reasonable litigation position does not establish substantial justification in the face of a clearly unjustified underlying action."). The Government detained Mr. Franco, an individual with the IQ of a young child, for *nearly five years*. *See* Dkt. 344 ¶¶ 32-37. For the vast majority of that time there were no open removal proceedings pending against him, but Defendants did not even give him an opportunity to request bond, ultimately releasing him from custody only after this lawsuit was filed. *See* Dkt. 344 ¶¶ 11. For all these reasons, Defendants' litigation position with respect to Mr. Franco's claims was not substantially justified.

### 3.    *The Fees Sought Are Reasonable*

Under both EAJA and the Rehabilitation Act, the lodestar is the "most useful starting point" for a fee award. *See Hensley*, 461 U.S. at 433. Plaintiffs' lodestar calculations of its EAJA fees to date are summarized in the chart attached as Exhibit A to the Chia Declaration. Plaintiffs seek EAJA fees in the amount of $1,191,907.89.

### i.    *The Number of Hours Claimed is Reasonable*

For the reasons set forth above in Section III.A.2.i, *supra*, the hours sought by Plaintiffs are reasonable. Moreover, specifically as to the Allocation Methodology, the number of hours for which compensation is sought solely under EAJA is reasonable. The attorneys primarily involved in litigating Mr. Franco's individual detention claims and Plaintiffs' bond hearing claim under the INA expended far less time on those claims than most other attorneys would have, particularly given the complexity of these issues, because they already had

1  significant litigation experience in this area, *see* Arulanantham Decl. at ¶ 12;
2  Rabinovitz Decl. at ¶¶ 2-4; London Decl. ¶ 7.

3       ii.       ***Attorneys Preis, Steinberg, Rabinovitz, London, Adams,
4                 and Arulanantham Are Entitled to Enhanced Rates***

5       Although EAJA generally authorizes fees not to exceed $125 per hour
6  adjusted for inflation, the Court may award higher fees when justified by "a special
7  factor," 28 U.S.C. § 2412(d)(2)(A)(ii), including when an attorney possesses
8  distinctive knowledge or specialized skills necessary to the litigation, and where an
9  attorney with similar knowledge and skills could not have been obtained at the
10 statutory rate. *See Nadarajah*, 569 F.3d at 912.

11      Mr. Preis is a nationally-recognized expert on mental health law. *See* Sobel
12 Decl. ¶ 9; *see also* Preis Decl., Sub-Exhibit A (Preis C.V.). His distinctive
13 knowledge and skill in the area of mental health law was critical to the
14 development of the methods for identifying Main Class members, as well as for the
15 arguments as to why class members were more likely to face prolonged detention
16 due to their mental disabilities. *See, e.g.*, *Pirus v. Bowen*, 869 F.2d 536, 542 (9th
17 Cir. 1989). There are few, if any, mental health law experts of Mr. Preis's caliber.
18 *See* Sobel Decl. at ¶ 9.

19      The expertise of Michael Steinberg similarly merits enhanced fees. Mr.
20 Steinberg took a leading role for the Plaintiff Class, including serving as Co-Lead
21 Counsel since 2011. He has over 25 years of experience litigating complex class
22 action lawsuits and other complex lawsuits, including numerous trials, *see*
23 Steinberg Decl. ¶ 4-12, and has achieved widespread professional recognition. *Id.*
24 Mr. Steinberg brought his skills to bear in developing and litigating the class-based
25 claims specific to detained individuals with mental disabilities, and was also
26 critical in assessing the relationship between this class and others involved in the
27 detention context (including the *Rodriguez* class), and in obtaining the discovery
28 necessary to prove numerosity for Plaintiffs' proposed class. *Id.* at ¶ 12-13.

-23-

1    Plaintiffs simply could not have achieved class-wide relief on the detention claim

2    without an attorney with Mr. Steinberg's unique expertise.

