AHILAN T. ARULANANTHAM (SBN 237841)
aarulanantham@aclusocal.org
CARMEN IGUINA (SBN 277369)
ciguina@aclusocal.org
ACLU FOUNDATION OF SOUTHERN CALIFORNIA
1313 West 8th Street
Los Angeles, California 90017
Telephone: (213) 977-5211
Facsimile: (213) 417-2211

MICHAEL H. STEINBERG (SBN 134179)
steinbergm@sullcrom.com
SULLIVAN & CROMWELL LLP
1888 Century Park East, Suite 2100
Los Angeles, California 90067-1725
Telephone: (310) 712-6600
Facsimile: (310) 712-8800

*Attorneys for Plaintiffs-Petitioners*
(Additional Counsel for Plaintiffs on Following Page)

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSE ANTONIO FRANCO-GONZALEZ, et al., <br><br> *Plaintiffs & Petitioners,* <br><br> v. <br><br> ERIC H. HOLDER, Jr., Attorney General, et al., <br><br> *Defendants & Respondents.* | Case No. 10-CV-02211 DMG (DTBx) <br><br> **DECLARATION OF MICHAEL H. STEINBERG IN SUPPORT OF PLAINTIFFS' MOTION FOR ATTORNEYS' FEES** <br><br> The Honorable Dolly M. Gee <br><br> Hearing Date: October 30, 2015 <br> Hearing Time: 10:00 a.m. <br> Court Room: 7 |

1 | JUDY LONDON (SBN 149431)
jlondon@publiccounsel.org
2 | TALIA INLENDER (SBN 253796)
tinlender@publiccounsel.org
3 | PUBLIC COUNSEL
610 South Ardmore Avenue
4 | Los Angeles, California 90005
Telephone:  (213) 385 2977
5 | Facsimile:  (213) 385-9089

6 | JUDY RABINOVITZ (pro hac vice)
jRabinovitz@aclu.org
7 | ACLU IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
8 | New York, New York 10004-2400
Telephone:  (212) 549-2618
9 | Facsimile:  (212) 549-2654

10 | DAVID LOY (SBN 229235)
davidloy@aclusandiego.org
11 | ACLU OF SAN DIEGO & IMPERIAL COUNTIES
Post Office Box 87131
12 | San Diego, California 92138
Telephone:  (619) 232-2121
13 | Facsimile:  (619) 232-0036

14 | JAMES PREIS (SBN 82690)
jpreis@mhas-la.org
15 | MENTAL HEALTH ADVOCACY SERVICES
3255 Wilshire Boulevard, Suite 902
16 | Los Angeles, California 90010
Telephone:  (213) 389-2077
17 | Facsimile:  (213) 389-2595

18 | MATT ADAMS (SBN 28287)
matt@nwirp.org
19 | NORTHWEST IMMIGRANT RIGHTS PROJECT
615 2nd Avenue, Suite 400
20 | Seattle, Washington 98104-2244
Telephone:  (206) 957-8611
21 | Facsimile:  (206) 587-4025

22 | JAMES LYALL (SBN 330045)
jlyall@acluaz.org
23 | ACLU FOUNDATION OF ARIZONA
3707 N. 7th Street, Suite 235
24 | Phoenix, Arizona 85014
Telephone:  (602) 773-6001
25 | Facsimile:  (602) 650-1376

26 | *Attorneys for Plaintiffs-Petitioner*

## DECLARATION OF MICHAEL H. STEINBERG

I, Michael H. Steinberg, declare as follows.

1.      I am a member of the Bar of the State of California, admitted to practice before this Court, and a partner of Sullivan & Cromwell LLP.  I am co-lead counsel for Plaintiffs in this action.  I submit this declaration in support of Plaintiffs' Motion for Attorneys' Fees ("Motion").  I have personal knowledge of the facts set forth herein, and, if called to testify, could and would testify competently thereto.

2.      I am enormously proud of the work that we have accomplished in these five-plus years of litigation.  At the commencement of my involvement, I did not believe that the Government would spend the resources it did trying to defeat the fundamental aim of this litigation — providing legal assistance to detainees with serious mental illnesses stuck in immigration proceedings who were being forced to represent themselves.  Nevertheless, my co-counsel and my firm lived up to our obligation to zealously prosecute the interests of what became the *Franco* Classes.

3.      Through this Motion, Plaintiffs are seeking an award of fees and costs, including those of Sullivan & Cromwell LLP, for the successful results achieved in this contentious, but ultimately successful, *pro bono* litigation.  While Plaintiffs seek fees for the work that Sullivan & Cromwell LLP has performed, we have committed to donate to our co-counsel all of the fees that we obtain in this action.  Sullivan & Cromwell LLP intends to keep only reimbursement of certain (discounted) out of pocket costs.[1]  From the beginning, it has been Sullivan & Cromwell LLP's intention to donate all fees to the public interest organizations serving as our co-counsel in this case, to ensure that these organizations are well-

---

[1]     These fees and costs are based on the inception of the case to June 30, 2015, and Sullivan & Cromwell LLP reserves the right to supplement these numbers.

1  funded so they may continue their important work protecting the rights of

2  vulnerable populations.

3  **I.     SULLIVAN & CROMWELL LLP QUALIFICATIONS**

4         4.     I am serving as Co-Lead Counsel in part because of my

5  extensive experience and expertise in trial work, class action lawsuits and other

6  complex litigation.[2]  I, along with attorneys working under my supervision at

7  Sullivan & Cromwell LLP, first appeared on behalf of Plaintiffs in July of 2010.

8  (Dkt. 17.)  However, since April 2010, Sullivan & Cromwell LLP has been an

9  extremely active member of the team planning for (and then litigating) this case on

10  behalf of Plaintiffs, including taking a leading role in formulating all case strategy

11  during the five-plus years of litigation in *Franco*.  Although Sullivan & Cromwell

12  LLP was not initially slated to be Co-Lead Counsel on behalf of the *Franco* class,

13  our co-counsel honored Sullivan & Cromwell LLP by elevating us to that status in

14  September of 2011.  (*See* Dkt. 307.)

15         **A.     My Professional Background**

16         5.     I graduated from the University of California at Berkeley with

17  highest honors in 1983.  I then graduated from Stanford Law School in 1986,

18  where I was also awarded honors and was a member of, and then articles editor for,

19  the Stanford Law Review.  After law school, I clerked for the Honorable Thomas

20  P. Griesa of the United States District Court, Southern District of New York, from

21  1986-87.  I was a summer associate at Sullivan & Cromwell in New York in 1986,

22  and have been with Sullivan & Cromwell LLP, resident in its Los Angeles office,

23  since 1990.  I was elected to partner in 1994.  I am admitted to practice before nine

24  United States Courts of Appeals as well as the Supreme Court of the United States.

25

26

27  [2]  My parents raised me to never 'brag' about what I have accomplished, so please forgive the awkwardness of pages about what I have had the good fortune of doing

28  in my professional career.

