# APPENDIX D

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSE ANTONIO FRANCO-GONZALEZ, ET AL., <br><br> Plaintiffs, <br> v. <br><br> JEFFERSON B. SESSIONS, III, ATTORNEY GENERAL, ET AL., <br><br> Defendants. | Case No. CV 10-02211 DMG (DTBx) <br><br> **MONITOR'S SUPPLEMENTAL REPORT ON IJ TRAINING PROGRAM** |

This Supplemental Report was prepared following the Monitor's observation of an Immigration Judge ("IJ") training session on March 23, 2017. The observation took place after the Court ordered Defendants to allow the Monitor and Expert Dr. Melissa Piasecki ("the Monitoring Team") to observe a training under Section B.1.b of the Monitoring Order. [Doc. ## 810, 927.] This Supplemental Report is filed concurrently with the Fourth Monitoring Report and is intended to be considered in tandem with that Report. This Supplemental Report is subject to the Protective Order Addendum and is

1

docketed in accordance with the procedures set forth therein. [Doc. # 930.] The Monitor thanks Defendant EOIR for its cooperation in facilitating the observation.

## I. BASIS FOR RECOMMENDATIONS

Throughout the four Monitoring Reports, the Monitor has reviewed over 300 Judicial Competency Inquiries ("JCIs") and Competency Reviews ("CRs") conducted by IJs at Immigration Courts throughout the Covered States. Although the Monitor has observed substantial procedural compliance, each Monitoring Sample has included a significant number of cases in which IJs appeared to misapply or misunderstand their obligations under the Implementation Plan. While these cases were not a majority, they were sufficiently common to merit investigation into how best to prevent future errors efficiently and without imposing an undue burden on Defendants.

Dr. Piasecki has extensive experience developing and administering judicial training programs on mental-health issues. In addition to having provided trainings to Immigration Judges on other matters prior to the start of this case, Dr. Piasecki has served on the faculties of the National Judicial Council and the National Council of Juvenile and Family Court Judges for over a decade each. She has taught attorneys and judges on a variety of mental-health topics, including many of the topics implicated by this Court's orders. Thus, Dr. Piasecki is well qualified to offer informed, well-reasoned recommendations for improving EOIR's IJ training program on the Implementation Plan. This Supplemental Report was prepared in close consultation with Dr. Piasecki, and the recommendations contained herein are endorsed by both the Monitor and Dr. Piasecki. The Monitoring Team hopes that these recommendations can be used to strengthen an already responsible program to minimize the occurrence of IJ misapplications after the Monitoring Term.

## II. DESCRIPTION OF TRAINING

The IJ training took place on March 23, 2017 in a conference room of one of the Immigration Courts having jurisdiction over Covered Facilities. The training lasted

approximately six hours, excluding breaks, and trainees were also provided several 15-minute breaks and one hour-long lunch break.

The training was conducted by five instructors, including three representatives from EOIR Headquarters ("HQ Instructors"), one experienced IJ ("IJ Instructor"), and one forensic psychologist ("Psychologist Instructor"). Instructors used a PowerPoint presentation to guide the training, but a copy of the presentation slides was not provided to the Monitor. In addition to the PowerPoint, trainees (and the Monitoring Team) were provided paper for taking notes, as well as several informational handouts throughout the course of the day.[1]

The training was presented in five sections:

**1. Background of the *Franco* litigation**: provided a procedural history of the case, including issuance of the permanent injunction [Doc. # 592] and Implementation Plan [Doc. # 786] and appointment of the Monitor;

**2. Scope of the Class**: addressed the Class definition; the means by which a Class Member may be identified (i.e. by Qualified Mental Health Provider ("QMHP" or by IJ in court); and the "bona fide doubt standard," including evidence to be considered and the process for making such a finding;

**3. Competency Standard**: addressed process for conducting a JCI; the *pro se* competency standard, including standards for finding competent, incompetent, or ordering a Forensic Competency Evaluation ("FCE"); the structure and purpose of the FCE tool; and the process for conducting a CR;

**4. Overview of the National Qualified Representative Program ("NQRP")**: described process for appointment of a QR after a finding of incompetency; processes for replacement of QRs when necessary due to changes of venue and/or other withdrawals; and roll-out of national program.

---

[1] These handouts were part of the training materials previously provided to the Monitor.

5. **Additional Requirements Under the *Franco* Orders:** addressed bond-hearing requirements for Subclass Two members; requirements for released Class Members; restorations to competency; appeals issues; and the Post-Removal Settlement Agreement [Doc. # 801].

Following the training, the Monitoring Team sent follow-up questions to EOIR regarding the training. EOIR provided timely responses to those questions, and that information was also considered in the preparation of this Report.