3          With respect to the remaining four attorneys seeking enhanced rates, the

4    Ninth Circuit has recognized that Mr. Arulanantham and Ms. Rabinovitz have

5    distinctive knowledge and skills in the areas of "constitutional immigration law"

6    and the "rights of detained immigrants" for enhanced rates under EAJA. *See id.*

7    That ruling is also dispositive with respect to Mr. Adams and Ms. London, each of

8    whom have the same or more experience than does Mr. Arulanantham in the area

9    of constitutional immigration law or the rights of detained immigrants.[14] Their

10   specialized knowledge was critical to Plaintiffs' success on the detention claims.

11   *See* Declaration of Stacy Tolchin ("Tolchin Decl.") at ¶¶ 9-16.

12         Finally, an enhanced rate determination requires examination of whether

13   qualified counsel would have been available at the statutory rate. Few attorneys

14   could have litigated these claims at all, and none would have done so at the

15   statutory rate. *See, e.g.*, *Pirus*, 869 F.2d at 542 (awarding enhanced rates under

16   EAJA in "class action [that] was no routine disability case"). Tolchin Decl. ¶ 17;

17   Steinberg Decl. at ¶ 13.

18         Once the party seeking fees establishes that his attorneys are entitled to

19   enhanced rates, the attorneys are to be compensated at prevailing market rates.

20   *Pierce v. Underwood*, 487 U.S. 552, 571-72 (1988); 28 U.S.C. § 2412(d)(2)(A). As

21   the discussion at Section III.A.2.ii, *supra*, demonstrates, the market rates sought for

22   Attorneys Arulanantham, Adams, Rabinovitz, London, Steinberg, and Preis are

23   reasonable. For all other attorneys and paralegals, Plaintiffs seek the EAJA-

24   authorized rates adjusted by inflation. *See* London Decl. ¶ 20.

25

26

27   [14]    Their respective Declarations and the Declaration of Carol Sobel further
28   confirm their specialized knowledge. *See* Arulanantham Decl. ¶¶ 9-15; Adams
     Decl. ¶¶ 3-7; Rabinovitz Decl. ¶¶ 2-4; London Decl. ¶¶ 2-7.

### C.   Plaintiffs Are Entitled to Recover Out-of-Pocket Costs

"Costs are awarded to the prevailing party in civil actions as a matter of course absent express statutory provision, 'unless the court otherwise directs.' Fed. R. Civ. 54(d)." *Nat'l Org. for Women v. Bank of Cal., Nat'l Ass'n.*, 680 F.2d 1291, 1294 (9th Cir. 1982). Plaintiffs are entitled to their taxable costs under Fed. R. Civ. Proc. 54; 28 U.S.C. § 1920 (Rehabilitation Act); and 28 U.S.C. § 2412(a)(1) (EAJA). Plaintiffs are also entitled to related nontaxable expenses, which attach to attorneys' fees as case-related out-of-pocket expenses in civil rights cases, such as expenses ordinarily charged to paying clients, which are recoverable as costs. *See Dang* v. *Cross*, 422 F.3d 800, 814 (9th Cir. 2005). Each of Plaintiffs' counsel have submitted their discounted itemization of recoverable costs and expenses being claimed in this litigation, which include, *inter alia*, filing fees, courier/messenger services, court reporting services, transcripts, local transportation, and out of town travel expenses. The total sought in costs is $ 79,990.51. *See* Chia Decl., Exhibit A.[15]

### IV.   <u>CONCLUSION</u>

For these reasons, Plaintiffs respectfully request that this Court grant their Motion for fees and costs, as specified in the accompanying proposed order.

Respectfully submitted,

ACLU OF SOUTHERN CALIFORNIA

Dated: July 31, 2015        By:    /s/ Ahilan T. Arulanantham
                                   AHILAN T. ARULANANTHAM
                                   *Attorney for Plaintiffs-Petitioners*

                            By:    /s/ Michael Steinberg
                                   MICHAEL STEINBERG
                                   *Attorney for Plaintiffs-Petitioners*

---

[15]    *See, e.g.*, Steinberg Decl at ¶ 39; Arulanantham Decl. at ¶ 56; Adams Decl. at ¶ 14; London Decl. ¶ 18-19.