6.    My practice over the years has primarily focused on complex commercial litigation, including discovery-intensive, complex class actions, and trial work.  A list of my published cases is attached as Exhibit A.  I have been litigating class actions since 1988.  I personally have defended dozens of class actions throughout my career.  Highlights of my class action experience include:

- *In re Volcano Corp. S'holder Litig.*, No. 10485-VCP (Del. Ch. 2014-15) (lead counsel for Philips in four class action lawsuits challenging the approximately $1 billion tender offer for Volcano Corporation made by Philips);

- *In re Polyurethane Foam Antitrust Litig.*, MDL 2196, No. 10-MD-2196 (JZ) (N.D. Ohio 2014-15) (retained as lead counsel to FXI Holdings, Inc. 11 weeks before trial of multiple direct purchaser class cases seeking $3 billion in damages and successfully obtained partial summary judgment and a favorable settlement and litigated the indirect purchase class cases as well);

- *In re American Realty Capital Properties, Inc. Litig.*, 15-mc-00040 (AKH) (S.D.N.Y. 2015) (lead counsel for the Cole Real Estate Defendants for this consolidated litigation challenging a $4 billion loss of value caused by ARCP's restatement);

- *Coe* v. *Philips Oral Healthcare, Inc. et al.*, No. C13-518 (MJP) (W.D. Wa. 2013-14) (as lead counsel for Philips, successfully obtained order denying class certification and entry of judgment in favor of Philips on individual claims potentially valued at $463 million);

- *Perkins* v. *Philips Oral Healthcare*, No. 12-cv-01414 (S.D. Cal. 2012-14) (as lead counsel, representing Philips in connection

with class action products liability suit challenging Philips' advertising of the Airfloss Product);

- *In re Philips/Magnavox Television Litig.*, No. 09-3072 (PGS) (D.N.J. 2009-12) (as lead counsel, representing successfully Philips in connection with a purported consumer class action asserting a defect in more than $1.7 billion of flat-screen television sets, which was settled on terms favorable to Philips);

- *In re Bisphenol A (BPA) Polycarbonate*, MDL 1967, No. 08-1967-MD-W-ODS (W.D. Mo. 2008-11)(including 20 separate class actions) (as lead counsel for Avent, successfully limited and then resolved $1 billion consumer class-action fraud claim; served as Liason Counsel at the request of co-Defendants);

- *Ganjei* v. *Ralphs et al.*, No. BC367732 (Cal. Super. Ct. 2007-08) (as lead counsel for Avent, defeated class action challenging whether Philips included phthalates in its baby and toddler products);

- *Guttman* v. *McGinnis*, No. 3450-VCL (Del. Ch. 2008) (defeated class action challenging Royal Philips, N.V.'s $5 billion acquisition of Respironics);

- *Union Bank of Switz. et al.* v. *Argenal*, No. 97-56325 (9th Cir. 1997) (defended class action claim that UBS laundered $500 million in funds supposedly obtained from the former president of the Philippines);

- *Slomovics* v. *Gallogly*, No. C-94-2262-CAL (N.D. Cal. 1995-96) (securities fraud class action in connection with offering of Resound Corporation);

- *Young's Market Going Private Litigation*, (Cal. Super. Ct.) (1990-1) (represented Goldman Sachs & Co. in class action

litigation concerning the going private transaction involving
Young's Market);

- *Karatz* v. *Fine, et al.*, No. 92-CV-2172-WJR (C.D. Cal. 1992-
  94) (class action and consolidated trustee's action for fraud and
  breach of fiduciary duty, where as Defendants, defeated motion
  for class certification);
- *Cal. State Electrics Assoc.* v. *Matsushita*, No. BC048196 (Cal.
  Super. Ct. 1992-94) (class action seeking reimbursement for
  warranty repairs from all major electronics manufacturers);
- *Lewis* v. *Hamilton Oil Corp.*, No. 91 Civ. 2328 (LMM)
  (U.S.D.C., S.D.N.Y 1991) (class action challenge to the $4.3
  billion acquisition of Hamilton Oil Corporation by Broken Hill
  Proprietary Company);
- *Shields* v. *IMA Holdings Corp.*, No. BC024539 (Cal. Super. Ct.
  1991) (class action for fraud and breaches of fiduciary duty in
  connection with sale of company).

7.     Part of the value that I bring to this case is my understanding of
the trial process and willingness and ability to try all of my cases if necessary and
to prepare each case as if it will be tried, including this one.  My practice in
complex litigation over the years, including my extensive trial practice, has given
me a significant amount of expertise strategizing in high stakes litigation, which
was critical at various stages of this litigation.  I have tried over 20 cases.  Even
during the pendency of this highly contested lawsuit, I participated in four
extremely complex commercial matters (aside from the actions mentioned above),
including:

- *Energy Transfer Partners LP* v. *Enter. Prods. Partners LP*, No.
  DC1112677 (Tex. Dist. 2011-15) (as lead counsel, obtained
  unanimous jury verdict after a five week trial in Texas state

court where plaintiffs sought in excess of $1 billion, and where
plaintiffs succeeded in obtaining a judgment against a co-
defendant in excess of $500 million);

- *Brinckerhoff* v. *Enbridge Energy Co., Inc.,* C.A. No. 5526-VCN
(Del. 2013) (as lead counsel, successfully defeated derivative
and class action lawsuit seeking approximately $300 million or
to unwind the restructuring of the Alberta Clipper pipeline;
representation included two arguments before the Delaware
Supreme Court, with the favorable motion on that decision
published at 67 A.3d 369, 373 (Del. 2013));

- *ABN AMRO* v. *MBIA*, 962 N.Y.S.2d 854 (N.Y. Sup. Ct. 2013)
(counsel for leading financial institutions challenging MBIA's
2009 multi-billion restructuring, including a five-week
evidentiary hearing in New York State Supreme Court); and

- *NXP Semiconductors USA, Inc.* v. *Exatel Visual Sys., LTD*, No.
10-cv-01808-RJL (D.C. 2010-11) (as lead counsel, successfully
defeated, in whole, an $80 million damage claim against NXP
Semiconductors mid-way through the hearing of an in ICDR
Arbitration and related federal court proceedings).

8.      For my work, I have been recognized by my peers and by
various courts.  I am a Fellow and a contributing member of the Complex
Litigation Committee of the American College of Trial Lawyers, one of the
premier legal professional associations in America.  Fellowship in the College is
extended by invitation only after careful investigation by peers to ensure each
candidate "demonstrates the highest degree of professionalism, ethics, and
civility."  *See* President's Message, http://www.actl.com.  To be invited, a Fellow
must be active in trial practice for more than 15 years and be recognized by the
judges they practice before and the opponents they face as being among the very

1  best trial lawyers in the state. *Id.* The College is dedicated to maintaining and

2  improving the standards of trial practice, the administration of justice, and the

3  ethics of the profession. *Id.* I am one of only about 90 attorneys listed in the

4  fellowship directory for Los Angeles, many of whom are retired. *See* Attorneys

5  Directory, http://www.actl.com/Source/Members/actl_Search.cfm?section

6  =Attorney_Directory.

7           9.      I am also a Fellow in the Litigation Counsel of America

8  ("LCA"), another invitation-only trial honorary society.  There are only 3,500

9  fellows peer-selected, accounting for less than one-half of one percent of American

10 lawyers. *See* LCA Proven Trial Lawyers, Overview,

11 http://www.litcounsel.org/about/. Fellows are selected after a rigorous evaluation

12 process for "effectiveness and accomplishment in litigation and trial work," as well

13 as an upstanding "ethical reputation." *Id.* The selection process includes Fellow

14 review, research, nominations, attorney feedback, evaluation of client selection of

15 counsel, input from active and retired judges, and reviews of acknowledgement

16 and recognition by other peer reviewing sources and associations. *Id.* There are

17 approximately 94 fellows listed in the LCA directory for the Los Angeles Area.

18 *See* LCA Fellows Directory, http://www.litcounsel.org/directory/.