## III. GENERAL OBSERVATIONS

First, the environment and tone of the training were comfortable, informal, and conducive to trainee engagement. Instructors were friendly and conversational and repeatedly encouraged trainees to ask questions throughout the day and to reach out after the training for ongoing support. This approachable tone was successful in promoting trainee engagement: trainees asked questions throughout the day, and instructors readily paused to answer those questions. All of the instructors were expert in the content they provided and were prepared to answer the questions that the IJ trainees raised about the processes related to *Franco*.

The training was well organized and the content was delivered in a clear and logical fashion. Instructors also used case examples to illustrate abstract concepts, which appeared to help trainees understand and engage with those concepts. Training materials used both written explanations and visual aids to convey concepts, which helped illustrate more complicated areas of the training.

## IV. RECOMMENDATIONS

As noted above, the IJ training was generally very thorough, clearly presented, and appeared to be effective for trainees. The following recommendations identify areas where the training could be improved to address concerns raised in the Monitoring Reports throughout the Term.

//

//

**A.     Inclusion of Substantive Mental Health Primer**

The Monitoring Team identified one relevant area that was absent from the IJ training. The IJ training—like the materials—lacks substantive content on presentation of mental health issues and how certain symptoms might inhibit one's competency. The absence of this topic would seem to explain some IJs' apparent lack of understanding of certain symptoms or diagnoses in JCIs throughout the Monitoring Term.

For example, the psychiatric symptoms and diagnoses included in the criteria for Class Membership were not defined or illustrated. In their responses to follow-up questions, EOIR confirmed that the training assumes that all participants have no prior training in handling cases involving mental competency issues under *Franco*. In light of this underlying assumption, the training should include some form of "Mental Health 101" primer to provide trainees with at least a basic overview of common symptoms and how they affect the various prongs of competency. To give IJs adequate substantive background to apply the competency standard, this primer should include:

1. What are psychotic symptoms and how do they potentially impact competency?[2]
2. What are the symptoms of major mood disorders and how do they potentially impact competency?
3. What are cognitive disorders, how are they measured, and how do they potentially impact competency?
4. What are the long- and short-term effects of medications on mental illness, and how might they impact competency?
5. How does past substance use potentially impact competency?

The Psychologist Instructor mentioned all of these categories throughout the training, but he did not provide any foundational guidance on them. For example,

---

[2] This section could address, for example, scenarios in which certain symptoms, such as delusions or hallucinations, may or may not inhibit competency.

"intellectual disabilities" were referenced during the training, but instructors did not discuss the broader category of "cognitive disabilities" such as seizure disorders, dementia, or cognitive disabilities caused by traumatic head injuries. This class of conditions is referenced in the Class criteria and may compromise one's competency, as demonstrated by a number of cases in the Monitoring Samples, (*see, e.g.*, Fourth Monitoring Report at 19, Third Monitoring Report at 30), although a layperson untrained in mental health might not know how to assess for them. Similarly, although the Psychologist Instructor mentioned drug-induced symptoms, the training lacked a deeper explanation of how certain drugs can cause mental health problems, how drug-induced symptoms may compare to symptoms of other mental illness, and how those symptoms may affect competency. It is important that IJs understand that substance-induced disorders may affect competency in the same way as symptoms that arise from injury, medical illness, or mental illness. The current training lacks substantive discussion of these issues.

The Monitoring Team acknowledges that IJs are not mental health professionals and are not expected to maintain an expert knowledge of psychological symptoms and diagnoses. Nor is it practical for the training to thoroughly cover every aspect of mental health. Although the competency standard is a legal one, it is intimately tied to fundamental principles of mental health symptoms, and IJs should receive some basic training in those principles in order to accurately apply the competency standard. A basic training on these topics would likely reduce the frequency of errors based on apparent lack of background on mental health. Moreover, given that a mental health professional already participates in the training and is well equipped to instruct trainees on this topic, it would appear to be feasible for EOIR to add this component to the training.

### B. Manner of Class-Member Identification and the Role of IJs

During the "Scope of the Class" portion of the training, instructors described the two processes by which Class Members can be identified, either by facility staff or by the IJ in court. Consistent with the Implementation Plan and the Monitor's observations in

previous Reports, instructors emphasized that the "bona fide doubt" standard is low and not dependent on the presence or absence of medical records.[3] The Psychologist Instructor noted that, as matter of general practice, intake medical staff at detention facilities primarily assess for urgent medical needs, not necessarily indicia of incompetency.[4] This was an important notice to IJs, but EOIR may consider spending more time discussing it in future trainings. (*See* Third Monitoring Report at 28-33.)

As the Monitor has noted in previous Reports, some IJs have improperly relied on the absence of a QMHP finding to conclude that an individual is not a Class Member. (*See, e.g.*, Second Monitoring Report at 39, Third Monitoring Report at 31.) By acknowledging that facility staff, accustomed to screening for treatment needs, may not always identify the competency implications of mental-health symptoms, the Psychologist Instructor's statement reinforces that the "bona fide doubt" finding is an independent assessment that need not defer to medical records in every case. The statement is especially important in light of the fact that the facilities still use 12 unique sets of screening forms, none of which, according to Dr. Piasecki, adequately assess for all Class Membership criteria. (*See* Third Monitoring Report, App. C.)