19          10.      Over the years, I have been consistently recognized in different

20 areas of litigation, including by Chambers USA (2012-2015), Best Lawyers in

21 America (2007-2015), Los Angeles' Best Lawyers (2012), Super Lawyers

22 Corporate Counsel Edition (2008-2011), Southern California Super Lawyers

23 (2009-2015), The Legal 500 United States (2014) and by BTI Consulting Group as

24 a BTI Client Service All-Star (2013).  I have received the following awards for my

25 work in this matter:  the American Lawyer Global Awards for Global Pro Bono

26 Dispute of the Year (2014), the National Legal Aid and Defender Association's

27 Beacon of Justice Award (2014), and the American Immigrants Lawyers

28

1  Association's Jack Wasserman Memorial Award for Excellence in Litigation
2  (2014), among others.

3        11.    My specialized experience and knowledge of complex class
4  actions, discovery practice, trial preparation, and litigation strategy were important
5  for the successful litigation of this matter.  My experience defending class actions
6  was integral to our Plaintiffs' success in framing the classes in this case, obtaining
7  class certification, and then defending this Court's class certification ruling against
8  numerous challenges from the Government.  In addition, this case required
9  strategic thinking at every stage.  Throughout this case, I have been instrumental in
10 formulating case strategy and interacting with co-counsel, opposing counsel and
11 the Court.  I prepared for and went to numerous hearings and conferences, taking
12 time away from my separate caseload.  I also took a leading role in Plaintiffs'
13 written correspondence, motions and negotiations.

14        12.    My work on this case continued at all times throughout the last
15 five-plus years.  I have spent more than 1,243 hours on this matter.  Like any other
16 matter, I have dedicated myself to the success of my clients, and strived to be
17 available at all times, even when I was traveling for other matters or on vacation
18 with my family (including participating in arguments before Judge Bristow during
19 several planned family vacations).

20        13.    My expertise was necessary to ensure the success of this
21 litigation.  Based on my own experience representing both paying and *pro bono*
22 clients, I am confident that an attorney with my extensive knowledge,
23 qualifications and experience, as described herein, in this geographic area would
24 not have handled a case of this extraordinary complexity and importance for less
25 than the rate I am including in this motion, and certainly not at the current statutory
26 rate under the Equal Access to Justice Act ("EAJA"), which is $189.68 for FY
27 2015.

28

## B.     Qualifications of Sullivan & Cromwell LLP's Associates

14.     In addition to making the decision to take on this case, I also recruited a team of associates to work with me.  Over the life span of this litigation, a total of eight Sullivan & Cromwell LLP associates—under my sole supervision, and usually only two to three participating actively at any given time—have worked on this matter in addition to the rest of their active caseloads.  Outside of the work completed for the *Franco* litigation, all of our associates have complex commercial litigation experience in federal and state court, and serve a diverse range of clients.  I provide below a brief summary of each of their qualifications:

15.     ***Damion D. D. Robinson*** received his J.D. from UCLA School of Law in 2007, where he earned Order of the Coif recognition.  Mr. Robinson went on to clerk for the Honorable David O. Carter from 2007 to 2008, before joining the Sullivan & Cromwell LLP team.  He worked on the *Franco* litigation from April 27, 2010 to January 13, 2012, during which he won the Pro Bono Attorney of the Month from Kids in Need of Defense (KIND).  Mr. Robinson dedicated a total of 322.25 hours to the *Franco* litigation, and Sullivan & Cromwell LLP is only including 269.5 hours in the fee motion:  112.0 in Period 2, 39.5 in Period 3, 95.25 in Period 4, and 22.75 in Period 5.  This is a 16.36% discount, reflecting the billing judgments described herein.  Although we are only seeking $865/hour here, Sullivan & Cromwell LLP regularly achieves rates higher than that when billing work of associates of Mr. Robinson's class to other clients.

16.     ***Shawn J. Lichaa*** received his J.D. from the University of California, Berkeley, School of Law in 2007, graduating near the top of his class and earning not only the Jurisprudence American Awards, which requires a top score in four classes, but also the Prosser Award, which recognizes the second highest score in one class.  While at Law School, Mr. Lichaa earned recognition for the most outstanding oral argument in his Written & Oral Advocacy class.  Mr. Lichaa worked on the *Franco* litigation since its inception, until January of 2013,

-9-

1  when he left Sullivan & Cromwell LLP to work for Fenwick and West.  He is now
2  legal counsel at Gilead Sciences.  Mr. Lichaa dedicated 1705.75 hours to this
3  litigation from May 17, 2010 to January 4, 2013, but Sullivan & Cromwell LLP is
4  only requesting reimbursement for 1638.5 in the fee motion:  477.0 in Period 2,
5  431.75 in Period 3, 448.75 in Period 4, and 281.0 in Period 5.  This is
6  approximately a 4% discount, reflecting the billing judgments described herein.
7  Although we are only seeking $865/hour here, Sullivan & Cromwell LLP regularly
8  achieves rates higher than that when billing work of associates of Mr. Lichaa's
9  class to other clients.

10         17.    *Asel M. Aliyasova* received her J.D. from Yale School of Law
11  in 2008 and a Master's Degree from Boston College in 2005.  While at Yale, Ms.
12  Aliyasova worked as a Research Assistant for Professor Ian Ayres and was the
13  editor-in-chief of the Yale Journal on Regulation.  Ms. Aliyasova worked on the
14  *Franco* litigation since its inception, until late June of 2014.  In June of 2014, she
15  left Sullivan & Cromwell LLP to become senior counsel with the global litigation
16  group at GlaxoSmithKline.  She is also fluent in Russian, Turkish, and Kyrgyz,
17  which was an added benefit because of her ability to communicate directly with
18  some of our class members who spoke Russian.  For example, Ms. Aliyasova was
19  involved in virtually all communication for Plaintiffs with the Zhalezny family,
20  and played a critical role in preparing Piotr Zhalezny for a deposition, because she
21  was able to bring to bear her knowledge and experience of deposition practice in
22  Russian, without our having to hire an interpreter.  Ms. Aliyasova's total dedicated
23  hours are 1114, but Sullivan & Cromwell LLP is only including 1024.5 hours in
24  the fee motion:  202.75 in Period 2, 269.25 in Period 3, 58.5 in Period 4, 240.5 in
25  Period 5, and 261.75 in Period 6.  This is a 7.29% discount, reflecting the billing
26  judgments described herein.  Although we are only seeking $850/hour here,
27  Sullivan & Cromwell LLP regularly achieves rates higher than that when billing
28  work of associates of Ms. Aliyasova's class to other clients.

-10-

18.     ***Theresa A. Buckley*** received her J.D. from the University of California, Berkeley, School of Law in 2008, after serving on the California Law Review as the Executive Editor and winning the Jurisprudence Award in Family Law.  Ms. Buckley worked on the *Franco* litigation since its inception, until January of 2012, when she left Sullivan & Cromwell LLP to become an associate at Crowell & Moring LLP.  She is now Associate General Counsel for Litigation and Risk Management at SunEdison.  Ms. Buckley dedicated 584.75 hours from May 26, 2010 to January 20, 2012.  Sullivan & Cromwell LLP is only seeking 502.0 hours for Ms. Buckley:  232.5 in Period 2, 68.5 in Period 3, 183.25 in Period 4, and 17.75 in Period 5.  This is a 14.15% discount, reflecting the billing judgments described herein.  Although we are only seeking $850/hour here, Sullivan & Cromwell LLP regularly achieves rates higher than that when billing work of associates of Ms. Buckley's class to other clients.

19.     ***Alexa M. Lawson-Remer*** received her J.D. from the University of California Gould School of Law in 2007.  Ms. Lawson-Remer has gained extensive experience in complex litigation since she joined Sullivan & Cromwell LLP in 2007.  In addition, she has an active pro bono practice.  Outside of the *Franco* litigation, Ms. Lawson-Remer has also assisted in securing asylum for a Guatemalan refugee, who fled to the United States at the age of 17 to escape physical torture and sexual abuse.  Ms. Lawson-Remer began working on this matter on May 21, 2010.  Her total hours dedicated to this litigation are 1041.75. Sullivan & Cromwell LLP is only including 504.5 of Ms. Lawson-Remer's hours in the fee motion:  165.75 in Period 2, 45.5 in Period 3, 69.5 in Period 4, 192.75 in Period 5, and 31.0 in Period 6.  This is a 51.57% discount, reflecting the billing judgments described herein, and the decision not to bill certain time related to monitoring.  Although we are only seeking $800/hour here, Sullivan & Cromwell LLP regularly achieves rates higher than that when billing work of associates of Ms. Lawson-Remer's class to other clients.