---

[3] The "IJ Competency Evaluation Checklist" distributed at the training, dated January 20, 2015, misstated the standard for finding a Class Member competent, instructing IJs to "use no 'reasonable cause to believe is incompetent'/competence is established by a 'preponderance of the evidence' standard." This is consistent with the Fourth Monitoring Report's findings that some IJs regularly misstate or misapply the standard, in some cases using this exact language. (Fourth Monitoring Report at 29-30.) Following the training, Defendants provided the Monitor with an updated Checklist that now accurately reflects the standard. Although the Monitor is not aware when this new Checklist came into use, the Monitor is hopeful that this correction will eliminate some of the errors identified in the Fourth Report.

[4] The Monitoring Team did not interpret this statement as a suggestion by the Instructor that facility personnel do not comply with the Implementation Documents. Rather, the Monitoring Team understood this to be a fair and informed statement about the usual functions of detention-facility medical staff, which is consistent with National Detention Standards and common practice in institutional medical screening.

7

### C. Increased Opportunities for Discussion, Participation and Skills-Building

As noted above, instructors used case examples throughout the training to illustrate abstract concepts. For example, the IJ Instructor offered examples of the types of evidence that might give rise to a bona fide doubt. Similarly, the Psychologist Instructor illustrated the difference between "factual" and "rational" understanding with the example of a criminal defendant who had a factual understanding of his proceedings but, due to a mental health diagnosis, lacked a *rational* understanding of the proceedings. These case examples helped contextualize otherwise abstract concepts and kept trainees engaged with the material. EOIR could build on this anecdotal method by prompting discussions or exercises to further engage trainees.

For example, after offering examples of evidence for a bona fide doubt finding, the IJ could have asked trainees, "What other kinds of evidence might raise concerns for you?" or "When this type of evidence comes up in court, what kinds of questions might you ask to determine whether you have a bona fide doubt?"

Discussion or participation may be particularly valuable in the JCI section of the training, which currently includes no illustrative or demonstrative tools other than the "Process for Conducting a Competency Inquiry." (*See* Implementation Plan, App. B.) Given the complexity of the competency standard and the many factors that IJs must consider during a JCI, it may be useful to listen to a sample JCI and conduct a mock JCI as a group, followed by a brief discussion. This would help trainees identify useful questions, avoid problematic ones (such as "Yes/No" questions, which Instructors did emphasize are of limited utility), and better understand how to assess for each prong of the competency standard.

Adding a participatory element to this section of the training would provide IJs with stronger tools to effectively evaluate Class Membership and competency throughout proceedings. Doing so may prevent future use of problematic lines of questioning, such as repeated Yes/No questions, and help IJs identify particular symptoms or areas of

concern in each case that may merit further questioning or investigation. (*See* Second Monitoring Report at 34-35.)

### D. Increase in Number and Relevancy of Case Illustrations

Many of the concepts related to competency are drawn from the extensive literature and experience in criminal competency. As the Psychologist Instructor explained—and as Dr. Piasecki noted in her previous report—current research on mental health and competency in the immigration context is extremely limited, so often examples from the criminal realm are the best approximation for illustrating competency concepts. Nevertheless, such examples remain imperfect for purposes of *Franco* instruction, which the Psychologist Instructor acknowledged during his presentation.

As *Franco* matures and increased numbers of respondents are evaluated for competency, however, more examples specific to immigration rather than criminal courts will be available to illustrate key concepts. For example, a case example illustrating a "rational" versus "factual" understanding of one's immigration proceedings may be particularly useful. Similarly, case examples examining cultural factors to competency would be more instructive if specific to immigration proceedings, the realm in which IJs operate and apply the *pro se* competency standard.

In addition, it may be helpful to provide IJs case examples that illustrate the course of one or more respondents from screening to final disposition as a way to summarize the process and reinforce specific content areas. These long-view case examples could include a review of an FCE to highlight the types of psychological symptoms and functional assessments documented in these reports, and might highlight the issues or symptoms identified by the FCE provider but not recorded by facility screening staff. If EOIR includes case examples in future trainings, we recommend that one example illustrate cognitive deficits and another illustrate a different type of mental health problem, as both categories carry competency implications but manifest in different ways.

//

## V. CONCLUSION

Again, the Monitoring Team thanks Defendants and EOIR specifically for facilitating observation of this training. The above recommendations are offered as, in the Monitor's view, the most efficient and least burdensome manner of ameliorating IJ errors on a broad scale, rather than merely addressing them on a case-by-case basis.

Respectfully submitted:

Dated: May 5, 2017                     /s/ Katherine Mahoney
                                       Katherine Mahoney
                                       Monitor