1    20.    ***Antonia E. Stamenova-Dancheva*** received her J.D. from

2    UCLA School of Law in 2009.  While at law school, Ms. Stamenova-Dancheva

3    was the Co-Editor In Chief of UCLA's Journal of International Law and Foreign

4    Affairs.  Ms. Stamenova-Dancheva was born in Sofia, Bulgaria and is fluent in

5    English and Bulgarian.  Ms. Stamenova-Dancheva began working on this litigation

6    shortly after its inception on May 11, 2010, and has remained working on it

7    throughout most of the five years in which it has been active.  Her total dedicated

8    hours are 1567.5, but Sullivan & Cromwell LLP is only requesting 1413.75

9    number of hours in the fee motion: 200.75 in Period 2, 48.25 in Period 3, 137.5 in

10   Period 4, 371.75 in Period 5, 652.5 in Period 6, and 3.0 in Period 7.  This is a 9.8%

11   discount, reflecting the billing judgments described herein.  Although we are only

12   seeking $800/hour here, Sullivan & Cromwell LLP regularly achieves rates higher

13   than that when billing work of associates of Ms. Stamenova-Dancheva's class to

14   other clients.

15   21.    ***Michael P. Murtagh*** received his J.D. from UC Hastings

16   College of Law in 2010, graduating *summa cum laude*, Valedictorian and earning

17   Order of the Coif.  While at Hastings, Mr. Murtagh served on the Hastings Law

18   Journal, first as a member and then as a Managing Notes Editor.  He also earned

19   Best Brief in Moot Court class and was an active member of a Moot Court team, a

20   Moot Court coach and a member of the Moot Court Board.  He received the

21   Witkin and CALI orders (top student in class) for 12 classes at Hastings and also

22   graduated first in his class while earning a Comparative Constitutional Law L.L.M

23   in 2007.  Mr. Murtagh has published his L.L.M. thesis, Law Journal note and,

24   while working at Sullivan & Cromwell LLP, a law review article on class actions[3]

25   and an article regarding fraud claims in New York.  He began his career with

26   _____

27   [3]   Michael P. Murtagh, *The Rule 23(b)(3) Superiority Requirement and Transnational Class Actions:  Excluding Foreign Class Members in Favor of European Remedies*, 34 Hastings Int'l & Comp. L. Rev. 1 (2011).

28

1    Sullivan & Cromwell LLP in 2010, and then went on to clerk for the same Judge

2    that I clerked for (The Honorable Thomas P. Griesa of the United States District

3    Court in the Southern District of New York) from 2011-2012, before returning to

4    Sullivan & Cromwell LLP in 2012. Mr. Murtagh is admitted to practice law in

5    both California and New York. Mr. Murtagh joined the *Franco* litigation team on

6    July 31, 2012, shortly after his return to the firm, and has been a consistent

7    member of the team ever since. He has dedicated 1269.5 hours to this matter.

8    Sullivan & Cromwell LLP has only included 1153.75 of his hours in the fee

9    motion: 688.0 in Period 5, 298.5 in Period 6, and 167.25 in Period 7. This is a

10    9.11% discount, reflecting the billing judgment described herein. Although we are

11    only seeking $750/hour here, Sullivan & Cromwell LLP regularly achieves rates

12    higher than that when billing work of associates of Mr. Murtagh's class to other

13    clients.

14        22.    ***Lauren M. Cruz*** received her J.D. from New York University

15    School of Law in 2014, while serving as the Senior Articles Editor of the *Journal*

16    *of Law and Liberty* and a Staff Editor of the *Environmental Law Journal*. Ms.

17    Cruz joined the *Franco* team shortly after joining the firm in 2014, and has been a

18    consistent member of the team ever since. She has dedicated a total of 522.25

19    hours to this case, but the number of hours included in the fee motion for Ms. Cruz

20    is 248.75: 61.0 in Period 6 and 187.75 in Period 7. This is a 52.36% discount,

21    reflecting the billing judgment described herein, and an exclusion of all of her

22    work relating to this motion. Ms. Cruz also dedicated 89.25 hours to this case as a

23    summer associate in Period 6, but we are not seeking compensation for those

24    hours. Although we are only seeking $370/hour here, Sullivan & Cromwell LLP

25    regularly achieves rates higher than that when billing work of associates of Ms.

26    Cruz's class to other clients.

27    //

28

## II.    SULLIVAN & CROMWELL LLP'S BILLING PHILOSOPHY

23.    I, along with the team of Sullivan & Cromwell LLP associates, have dedicated over 9,000 hours to litigating this case. Including time spent by non-lawyer staff members and summer associates, Sullivan & Cromwell LLP has identified a total of 11,910.0 total hours on work related to this case.

24.    Sullivan & Cromwell's traditional billing philosophy is based on the value of the professional advice and services we provide, and not the hours spent on any particular matter. The objective is to set a fee that is fair and reasonable, competitive and satisfactory to the client. We believe that value is determined by balancing several factors, including, but not limited to, (a) the contribution made, responsibility assumed, amount involved and results achieved; (b) the novelty, complexity and difficulty of the questions presented and the skills required; (c) any extraordinary efforts required to meet time constraints or other requirements imposed by the client or the circumstances; and (d) the time and labor required and the experience of those performing the services. *See also* ABA MODEL RULES OF PROF'L CONDUCT R. 1.5 and CAL. R. OF PROF. CONDUCT 4-200.

### A.    Sullivan & Cromwell LLP's Billing on this Matter

25.    We are able to achieve the rates we do from our clients, owing to their view (with a vast array of choices and competitive information available to them) that we are worth what we charge them. Nonetheless, I am requesting fees for my time below the rates paid by any of my corporate or individual clients this year, even those for whom I give a discount due to our longstanding relationship. In addition, as I explain further below, the rates I seek here are below those approved by courts as reasonable for me (or other litigation partners of Sullivan & Cromwell LLP).

26.    Similarly, the rates set forth below for the associates who worked on this case are below those set by courts in analogous situations involving associates from our firm.

-14-

27.    Through this Motion, we are seeking attorneys' fees at the following rates for fees awarded pursuant to the Rehabilitation Act:[4]

- Michael H. Steinberg $1,040.00;
- Damion D.D. Robinson $865;
- Shawn J. Lichaa $865;
- Asel M. Aliyasova $850;
- Theresa A. Buckley $850;
- Alexa M. Lawson-Remer $800;
- Antonia E. Stamenova-Dancheva $800;
- Michael P. Murtagh $750; and
- Lauren M. Cruz $370.

28.    We also identify the following rates for our support staff for fees awarded pursuant to the Rehabilitation Act:  summer associates (see note below) at $220; e-discovery, litigation support specialists, and librarians at $290; and project assistants and legal assistants at $255.  (As I note below, we are *not* seeking payment for any of the work performed by our summer associates.  We identify a rate solely to show the value of the hours we have waived.)

29.    For fees awarded pursuant to the EAJA, we are seeking to recover the following historic market rates for the work I personally did over the course of this litigation, all of which are below the rates I billed my commercial clients for my time during the respective years listed below:

- 2010 - $890/hour
- 2011 –$950/hour
- 2012 - $1,000/hour
- 2013 - $1,010/hour

---

[4]   The rates for Sullivan & Cromwell LLP associates were chosen based upon the lowest of the most recent rates approved by courts for Sullivan & Cromwell LLP attorneys.

1      • 2014 - $1,020/hour

2      • 2015 - $1,040/hour

3      30.    For Sullivan & Cromwell LLP associates and support staff, we

4  are seeking the EAJA statutory maximum rates for fees awarded pursuant to

5  EAJA.

6      31.    The methodology for allocating the hours worked on this case

7  between the Rehabilitation Act and the EAJA is explained in Sub-Exhibit E to the

8  Declaration of Ahilan Arulanantham in Support of Plaintiffs' Motion for

9  Attorneys' Fees.  I utilized that methodology to allocate the hours Sullivan &

10 Cromwell LLP spent in this case between the two statutes and to calculate our

11 lodestar.  Our lodestar for this matter, comprised of 9,410 total hours at the rates

12 described above, is $6,131,803.23.

13     **B.    Daily Time Entries and Time Charged**

14     32.    Attached as Exhibit B is a detailed and itemized accounting of

15 the time for which Sullivan & Cromwell LLP is seeking fees.  The time entries in

16 Exhibit B are records maintained by Sullivan & Cromwell LLP beginning in April

17 2010 through June 30, 2015.  These time entries are generated from data input

18 based upon each individual attorney's or non-attorney's timesheet maintained by

19 the attorney or non-attorney in question contemporaneously, or nearly

20 contemporaneously, with the performance of the activity indicated.  The time

21 entries are organized by day and task, and divided among the fee periods.  I have

22 personally reviewed these time entries and found them sufficient to determine what

23 tasks are being performed and the amount of time spent on the tasks, particularly

24 given my direct involvement in the matter.

25     33.    For my own entries, I take deep personal pride in being

26 available and responsive to my clients at all times of the day.  Because of the

27 amount of contact, I keep a running total of my daily tasks in an open email in

28 which I identify the times dedicated to each client.  At the end of each day, I

-16-

1    identify all of the major tasks in that email, which I then provide to my assistant to
2    input.

3         34.    I have reviewed the time records of the timekeepers involved
4    (including my own) in assessing the Sullivan & Cromwell LLP lodestar.  In the
5    exercise of billing judgment, Sullivan & Cromwell LLP is only seeking
6    compensation for 9410 hours—a reduction of 20.99% of the hours recorded.
7    Sullivan & Cromwell LLP is not seeking fees in whole for certain projects, and has
8    discounted or reduced the hours of many other projects and timekeepers.  As an
9    example, although multiple Sullivan & Cromwell LLP team members typically
10   joined a weekly call with our co-counsel to discuss strategy and developments, we
11   are only seeking recovery for the most senior lawyer involved in those calls.
12   Therefore, we are only seeking fees for one Sullivan & Cromwell LLP attorney, no
13   matter how many participated in each call.  Although these group calls enabled our
14   team to operate more efficiently and to achieve solutions to litigation issues we
15   faced, we are not seeking all of the hours associated with them.

16        35.    Similarly, where one or more of Sullivan & Cromwell LLP
17   lawyer attended hearings with the Court or Special Master, we are generally only
18   seeking fees for the time of the most senior of those lawyers.  We have also
19   subtracted all time relating to press announcements and publicity, even though we
20   understand that they are compensable.

21        36.    Although Sullivan & Cromwell LLP summer associates billed
22   over 870 hours to this matter over the last several years, we are not requesting
23   payment for any of their time.  We have chosen not to submit their time even
24   though their work undoubtedly contributed to our success in this litigation and
25   saved attorney hours, and even though it is compensable under governing law.

26        37.    Additionally, given the high demands that this case put on
27   Sullivan & Cromwell LLP associates over the course of several years, even in the
28   face of an otherwise full caseload, I felt the need to always have associates

1   apprised of the relevant issues so that they could contribute to projects as needed.

2   As a result, I have excluded certain additional associate hours as an exercise of

3   billing judgment.

4          38.    Finally, we have reduced the hours we are seeking since the

5   Court's Permanent Injunction (Dkt. 593), including excluding substantial attorney

6   hours from several timekeepers and all but one support staff member, even though

7   Plaintiffs have successfully litigated numerous complex and contested issues over

8   the last two years, including most recently the numerous filings and conferences

9   culminating in the Court entering, over the Government's objections, its Order

10   Appointing Monitor (Dkt. 810) ("Monitoring Order").  We also are not seeking

11   compensation for Lauren Cruz's time spent preparing the fee motion, totaling over

12   230 hours, although her efforts benefitted the entire litigation team and we believe

13   we are entitled to recover our attorneys' fees for such work.

14       **C.**    **Expenses**

15          39.    In addition, Sullivan & Cromwell LLP charges its paying

16   clients for disbursements we incur in connection with other engagements, such as

17   disbursements to third parties, travel costs and significant copying jobs.  The firm

18   does not charge its clients for Lexis, Westlaw, or the use of other standard

19   databases, ordinary word processing, or incidental phone calls, postage, document

20   retrieval and faxes.  However, these costs are incurred and treated as overhead, to

21   be included in the hourly rates.  Sullivan & Cromwell LLP frequently incurred

22   costly disbursements on behalf of the Class, including transcripts of depositions

23   and hearings.  Sullivan & Cromwell LLP had a total of $101,488.70 in costs for

24   this matter.[5]

25

26

27      [5]   Attached as Exhibit C is a detailed and itemized accounting of the

28   disbursements for which Sullivan & Cromwell LLP is seeking reimbursement.

40.     Of the over one hundred thousand dollars in costs that Sullivan & Cromwell LLP spent on this litigation since its inception, Sullivan & Cromwell LLP is only seeking reimbursement for $53,740.41.  This number includes Courier and Public Messenger fees of $6,331.77, local transportation expenses of $3,125.49, out-of-town meals totaling $686.19, attorney travel expenses totaling $8,584.39, outside professional services at $2,550.00, and conference or videoconference costs of $1,930.15.  The local transportation expenses include items such as parking for court hearings, and traveling expense from the airport to Sullivan & Cromwell LLP offices.  The out-of-town travel expenses have been significantly reduced.  For example, on June 21, 2011, I travelled to the District of Columbia to take a 30(b)(6) deposition.  My hotel expenses were $486.63 and my round-trip flight totaled $2,349.10, but those amounts were not for "coach" travel and I selected a hotel close to my D.C. office where the deposition was set to take place, rather than looking for a less expensive hotel farther away.  To account for this more broadly, I have applied a 33% cut to all out-of-town travel and meal expenses for all lawyers.

41.     Sullivan & Cromwell LLP is also seeking reimbursement for other costs, including filing fees for $1,638.15, deposition transcripts used to draft briefing and other case documents for $21,668.61, hearing transcripts for $5,155.86, other transcripts necessary to the case for $1,040.25, and outside reproduction expenses totaling $1,029.56.

## III.     SULLIVAN & CROMWELL LLP AND MICHAEL STEINBERG'S HISTORY OF RATES ACHIEVED

42.     Courts have approved the hourly rates of attorneys working for Sullivan & Cromwell LLP on several occasions in the past.  Sullivan & Cromwell LLP does not have different "prices" or rates for different locations in the United States; in the markets in which we participate, the work is judged among a national market of lawyers familiar with highly complex litigation.  For example, in 2014

1  and 2015, my cases have principally been litigated in locations outside of

2  California, including (i) New York City; (ii) Dallas, Texas; (iii) Seattle,

3  Washington; (iv) Toledo, Ohio; and (v) Winnebago County, Illinois.

4        43.    Sullivan & Cromwell LLP's rates are rarely litigated.

5  However, I have attached the only three comprehensive analyses of Sullivan &

6  Cromwell LLP's billing and rate structures for partners and associates that I am

7  aware of.  Two of these decisions (*Kodak* and *EFH*) are from complex matters in

8  bankruptcy court where a variety of Sullivan & Cromwell LLP lawyers, including

9  litigation partners and associates, represented the debtor in connection with

10 complex commercial disputes, and one is from the *McCourt* litigation, where a Los

11 Angeles-based team of Sullivan & Cromwell LLP lawyers represented Frank

12 McCourt in an action to set aside a martial property settlement agreement on the

13 basis of fraud concerning the value of the Los Angeles Dodgers.

14       44.    Attached hereto as Exhibit D is a copy of the Court's decision

15 in *Energy Future Holdings Corp.*, No. 14-10979, slip op. at 3 (CSS) (Bankr.

16 D.Del. January 12, 2015), and the accompanying Application For An Order

17 Authorizing the Retention and Employment of Sullivan & Cromwell LLP as

18 Counsel.  In this recent decision, the bankruptcy court in the District of

19 Delaware—upon an extensive record—upholds hourly rates of Sullivan &

20 Cromwell LLP partners of my seniority to be $1,295, associate rates between

21 $460-$865, and legal assistants between $225-$355, as well as other timekeepers

22 such as electronic discovery personnel at rates between $315-$355, Project

23 Assistants between $225-$335, and Research Librarians between $225-$355.  The

24 fees represented a discount from the rates used by Sullivan & Cromwell LLP when

25 preparing estimates of fees under its normal billing procedures.

26       45.    Attached hereto as Exhibit E is a copy of the Court's decision

27 in *In re McCourt* v. *McCourt*, No. BD514309, slip op. at 28, 33 (Cal. Super. Ct.

28 June 24, 2014).  In this recent decision, the Los Angeles Superior Court upheld

-20-

1  hourly rates of Sullivan & Cromwell LLP partners of my seniority to be between
2  $1,130 and $1,390, associate rates between $430-$875, legal assistants at $255,
3  and research librarians at $290.

4  46.   Attached hereto as Exhibit F is a copy of the Court's decision in
5  *In re Eastman Kodak Co.*, No. 12-10202 (ALG), slip op. at 2-3 (Bankr. S.D.N.Y
6  Dec. 03, 2013), and accompanying excerpts of the Summary of Fourth Interim Fee
7  Application and the Fifth and Final Interim Fee Applications of Sullivan &
8  Cromwell LLP.  This order, which will be nearly two years old at the time the
9  Court hears the instant fee motion, reflects the rates charged by Sullivan &
10  Cromwell LLP lawyers and nonlawyer staff in the Kodak bankruptcy and approved
11  by the United States Bankruptcy Court for the Southern District of New York.  The
12  Order upholds rates of Sullivan & Cromwell LLP partners of my seniority to be
13  between $990 and $1,150, associate rates between $395-$875, legal assistant rates
14  between $255-$290, and legal librarians at $290.

15  47.   Finally, the Ninth Circuit approved my own legal fees eight
16  years ago.  Attached as Exhibit G is a copy of the Ninth Circuit's decision in
17  *Softbank Content Servs. Inc.* v. *MPO Canada Inc.*, 225 F. App'x. 687, 690 (9th
18  Cir. 2007), upholding my fee award.

19  48.   Below is a chart showing the highest rates approved for
20  Sullivan & Cromwell LLP associates in the above mentioned cases, for associates
21  of comparable class years.
22  //

23
24
25
26
27
28

-21-

STEINBERG DECLARATION

| Associate | Class Year | Hourly Rates Sought in This Case | Comparable *Energy Future* Hourly Rate (2014) Associate Range $460-865 | Comparable *McCourt* Hourly Rate (2013) Associate Range: $430-875 | Comparable *Kodak* Hourly Rate (2013) Associate Range: $395-875 |
|---|---|---|---|---|---|
| Damion D.D. Robinson | 2007 | $865 | $865 | $875 | $850 |
| Shawn J. Lichaa | 2007 | $865 | $865 | $875 | $850 |
| Asel M. Aliyasova | 2008 | $850 | $865 | N/A | $850 |
| Theresa A. Buckley | 2008 | $850 | $865 | N/A | $850 |
| Alexa M. Lawson-Remer | 2009 | $800 | $865 | N/A | $825 |
| Antonia Stamenova-Dancheva | 2009 | $800 | $865 | N/A | $825 |
| Michael P. Murtagh | 2010 | $750 | $855 | N/A | $800 |
| Lauren M. Cruz | 2014 | $370 | $460 | $430[6] | $345[7] |

49.     The rates requested in this Motion are competitive in the market in which I work.  As part of providing value to my clients, I track the rates used by other competitive firms.  Below is a sample of the firms with which I regularly, and successfully, compete to both garner and maintain a vast client base.

| Category | Gibson Dunn | Latham & Watkins | Skadden | Quinn Emanuel | Morrison & Foerster | Orrick Herrington & Sutcliffe |
|---|---|---|---|---|---|---|
| Partner High | $1,800 | $1,110 | $1,150 | $1,075 | $1,195 | $1,095 |
| Partner Average | $980 | $990 | $1,035 | $915 | $865 | $845 |
| Associate High | $930 | $725 | $845 | $675 | $725 | $710 |
| Associate Average | $590 | $605 | $620 | $410 | $525 | $560 |

---

[6] This rate was for an associate with two years of experience.

[7] This range is for a 2013 graduate, a first year associate when the fees were requested.

-22-

*Billing Rates at the Nation's Priciest Law Firms*, Nat'l L.J (Online), (Jan. 5, 2015), http://www.nationallawjournal.com/id=1202713889426?keywords=billing&slretur n=20150630205331.

50.     I have also reviewed publicly available materials reflecting the rates of other firms with which Sullivan & Cromwell LLP regularly competes for commercial clients, which are similar to the rates Sullivan & Cromwell LLP seeks through this motion.

51.     Attached hereto as Exhibit H is a true and correct copy of an excerpt from the application of Kirkland & Ellis LLP for retention as debtors' counsel in *In re Sbarro LLC*, No. 14-10557 (MB) (Bankr. S.D.N.Y.), showing 2014 hourly rates ranging from $450 to $835 for associates and partners from $665 to $1225.

52.     Attached hereto as Exhibit I is a true and correct copy of an excerpt from the application of Latham & Watkins LLP for retention as debtors' counsel in *In re Tuscany International Holdings (U.S.A.) Ltd.*, No. 14-10193 (KB) (Bankr. D. Del.), showing 2014 hourly rates ranging from $395 to $855 for associates and $875 to $1275 for partners.

53.     Attached hereto as Exhibit J is a true and correct copy of an excerpt from the First Interim Fee Application of Skadden, Arps, Slate, Meagher & Flom LLP, counsel for debtors in *In re Excel Maritime Carries Ltd.*, No. 13-23060 (RDD) (Bankr. S.D.N.Y.), showing 2013 hourly rates ranging from $425 (class of 2013) to $755 for associates and from $795 to $1,910 for partners.

## IV.     SULLIVAN & CROMWELL LLP DEDICATION TO PRO BONO

54.     Sullivan & Cromwell LLP is dedicated to pro bono work, and considers it an important commitment of every lawyer.  In 2014, Sullivan & Cromwell LLP devoted more than 65,000 hours to a range of pro bono activities, and served untold individuals as well as legal, charitable, and government organizations.  *See* Pro Bono, http://www.sullcrom.com/pro-bono.  Some of

-23-

1  Sullivan & Cromwell LLP's signature projects include Bet Tzedek Holocaust

2  Reparations Project, Sanctuary for Families' U Visa Project, Transgender Legal

3  Defense and Education Fund's name change clinic, Microsoft KIND, and the

4  Sullivan and Cromwell Foundation.[8] *See* Pro Bono, http://www.sullcrom.com/pro-

5  bono?view=Representations.

6       55.    Sullivan & Cromwell LLP takes pride in not only taking part in

7  large-scale efforts, but upholding justice under the laws for every person, even

8  when protecting one individual at a time.  I too have a long history of dedication to

9  pro bono work.  As a member of the firm's Pro Bono Committee as well as a

10  member of the Board of Directors and Executive Committee of Public Counsel, I

11  dedicate myself to pro bono matters like any other professional responsibility.  As

12  an example, I represented Bruce Sons for 11 years and obtained his freedom in a

13  case where he was convicted in 1994 of premeditated murder.  It was after Mr.

14  Sons was sentenced that we became involved in his representation.  After over a

15  decade of devotion by the Sullivan & Cromwell LLP team, and three retrials, Mr.

16  Sons has been freed.  Appellate decisions related to this representation can be

17  found at 22 Cal. Rptr. 3d 647 (Cal. App. Dep't Super. Ct. 2004) and 78 Cal. Rptr.

18  3d 679 (Cal. Ct. App. 2008).

## V.    DEFENDANTS' LITIGATION CONDUCT DRASTICALLY INCREASED SULLIVAN & CROMWELL'S HOURS

21       56.    Defendants' litigation conduct dramatically increased the

22  amount of time that Sullivan & Cromwell LLP needed to expend in litigating this

---

[8]  "Since its inception in 2001, the Foundation has collected and disbursed more than $2.4 million m contributions to aid those affected by the September 11 attacks on the World Trade Center and the Pentagon; organizations dedicated to rebuilding the Downtown and Battery Park areas of New York City; organizations dedicated to providing aid to the victims of the tsunami that struck Southeast Asia; and charitable organizations in Louisiana and Mississippi to aid the victims of Hurricane Katrina." *See* Pro Bono, http://www.sullcrom.com/pro-bono?view=Representations.

1    case.  For example, many of Sullivan & Cromwell LLP's billable hours were

2    expended during discovery, including class certification discovery.  Owing to our

3    expertise in this area, Sullivan & Cromwell LLP took the lead on many discovery

4    and class certification issues for the Plaintiff class, and Defendants' litigation

5    strategy included contesting discovery throughout the course of the case.  A

6    substantial portion of this discovery was imposed by Defendants' strategic decision

7    to oppose class certification on numerosity grounds, even though Defendants had

8    possession, custody and control of information establishing the numerosity of the

9    Class.  Defendants actually argued that because they did not track the number of

10   individuals with serious mental health illnesses in their custody, we could not show

11   numerosity.  *See* Dkt. 126-1, Ex. 131 at 2.  This delayed class certification for

12   months and led to additional time expended, including extra briefing, hearings and,

13   unfortunately, discovery motions directed toward obtaining relevant evidence.

14           57.    I and other Sullivan & Cromwell LLP attorneys also expended

15   a great deal of time litigating the merits of the class certification on numerosity

16   grounds even after our discovery efforts had revealed that the class was clearly

17   numerous under governing law.  To give but one example, Defendants argued that

18   the Main Class was not numerous even though there were 112 members in it on a

19   given "snapshot" day when data was gathered.  (*See* Dkt. 328 at 4-15.)

20           58.    After class certification, Sullivan & Cromwell LLP, on behalf

21   of Plaintiffs, filed six motions to compel from July 11, 2012 to August 1, 2013.

22   (Dkts. 405, 406, 499, 522, 632, 633.)  Oftentimes, Plaintiffs would need to seek the

23   Court's intervention again even after being successful in a prior motion.  For

24   example, Plaintiffs had to file three separate motions to compel in order to secure

25   the necessary Class member files to litigate this case.  (Dkts. 405, 522, 633.)

26   Again, Defendants' litigation strategy caused Plaintiffs to expend significant hours

27   seeking to compel Defendants to comply with their obligations.

28

-25-

1    59.    Plaintiffs even had to file motions regarding the timing of

2    discovery motions:  in one instance, Plaintiffs had to file an *ex parte* motion to

3    change a discovery motion hearing date set by the Judge Bristow because

4    Defendants' counsel refused to accommodate my family vacation.  (Dkt. 429.)  In

5    another instance, Plaintiffs had to file an *ex parte* motion for more time to reply to

6    a motion to compel because Defendants' counsel would not grant Plaintiffs an

7    extension of time to respond to a Local Rule 37-1 joint statement that would

8    otherwise have been due the day after the Christmas holiday, when nearly every

9    member of the team was with their families.  (Dkt. 511.)

10    60.    Similarly, Defendants required extensive litigation regarding

11    the appropriate form and scope of a protective order to allow for the production of

12    confidential information in discovery.  Although in many cases a stipulated

13    protective order is easily negotiated between the parties, in this case it required

14    multiple hearings and conferences before Judge Bristow and the Court.  (Dkts. 246,

15    278, 281, 282, 290, 291, 292, 303, 321, 462.)  The Government further insisted that

16    each stipulated protective order cover only certain designated discovery requests,

17    which meant that the parties had to negotiate five protective orders over the life of

18    this case. [9]  This, also, had the consequence of making compliance with each of the

19

20    [9]    The December 3, 2010 protective order was limited to Ex. 78 in Dkt. 60-2.  *See*

21    Dkt. 84.  The June 7, 2011 protective order was limited to copies of validly
executed ICE Form 60-001 (Privacy Waiver Authorizing Disclosure to a Third

22    Party).  *See* Dkt. 214.  The August 29, 2011 Protective Order was limited to a July
29, 2011 Joint Stipulation, consisting of A-number and mental competency

23    evaluations of ICE detainees, plus the names of individuals identified as class or
subclass members.  *See* Dkt. 294.  The January 24, 2012 protective order solely

24    governed the discovery produced as a result of Plaintiffs' October 17, 2011,
November 29, 2011, and December 13, 2011 requests for production, Defendants'

25    November 20, 2011 and January 10, 2012 requests for production, as well as any
further merits discovery.  *See* Dkt. 367.  The Revised November 2, 2012 protective

26    order governed Plaintiffs' October 17, 2011, November 29, 2011, December 13,
2011, July 13, 2012, and July 16, 2012 requests for production, and Defendants'

27    November 30, 2011, January 10, 2012, and August 17, 2012 requests for
production, as well as any further merits discovery propounded by the parties.  *See*

28    Dkt. 507.

-26-

1   various (and different) protective orders difficult.  Even after those orders were

2   entered, Defendants continued to object to discovery production on grounds that

3   were covered by the Protective Orders.  Defendants repeatedly claimed, almost as

4   a mantra, that they could not provide responsive data to Plaintiffs' own counsel

5   absent privacy waivers from the detainees whom it concerns because the

6   information is covered by the Privacy Act, 5 U.S.C. § 522a.  (*See* e.g., Dkt. 499-1,

7   Arulananthum Dec. at ¶ 35).  This necessitated constant renegotiation and litigation

8   of protective orders, even though each comprehensively governed the disclosure of

9   such information.

10          61.   I also appeared at a telephonic discovery conference because

11   Defendants' former counsel, Victor Lawrence, engaged in what I considered

12   inappropriate behavior in a Rule 30(b)(6) deposition by, *inter alia*, failing to

13   properly prepare the witness on the deposition topics and instructing him not to

14   answer valid questions.  Mr. Lawrence also continued to assert a *Touhy* protection

15   that Judge Bristow ruled was invalid based on controlling Ninth Circuit precedent

16   that Mr. Lawrence had failed to cite.  (Dkt. 244, at 32-34.)  Again, Defendants'

17   litigation conduct caused Plaintiffs to expend significantly more hours than would

18   otherwise have been necessary to secure basic discovery.  As a sanction, Judge

19   Bristow gave us the opportunity to conduct the deposition again if we so wished.

20   (*See* Dkt. 234.)  Because of the production of other materials (again, fought over

21   but ultimately provided), no further deposition became necessary.

22          62.   During the period of time between April 29, 2011 and April 2,

23   2013, I personally argued at 12 separate discovery conferences in front of Judge

24   Bristow to resolve discovery disputes, including telephonic conferences during my

25   personal pre-scheduled vacations on July 18, 2011, August 30, 2012, and April 3,

26   2013.  (Dkts. 243, 463, 578.)  I viewed my personal appearance at these

27   conferences as necessary because Judge Bristow had previously directed that lead

28

-27-

1  counsel must be present at all hearings, referring to Victor Lawrence (U.S.

2  Department of Justice, Civil Division) and myself.  *(Dkt. 421-2.)*[10]

3        63.    Sullivan & Cromwell LLP also devoted substantial effort to the

4  four preliminary injunctions filed on behalf of individual Class members, including

5  the necessary factual development for those motions.  Although Plaintiffs prevailed

6  on all of these motions (the last of which was rendered moot by the grant of

7  summary judgment), Defendants continued their scorched-earth resistance to this

8  Court's orders and did not change their policies to prospectively comply with the

9  holdings of this Court's preliminary injunction orders.  *See Franco-Gonzalez* v.

10 *Holder*, 767 F. Supp. 2d 1034, 1061-62 (C.D. Cal. 2010); 828 F. Supp. 2d 1133,

11 1150 (C.D. Cal. 2011); 2011 WL 5966657, at *7, n.3 (C.D. Cal. Aug. 2, 2011)

12 ("As Andre Gide, the French author, once observed, 'Everything has been said

13 already; but no one listens, we must always begin again.'"); 2013 WL 3674492, at

14 *20 (C.D. Ca. April 23, 2013).  *See* Dkts. 107, 204, 285, 592.

15 **VI.   *FRANCO* LITIGATION SUCCESS**

16        64.    On April 23, 2013, this Court entered summary judgment on

17 Counts Four and Eight, and granted permanent injunctive relief on behalf of Sub-

18 Class One and Sub-Class Two Members, ordering Defendants to provide Qualified

19 Representatives as a reasonable accommodation and a bond hearing after 180 days

20 in detention.  (Dkts. 592, 593; *Franco-Gonzalez* v. *Holder*, 2013 WL 8115423, at

21 *1 (C.D. Cal. Apr. 23, 2013); *Franco-Gonzalez*, 2013 WL 3674492, at *20.)  Since

22 then, Sullivan & Cromwell LLP has remained actively involved in litigating the

23 remaining issues, including taking the lead on monitoring issues, and negotiating

24

---

25 [10]  The Court: "And the reason I only wanted you two gentlemen [Messrs. Steinberg and Lawrence] on the call was, one, it becomes extraordinarily unwieldy

26 if all counsel want to weigh in on a topic . . . .  So, for purposes of efficiency, I only want two participants to speak for each side, but, more to the point, I chose

27 the two of you [Messrs. Steinberg and Lawrence] because I – it seems to me you are the senior members of each side's respective team."  (Dkt. 421-2, July 8, 2011

28 Telephonic Status Conference Tr. 11:13-15, 19-22.)

1  and litigating the scope of the Court's Order Further Implementing the Court's

2  Permanent Injunction ("Implementation Plan Order"), which was entered on

3  October 29, 2014.  (Dkt. 786.)  In my view, the Permanent Injunction and

4  Implementation Plan Order provide class members with important relief.

5      65.    This case has fundamentally altered the legal landscape for

6  people with serious mental disabilities facing removal.  So far, this lawsuit has

7  already helped hundreds of individuals obtain representation as a matter of legal

8  right.  It also created an entirely new system to identify immigration detainees with

9  mental disabilities.

10      66.    The Court's Permanent Injunction is the first decision to

11  provide for free legal representation in immigration proceedings.  This landmark

12  ruling has been hailed by the *National Law Journal* as the "first fundamental

13  expansion of the right to counsel in 30 years" and represents an enormous victory

14  in the fight for humane treatment of people with mental disabilities.  Jenna Greene,

15  *Incompetent Immigration Detainees Win Right to Counsel*, Nat'l L.J. (Online),

16  (Apr. 25, 2013), http://www.nationallawjournal.com/id=1202597575709

17  Incompetent-Immigration-Detainees-Win-Right-to-Counsel.  (*See* Exhibit K)  The

18  New York Times notes that the decision was "the first time a court has required the

19  government to provide legal assistance for any group of people before the nation's

20  immigration courts."  Julia Preston, *In a Fist, Judge Orders Legal Aid for Mentally*

21  *Disabled Immigrants Facing Deportation*, N.Y. TIMES, Apr. 24, 2013, at A18.

22  (*See* Exhibit L.)  The *Los Angeles Times* editorial board applauded the decision as

23  "welcome," and one that "could help bring more fairness to the system."  Times

24  Editorial Board, *Legal help for detainees*, (Apr. 25, 2013),

25  http://articles.latimes.com/2013/apr/25/opinion/la-ed-mentally-ill-detainees-

26  20130425.  (*See* Exhibit M.)  Since the date of this Court's Permanent Injunction,

27  Plaintiffs estimate that over 300 Class Members have been found not competent to

28

-29-

1  represent themselves (and thus eligible for representation by qualified
2  representatives).

3      67.   Upon threat of further litigation, the Government has also
4  announced that they will extend similar protections nationwide. (Dkt. 583.)
5  During various settlement efforts, Defendants offered the "carrot" of a nationwide
6  class, if Plaintiffs would only agree to limited relief in the *Franco* case. My
7  repeated response was that we were prepared to litigate this case fully until a
8  nationwide solution was achieved. In fact, I made this point quite directly in a
9  conversation with Deputy Attorney General James Cole in early April of 2013,
10  during which I threatened to file similar lawsuits in every Circuit until I covered
11  the United States and obtained the relief that I thought was appropriate. Two
12  weeks later, the Government filed its nationwide plan before this Court,
13  undoubtedly to make my efforts to bring other cases more difficult.

14      68.   The Court's Implementation Plan Order is the first to create
15  binding screening rules for immigration detainees, require disclosure of medical
16  information in removal proceedings, establish a fixed *pro se* competency definition
17  in any context, and provide for competency evaluations for the immigration
18  system.

19      69.   The Court's Monitoring Order is the first time that Plaintiffs are
20  aware of the Department of Homeland Security being subject to a third party
21  Monitor. The Monitoring Order requires independent scrutiny and oversight of the
22  Government's conduct, to ensure "Defendants' ongoing compliance with the
23  Implementation Plan Documents, and that such compliance will continue without
24  the presence of a Monitor." (Dkt. 810 at 3 n.2.)

25      70.   All of these landmark rulings came after significant efforts by
26  Plaintiffs' counsel, including 11,910.0 hours of efforts by Sullivan & Cromwell
27  LLP, and they occurred despite Defendants' vigorous opposition at every stage of
28  the case.

71.     For these reasons, Sullivan & Cromwell LLP seeks fees of $5,599,675.53 under the Rehabilitation Act and $532,127.72 under the EAJA.

I declare under the penalty of perjury under the laws of the State of California that the foregoing is true and correct to the best of my knowledge.

Executed this 31st day of July, 2015 in Los Angeles, California.

Michael H. Steinberg

-31-